No. 23-20480

# In the United States Court of Appeals for the Fifth Circuit

THE WOODLANDS PRIDE, INCORPORATED; ABILENE PRIDE ALLIANCE; EXTRAGRAMS L.L.C.; 360 QUEEN ENTERTAINMENT, L.L.C.; BRIGITTE BANDIT,

*Plaintiffs-Appellees,*

*v.*

WARREN KENNETH PAXTON, IN AN OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS; BRETT LIGON, IN AN OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF MONTGOMERY COUNTY; MONTGOMERY COUNTY, TEXAS; JAMES HICKS, IN AN OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF TAYLOR COUNTY; TAYLOR COUNTY, TEXAS; CITY OF ABILENE, TEXAS,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Southern District of Texas, Houston Division

## APPELLANT'S OPPOSED MOTION FOR STAY PENDING APPEAL

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

WILLIAM F. COLE
Assistant Solicitor General

Counsel for Defendant-Appellant
Attorney General Paxton

## CERTIFICATE OF INTERESTED PERSONS

No. 23-20480

THE WOODLANDS PRIDE, INCORPORATED; ABILENE PRIDE ALLIANCE; EXTRAGRAMS L.L.C.; 360 QUEEN ENTERTAINMENT, L.L.C.; BRIGITTE BANDIT,

*Plaintiffs-Appellees,*

*v.*

WARREN KENNETH PAXTON, IN AN OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS; BRETT LIGON, IN AN OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF MONTGOMERY COUNTY; MONTGOMERY COUNTY, TEXAS; JAMES HICKS, IN AN OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF TAYLOR COUNTY; TAYLOR COUNTY, TEXAS; CITY OF ABILENE, TEXAS,

*Defendant-Appellant.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellant, as a governmental party, need not furnish a certificate of interested persons.

/s/ Lanora C. Pettit
LANORA C. PETTIT
*Counsel of Record for*
*Defendant-Appellant*
*Attorney General Paxton*

i

# Introduction

Following reports of an uptick in graphic, sexually explicit performances presented in front of minors in public and private venues in Texas, the 88th Legislature responded by passing the Act of May 29, 2023, 88th Leg., R.S., ch. 931, commonly known as "S.B. 12." Designed to protect children from the harms that can be caused by exposure to such performances, S.B. 12 imposes an age limit to attend performances that involve nudity or five narrowly defined categories of "sexual conduct" and that appeal to the prurient interest in sex. S.B. 12 §§ 1, 3.

Before S.B. 12 ever took effect, four entities that produce, and one performer that participates in, theatrical "drag shows" launched the instant lawsuit arguing that S.B. 12 facially violates the First Amendment by restricting the "inherently expressive conduct" that occurs at such "drag shows." During a two-day trial on the merits, plaintiffs offered evidence that they wished put on shows with performers dancing while dressed in clothing associated with another sex, but they disclaimed any desire to perform nude or engage in sexual acts on stage. Notwithstanding that the conduct in which plaintiffs seek to engage in falls outside the scope of S.B. 12, the district court permanently enjoined the Texas Attorney General and several local officials from enforcing S.B. 12 in its entirety.

The Court should stay that order pending appeal because the Attorney General is likely to show that the district court lacked jurisdiction. To start, because plaintiffs offered no evidence that they wish to participate in highly sexualized performances in front of minors, plaintiffs failed to establish the most fundamental aspect of Article III standing: a concrete injury. Plaintiffs also failed to establish that their non-

existent injury is traceable to the Attorney General, who may only enforce S.B. 12 against violators that "control the premises of a commercial enterprise." No plaintiff established that it (or she) controls such an enterprise.

The Attorney General is also likely to show that plaintiffs failed to prove their claims on the merits. Contrary to plaintiffs' suggestion, S.B. 12 does not proscribe all dancing while dressed in costume. And plaintiffs failed to demonstrate that the sexually oriented performances regulated by S.B. 12 involve any "inherently expressive conduct" protected by the First Amendment. Instead, because S.B. 12 is (at most) a content-neutral time, manner, or place restriction that targets the adverse "secondary effects" of minors' exposure to sexually explicit shows, it easily survives constitutional scrutiny. At minimum, plaintiffs *facial* challenge is defective because they did not demonstrate that S.B. 12 violates the First Amendment in a "substantial number" of its applications rather than in extreme, hypothetical cases at the margins.

Because the remaining stay factors favor the Attorney General, a stay pending appeal is warranted.

## Background

**1.**  In response to reports detailing the occurrence of sexually explicit performances in the presence of children, ROA.583, the 88th Texas Legislature enacted S.B. 12. The law begins by carefully defining "sexually oriented performance[s]" to include a "visual performance" that: (1) involves a performer who either is "nude, as defined by Section 102.051, Business & Commerce Code," or "engages in sexual conduct" and (2) "appeals to the prurient interest in sex." Tex. Penal Code

§ 43.28(a)(2)(A)-(B). In turn, S.B. 12 narrowly defines "sexual conduct" as "the exhibition or representation, actual or simulated" of (1) "sexual acts, including vaginal sex, anal sex, and masturbation"; (2) "male or female genitals in a lewd state, including in a state of sexual stimulation or arousal"; (3) "a device designed and marketed as useful primarily for the stimulation of male or female genitals"; (4) "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person"; or (5) "sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics." *Id.* § 43.28(a)(1)(A)-(E).

S.B. 12 seeks to limit the exposure of minors to such sexually explicit performances (so defined) in three substantive ways. *First*, it prohibits those who "control[] the premises of a commercial enterprise" from "allow[ing] a sexually oriented performance to be presented on the premises in the presence of an individual younger than 18 years of age." Tex. Health & Safety Code § 769.002(a). *Second*, S.B. 12 forbids a municipality or county to "authorize a sexually oriented performance" "on public property" or "in the presence of [such] an individual." Tex. Loc. Gov't Code § 243.0031(c)(1)-(2). *Third*, S.B. 12 makes the presentation of a "sexually oriented performance" a misdemeanor, Tex. Penal Code § 43.28(c), but clarifies that "an offense" occurs only if a sexually oriented performance takes place "(1) on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child; or (2) in the presence of an individual younger than 18 years of age," *id.* § 43.28(b)(1)-(2). The law tasks the Attorney General with enforcing only the first of these provisions. Tex. Health & Safety Code § 769.002(c).

3

**2.** One month before S.B. 12 was scheduled to take effect, two non-profits (The Woodlands Pride, Inc. and Abilene Pride Alliance), two drag-show entertainment and production companies (Extragrams, LLC and 360 Queen Entertainment, LLC), and one drag performer (Brigitte Bandit)—sued the Attorney General, two counties, one city, and several district attorneys (collectively, "defendants"). ROA.20-62. Their complaint asserted that S.B. 12 violated the First Amendment in a litany of ways, including as a content- and viewpoint-based restriction on speech and under the overbreadth, vagueness, and prior-restraint doctrines. ROA.58-61. One week later, plaintiffs moved for a temporary restraining order and a preliminary injunction. ROA.104-66.

The district court subsequently consolidated the trial with the hearing on plaintiffs' motion for a preliminary injunction and set it for August 28, ROA.240-41—three days before S.B. 12 was scheduled to go into effect. Over two days, the district court heard testimony from five witnesses, one representing each plaintiff. ROA.1373-1585, 1659-70. And on August 31, the court issued a TRO enjoining the defendants from enforcing S.B. 12 for the next fourteen days, ROA.960-64, which it later extended, ROA.1186-88.

On September 26, the district court permanently enjoined defendants from enforcing S.B. 12. ROA.1240-95. The court first rejected the Attorney General's arguments that plaintiffs lacked standing, finding that plaintiffs were harmed because S.B. 12 regulates "drag shows," and that the harm was traceable to the Attorney General's ability to enforce S.B. 12 against those who "control[] the premises of a commercial enterprise." ROA.1265-72. On the merits, the court concluded that

S.B. 12 was a content- and viewpoint-based restriction on "expressive conduct"—drag shows—and failed strict scrutiny because it was not "narrowly tailored to promote" the State's concededly compelling interest in protecting children. ROA.1274-85. The court also concluded that S.B. 12's definition of "sexual conduct" was unconstitutionally overbroad; that (notwithstanding their use in numerous judicial opinions) the terms "prurient interest in sex" and "lewd" were unconstitutionally vague; that S.B. 12's authorization for local governments to pass ordinances regulating "sexually oriented performances" was a "prior restraint on speech"; and that no part of S.B. 12 was severable from its definition of "sexually oriented performances." ROA.1272-73, 1286-93.

The Attorney General appealed, ROA.1296-97, and moved the district court for a stay pending appeal on September 29, ROA.1299-1322. After a multi-week delay, the district court denied the request on October 20.

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

In determining whether to exercise its "inherent" power to stay an order "while it assesses the legality of the order," the Court considers the Attorney General's likelihood of success on the merits, whether he will suffer irreparable harm without a stay, whether plaintiffs will be substantially harmed by a stay, and the public interest. *Nken v. Holder*, 556 U.S. 418, 426 (2009). All four factors favor the Attorney General.

## ARGUMENT

## I. The Attorney General Is Likely to Succeed on Appeal.

### A. Plaintiffs lack standing to sue the Attorney General.

Plaintiffs' facial challenge to S.B. 12 fails at the outset because they lack standing to sue the Attorney General. The "evidence adduced at trial," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), failed to show (among other things) both the injury-in-fact and traceability elements of the familiar three-pronged standing test.

#### 1. Plaintiffs failed to establish a cognizable injury-in-fact.

In the context of "pre-enforcement free speech challenges" like this one, "chilled speech or self-censorship is an injury sufficient to confer standing." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215 (5th Cir. 2023). To establish a cognizable injury-in-fact in this context, plaintiffs must show that they "(1) [] intend[] to engage in a course of conduct arguably affected with a constitutional interest; (2) that the course of action is arguably proscribed by statute; and (3) that there exists a credible threat of prosecution under the statute." *Id.* at 215-16 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). Even if they established the first and third elements, plaintiffs failed to prove the second.

At the outset, plaintiffs have affirmatively disclaimed any desire to engage in any of the statutorily defined acts constituting a "sexually oriented performance[]" in front of minors. *See, e.g.*, ROA.1472-73, 1549-51, 1665. Instead, the gravamen of plaintiffs' case is that they fear that overzealous public officials might read S.B. 12 in an impermissibly broad manner in two ways.

*First*, Extragrams, Abilene Pride Alliance, and Woodlands Pride fret that law enforcement might conclude that the traditional accoutrements of a "drag show" fall within S.B. 12's ambit and that the statute thus will operate as an implicit ban on drag shows. For example, Extragrams's representative testified to a concern that some could construe S.B. 12 to prohibit performers from "performing with gender marker accessories, [performers] moving their hips, [or] shimmying their shoulders." ROA.1400. Abilene Pride Alliance's representative thought S.B. 12 might prohibit "front-facing hugs," "accidental bumping[]," "hip bump[s]," and "[d]ancing, lip syncing, the use of wigs, makeup, chest plate[s], hip pads, dresses, jewelry, and other accessories," such as a "packer" (a device that provides the illusion of enlarged male genitalia). ROA.1465, 1468-69. And Woodlands Pride's representative suggested that different types of "dancing," including a Conga line or "twerking," could now run afoul of S.B. 12, even if done without intending to appeal to the prurient interest in sex. ROA.1547-48; *see also* ROA.1525-26.

None of the conduct highlighted even "arguably" violates S.B. 12's discrete prohibition on "sexually oriented performances" in the presence of minors. For example, plaintiffs offered no evidence that this conduct—which typically involves dressing in costume—is undertaken in the nude or could even arguably be described as the "exhibition or representation of" (1) "sexual acts, including vaginal sex, anal sex, and masturbation"; (2) "male or female genitals in a lewd sate, including a state of sexual stimulation or arousal"; or (3) "exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals." Tex. Penal Code § 43.28(a)(1)(A)-(C). Nor do these wardrobe items or dancing discussed

by plaintiffs' witnesses appear to resemble "simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person" or "sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics." *Id.* § 43.28(a)(1)(D)-(E).

To the extent there were room for debate about the scope of these categories, the conduct plaintiffs identify would *still* not violate S.B. 12 because—by their own account—plaintiffs' theatrical drag shows are *not* intended to "appeal[] to the prurient interest" in sex. *Id.* § 43.28(a)(2)(B). To the contrary, plaintiffs insist that they are concerned about whether S.B. 12 will be enforced against "accidental" physical conduct, ROA.1465, inadvertent "wardrobe malfunctions," ROA.1392, 1408, or dances that are not intended to be of a sexual nature, ROA.1466, 1544-45, 1581-82. While perhaps risqué, none of these would fall within the longstanding definition of "prurient interest": "material having a tendency to excite lustful thoughts." *Roth v. United States*, 354 U.S. 476, 487 n.20 (1957).

*Second*, 360 Queen Entertainment and Brigette Bandit—whose business model includes promoting adult-oriented conduct, including lap dances, spanking, touching the performer's bosom, and revealing clothing, *e.g.*, ROA. 1430, 1442-43, 1576, 1580-81, 1582—worry that their already age-restricted shows might be unwittingly viewed by a minor who happens to pass through the venue or observe the performance from off-premises. *See* ROA.1415-17, 1424, 1425-26, 1434, 1436-37, 1440-41, 1571, 1578-79. But S.B. 12 uses a penal-code definition of "sexually oriented performance," which requires the performance to be "in the presence of" a minor or "reasonably expected to be viewed" by one. Tex. Penal Code § 43.28(b)(1)-(2). Under

Texas criminal law, such a definition has an implied mens rea requirement of, at minimum, criminal negligence. *See* Tex. Penal Code § 6.02(a)-(b). Because "criminal negligence" in this context would involve the "failure to perceive" "a substantial and unjustifiable risk" of exposure to minors, *id.* § 6.03(d), it would not encompass the type of inadvertent or fleeting exposure of minors to sexually oriented performances posited by plaintiffs.

As a result, because S.B. 12 does not encompass the behavior in which plaintiffs wish to engage, they have not established the injury-in-fact element of standing. *Strain*, 65 F.4th at 215-16.

### 2.   Plaintiffs' injuries are not fairly traceable to the Attorney General.

Plaintiffs also cannot establish that any hypothetical injury is "fairly traceable to the challenged action of the defendant"—the Attorney General—"and not the result of the independent action of some third party not before the court." *E.T. v. Paxton*, 41 F.4th 709, 718 (5th Cir. 2022) (quoting *Lujan*, 504 U.S. at 560). The Attorney General can only enforce S.B. 12 by seeking injunctive relief or civil penalties against "[a] person who controls the premises of a commercial enterprise" and "allow[s] a sexually oriented performance to be presented on the premises in the presence of" a minor. Tex. Health & Safety Code § 769.002(a); *see id* § 769.002(c)-(f). Because no plaintiff offered evidence at trial that it (or she) "controls the premises of a

commercial enterprise," any injury plaintiffs might suffer from S.B. 12's enforcement would not result from enforcement by the Attorney General.[1]

Although S.B. 12 does not define the term "control," common dictionary definitions define it to mean "[t]o exercise power or influence over" or "[t]o regulate or govern." *Control*, Black's Law Dictionary (11th ed. 2019). In the context of S.B. 12, the phrase "control the premises of a commercial enterprise" targets the owners or proprietors of private businesses who might choose to "allow" sexually oriented performances to be presented—not the performers or companies who might rent or utilize those commercial enterprises for a few hours and who may be subject to potential criminal liability under another provision of S.B. 12. *See* Tex. Penal Code § 43.28(b), (c). Because the Attorney General lacks criminal enforcement authority, any harm from the provision that arguably regulates plaintiffs is not traceable to him. *Ostrewich v. Tatum*, 72 F.4th 94, 101 (5th Cir. 2023); *Paxton*, 2022 WL 2208519, at *1.

Plaintiffs also do not control the premises of any commercial enterprise and are thus not subject to enforcement actions *by the Attorney General.* For example, Extragrams serves as a middleman between independent-contractor performers and customers wishing to host "drag shows" at their "houses, places of work, [and] companies." ROA.1375-76, 1397-98. There is no evidence that Extragrams *controls* the premises of any of its commercial customers. Similarly, 360 Queen Entertainment books "drag queens" to perform on the patio of a bar in San Antonio that a third

---

[1] For similar reasons, plaintiffs' case is barred by sovereign immunity. *See, e.g.*, *Longoria v. Paxton*, No. 22-50110, 2022 WL 2208519, at *1 (5th Cir. June 21, 2022) (citing *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020)).

party owns. ROA.1413. Although that owner is the father of one of 360 Queen's founders, the company has only an unspecified "agreement with the restaurant" to use the patio on days when "drag shows" will take place. ROA.1413-15. The evidence offered at trial reflects that the restaurant continues to "control" the premises, including supplying food service, waitstaff, and bussers. ROA.1415-16, 1431, 1438-39.

In the past, Abilene Pride Alliance has held "drag brunches" in "a locally owned coffee shop" that allowed the organization to use "their space on Sundays when they were normally closed." ROA.1452. Assuming this occasional use continues, it at most makes Abilene Pride Alliance a "business invitee" of the coffee shop. *See Lechuga v. S. Pac. Transp. Co.*, 949 F.2d 790, 794-96 (5th Cir. 1992). As far as the evidence reflects, the owner of the coffee shop—not Abilene Pride Alliance—retains "control" over the premises, including the "right to exclude," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021), subject to prevailing public-accommodations laws, *see Hurley v. Irish Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 571-72 (1995).

Woodlands Pride's past events at "local coffee shops," ROA.1512, fail to establish control of those premises for the same reason. And although Woodlands Pride's representative testified about possible future plans to host drag performances at a fundraiser on the premises of a private car dealership, ROA.1513, its representative rightly conceded that any such hypothetical future "control" would be limited to "ticket sales." ROA.1538. He admitted: "we don't own the premises, so we don't have control." ROA.1539.

Finally, Brigitte Bandit performs in "drag shows" at "21-and-up" nightclubs and sometimes at all-ages "drag brunches." ROA.1566-67. Far from showing that Bandit "controls" the premises of these nightclubs and restaurants, the evidence in the record reflects that Bandit is an independent contractor and cannot be sure of who is in the audience. As she explained, "[s]ometimes clubs" or other "venues" make exceptions about whether to admit underage persons. ROA.1569-70. Bandit also explained that "*some venues* that have hired me recently have also had to hire personal security for *their space* during the event." ROA.1584. And Bandit's fear about S.B. 12 taking effect is that the *venues* will choose not to host her drag shows, ROA.1584—a problem that would not exist if *Bandit* controlled the premises.

Because none of the plaintiffs controls a commercial premises, any injury they suffer cannot be traced to the Attorney General, whose enforcement authority is limited to such premises.

## B. S.B. 12 does not violate the First Amendment.

Even if plaintiffs had established jurisdiction, they did not demonstrate that S.B. 12 regulates *any* First Amendment protected conduct—let alone enough protected conduct to justify facially enjoining enforcement of a state law before that law has ever been enforced. *NetChoice, LLC v. Paxton*, 49 F.4th 439, 449 (5th Cir. 2022), *cert. granted* 2023 WL 6319650 (U.S. Sept. 29, 2023). And even if S.B. 12 did have some tangential effect on expressive conduct, it would still satisfy the applicable level of scrutiny because it is (at most) a reasonable effort to regulate the secondary effects of sexually explicit performances, which are harmful to children. Moreover, as S.B. 12 speaks in terminology that *courts* have long used to define areas outside the

scope of the First Amendment, its terms can hardly be held unconstitutionally vague without causing jurisprudential chaos.

### 1.   S.B. 12 does not regulate First-Amendment-protected conduct.

The First Amendment's Free Speech Clause forbids the government to "restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). This prohibition extends not only to laws "telling people what they must say," but also to certain "conduct that is inherently expressive," *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 61, 66 (2006) (*"FAIR"*), because it is "sufficiently imbued with elements of communication," *Texas v. Johnson*, 491 U.S. 397, 404 (1989). At the same time, the Court has consistently "rejected the view that 'conduct can be labeled 'speech' whenever the person engaging in conduct intends thereby to express an idea.'" *FAIR*, 547 U.S. at 65-66.

The district court wrongly found that the conduct regulated by S.B. 12 is "inherently expressive," *id*. at 66, because it started from a false premise: that S.B. 12 regulates "drag shows," ROA.1274-78. According to plaintiffs' testimony, a typical "drag show" is a "theatrical" performance involving "the overdramatization of a character or a gender," often concerning "celebrity lookalikes." ROA.1374-75. The performer is usually bedecked in "[l]ots of sequins, big hair, wigs, breastplates, [] hip pads, packers, [and] exaggerated jewelry," ROA.1451, to enhance the "illusion" of "a gender or character," ROA.1391. And the performances "[t]ypically" involve "dancing, lip syncing, engaging with the audience by hugging, kissing on the cheek, sometimes bumping hips." ROA.1451. According to plaintiffs, these performances

convey varied messages ranging from simple "comedic and serious entertainment," ROA.1515-16, to "solidarity with . . . the LGBT+ community," ROA.1516, to various messages of "social justice," ROA.1432-33.

The Attorney General has not disputed that these types of drag-show performances might well constitute "inherently expressive conduct" protected by the First Amendment. But as noted above, costuming is not nudity, and dancing in a dress by itself is hardly the type of highly "sexual *conduct*" that falls within the scope of S.B. 12—no matter how much that dress is bedecked in sequins. *Supra* at 7-8. Neither plaintiffs nor the district court explained how the highly sexualized conduct actually regulated by S.B. 12—in which plaintiffs have disclaimed any interest in engaging in front of minors, *supra* at 6—is protected by the First Amendment.

> **2. Even if S.B. 12 regulates some First Amendment activity, plaintiffs cannot meet the high standards necessary to sustain a facial challenge.**

Even if plaintiffs had shown that S.B. 12 regulates some First Amendment activity, in this pre-enforcement posture they cannot show that S.B. 12 is *facially* unconstitutional. Plaintiffs rely on the First Amendment "overbreadth" doctrine, which requires them to show that "a substantial number of [S.B. 12's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *NetChoice,* 49 F.4th at 450 (quoting *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021)). Because the "[o]verbreadth doctrine has a 'tendency . . . to summon forth an endless stream of fanciful hypotheticals,'" the Supreme Court has instructed courts to "avoid 'speculat[ing] about 'hypothetical' or 'imaginary'

cases,'" and instead focus on "the statute's facial requirements." *Id.*at 452 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008)).

The district court failed to heed these established standards. Instead of focusing on S.B. 12's text, the court speculated that S.B. 12's prohibitions might apply to "cheerleading, dancing, live theater, and other common occurrences" and thereby sweep in "a large amount of constitutionally protected conduct." ROA.1288. No evidence at trial even hinted that "cheerleading, dancing, [and] live theater" is typically (or even frequently) performed in the "nude" or that it meets any of the statute's definitions of "sexual conduct." Tex. Penal Code § 43.28(a)(2)(A).[2] More importantly, S.B. 12's "language renders implausible many of the[se] . . . extreme hypothesized applications of the law." *NetChoice*, 49 F.4th at 452. Again, in the rare case where these commonplace activities might theoretically involve sexual conduct, they are only proscribed if they "appeal[] to the prurient interest in sex." Tex. Penal Code § 43.28(a)(2)(B). The district court's uncertainty about how enforcement actors would define the phrase "prurient interest," ROA.1287-88, was unjustified in the mine run of cases—which are, after all, the focus of a facial challenge under the overbreadth doctrine, *see United States v. Hansen*, 599 U.S. 762, 784 (2023)—given that case law has defined that the phrase for seven decades. *See Roth*, 354 U.S. at 487 n.20.

---

[2] Indeed, it is well established that minors *can* be excluded from theaters where the performers are nude. *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 69 (1973).

### 3.   S.B. 12 is, at most, a content-neutral time, manner, and place restriction that survives constitutional scrutiny.

**a.**   Even if the sexually oriented performances regulated by S.B. 12 could qualify for some level of First Amendment protection as "inherently expressive conduct," S.B. 12 survives constitutional review under "under a two-step test adopted" for assessing adult entertainment "in *City of Renton v. Playtime Theaters*, 475 U.S. 41 (1986)." *Ass'n of Club Execs. of Dall., Inc. v. City of Dallas*, 2023 WL 6630302, at *3 (5th Cir. Oct. 12, 2023). "The first step asks whether the measure 'ban[s]' [sexually oriented businesses] or regulates only the 'time, place, and manner' of their operation." *Id.* (quoting *Renton*, 475 U.S. at 46). "If the latter, the second step asks whether the regulation is 'designed to combat the undesirable secondary effects' of 'business that purvey sexually explicit materials' rather than to restrict their free expression.'" *Id.* (quoting *Renton*, 475 U.S. at 48-49). "A regulation satisfying both steps is 'reviewed under the standards applicable to 'content-neutral' time, place, and manner regulations,' namely intermediate scrutiny.'" *Id.* (quoting *Renton*, 475 U.S. at 50). "Accordingly, the regulation will be upheld if it 'is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication.'" *Id.*

S.B. 12 meets both prongs of the *Renton* test and survives intermediate scrutiny. Here, S.B. 12 does not "ban" "sexually oriented performances" but instead imposes a modest "manner" or "place" requirement—namely, an age limitation. Tex. Health & Safety Code § 796.002(a). Nor is S.B. 12 targeted at the expressive elements (if any) of sexually oriented performances: it merely limits the age of

attendees to curb the deleterious "secondary effects" of minors' exposure to sexually explicit materials. *See* ROA.1500-05.

The Attorney General is likely to succeed at minimum due to a fundamental evidentiary error: although the district court permitted the Attorney General's expert witness to make a 10-minute "offer of proof" about these secondary effects, the court deemed the testimony "irrelevant" to the Attorney General's constitutional defense. ROA.1496-1506. That evidentiary ruling was clearly erroneous: the relevancy standard for evidence is "low." *See Hicks-Field v. Harris County*, 860 F.3d 803, 809 (5th Cir. 2017). Given that the Attorney General argued that S.B. 12 was justified to regulate the secondary effects of sexually explicit performances on minors, ROA.1483-86, it is hard to imagine anything *more* relevant than evidence of what those secondary effects *are*, *see* Fed. R. Evid. 401.

Even apart from that evidentiary error, the district court's legal conclusion cannot be sustained. This Court recently reiterated that where sexually oriented businesses—the entities against whom the Attorney General can enforce S.B. 12, *supra* at 3, 10—are concerned, "very little evidence is required" for the government to meet its "light burden" to demonstrate that a regulation is aimed at curbing secondary effects, rather than free expression. *Ass'n of Club Execs.*, 2023 WL 6630302, at *5 (quoting *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 451 (2002) (Kennedy, J., concurring in the judgment)). Here, plaintiffs' counsel conceded that sexually explicit content can hurt children. ROA.1483. Indeed, the principle could hardly be denied given the testimony on the topic presented to the Texas Legislature. *See generally* Hearing on S.B. 12 Before the S. Comm. on State Affairs, 88th Leg.,

R.S. (Mar. 23, 2023); Hearing on S.B. 12 Before the H. Comm. on State Affairs, 88th Leg., R.S. (May 10, 2023).

S.B. 12 also easily clears the hurdle of intermediate scrutiny. The district court itself readily acknowledged that the State's "interest in protecting children" is "compelling," ROA.1281, not merely "substantial," *Ass'n of Club Execs.*, 2023 WL 6630302, at *3. And plenty of "reasonable alternative avenues of communication" exist: S.B. 12 does not close any "avenues of communication" to proprietors of sexually oriented performances. *Id.* It only limits which customers can travel down those avenues.

**b.** The district court deemed the secondary-effects doctrine inapplicable—and thus concluded that S.B. 12 was subject to strict scrutiny—on the ground that it only "applies to zoning regulations on sexually oriented businesses." ROA.1285. As this Court recently observed, that is wrong: *Renton*'s test applies far more broadly than just to zoning regulations. *See Ass'n of Club Execs.*, 2023 WL 6630302, at *3 & n.3. Instead, it applies to regulations targeting the "adverse secondary effects produced by . . . adult entertainment." *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 481 (5th Cir. 2002). The presentation of sexually oriented performances of the type regulated by S.B. 12 qualifies "adult entertainment" and is thus subject to this test. *Supra* at 7-8.

### 4. S.B. 12 is not unconstitutionally vague.

Finally, because S.B. 12 "provide[s] those targeted by the statute a reasonable opportunity to know what conduct is prohibited," it is not unconstitutionally vague. *Doe I v. Landry*, 909 F.3d 99, 116 (5th Cir. 2018). A law need not "'delineate the

exact actions a [person] would have to take to avoid liability,'" *id.* at 118, or give "'perfect clarity and precise guidance,'" *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018). "[O]nly a reasonable degree of certainty is required" to survive scrutiny. *United States v. Tansley*, 986 F.2d 880, 885 (5th Cir. 1993).

The district court pointed to two phrases that it found vague: "prurient interest in sex" and "lewd." ROA.1290-91. But "the common understanding of the term[s] supplies a clear enough standard," *Doe I*, 909 F.3d at 117, particularly given years of accumulated precedent, *Hansen*, 599 U.S. at 778. "Prurient interest in sex" is a legal term of art whose meaning has been developed over decades. *Roth*, 354 U.S. at 487 n.20. "[O]fficial interpretations and the historical application" of this standard can shape its contours and "become limiting constructions"—even if some "discretion [is] placed in the hands of [enforcement] officials." *Doe I*, 909 F.3d at 117 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 795-96 (1989)). Likewise, the term "lewd" is "a commonsensical term whose constitutionality was specifically upheld in *Miller v. California*, 413 U.S. 15, 25 (1973) and [*New York v. Ferber*, 485 U.S. 747, 765 (1982)]." *United States v. Wiegand*, 812 F.2d 1239, 1243 (9th Cir. 1987). Indeed, *Ferber* and *Miller* specifically upheld the constitutionality of that term in the context of the phrase "lewd exhibition of the genitals"—a phrase strikingly similar to the one in S.B. 12. *Cf.* Tex. Penal Code § 43.28(a)(1)(B).

Because these phrases are sufficiently definite enough to survive a facial vagueness challenge, the Attorney General is likely to succeed in this appeal. "[W]hat remains are possible as-applied challenges brought in post-enforcement proceedings

where the exact manner in which a regulation is implemented may be addressed."
*Doe I*, 909 F.3d at 118.

## II.  The Remaining Factors Favor a Stay.

The remaining stay factors also all favor the Attorney General. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). And the balance of the equities and the public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Conversely, a stay will not "substantially injure" plaintiffs. *Id.* at 426. Although "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), plaintiffs cannot show that they would lose any First Amendment freedoms here—particularly because they have disclaimed an intention to engage in the conduct actually proscribed by S.B. 12. ROA.1472-73, 1549-51, 1665.

## CONCLUSION

The Court should stay the permanent injunction pending appeal.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Lanora C. Pettit
LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

WILLIAM F. COLE
Assistant Solicitor General

Counsel for Defendant-Appellant
Attorney General Paxton

## Certificate of Conference

On October 27, 2023, counsel for Appellant conferred with counsel for Appellees, who stated that Appellees oppose the relief requested in this motion.

/s/ Lanora C. Pettit
Lanora C. Pettit

## Certificate of Service

On October 27, 2023, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lanora C. Pettit
Lanora C. Pettit

## CERTIFICATE OF COMPLIANCE

This document complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,199 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Lanora C. Pettit
LANORA C. PETTIT