No. 23-20480

# In the United States Court of Appeals for the Fifth Circuit

THE WOODLANDS PRIDE, INCORPORATED; ABILENE PRIDE ALLIANCE; EXTRAGRAMS L.L.C.; 360 QUEEN ENTERTAINMENT, L.L.C.; BRIGITTE BANDIT,

*Plaintiffs-Appellees*,

*v.*

WARREN KENNETH PAXTON, IN AN OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS; BRETT LIGON, IN AN OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF MONTGOMERY COUNTY; MONTGOMERY COUNTY, TEXAS; JAMES HICKS, IN AN OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF TAYLOR COUNTY; TAYLOR COUNTY, TEXAS; CITY OF ABILENE, TEXAS,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division

## APPELLANT ATTORNEY GENERAL PAXTON'S OPENING BRIEF

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

LANORA C. PETTIT
Principal Deputy Solicitor General

WILLIAM F. COLE
Assistant Solicitor General
William.Cole@oag.texas.gov

BENJAMIN E. PRENGLER
Assistant Attorney General

Counsel for Attorney General Paxton

## CERTIFICATE OF INTERESTED PERSONS

No. 23-20480

THE WOODLANDS PRIDE, INCORPORATED; ABILENE PRIDE ALLIANCE; EXTRAGRAMS L.L.C.; 360 QUEEN ENTERTAINMENT, L.L.C.; BRIGITTE BANDIT,

*Plaintiffs-Appellees*,

*v.*

WARREN KENNETH PAXTON, IN AN OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS; BRETT LIGON, IN AN OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF MONTGOMERY COUNTY; MONTGOMERY COUNTY, TEXAS; JAMES HICKS, IN AN OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF TAYLOR COUNTY; TAYLOR COUNTY, TEXAS; CITY OF ABILENE, TEXAS,

*Defendant-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellant, as a governmental party, need not furnish a certificate of interested persons.

/s/ William F. Cole
WILLIAM F. COLE
*Counsel of Record for*
*Attorney General Paxton*

i

## Statement Regarding Oral Argument

The Attorney General respectfully suggests that oral argument is warranted in this sprawling pre-enforcement First Amendment challenge to the Act of May 29, 2023, 88th Leg., R.S., ch. 931, 2023 Tex. Sess. Law Serv. 2975, commonly known as "S.B. 12," which prohibits certain graphic "sexually oriented performances" in the presence of minors. After converting a hearing on a preliminary-injunction motion into a two-day trial, the district court held that S.B. 12 facially violated the First Amendment on at least four separate theories and permanently enjoined the Texas Attorney General, two counties and their district attorneys, and one city from enforcing any of its provisions. In the process, it overlooked that Plaintiffs' own testimony at trial revealed several dispositive jurisdictional defects bearing on their claims. And on the merits, the court misconceived the facts and then misapplied First Amendment precedents of both the Supreme Court and this Court. Given the complexity of both the record and the relevant legal doctrines, discussion of the facts and applicable precedent would likely aid the Court's decisional process.

# Table of Contents

Certificate of Interested Persons .................................................................i

Statement Regarding Oral Argument .......................................................ii

Table of Contents ......................................................................................iii

Table of Authorities ..................................................................................v

Introduction ...............................................................................................1

Statement of Jurisdiction .........................................................................2

Issues Presented ........................................................................................2

Statement of the Case ...............................................................................2

    I.   Factual Background ..........................................................................2

    II.  Procedural History ...........................................................................5

Summary of the Argument........................................................................8

Standard of Review .................................................................................10

Argument..................................................................................................11

    I.   The District Court Lacked Jurisdiction Over Plaintiffs' Claims
       Against the Attorney General Because Plaintiffs Lack Standing..............11

       A.  Because S.B. 12 does not proscribe conduct in which Plaintiffs wish
           to engage, Plaintiffs have no injury-in-fact.........................................11

       B.  Plaintiffs' injuries are not fairly traceable to the Attorney General. ...20

    II.  S.B. 12 Does Not Violate the First Amendment.......................................23

       A.  S.B. 12's regulation of "sexually oriented performances" does not
           infringe any "inherently expressive" conduct..................................24

       B.  S.B. 12 survives any level of constitutional scrutiny...........................27

           1.  S.B. 12's age-limit requirement is subject to, at most,
               intermediate scrutiny—which it easily passes as a content-
               neutral "manner" or "place" restriction. .................................27

           2.  S.B. 12's age-limit requirement would also survive strict
               scrutiny. ...................................................................................38

           3.  S.B. 12's age-limit requirement is not unconstitutionally
               vague. ......................................................................................40

           4.  S.B. 12 does not operate as a prior restraint on any First
               Amendment activity. ...............................................................42

C.   Even if some applications of S.B. 12 regulate First Amendment activity, Plaintiffs failed to prove their *facial* challenge. ..................... 43

D.   Any unconstitutional provisions of S.B. 12 are severable. .................. 47

Conclusion ....................................................................................................... 49

Certificate of Service ..................................................................................... 50

Certificate of Compliance ............................................................................ 50

# Table of Authorities

**Page(s)**

**Cases:**

*Action for Children's Television v. FCC*,
58 F.3d 654 (D.C. Cir. 1995) (en banc) ............................................................ 40

*Alexander v. United States*,
509 U.S. 544 (1993) ............................................................................................ 42

*Ams. for Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (2021) ................................................................................... 43-44

*Andrews v. State*,
652 S.W.2d 370 (Tex. Crim. App. 1983) ........................................................ 41

*Ashcroft v. ACLU*,
535 U.S. 564 (2002) .............................................................. 19, 45, 46, 47

*Ass'n of Club Execs of Dall., Inc. v. City of Dallas*,
83 F.4th 958 (5th Cir. 2023) ................................................. 32, 35, 36, 37, 38

*Baby Dolls Topless Saloons, Inc. v. City of Dallas*,
295 F.3d 471 (5th Cir. 2002) ............................................................................ 32

*Barilla v. City of Houston*,
13 F.4th 427 (5th Cir. 2021) ............................................................................ 11

*BBL, Inc. v. City of Angola*,
809 F.3d 317 (7th Cir. 2015) ............................................................................ 30

*Brnovich v. Democratic Nat'l Comm.*,
141 S. Ct. 2321 (2021) ...................................................................................... 33

*Brown v. City of Houston*,
660 S.W.3d 749 (Tex. 2023) ............................................................................. 21

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ............................................................................................ 39

*Builder Recovery Servs., LLC v. Town of Westlake*,
650 S.W.3d 499 (Tex. 2022) ............................................................................. 47

*Cabrol v. Town of Youngsville*,
106 F.3d 101 (5th Cir. 1997) .............................................................. 24, 25, 26

*Cath. Leadership Coal. of Tex. v. Reisman*,
764 F.3d 409 (5th Cir. 2014) ............................................................................ 42

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) ...................................................................................... 22

*City of Austin v. Paxton,*
   943 F.3d 993 (5th Cir. 2019) ......................................................9

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
   596 U.S. 61 (2022) ............................................................28, 29

*City of El Cenzio v. Texas,*
   890 F.3d 164 (5th Cir. 2018) .....................................................43

*City of Erie v. Pap's A.M.,*
   529 U.S. 277 (2000) ............................................28, 32, 34, 35, 37

*City of L.A. v. Alameda Books, Inc.,*
   535 U.S. 425 (2002) ...........................................................35, 36

*City of Renton v. Playtime Theatres, Inc.,*
   475 U.S. 41 (1986) ...............................................10, 29, 35, 38

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ................................................................11

*Clark v. Cmty. for Creative Non-Violence,*
   468 U.S. 288 (1984) ......................................................27, 28, 29

*Ctr. for Fair Pub. Pol'y v. Maricopa County,*
   336 F.3d 1153 (9th Cir. 2003) ..................................................36

*Davidson v. City of Clinton,*
   826 F.2d 1430 (5th Cir. 1987) (per curiam) ..............................35

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.,*
   274 F.3d 377 (6th Cir. 2001)....................................................29

*DeJoria v. Maghreb Petrol. Expl., S.A.,*
   935 F.3d 381 (5th Cir. 2019) ...................................................10

*Doe I v. Landry,*
   909 F.3d 99 (5th Cir. 2018) ...............................................30, 41

*E.T. v. Paxton,*
   41 F.4th 709 (5th Cir. 2022)......................................................20

*Exxon Mobile Corp. v. Allapattah Servs., Inc.,*
   545 U.S. 546 (2005) .................................................................34

*Fantasy Ranch, Inc. v. City of Arlington,*
   459 F.3d 546 (5th Cir. 2006) .....................28, 29, 34, 35, 37

*FCC v. Pacifica Found.,*
   438 U.S. 726 (1978) .................................................................39

*Ginsberg v. New York,*
   390 U.S. 629 (1968) .................................................................38

*Hicks-Field v. Harris County*,
  860 F.3d 803 (5th Cir. 2017) ............................................................. 31

*Hurley v. Irish Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) ..........................................................................22

*Jackson v. Firestone Tire & Rubber Co.*,
  788 F.2d 1070 (5th Cir. 1986) ........................................................... 36

*Jaster v. Comet II Const., Inc.*,
  438 S.W.3d 556 (Tex. 2014) ............................................................. 15

*Kleinman v. City of San Marcos*,
  597 F.3d 323 (5th Cir. 2010) ............................................................. 34

*Knowles v. City of Waco*,
  462 F.3d 430 (5th Cir. 2006) ............................................................. 38

*Laird v. Tatum*,
  408 U.S. 1 (1972) ........................................................................ 8, 12

*Leavitt v. Jane L.*,
  518 U.S. 137 (1996) (per curiam) ...................................................... 47

*Lechuga v. S. Pac. Transp. Co.*,
  949 F.2d 790 (5th Cir. 1992) (per curiam) ........................................22

*LLEH, Inc. v. Wichita County*,
  289 F.3d 358 (5th Cir. 2002) ........................................................ 37, 38

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................8, 11, 20

*Miller v. California*,
  413 U.S. 15 (1973) ............................................................................ 41

*Minn. Voters All. v. Mansky*,
  138 S. Ct. 1876 (2018) ...................................................................... 41

*Montano v. Texas*,
  867 F.3d 540 (Tex. 2017) .................................................................. 48

*Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*,
  647 F.3d 202 (5th Cir. 2011) ............................................................. 47

*Nat'l Press Photographers Ass'n v. McCraw*,
  84 F.4th 632 (5th Cir. 2023) ............................................................. 24

*NetChoice, LLC v. Paxton*,
  49 F.4th 439 (5th Cir. 2022) ...............................................43, 44, 45, 46

*New York v. Ferber*,
  458 U.S. 747 (1982) .....................................................................15, 41

*Ostrewich v. Tatum*,
  72 F.4th 94 (5th Cir. 2023)................................................................44

*Red Bluff Drive-In, Inc. v. Vance*,
  648 F.2d 1020 (5th Cir. Unit A, June 1981) .................................... 41

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) .................................................... 24, 28, 29

*Roise v. State*,
  7 S.W.3d 225 (Tex. App.—Austin 1999)..........................................42

*Rose v. Drs. Hosp.*,
  801 S.W.2d 841 (Tex. 1990) ..................................................... 47, 48

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) .................................................................32

*Roth v. United States*,
  354 U.S. 476 (1957) .......................................... 19, 41, 46, 47

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006) ....................................... 9, 24, 26, 27, 34

*Sable Commcn's of Cal., Inc. v. FCC*,
  492 U.S. 115 (1989) ............................................................ 38, 39

*Sekhar v. United States*,
  570 U.S. 729 (2013)..................................................................18

*Spence v. Washington*,
  418 U.S. 405 (1974) (per curiam) ........................................ 24, 25

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)...................................................................11

*State v. Bolles*,
  541 S.W.3d 128 (Tex. Crim. App. 2017)..........................................16

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014).............................................................11, 12

*Tex. State LULAC v. Elfant*,
  52 F.4th 248 (5th Cir. 2022) ...................................................12

*Texas All. for Retired Ams. v. Scott*,
  28 F.4th 669 (5th Cir. 2022) .....................................................23

*Texas v. Johnson*,
  491 U.S. 397 (1989) ..........................................................25, 28

*Tovar v. State*,
  165 S.W.3d 785 (Tex. App.—San Antonio 2005)..............................42

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ................................................................. 11

*Turtle Island Foods, S.P.C. v. Strain,*
    65 F.4th 211 (5th Cir. 2023) ............................................ 8, 12, 14, 20

*United States v. Ahsani,*
    76 F.4th 441 (5th Cir. 2023) ...................................................... 10

*United States v. Albertini,*
    472 U.S. 675 (1985) ................................................................. 37

*United States v. Edwards,*
    231 F.3d 933 (5th Cir. 2000) ...................................................... 17

*United States v. Hansen,*
    599 U.S. 762 (2023) .................................... 2, 8, 10, 18, 41, 44, 45, 46

*United States v. Navarro,*
    169 F.3d 228 (5th Cir. 1999) ...................................................... 17

*United States v. O'Brien,*
    391 U.S. 367 (1968) ............................... 10, 24, 28, 33, 34, 35, 38

*United States v. Salerno,*
    481 U.S. 739 (1987) ................................................................. 43

*United States v. Tansley,*
    986 F.2d 880 (5th Cir. 1993) ...................................................... 41

*United States v. Wiegand,*
    812 F.2d 1239 (9th Cir. 1987) ..................................................... 41

*Voting for Am., Inc. v. Steen,*
    732 F.3d 382 (5th Cir. 2013) ...................................................... 24

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) .......................................................... 23, 29, 39, 41

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) ........................................................... 43, 44

*Willey v. Harris Cnty. Dist. Att'y,*
    27 F.4th 1125 (5th Cir. 2022) .................................................. 38, 39

*Williams-Yulee v. Fla. Bar,*
    575 U.S. 433 (2015) ................................................................. 39

*Ex parte Young,*
    209 U.S. 123 (1908) ................................................................. 23

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const. amend. I ................................................................*passim*

28 U.S.C. § 1291 .............................................................................2

Tex. Bus. & Com. Code:

§ 102.051.........................................................................................4

§ 102.051(1) ..................................................................................14

§ 102.051(1)(A) .............................................................................18

Tex. Health & Safety Code:

§ 769.001(2) ..................................................................................18

§ 769.002(a)..........................................1, 5, 9, 12, 16, 20, 23, 37, 48

§ 769.002(c)......................................................................................5

§ 769.002(c)-(f) ..............................................................................20

Tex. Loc. Gov't Code:

§ 243.0031(b) .......................................................................42, 43, 47

§ 243.0031(c) ..................................................................................20

§ 243.0031(c)(1)-(2) .........................................................................5

Tex. Penal Code:

§ 6.02(a)-(b) ...................................................................................17

§ 6.03(d) .........................................................................................17

§ 43.28(a) ........................................................................................25

§ 43.28(a)(1) ...................................................................................45

§ 43.28(a)(1)-(2) ..........................................................................9, 26

§ 43.28(a)(1)(A) .....................................................................14, 26, 45

§ 43.28(a)(1)(B) .................................................................14, 15, 42, 45

§ 43.28(a)(1)(C) .........................................................................14, 26

§ 43.28(a)(1)(D).....................................................................14, 19, 26

§ 43.28(a)(1)(E) ..............................................................................33

§ 43.28(a)(1)(A)-(E) .........................................................................4

§ 43.28(a)(2)....................................................................................12

§ 43.28(a)(2)(A) .........................................................................12, 29

§ 43.28(a)(2)(A)(i).......................................................................14, 19

§ 43.28(a)(2)(A)-(B) .........................................................................4

§ 43.28(a)(2)(B)......................................................................12, 19, 45, 46

§ 43.28(b)(1)-(2) ...................................................................5, 17, 37,48

§ 43.28(b)(2).....................................................................................12

§ 43.28(c).....................................................................................5, 20

Fed. R. Evid. 401.............................................................................31

**Other Authorities:**

Act of May 29, 2023, 88th Leg., R.S., ch. 931, 2023 Tex. Sess. Law
    Serv. 2975 ................................................................................. 1, 47

Black's Law Dictionary (11th ed. 2019) ................................... 16, 17, 19, 20, 21, 46

Felix Frankfurter, *Some Reflections on the Reading of Statutes*,
    47 Colum. L. Rev. 527 (1947) ...........................................................18

Hearing on S.B. 12 before the H. Comm. on State Affairs, 88th Leg.,
    R.S. (May 10, 2023), http://tinyurl.com/52t8fut8 ...........................................4

Hearing on S.B. 12 before the S. Comm. on State Affairs, 88th Leg.,
    R.S. (Mar. 23, 2023), http://tinyurl.com/5nrwmbuf ............................... 3, 4, 30

Mark Lungariello, *Video of drag queen gyrating in front of child has Texas
    pols pushing for legislative action*, N.Y. Post (Oct. 19, 2022) ..................................3

Merriam-Webster's Collegiate Dictionary (11th ed. 2003) .............. 15, 16, 17, 19, 20

Soli Rice, *GRAPHIC: Undercover Reporter Documents Shocking 'Family-
    Friendly' Drag Show*, Texas Scorecard (Dec. 19, 2022),
    http://tinyurl.com/3u6w2nns...........................................................3

*This Is The Army*, YouTube, http://tinyurl.com/nhcmwczm (last
    accessed Jan. 9, 2024) ......................................................... 33

# Introduction

S.B. 12 serves a clear purpose: it protects children and the public from the deleterious effects of minors' exposure to graphic sexually explicit conduct. S.B. 12 accomplishes this purpose by restricting minors from attending performances that involve nudity or five narrowly defined categories of "sexual conduct" and that appeal to the prurient interest in sex. S.B. 12 §§ 1, 3. Not once during a two-day trial on the merits did any of the five separate plaintiffs in this facial, pre-enforcement challenge assert any desire to perform nude or engage in sexual acts on stage in the presence of minors. Nevertheless, they insist that S.B. 12 violates their rights to free speech by prohibiting them from participating in or producing theatrical "drag shows." And the district court agreed, permanently enjoining the Texas Attorney General and several local officials from enforcing S.B. 12 in its entirety.

The Court should reverse and render judgment for the Attorney General because the district court lacked jurisdiction. To start, because Plaintiffs offered no evidence that they wish to participate in highly sexualized performances in front of minors, Plaintiffs failed to establish the most fundamental aspect of Article III standing: an injury. Plaintiffs also failed to establish that their non-existent injury is traceable to the Attorney General, who may enforce S.B. 12 only against violators that "control the premises of a commercial enterprise." Tex. Health & Safety Code § 769.002(a). No Plaintiff established that it (or she) controls such an enterprise.

Plaintiffs likewise failed to prove their claims on the merits. Contrary to Plaintiffs' repeated suggestions, S.B. 12 does not ban the theatrical "drag shows" they wish to stage or perform that involve the mere conduct of dancing while dressed in

costume. And Plaintiffs failed to demonstrate that the sexually oriented performances that *are* regulated by S.B. 12 involve any "inherently expressive" conduct that the First Amendment protects. Instead, because S.B. 12 is (at most) a content-neutral "manner" or "place" restriction that targets the adverse "secondary effects" of minors' exposure to sexually explicit conduct, it easily survives constitutional scrutiny. At minimum, Plaintiffs' *facial* challenge is defective because they did not demonstrate that S.B. 12's "unconstitutional applications [are] realistic, not fanciful, and their number [are] substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023).

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

**1.** Whether Plaintiffs failed to establish the injury-in-fact and traceability elements of the Article-III-standing test at trial.

**2.** Whether S.B. 12's age limitation for attendance at "sexually oriented performances" complies with the First Amendment's Free Speech Clause.

## STATEMENT OF THE CASE

### I.  Factual Background

In late 2022, the media reported that a number of highly graphic and sexualized performances were being staged in front of minors. For example, one well-publicized incident at a restaurant in Plano, Texas, involved a performer "lifting her skirt and gyrating while lip-synching lyrics" that described oral sex, as well as giving "lap

dances," while "a confused kid look[ed] on." Mark Lungariello, *Video of drag queen gyrating in front of child has Texas pols pushing for legislative action*, N.Y. Post (Oct. 19, 2022), http://tinyurl.com/2fmuushz. In Austin, two individuals "clad in BDSM harnesses and fur" "simulat[ed] sex multiple times, grinding against each other and shoving their faces in" another's "fake, fur-covered breasts while the other humped the man's rear." Soli Rice, *GRAPHIC: Undercover Reporter Documents Shocking 'Family-Friendly' Drag Show*, Texas Scorecard (Dec. 19, 2022), http://tinyurl.com/3u6w2nns. After engaging in these sexually explicit acts, one participant "ask[ed] [a] little boy [in the audience] what his favorite part of the show was." *Id.* Another event involved individuals "simulat[ing] grinding and humping while touching themselves inappropriately." *Id.* Yet another involved a man stripping down to a thong, exposing "fully nude faux breasts," and "multiple audience members slap[ping] his rear" before he "approach[ed] one child in the audience" stating, "[Y]ou're reaching for my titties. Are you hungry?" *Id.* This individual then goaded the audience into laughing at the child for calling for his mother. *Id.*

In response to such reports, ROA.583, the Texas Legislature began formulating what would eventually become S.B. 12. In subcommittees, the Legislature heard testimony in favor of the bill describing the harms that befall children who are exposed to sexually explicit conduct at an early age. One witness, for example, testified that "research has proven time and time again" that "exposing kids to very sexual content at an early age," "leads to a lot of issues later on in life, including becoming violent, facing problems with intimacy, and even dysfunction later on in life." *See* Hearing on S.B. 12 before the S. Comm. on State Affairs, 88th Leg., R.S. at 1:04:16-

33 (Mar. 23, 2023), http://tinyurl.com/5nrwmbuf ("Senate Hearing"). Another testified that because exposure at an early age to the types of performances S.B. 12 regulates can be a "traumatic experience," the effect "doesn't go away," and may persist "for decades." *Id.* at 1:07:25-58.

The Legislature also heard—and accounted for—testimony from the bill's opponents, who expressed concern that S.B. 12 would ban theatrical "drag shows." *See, e.g.*, *id.* at 1:10:14-1:16:32, 4:12:00-4:19:28, 4:21:40-4:23:35; Hearing on S.B. 12 before the H. Comm. on State Affairs, 88th Leg., R.S. at 1:08:00-1:09:59, 1:20:50-1:23:05 (May 10, 2023), http://tinyurl.com/52t8fut8. Specifically, the Legislature limited S.B. 12's scope to "sexually oriented performance[s]," defined to include a "visual performance" that: (1) involves a performer who either is "nude, as defined by Section 102.051, Business & Commerce Code" or "engages in sexual conduct" and (2) "appeals to the prurient interest in sex." Tex. Penal Code § 43.28(a)(2)(A)-(B). In turn, S.B. 12 narrowly defines "sexual conduct" as "the exhibition or representation, actual or simulated" of (1) "sexual acts, including vaginal sex, anal sex, and masturbation"; (2) "male or female genitals in a lewd state, including in a state of sexual stimulation or arousal"; (3) "a device designed and marketed as useful primarily for the stimulation of male or female genitals"; (4) "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person"; or (5) "sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics." *Id.* § 43.28(a)(1)(A)-(E).

4

S.B. 12 seeks to limit the exposure of minors to such sexually explicit performances in three substantive ways. *First*, those who "control[] the premises of a commercial enterprise may not allow a sexually oriented performance to be presented on the premises in the presence of an individual younger than 18 years of age." Tex. Health & Safety Code § 769.002(a). *Second*, S.B. 12 forbids a municipality or county to "authorize a sexually oriented performance" "on public property" or "in the presence of [such] an individual." Tex. Loc. Gov't Code § 243.0031(c)(1)-(2). *Third*, S.B. 12 makes the presentation of a "sexually oriented performance" a misdemeanor, Tex. Penal Code § 43.28(c), but clarifies that "an offense" occurs only if a sexually oriented performance takes place "(1) on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child; or (2) in the presence of an individual younger than 18 years of age," *id.* § 43.28(b)(1)-(2). The law tasks the Attorney General with enforcing only the first of these provisions. Tex. Health & Safety Code § 769.002(c).

## II.  Procedural History

One month before S.B. 12 was scheduled to take effect, two non-profits (The Woodlands Pride, Inc. and Abilene Pride Alliance), two entertainment companies that produce drag shows (Extragrams, L.L.C. and 360 Queen Entertainment, LLC), and one drag-show performer (Brigitte Bandit)—sued the Attorney General, two counties, one city, and several district attorneys. ROA.20-62. Their complaint asserted that S.B. 12 violated the First Amendment in a litany of ways, including as a content- and viewpoint-based restriction on speech and under the overbreadth, vagueness, and prior-restraint doctrines. ROA.58-61. One week later, Plaintiffs

moved for a temporary restraining order and a preliminary injunction. ROA.104-66. The district court subsequently converted the hearing on Plaintiffs' motion for a preliminary injunction into a trial on the merits, which it set three days before S.B. 12 was to take effect. ROA.240-41.

Over two days, the district court heard testimony from five witnesses, one representing each Plaintiff. ROA.1373-1585, 1659-70. Each described how they wished to stage or perform "drag [shows]," which they described as "theatrical" performances involving "the overdramatization of a character or a gender," often concerning "celebrity lookalikes." ROA.1374-75. According to the Plaintiffs, *their* performances "[t]ypically" involve "dancing, lip syncing, engaging with the audience by hugging, kissing on the cheek, sometimes bumping hips." ROA.1451. Extragrams, Abilene Pride Alliance, and Woodlands Pride stressed that their performances and dancing, which are performed for all ages, are *not* sexual in nature, ROA.1391-92, 1466, 1544-45, 1581-82. Although 360 Queen and Bandit admitted that they do stage or perform some sexually explicit performances, they insisted that such performances are limited to adults. ROA.1416, 1566-67, 1664-65.

In response, the Attorney General attempted to offer the testimony of a psychiatrist who would have described the deleterious effects that exposure to sexually explicit conduct has on minors. But the district court deemed such testimony not "relevant," and did not permit the witness to testify outside of a ten-minute proffer. ROA.1496-97. During those ten minutes, the witness stated that harmful effects stemming from early exposure to sexually explicit conduct included various

interpersonal and social issues, ROA.1501; subsequent exploitation, ROA.1502-03; chronic masturbation, ROA.1504; and other sexual deviance, ROA.1504.

The district court issued a temporary restraining order, ROA.960-64, 1186-88, and, later, a permanent injunction, preventing Defendants from enforcing S.B. 12, ROA.1240-95. Over the Attorney General's objection, the district court found that Plaintiffs had standing because S.B. 12 regulates "drag shows," thus harming Plaintiffs in a way traceable to the Attorney General because he can "enforce [civil] penalties" against those who "control . . . premises" where such performances are presented. ROA.1265-72. On the merits, the court concluded that S.B. 12 was a content- and viewpoint-based restriction on "expressive conduct"—drag shows—and failed strict scrutiny because it was not "narrowly tailored to promote" the State's concededly compelling interest in protecting children. ROA.1274-85. The court also concluded that S.B. 12's definition of "sexual conduct" was unconstitutionally overbroad; that the terms "prurient interest in sex" and "lewd" were unconstitutionally vague notwithstanding their judicial provenance; that S.B. 12's authorization for local governments to regulate "sexually oriented performances" was a "prior restraint on speech"; and that no part of S.B. 12 was severable from its definition of "sexually oriented performances." ROA.1272-73, 1286-93.

The Attorney General appealed, ROA.1296-97, and moved the district court for a stay pending appeal on September 29, ROA.1299-1322. After a multi-week delay, the district court denied the request on October 20. The Attorney General then moved this Court for a stay pending appeal, which remains pending.

7

## Summary of the Argument

**I.**    At the outset, the district court lacked jurisdiction over Plaintiffs' claims because the "evidence adduced at trial," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), demonstrated that Plaintiffs cannot meet either the injury-in-fact or traceability element of the familiar three-pronged test for Article III standing.

To start, Plaintiffs have not proven that the conduct in which they wish to engage is "arguably proscribed" by S.B. 12, as this Court requires for facial, pre-enforcement First Amendment challenges. *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 216 (5th Cir. 2023). Indeed, Plaintiffs' trial witnesses either *disclaimed* any desire to engage in conduct falling within the statutory definition of "sexually oriented performances" in front of minors or testified that Plaintiffs do not engage in such conduct. Plaintiffs' *only* evidence of a putative injury was mere speculation that S.B. 12 could be interpreted to ban what they insist is non-sexual dancing and costuming that takes place at their putatively theatrical "drag shows," as well as inadvertent wardrobe malfunctions or accidental physical contact. Because none of these "fanciful" applications of S.B. 12, *Hansen*, 599 U.S. at 770, even "arguably" follows from the plain language of S.B. 12, Plaintiffs have shown (at most) a subjective chill, which is insufficient to establish standing as a matter of law, *e.g.*, *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

Plaintiffs certainly have not established that any hypothetical injury they may theoretically have suffered is fairly traceable to the Attorney General. S.B. 12 tasks the Attorney General with enforcement power only against "[a] person who controls the premises of a commercial enterprise" and "allow[s]" a sexually oriented

performance to be presented on premises "in the presence of" a minor. Tex. Health & Safety Code § 769.002(a). But the evidence presented at trial demonstrated that no Plaintiff "controls" the premises of any "commercial enterprise." Instead, at most, Plaintiffs borrow commercial venues for a few hours on certain days with the consent of the owners or proprietors that *do* control them. Absent evidence that the Attorney General can and likely will enforce S.B. 12 against them, they lack traceability (or a route around sovereign immunity). *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019).

**II.**    Even if Plaintiffs had established jurisdiction, they failed to demonstrate that S.B. 12 violates the First Amendment. To bring the Free Speech Clause into play, Plaintiffs must prove that the five carefully defined categories of "sexual conduct" and nudity that S.B. 12 regulates, Tex. Penal Code § 43.28(a)(1)-(2), are "inherently expressive," *see Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) ("*FAIR*"). Plaintiffs attempted to do so exclusively by theorizing that S.B. 12 regulates "drag shows" and the multiplicity of communicative elements that such shows supposedly convey. But S.B. 12 does not regulate "drag shows" as Plaintiffs defined them at trial—let alone any expressive messages that such shows may intend to convey. And Plaintiffs otherwise wholly failed to explain how the highly sexualized conduct that *is* regulated by S.B. 12—such as the exhibition of sex acts or lewd displays of genitalia—qualifies as conduct that the First Amendment protects.

Even if conduct protected by the First Amendment were at issue, S.B. 12 would survive any applicable level of constitutional scrutiny. At most, S.B. 12 should be reviewed under—and survive—intermediate scrutiny because its age-limit

requirement is a content-neutral "manner" or "place" restriction aimed at regulating the deleterious secondary effects of sexually explicit performances on minors. *See United States v. O'Brien*, 391 U.S. 367, 376 (1968); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46-49 (1986). Alternatively, S.B. 12 would survive even strict scrutiny because its age-limit requirement is narrowly tailored to meet the State's compelling interest in protecting the psychological and physical well-being of minors. Moreover, S.B. 12's terms are hardly unconstitutionally vague given that it speaks in terminology that *courts* have long used to define areas outside the scope of the First Amendment. And S.B. 12's grant of authority to local governments to regulate "sexually oriented performances" does not operate as a prior restraint because it does not condition the exercise of First Amendment rights on pre-approval by government entities.

At minimum, Plaintiffs have failed to show—as they must to rely on the "overbreadth" doctrine—that the number of S.B. 12's *realistic* unconstitutional applications (if any) substantially outnumber its constitutional ones. *E.g.*, *Hansen*, 599 U.S. at 770. Instead, Plaintiffs tellingly rely on implausible hypotheticals that some court might someday apply S.B. 12 to outlaw cheerleading, dancing, and live theater. That does not suffice. *Id.*

## Standard of Review

This Court reviews legal questions de novo and findings of fact for clear error, *United States v. Ahsani*, 76 F.4th 441, 446 (5th Cir. 2023), including any "facts that underlie a jurisdictional determination," *DeJoria v. Maghreb Petrol. Expl., S.A.*, 935 F.3d 381, 390 (5th Cir. 2019).

## ARGUMENT

### I. The District Court Lacked Jurisdiction Over Plaintiffs' Claims Against the Attorney General Because Plaintiffs Lack Standing.

Plaintiffs' facial challenge to S.B. 12 falters at the outset because they failed to show that they "have (1) suffered an injury in fact [sufficient to confer standing], (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Specifically, the "evidence adduced at trial," *Lujan*, 504 U.S. at 561, failed to establish either the injury-in-fact or traceability element of this familiar three-pronged standing test. Because "[t]he plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," Plaintiffs' claims should have been dismissed. *Spokeo*, 578 U.S. at 338.

### A. Because S.B. 12 does not proscribe conduct in which Plaintiffs wish to engage, Plaintiffs have no injury-in-fact.

An injury-in-fact cognizable under Article III must be "concrete, particularized, and actual or imminent," not "hypothetical or abstract." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). As relevant here, "[a]n allegation of future injury may suffice" to meet the "imminence" component of the Article III standing test "if the threatened injury is 'certainly impeding' or there is a ''substantial risk' that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). "In pre-enforcement cases" like this one, where a plaintiff "alleg[es] a violation of the First Amendment's Free Speech Clause, the Supreme Court has recognized that chilled speech or self-censorship is an injury sufficient to confer standing." *Barilla v. City of*

*Houston*, 13 F.4th 427, 431 (5th Cir. 2021). But "[t]he chilling effect must have an objective basis; '[a]llegations of a subjective 'chill' are not an adequate substitute.'" *Tex. State LULAC v. Elfant*, 52 F.4th 248, 256 (5th Cir. 2022) (quoting *Laird*, 408 U.S. at 13-14).

To make this showing, Plaintiffs must demonstrate that they (1) "intend[] to engage in a course of conduct arguably affected with a constitutional interest," (2) that "is arguably proscribed by statute," and (3) for which "there exists a credible threat of prosecution." *Turtle Island*, 65 F.4th at 215-16 (quoting *Driehaus*, 573 U.S. at 159). Even assuming Plaintiffs met the first and third elements of this test, their own testimony shows that they cannot meet the second because none of the conduct in which they wish to engage is even arguably proscribed by S.B. 12's prohibition against "sexually oriented performance[s]" "in the presence of" a minor. Tex. Health & Safety Code § 769.002(a); *see also* Tex. Penal Code § 43.28(a)(2), (b)(2). Even though Plaintiffs maintain that they do not wish to stage or present "sexually oriented performances" in the presence of minors, they nevertheless insist that overzealous law-enforcement officials might interpret their putatively theatrical dragshow performances as running afoul of this prohibition in two ways. Neither theory has merit.

**1.**   To qualify as a "sexually oriented performance," a "visual performance" must contain two components. *First*, it must "feature" either nudity or a "performer who engages in" one of five carefully defined categories of "sexual conduct." Tex. Penal Code § 43.28(a)(2)(A). *Second*, that "visual performance" must also "appeal[] to the prurient interest in sex." *Id.* § 43.28(a)(2)(B).

The evidence adduced at trial demonstrates that Plaintiffs' proposed conduct meets neither component of this definition. Bandit and 360 Queen testified that they generally arrange or perform shows for *adults*, not minors, ROA.1416, 1566-67—yet performances in the presence of adults are not regulated by S.B. 12. When presented with the statutory definitions of sexual conduct and asked by counsel whether their performers engage, or wish to engage, in such statutorily proscribed conduct, representatives from both Abilene Pride Alliance and Woodlands Pride repeatedly and unequivocally stated "no." ROA.1472-73, 1549-51. Likewise, Extragrams's representative testified that its company policies prohibit full or partial nudity and regulate its performers costuming. ROA.1402-04. Its performers also do not engage in performances that are "sexual," ROA.1391-92, but instead tailor performances to the age of the audience, ROA.1388. Bandit similarly testified that she would not "perform one of [her] sexual shows at an all-ages event" and disclaimed any effort to obtain permission, through this lawsuit, to "perform actual or simulated sex acts for a sexual purpose" or "perform nude at all-ages events." ROA.1664-65.

**2.** Extragrams, Abilene Pride Alliance, and Woodlands Pride nonetheless fret that law enforcement might enforce S.B. 12 against "drag shows" based on the costuming, dancing, and other traditional accoutrements of such a "drag show." For example, Extragrams's representative expressed concern that some could construe S.B. 12 to prohibit performers from "performing with gender marker accessories, [performers] moving their hips, [or] shimmying their shoulders." ROA.1400. Abilene Pride's representative thought S.B. 12 might prohibit "front-facing hugs," "accidental bumping[]," "hip bump[s]," and "[d]ancing, lip syncing, the use of wigs,

makeup, chest plate[s], hip pads, dresses, jewelry, and other accessories," such as a "packer[]" (a device that provides the illusion of enlarged male genitalia). ROA.1465, 1468-69. Woodlands Pride's representative suggested that different types of "dancing," including a Conga line or "twerk[ing]," might be barred by S.B. 12. ROA.1547-48; *see also* ROA.1525-26.

None of this conduct even "arguably," *Turtle Island*, 65 F.4th at 217, violates S.B. 12's discrete prohibition on "sexually oriented performances" in the presence of minors because S.B. 12 does not ban dancing while in costume. For example, Plaintiffs offered no evidence that their costuming and dancing is undertaken in the "nude," Tex. Penal Code § 43.28(a)(2)(A)(i), meaning "entirely unclothed" or "clothed in a manner that leaves uncovered or visible . . . any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks," Tex. Bus. & Com. Code § 102.051(1). Likewise, not even Plaintiffs have asserted that the dancing or costuming in which they wish to engage qualifies as an (1) "exhibition or representation of sexual acts . . . including vaginal sex, anal sex, and masturbation"; (2) "exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals"; or (3) "simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person." Tex. Penal Code § 43.28(a)(1)(A), (C), (D).

Plaintiffs have previously argued that dancing while using "accessories or prosthetics" such as "packers" or "breast plates" might be considered "sexual gesticulations" or an "exhibition" of "male or female genitals in a lewd state, including a state of sexual stimulation or arousal" in violation of Texas Penal Code section

14

43.28(a)(1)(B) and (E). *See* Doc. 55 at 10-11. But Plaintiffs' witnesses expressed a desire only to dance in Conga lines, "shimmy[] their shoulders," "twist[]" and "shak[e]," do the "splits" and "body waves" (defined as "dancing to the music, to the rhythm"), or "twerk." ROA.1389, 1390, 1396, 1400, 1525, 1547-48. Plaintiffs have never explained how these routines could be considered "sexual gesticulations"—at least without defining all types of "dancing" as inherently sexual.

Nor does Plaintiffs' proposed interpretation comport with the plain meaning of "sexual gesticulation." Though undefined in S.B. 12, the plain meaning of that phrase, derived from "dictionary definitions," *Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014), is "an expressive gesture made in showing strong feeling or in enforcing an argument," *Gesticulation*, Merriam-Webster's Collegiate Dictionary 525 (11th ed. 2003), "of, relating to, or associated with sex," *id.* at 1141. Yet Plaintiffs repeatedly testified that their performances and dancing are *not* sexual in nature, ROA.1391-92, 1466, 1544-45, 1581-82, so to the extent that dancing in Conga lines, doing the splits, shimmying one's shoulders, or twerking qualify as "gesticulations," they are not, by Plaintiffs' own admission, *sexual* gesticulations because they are not "of, relating to, or associated with sex," Merriam-Webster's, *supra* at 1141.

Nor have Plaintiffs tried to reconcile their trial testimony with the argument that the use of "packers" might be considered to be a representation or exhibition of "male . . . genitals in a lewd state, including a state of sexual stimulation or arousal." Tex. Penal Code § 43.28(a)(1)(B). The term "lewd" is a commonplace, *New York v. Ferber*, 458 U.S. 747, 765 (1982), if undefined term whose "plain meaning" is

"obscene or indecent; tending to moral impurity or wantonness," *State v. Bolles*, 541 S.W.3d 128, 138 (Tex. Crim. App. 2017). But Plaintiffs' testimony was unequivocal that "packers" are not "intended to simulate an erection," are not "worn on the outside of clothing," ROA.1469, and are used merely to enhance the "illusion" of a particular "gender or a character." ROA.1390-91, 1410-11, 1453, 1469. Because "packers" are a subtle, concealed component of certain performers' costuming, ROA.1469—not a conspicuous, animating feature of any performance—it is hard to see how their use in this manner could meet the plain meaning of the term "lewd." *See Bolles*, 541 S.W.3d at 138. That is, use of "packers" may be provocative (particularly in some quarters), but the trial record does not indicate that use of "packers" is "grossly repugnant to the generally accepted notions of what is appropriate," *Obscene*, Black's Law Dictionary 1295 (11th ed. 2019), or "grossly improper or offensive," *Lewd*, Merriam-Webster's, *supra* at 632.

**3.** 360 Queen and Bandit—who *do* promote or perform adult-oriented "drag shows" that include lap dances, spanking, touching the performer's bosom, and revealing clothing, *e.g.*, ROA. 1430, 1442-43, 1576, 1580-81, 1582—offer a different concern than the other three plaintiffs. They worry that their already age-restricted shows might be unwittingly viewed by a minor who briefly passes through the venue or observes the performance from off-premises, leading Plaintiffs to violate S.B. 12. *See* ROA.1415-17, 1424, 1425-26, 1434, 1436-37, 1440-41, 1571, 1578-79. Not so.

S.B. 12 proscribes only "sexually oriented performance[s]" "in the presence of" minors. Tex. Health & Safety Code § 769.002(a). But Plaintiffs' adult-themed shows could not be fairly considered "in the presence of" minors who may

unwittingly witness them from afar, for at least two reasons. *First*, the ordinary meaning of "presence" denotes "[c]lose physical proximity coupled with awareness." Black's, *supra* at 1432; Merriam-Webster's, *supra* at 982 ("the part of space within one's immediate vicinity"); *accord United States v. Edwards*, 231 F.3d 933, 934-37 (5th Cir. 2000); *United States v. Navarro*, 169 F.3d 228, 236 (5th Cir. 1999). Yet the type of exposure that 360 Queen and Bandit hypothesize does not involve "close physical proximity" but, instead, vantage points from distant *off-premises* venues such as neighboring restaurants, ROA.1415, parking lots, ROA.1419, 1423, 1424, public sidewalks, ROA.1424, 1571, 1578-79, and even hotel rooms with the aid of binoculars, ROA.1571. For the same reason, 360 Queen's performances on the patio of a restaurant would not rightly be considered in the "close" or "immediate" proximity of a minor who happens to glimpse that show from a different, interior portion of the restaurant separated from the patio by "one long, consecutive wall" of windows, ROA.1415, 1424.

*Second*, the sort of unwitting and unintentional exposure that Plaintiffs describe would not meet S.B. 12's implied *mens rea* requirement. S.B. 12 uses a Penal Code definition of "sexually oriented performance." Tex. Penal Code § 43.28(b)(1)-(2). And under Texas criminal law, that definition implicitly requires, at minimum, a *mens rea* of criminal negligence. *See* Tex. Penal Code § 6.02(a)-(b). Because "criminal negligence" in this context would involve the "failure to perceive" "a substantial and unjustifiable risk" of exposure to minors, *id.* § 6.03(d), it would not encompass the type of inadvertent or fleeting exposure of minors to sexually oriented performances that Plaintiffs posit.

That remains true with respect to the section of S.B. 12 that the Attorney General civilly enforces. That section incorporates the Penal Code "meaning" of "sexually oriented performances" into the civil-penalty provision. Tex. Health & Safety Code § 769.001(2). "[A]s Justice Frankfurter colorfully put it, 'if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.'" *Sekhar v. United States*, 570 U.S. 729, 733 (2013) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)). Because the Legislature expressly determined that the "meaning," Tex. Health & Safety Code § 769.001(2), of the Penal Code definition of "sexually oriented performances" should be fully incorporated into the civil portion of the statute, the criminal *mens rea*, which is an indispensable component, "comes with it" as "part of the package." *Hansen*, 599 U.S. at 778-79.

**4.** For similar reasons, none of the Plaintiffs can fall back on the argument that S.B. 12 will be enforced against them for unintentional conduct, such as inadvertent "wardrobe malfunctions," ROA.1392, 1408, and "accidental" physical contact, ROA.1465. For one, even a performer whose *clothing* malfunctions would not likely be "entirely unclothed," Tex. Bus. & Com. Code § 102.051(1)(A), and none of the wardrobe malfunctions Plaintiffs described at trial fits that definition, *see* ROA.1392, 1408, 1430, 1582-83. For another, *accidental* wardrobe malfunctions that expose "any portion of the breasts below the top of the areola" or "any portion of the genitals or buttocks," do not constitute "nudity" within the meaning of S.B. 12 because—as with the use of the term "presence"—the statute incorporates an element of intent for such nudity through its requirement that a sexually oriented performance

"feature[]" a performer who is nude. Tex. Penal Code § 43.28(a)(2)(A)(i). A visual performance that "features," *id.*, something "give[s] special prominence to" that attribute. Merriam-Webster's, *supra* at 458. But here, Plaintiffs' concern is a wardrobe *malfunction* that is, by definition, not "feature[d]" as part of the "visual performance" but instead an aberration. For similar reasons, *accidental* physical contact that might otherwise meet one of the definitions of "sexual conduct," *e.g.*, Tex. Penal Code § 43.28(a)(1)(D), is not "feature[d]" as part of a "visual performance."

**5.**    Finally, to the extent there were room for debate about whether certain iterations of Plaintiffs' dancing and costuming meets the definition of "sexual conduct," the conduct Plaintiffs identified at trial *still* would not violate S.B. 12 because—by their own account—Plaintiffs' theatrical drag shows are *not* intended to "appeal[] to the prurient interest" in sex. Tex. Penal Code § 43.28(a)(2)(B). The Supreme Court has explained that the phrase "prurient interest" means "material having a tendency to excite lustful thoughts." *Roth v. United States*, 354 U.S. 476, 487 n.20 (1957). That is, "[m]aterial appeals to the prurient interest . . . only if it is in some sense erotic." *Ashcroft v. ACLU*, 535 U.S. 564, 579 (2002). And Black's Law Dictionary defines "prurient" as "[c]haracterized by, exhibiting, or arousing inappropriate, inordinate, or unusual sexual desire; having or showing too much interest in sex." Black's, *supra* at 1482. But once again, Plaintiffs have repeatedly disclaimed that their performances are sexual in nature, ROA.1392, 1441, 1466, 1544-45, 1581-82, let alone that they are characterized by eroticism or "inappropriate, inordinate, or unusual sexual desire." And because Plaintiffs' conduct—by their own

description—is not "arguably proscribed by statute," Plaintiffs lack a cognizable injury-in-fact for this pre-enforcement challenge. *Turtle Island*, 65 F.4th at 215-16.

### B. Plaintiffs' injuries are not fairly traceable to the Attorney General.

Even if Plaintiffs had identified a cognizable injury-in-fact, their claims independently falter because Plaintiffs have failed to offer any evidence that their hypothetical injury is "fairly traceable to the challenged action of the" Attorney General, "not the result of the independent action of some third party not before the court." *E.T. v. Paxton*, 41 F.4th 709, 718 (5th Cir. 2022) (quoting *Lujan*, 504 U.S. at 560). The Attorney General can only enforce S.B. 12 by seeking injunctive relief or civil penalties against "[a] person who controls the premises of a commercial enterprise" and "allow[s] a sexually oriented performance to be presented on the premises in the presence of" a minor. Tex. Health & Safety Code § 769.002(a); *see id.* § 769.002(c)-(f). But because no Plaintiff offered evidence at trial that it (or she) "controls the premises of a commercial enterprise," any injury Plaintiffs might suffer from S.B. 12's enforcement would not result from enforcement by the Attorney General, but, if at all, from county or local prosecutors who may enforce other sections of S.B. 12 against them. *See, e.g.*, Tex. Loc. Gov't Code § 243.0031(c); Tex. Penal Code § 43.28(c).

Although S.B. 12 does not define the term "control," common dictionary definitions define it to mean "[t]o exercise power or influence over," Black's, *supra* at 416, "[t]o regulate or govern," *id.*, or "to exercise restraining or directing influence over," Merriam-Webster's, *supra* at 272. That term stands in contrast to the verb "allow," which the statute also uses and typically means "[t]o give consent to."

Black's, *supra* at 96. The use of both terms in close proximity indicates that the Legislature used "control" to reflect the type of discretion over how to use the premises exercised by the owners or proprietors of commercial venues, who might "allow" a temporary occupant to stage a "drag show." *Cf. Brown v. City of Houston*, 660 S.W.3d 749, 756 (Tex. 2023) ("This series of seemingly similar verbs provided the first textual indication that, at least in this context, words like 'bring' or 'brought' were not simply interchangeable with others like 'initiate' or 'commence.'").

The testimony at trial demonstrated that though Plaintiffs may be "allowed" to use commercial premises, they do not exercise "control" over them. For example, Extragrams serves as a middleman between independent-contractor performers and customers wishing to host "drag shows" at their "houses, places of work, [and] companies." ROA.1375-76, 1397-98. Extragrams's representative *admitted* at trial that if "we . . . go to someone's house and we're doing a party," "[t]here's just no control over that." ROA.1388. Similarly, 360 Queen books "drag queens" to perform on the patio of a bar in San Antonio that a third party owns. ROA.1413. Although that owner is the father of one of 360 Queen's founders, the company has only an unspecified "agreement with the restaurant" to use the patio on days when "drag shows" will take place. ROA.1413-15. The evidence offered at trial reflects that the restaurant continues to "control" the premises, including supplying food service, waitstaff, and bussers. ROA.1415-16, 1431, 1438-39.

In the past, Abilene Pride has held "drag brunches" in "a locally owned coffee shop" that allowed the organization to use "their space on Sundays when they were normally closed." ROA.1452. Assuming this occasional use continues, Abilene Pride

is (at most) a "business invitee" of the coffee shop. *See Lechuga v. S. Pac. Transp. Co.*, 949 F.2d 790, 794-96 (5th Cir. 1992) (per curiam). The shop's owner—not Abilene Pride—retains "control" over the premises, including the "right to exclude," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021), subject to prevailing public-accommodations laws, *see Hurley v. Irish Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 571-72 (1995). Woodlands Pride's past events at "local coffee shops," ROA.1512, fail to establish control of those premises for the same reason. And although Woodlands Pride's representative testified about possible future plans to host drag performances at a car dealership, ROA.1513, its representative rightly conceded that any such hypothetical future "control" would be limited to "ticket sales" for the purposes of fundraising, ROA.1538. As with Extragrams, Woodlands Pride's representative admitted: "we don't own the premises[,] so we don't have control." ROA.1539.

Finally, Bandit performs in "drag shows" at "21-and-up" nightclubs and sometimes at all-ages "drag brunches." ROA.1566-67. Consistent with the testimony of the other Plaintiffs, the trial evidence reflects that Bandit is an independent contractor and cannot be sure of who is in the audience. As she explained, "[s]ometimes clubs" or other "venues" make exceptions about whether to admit underage persons. ROA.1569-70. Bandit also explained that "*some venues* that have hired me recently have also had to hire personal security for *their space* during the event." ROA.1584 (emphasis added). And Bandit's fear about S.B. 12 taking effect is that the *venues* will choose not to host her drag shows, ROA.1584—a problem that would not exist if *Bandit* controlled the premises.

Because none of the Plaintiffs controls any commercial premises, they fall outside the scope of the Attorney General's enforcement authority. *See* Tex. Health & Safety Code § 769.002(a). Any injury Plaintiffs might have suffered is thus not traceable *to* the Attorney General, and this Court lacks jurisdiction over Plaintiffs' claims *against* the Attorney General.[1]

## II. S.B. 12 Does Not Violate the First Amendment.

Even if Plaintiffs had established jurisdiction to sue the Attorney General, S.B. 12 is fully consistent with the First Amendment. Its regulation of "sexually oriented performances" does not impinge on any conduct that the First Amendment protects. And even if it did, S.B. 12's age-limitation requirement would be subject to—and survive—intermediate scrutiny as a content-neutral regulation of the "manner" or "place" of sexually oriented performances. The district court's further conclusions that portions of S.B. 12 are unconstitutionally vague and operate as a prior restraint are similarly flawed—particularly in the context of a *facial* pre-enforcement challenge.

---

[1] For similar reasons, Plaintiffs' claims against the Attorney General run afoul of sovereign immunity. For a state official to be a proper defendant in a suit seeking injunctive relief under *Ex parte Young*, that official "must have '*some* connection with the enforcement of the [challenged] act.'" *Texas All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). Here, Plaintiffs have shown no such enforcement connection between themselves and the Attorney General.

### A. S.B. 12's regulation of "sexually oriented performances" does not infringe any "inherently expressive" conduct.

To start, S.B. 12 does not implicate the First Amendment's Free Speech Clause, which forbids the government to "restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). This prohibition extends not only to laws "telling people what they must say," but also to certain "conduct that is inherently expressive." *FAIR*, 547 U.S. at 61, 66. "[O]nly conduct that is 'inherently expressive' is entitled to First Amendment protection." *Nat'l Press Photographers Ass'n v. McCraw*, 84 F.4th 632, 648 & n.70 (5th Cir. 2023) (quoting *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013)). Sexually oriented performances of the type that S.B. 12 regulates are not such conduct.

"For activities to constitute expressive conduct and fall within the scope of the First Amendment, they must be 'sufficiently imbued with elements of communication.'" *Cabrol v. Town of Youngsville*, 106 F.3d 101, 109 (5th Cir. 1997) (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974) (per curiam)). At the same time, the Supreme Court has consistently "rejected the view that 'conduct can be labeled "speech" whenever the person engaging in conduct intends thereby to express an idea.'" *FAIR*, 547 U.S. at 65-66 (citing *O'Brien*, 391 U.S. at 376). Indeed, "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.* at 66. To decide "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," courts "ask whether an intent to

24

convey a particularized message was present and whether the likelihood was great that the message would be understood by those who viewed it." *Cabrol*, 106 F.3d at 109 (citing *Texas v. Johnson*, 491 U.S. 397, 404 (1989)).

Plaintiffs failed to demonstrate that the "sexual conduct" covered by S.B. 12 regulates any such inherently expressive actions. On its face, the statute regulates pure conduct: nudity and five carefully defined acts of "sexual conduct," including the "exhibition or representation" of various sexual acts, organs, toys or "gesticulations." Tex. Penal Code § 43.28(a). Plaintiffs nowhere explain how this pure conduct is "imbued with elements of communication," *Cabrol*, 106 F.3d at 109 (quoting *Spence*, 418 U.S. at 409), much less identify any "particularized message" that "would be understood by those who viewed it," *id.* (citing *Johnson*, 491 U.S. at 404).

The district court nonetheless concluded that the statute regulates conduct that the First Amendment protects based on the theory that S.B. 12 regulates "drag shows," which the court concluded contain "multiple messages and expressive purposes." ROA.1274-78. That conclusion is based on a false premise: that S.B. 12 regulates "drag shows." At trial, Plaintiffs defined "drag shows" as a "theatrical" performance involving "the overdramatization of a character or a gender," often concerning "celebrity lookalikes," ROA.1374-75, and which "[t]ypically" involve "dancing, lip syncing, engaging with the audience by hugging, kissing on the cheek, sometimes bumping hips." ROA.1451. Regardless of whether some such dance performances might constitute "inherently expressive" conduct protected by the First Amendment, S.B. 12 does not prohibit the "drag shows" that Plaintiffs identified. *Supra* at 11-20. Instead, what is regulated by S.B. 12 are several discrete categories of

highly "sexual *conduct*" that apply to all types of "visual performances," not drag shows in particular. Tex. Penal Code § 43.28(a)(1)-(2) (emphasis added).

Similarly, according to Plaintiffs, *their* performances may convey several varied messages, including challenging "gender norms and expectations," ROA.1564-65; "[c]ommunity," ROA.1447; a "nexus of belonging," ROA.1451; "representation," ROA.1459-60; "a message of strength," ROA.1515; "comedic entertainment or serious entertainment," ROA.1515-16; "solidarity with . . . the LGBT+ community," ROA.1516; and various messages of "social justice," ROA.1432-33. But neither Plaintiffs nor the district court even explain how such "messages of celebration, equality, and acceptance" or "messages of a political and social justice nature," ROA.1274, might apply equally to the highly sexualized performances that S.B. 12 regulates. For example, Plaintiffs did not even try to say what "particularized message," *Cabrol*, 106 F.3d at 109, of "social justice," ROA.1432-33, is sent by "the exhibition or representation . . . of sexual acts, including vaginal sex, anal sex, and masturbation," Tex. Penal Code § 43.28(a)(1)(A), or through "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person," *id.* § 43.28(a)(1)(D).

Here, to be expressive the sexual conduct that S.B. 12 regulates would, at minimum, need to be "accompanied . . . with speech explaining it." *FAIR*, 547 U.S. at 66. After all, Plaintiffs' audience members would "ha[ve] no way of knowing whether," *id.*, for example, "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals," Tex. Penal Code § 43.28(a)(1)(C), is for the purpose of hawking that product, commenting on

26

its utility, challenging gender norms, or something else entirely. But "[t]he fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection." *FAIR*, 547 U.S. at 66. And because Plaintiffs bore the burden of proof that the conduct regulated by S.B. 12 was inherently expressive, their failure to offer such evidence dooms their First Amendment claim. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).

## B. S.B. 12 survives any level of constitutional scrutiny.

Even if S.B. 12's regulation of "sexually oriented performances" implicates the First Amendment, it satisfies any level of constitutional scrutiny. Because S.B. 12's central feature imposes modest age limitations for attendance at sexually oriented performances, it is a "manner" or "place" restriction that easily passes intermediate scrutiny as a reasonable effort to regulate the deleterious secondary effects of exposure of minors to sexually explicit conduct. Indeed, even if strict scrutiny applies, S.B. 12 would survive because it is a narrowly tailored regulation aimed at meeting the State's compelling interest in safeguarding the physical and psychological well-being of minors. It also speaks in terms that are easily definitive enough to provide constitutionally sufficient notice and that do not act as a prior restraint.

### 1. S.B. 12's age-limit requirement is subject to, at most, intermediate scrutiny—which it easily passes as a content-neutral "manner" or "place" restriction.

To the extent that the sexually oriented performances S.B. 12 regulates could qualify for some level of First Amendment protection as "inherently expressive"

conduct, S.B. 12's age-limitation restriction passes the applicable, intermediate level of scrutiny. Determining the appropriate level of scrutiny turns on "whether the government's predominate purpose in enacting the regulation is related to the suppression of expression itself." *Fantasy Ranch, Inc. v. City of Arlington*, 459 F.3d 546, 554 (5th Cir. 2006) (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (plurality op.)). "If the government's interest is indeed related to the suppression of content, then that regulation of symbolic speech is subject to strict scrutiny." *Id.* (citing *Johnson*, 491 U.S. 397). But if "the government's predominate purpose is unrelated to the suppression of expression, such that the regulation can be 'justified without reference to the content of the regulated speech,' then intermediate scrutiny applies." *Id.* (quoting *Clark*, 468 U.S. 288) (citing *O'Brien*, 391 U.S. 367). The district court applied strict scrutiny because it concluded that S.B. 12 was either content-based or viewpoint-discriminatory. But S.B. 12 is neither.

   **a.**   To start, the district court wrongly held that S.B. 12 is a "content-based" restriction on expressive activity on the ground that it "targets conduct deemed to be 'sexual[ly] oriented.'" ROA.1280. "A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed*, 576 U.S. at 163). But the Supreme Court has "reject[ed] . . . the view that *any* examination of speech or expression inherently triggers heightened First Amendment concern." *Id.* at 73. "Rather, it is regulations

28

that discriminate based on 'the topic discussed, or the idea or message expressed' that are content based." *Id.* at 73-74 (quoting *Reed*, 576 U.S. at 171).

Conversely, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citing *Renton*, 475 U.S. at 47-48). Thus, "[g]overnment regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'" *Id.* (citing *Clark*, 468 U.S. at 293).

Applying these standards here, S.B. 12's age-limitation for sexually oriented performances can be "'*justified* without reference to the content of the regulated speech,'" *id.*—namely the "secondary effects" of such performances, *Fantasy Ranch*, 459 F.3d at 554-55. That is, even if one must "examin[e]," *Reagan Nat'l*, 596 U.S. at 73, these performances to determine whether they involve any "sexual conduct" or nudity, Tex. Penal Code § 43.28(a)(2)(A), the age-limitation requirement does not discriminate against "the topic discussed[,] or the idea or message expressed," *Reagan Nat'l*, 596 U.S. at 74—"even if it has an incidental effect on some speakers or messages but not others," *Ward*, 491 U.S. at 791. Instead, its "predominate concern is for secondary effects" of the regulated First Amendment conduct, "not the suppression of symbolic expression." *Fantasy Ranch*, 459 F.3d at 556. Indeed, it is well established that "'a distinction may be drawn between adult [businesses] and other kinds of [businesses] without violating the government's paramount obligation of neutrality,' when the government seeks to regulate only the secondary effects of erotic speech, and not the speech itself.'" *Id.* (quoting *Deja Vu of*

*Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 391 (6th Cir. 2001)). For that reason, "[r]egulations on sexually oriented businesses are nearly always reviewed under intermediate scrutiny as content-neutral regulations." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015).

Here both the evidence "presented to the enacting officials" and the evidence "produced at the time of trial," *Doe I v. Landry*, 909 F.3d 99, 110 (5th Cir. 2018), demonstrate that S.B. 12 is aimed at combatting the secondary effects of exposure of minors to sexually explicit content. That is, S.B. 12's age-limitation requirement seeks to guard against downstream effects that may manifest later in time, such as possible criminal and antisocial behavior and sexual deviancy. For example, the Senate Committee on State Affairs heard testimony that "research has proven time and time again" that "exposing kids to very sexual content at an early age," like the sexually oriented performances S.B. 12 regulates, "leads to a lot of issues later on in life, including becoming violent, facing problems with intimacy, and even dysfunction later on in life." *See* Senate Hearing, *supra* at 1:04:15-32. Indeed, the Senate heard testimony that the effects of exposure at an early age to the types of performances regulated by S.B. 12 "do[n't] go away," may persist "for decades," and constitute a "traumatic experience" for some. *Id.* at 1:07:25-58. And witnesses even invoked the "common sense" point that "sexually oriented entertainment" should be "lef[t] . . . for adults." *Id.* at 59:23-56, 1:00:19-37.

The Attorney General's expert witness attempted to testify at trial that exposure of minors to sexually explicit performances of the kind regulated by S.B. 12—for example, a performer flashing his anus or her breasts to minors, simulating

masturbation with a prosthetic penis, or allowing "a young child [to] stroke[] the genitals of a drag performer dressed as a little mermaid," ROA.1500-02—is "not appropriate for them developmentally." ROA.1504. He testified that because minors' "behavior is shaped by experience and by copying behavior," their "cognitive[] and emotional[] immatur[ity]" may lead them to reenact such behavior in other locales. ROA.1501. And such conduct may lead to various "interpersonal[] [and] social[]" problems, ROA.1501, including "chronic masturbation," "sexual deviance," ROA.1504, "rejection," a "sexual[] preoccupation for some that are sensation seeking," and even "exploit[ation]." ROA.1501-02. He further opined that, in his "professional experience," he has "observe[d] that individuals who lacked healthy interpersonal relationships and who were exposed to explicit sexual content and who experienced brief sexual/emotional pleasure engaging in these similar sexual activities . . . struggled with personal worth, anxiety, depression, substance abuse and sexual deviance." ROA.758.

The district court abused its discretion when it excluded such testimony on "relevance" grounds after permitting the Attorney General to make a ten-minute "offer of proof." ROA.1496-1506. The relevancy standard is "low": "evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Hicks-Field v. Harris County*, 860 F.3d 803, 809 & n.17 (5th Cir. 2017) (citing Fed. R. Evid. 401). The district court's conclusion that the Attorney General's expert's testimony was irrelevant was driven by a fundamental legal error: the court's conclusion that the secondary-effects doctrine only "applies to zoning

regulations on sexually oriented businesses." ROA.1285. But as this Court recently recognized, the secondary-effects doctrine applies far more broadly than just to zoning regulations. *See, e.g.*, *Ass'n of Club Execs of Dall., Inc. v. City of Dallas*, 83 F.4th 958, 963 & n.3 (5th Cir. 2023) (collecting cases); *see also Pap's A.M.*, 529 U.S. at 295. Indeed, it applies to regulations targeting the "adverse secondary effects produced by . . . adult entertainment." *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 481 (5th Cir. 2002). The presentation of sexually oriented performances of the type S.B. 12 regulates qualifies "adult entertainment" and is thus subject to this test.

    **b.**    For related reasons, the district court also erred by holding that S.B. 12 discriminates "based on viewpoint." ROA.1284-85. As an initial matter, because viewpoint discrimination is a "form of content discrimination," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), this argument fails because S.B. 12's regulation of sexually oriented performances is "justified without reference to the content." *Supra* at 28-31. Regardless, the district court was wrong to conclude that S.B. 12 discriminates based on viewpoint on the ground that one of the five definitions of "sexual conduct" is "directed at the specific act of impersonating or exaggerating a sex other than the one a performer is assigned." ROA.1285.

    To start, the district court misread this definitional provision: it does not define dressing up as or impersonating the opposite sex as such to be sexual conduct; instead, it defines sexual conduct to include "the exhibition of *sexual gesticulations* using accessories or prosthetics that exaggerate male or female sexual characteristics."

Tex. Penal Code § 43.28(a)(1)(E). The subject of this definition is "the exhibition of sexual gesticulations"—not dressing up or impersonating the opposite sex.

Moreover, the district court failed to identify what "viewpoint," if any, such sexual gesticulations might convey and what message S.B. 12 discriminates against. The district court obliquely suggested that S.B. 12 discriminates against a viewpoint related to the propriety of staging "drag shows." ROA.1285. But Plaintiffs testified at trial that their "drag shows" convey a multiplicity of messages, *supra* at 26—a concession that is more than sustained by historical experience.[2]

In any event, it was legal error to consider S.B. 12 viewpoint discriminatory based entirely on "legislative history and public statements by legislators." ROA.1285. In *O'Brien*, the Supreme Court concluded that such a free-floating inquiry into legislative purpose has no proper place in a First Amendment analysis, holding that "[i]nquiries into congressional motives or purposes are a hazardous matter," particularly where a court is "asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it." 391 U.S. at 383-84; *accord Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021). That is because "[w]hat motivates one

---

[2] For example, in 1943, future President Ronald Reagan starred in *This Is The Army*, which featured a show in which several members of the military danced and sang a song comparing being drafted into the army to being drafted into a female chorus. *See This Is The Army*, YouTube, http://tinyurl.com/nhcmwczm (last accessed Jan. 9, 2024). That movie undoubtedly *has* a viewpoint; it bears no resemblance to the putative messages of Plaintiffs' shows that the district court highlighted. ROA.1274; *see also supra* at 26.

legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *O'Brien*, 391 U.S. at 384; *see also Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). Thus, it is well established that courts "will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive." *Pap's A.M.*, 529 U.S. at 279.

    **c.**    Because S.B. 12's age limitation is, at most, a content-neutral regulation, it should be reviewed under intermediate scrutiny, which it easily passes. The *O'Brien* test applies in circumstances where a law regulates inherently "expressive conduct." *FAIR*, 547 U.S. at 67-68. It "rests on the principle that "when 'speech' and 'non-speech' elements are united in a course of conduct, a valid governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Kleinman v. City of San Marcos*, 597 F.3d 323, 328 (5th Cir. 2010). And "[u]nder *O'Brien*, a content-neutral regulation is constitutional if [1] it is within the constitutional power of the government; [2] it furthers an important or substantial governmental interest; [3] the government interest is unrelated to the suppression of free expression; and [4] the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* (citing *O'Brien*, 391 U.S. at 376). S.B. 12's age-limitation requirement meets each of these elements.

    *First*, S.B. 12 falls comfortably within the constitutional powers of the State. "[O]rdinances aimed at protecting the health and safety of citizens are squarely within the [government's] police powers," *Fantasy Ranch*, 459 F.3d at 558 (citing *Pap's A.M.*, 529 U.S. at 296), which "confer[] upon the states and local

governmental units broad regulatory authority over public health, welfare, and morals," *Davidson v. City of Clinton*, 826 F.2d 1430, 1433 (5th Cir. 1987) (per curiam). That is precisely what S.B. 12 does: it protects the public health and safety from the adverse effects of exposure to age-inappropriate material.

*Second*, S.B. 12 also furthers an important or substantial governmental interest in combatting the deleterious secondary effects of minors' exposure to sexually explicit conduct. *See supra* at 29-31. This prong of the *O'Brien* test contains "two distinct questions": "whether the threatened harm is real" and "whether the regulation furthers that interest." *Fantasy Ranch*, 459 F.3d at 558-59. Both questions are answered using the evidentiary "standard described in" *Renton*. *Id.* at 559; *see Pap's A.M.*, 529 U.S. at 297 ("[T]he evidentiary standard described in *Renton* controls here.").

As this Court explained just a few months ago, "very little evidence is required" for the government to meet its "light burden" to show that a regulation furthers a substantial government interest under *Renton*. *Ass'n of Club Execs.*, 83 F.4th at 967 (citing *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 451 (2002) (Kennedy, J., concurring in the judgment)). Indeed "a single study and common experience" can suffice to show that the law is appropriately tailored to address the secondary effects of adult conduct. *Id.* at 968. "[A]ll *Renton* demands is evidence 'reasonably believed to be relevant' to the problem." *Id.* (quoting *Renton*, 475 U.S. at 51). That does not require the government "to forge an ironclad connection between [sexually oriented businesses] and secondary effects or to produce studies examining precisely the same conditions at issue." *Id.* Nor does the government need to "rule[] out every theory

for the link between [sexually oriented businesses and secondary effects] that is inconsistent with its own." *Id.* (quoting *Alameda Books*, 535 U.S. at 437). "So long as [the government's] 'inferences appear reasonable, [the Court] should not say there is no basis for its conclusion.'" *Id.* at 967.

S.B. 12 easily satisfies this reasonable-belief standard. The testimony presented to the Legislature included references to research demonstrating the adverse manifestations, including antisocial and criminal behavior, that can result from exposure to highly sexual content at an early age. *Supra* at 30. The testimony likewise drew on "common experience." *See Ass'n of Club Execs*, 83 F.4th at 968. And if even a "single study and common experience" can suffice to meet the government's burden under Supreme Court precedent, *id.*, then improperly excluded testimony from the Attorney General's expert witness expounding on the adverse outcomes that can manifest downstream of a minor's exposure to sexually explicit content is more than adequate. After all, that showing doesn't have to be "overwhelming"—only reasonable. *Ctr. for Fair Pub. Pol'y v. Maricopa County*, 336 F.3d 1153, 1168 (9th Cir. 2003).[3]

*Third*, Texas's interest in regulating the secondary effects of minors' exposure to sexually explicit conduct is not related to the suppression of expression. As described above, S.B. 12's regulation of sexually oriented performances is "justified

---

[3] If the Court nevertheless believes that the evidentiary record is insufficient to reverse and render, the Court should reverse and remand for further development of the evidentiary record, due to the district court's erroneous exclusion of the Attorney General's expert witness's testimony. *See Jackson v. Firestone Tire & Rubber Co.*, 788 F.2d 1070, 1080, 1090 (5th Cir. 1986) (reversing and remanding due to improper exclusion of relevant evidence at trial).

without reference to the content" of those performances, but instead is targeted at curbing their secondary effects. *Fantasy Ranch,* 459 F.3d at 554; *supra* at 28-31.

*Finally*, any restriction on expressive conduct incident to S.B. 12 is "no greater than is essential to the furtherance of" the State's interests. A regulation with incidental burdens on expressive conduct is not invalid "simply because there is some imaginable alternative that might be less burdensome on speech," *United States v. Albertini*, 472 U.S. 675, 689 (1985). Such a regulation satisfies *O'Brien's* fourth prong "so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *LLEH, Inc. v. Wichita County*, 289 F.3d 358, 369 (5th Cir. 2002) (quoting *Albertini*, 472 U.S. at 689). S.B. 12 does so.

Texas's interest in regulating the secondary effects of minors' exposure to sexually explicit conduct, sounding in public health and safety, constitutes a substantial government interest. *See Pap's A.M.*, 529 U.S. at 301; *Fantasy Ranch*, 459 F.3d at 561. And S.B. 12 does not "ban" sexually oriented performances—it merely imposes a modest age requirement for attendees. *See* Tex. Health & Safety Code § 769.002(a); Tex. Penal Code § 43.28(b)(1)-(2). It therefore leaves open plenty of "reasonable alternative avenues of communication," *Ass'n of Club Execs.*, 83 F.4th at 969: S.B. 12 does not close any "avenues of communication" to proprietors of sexually oriented performances; it only limits which customers can travel down those avenues. *Id.*

Taken together, these factors show that S.B. 12 easily survives intermediate scrutiny under *O'Brien*.[4]

**2.   S.B. 12's age-limit requirement would also survive strict scrutiny.**

Even if strict scrutiny applies, S.B. 12's age-limitation requirement satisfies that standard because it is narrowly tailored to meet the compelling governmental interest of protecting minors from sexually explicit content. Even the district court recognized that S.B. 12 serves a "compelling" governmental interest. ROA.1281. For good reason: the Supreme Court has repeatedly "recognized that there is a compelling interest in protecting the physical and psychological well-being of minors." *Sable Commc'n of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). And "[t]his interest extends to shielding minors from the influence of literature that is not obscene by adult standards." *Id.* (citing *Ginsberg v. New York*, 390 U.S. 629, 639-40 (1968)).

S.B. 12 is also narrowly tailored to achieving this interest. "A speech restriction is narrowly tailored to a compelling state interest where it does no more 'than is necessary to further' the interest." *Willey v. Harris Cnty. Dist. Att'y*, 27 F.4th 1125, 1133-34 (5th Cir. 2022) (quoting *Knowles v. City of Waco*, 462 F.3d 430, 435 (5th Cir. 2006)). And the "[t]he 'essence of narrow tailoring' is to 'focus[] on the source of the evils the [government] seeks to eliminate . . . without at the same time banning

---

[4] As this Court has observed, it is somewhat unclear whether content-neutral regulations on adult-oriented entertainment should be reviewed under "the test for time, place, or manner regulations, described in" *Renton*, instead of the four-part test from *O'Brien. LLEH*, 289 F.3d at 365. Because the *Renton* and *O'Brien* tests "are interchangeable," ultimately, there "is little, if any, differen[ce]." *Id.* at 335-36. And here, the same result obtains: S.B. 12 is constitutional under intermediate scrutiny.

or significantly restricting a substantial quantity of speech that does not create the same evils." *Id.* at 1134 (quoting *Ward*, 491 U.S. at 799 n.4). Thus, the means chosen to meet the compelling interest must be "neither seriously underinclusive nor seriously overinclusive." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 805 (2011). S.B. 12 fits this description: it does not involve a "total ban" on sexually oriented performances, *cf. Sable*, 492 U.S. at 127, but instead imposes a modest age limit on attendance at such performances. *Cf. FCC v. Pacifica Found.*, 438 U.S. 726, 744-52 (1978).

The district court appears to have concluded that S.B. 12's age-limit requirement was not narrowly tailored for three reasons. Each is wrong. *First*, the court suggested that the age-limit requirement is underinclusive because it does not contain a parental-consent exception, and "[i]f the state's compelling concern is to protect children independent of their parents, a narrowly tailored statute would possibly include punishments for a parent who takes their child to" such a performance. ROA.1282-83. But this reasoning ignores that a challenger cannot establish underinclusiveness by "point[ing] out that a state did not 'address all aspects of a problem in one fell swoop.'" *Willey*, 27 F.4th at 1134 (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015)). Instead, a court "ask[s] whether the restriction is 'riddled with exceptions' or 'so woefully underinclusive as to render belief in [its stated] purpose a challenge to the credulous.'" *Id.* (quoting *Williams-Yulee*, 575 U.S. at 449). Plaintiffs did not try to make either showing.

*Second*, the district court suggested that S.B. 12's age-limit requirement was also *overinclusive* because it does not "distinguish children by the age of a child" and "treats an older teenager the same as a much younger child." ROA.1282. Yet as the

D.C. Circuit has observed in rejecting a similar argument, "most States have laws penalizing persons who disseminate sexually explicit materials to children ages 17 and under; and several Supreme Court decisions have sustained the constitutionality of statutes protecting children ages 17 and under." *Action for Children's Television v. FCC*, 58 F.3d 654, 664 (D.C. Cir. 1995) (en banc). Thus, "[i]n light of Supreme Court precedent and the broad national consensus that children under the age of 18 need to be protected from exposure to sexually explicit materials" Texas "was fully justified in concluding that the Government interest extends to minors of all ages." *Id.*

*Third*, the district court suggested that S.B. 12 is overinclusive because it "fails to provide any affirmative defenses, such as consent by a parent or a mistake on the part of the performer." ROA.1282. Yet as described above, S.B. 12 does not penalize regulated parties for inadvertent or accidental conduct. *Supra* at 18-19. And as the district court itself recognized, inclusion of a parental-consent exception is not required for S.B. 12 to be narrowly tailored to achieve the compelling interest of protecting the physical and psychological well-being of minors. *See* ROA.1282-83. Perhaps it would be if Plaintiffs were asserting a purported constitutional right for parents to admit their children to sexually oriented performances, but Plaintiffs champion no such right—likely because they would not have standing to do so.

### 3.   S.B. 12's age-limit requirement is not unconstitutionally vague.

Plaintiffs are also wrong to argue that several of S.B. 12's definitions are void for vagueness. Such a claim, sounding in the Due Process Clause, requires Plaintiffs to show that the law "fails to provide those targeted by the statute a reasonable

opportunity to know what conduct is prohibited." *Doe I*, 909 F.3d at 116. But even when speech is involved, a law need not "delineate the exact actions a [person] would have to take to avoid liability," *id.* at 118, or give "perfect clarity and precise guidance," *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018). "[O]nly a reasonable degree of certainty is required" to survive a vagueness challenge. *United States v. Tansley*, 986 F.2d 880, 885 (5th Cir. 1993).

In holding that S.B. 12 does not comply with these standards, the district court pointed to two terms that it found vague: "prurient interest in sex" and "lewd." ROA.1290-91. But "the common understanding of the term[s] supplies a clear enough standard," *Doe I*, 909 F.3d at 117, particularly given years of accumulated precedent, *Hansen*, 599 U.S. at 778. "Prurient interest in sex" is a legal term of art whose meaning has been developed over decades. *Roth*, 354 U.S. at 487 n.20; *see Red Bluff Drive-In, Inc. v. Vance*, 648 F.2d 1020, 1026 (5th Cir. Unit A, June 1981). "[O]fficial interpretations and the historical application" of this term can shape its contours and "become limiting constructions"—even if some "discretion [is] placed in the hands of [enforcement] officials." *Doe I*, 909 F.3d at 117 (citing *Ward*, 491 U.S. at 795-96). The phrase is so common that, in the view of the Texas Court of Criminal Appeals, it need not even be defined in a jury charge. *Andrews v. State*, 652 S.W.2d 370, 376-77 (Tex. Crim. App. 1983).

Likewise, the term "lewd" is "a commonsensical term whose constitutionality was specifically upheld in *Miller v. California*, 413 U.S. 15, 25 (1973) and *Ferber*, 458 U.S. at 765." *United States v. Wiegand*, 812 F.2d 1239, 1243 (9th Cir. 1987). Indeed, *Ferber* and *Miller* specifically upheld the constitutionality of that term in the context

of the phrase "lewd exhibition of the genitals"—a phrase strikingly similar to the one in S.B. 12. *Cf.* Tex. Penal Code § 43.28(a)(1)(B). And the Texas courts have specifically held that "'lewd' has a common meaning that jurors can be fairly presumed to know and apply." *Tovar v. State*, 165 S.W.3d 785, 790 (Tex. App.—San Antonio 2005); *see also Roise v. State*, 7 S.W.3d 225, 242 (Tex. App.—Austin 1999). It is in no sense unconstitutionally vague.

### 4. S.B. 12 does not operate as a prior restraint on any First Amendment activity.

Finally, Plaintiffs err by arguing that S.B. 12 operates as a "prior restraint." ROA.61. The canonical description of a prior restraint is an "administrative [or] judicial order[ ] forbidding certain communications when issued in advance of the time that such communications are to occur." *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 550 (1993)). And prior restraints may also include "speech licensing schemes that give the licensor too much discretion in how to exercise his authority," as well as "regulations that require registration before certain types of speech." *Id.*

No part of S.B. 12 remotely operates in any of these fashions. The district court held otherwise by pointing to a provision of S.B. 12 that permits municipalities or counties to "regulate sexually oriented performances as the municipality or county considers necessary to promote the public health, safety, or welfare," Tex. Loc. Gov't Code § 243.0031(b). ROA.1292-93. Yet the Legislature's mere grant of authority to local governments to regulate a particular topic does not "forbid" Plaintiffs from doing anything, much less require them to obtain prepublication approval

or a license from any municipal or county actor before engaging in "expressive conduct." Only a later-in-time ordinance passed by a city or county under its section 243.0031(b) power could theoretically constitute a prior restraint. But because section 243.0031(b) does not, by itself, regulate Plaintiffs, it cannot operate as a prior restraint.

### C. Even if some applications of S.B. 12 regulate First Amendment activity, Plaintiffs failed to prove their *facial* challenge.

Even if Plaintiffs had shown that some applications of S.B. 12 regulate some type of "inherently expressive" First Amendment conduct, Plaintiffs failed to prove that S.B. 12 is *facially* unconstitutional.

1. "To put it mildly, pre-enforcement facial challenges to legislative acts are 'disfavored.'" *NetChoice, LLC v. Paxton*, 49 F.4th 439, 448 (5th Cir. 2022) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). In keeping with the "disfavor" attendant to such challenges, "the legal standard for them is extraordinarily high," *id.* at 449, and "the most difficult . . . to mount successfully," *City of El Cenizo v. Texas*, 890 F.3d 164, 187 (5th Cir. 2018). Typically, a plaintiff bringing a facial challenge must "'establish that no set of circumstances exists under which the Act would be valid.'" *NetChoice*, 49 F.4th at 449 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). But in the First Amendment context, the Supreme Court has recognized a second type of facial challenge—the "overbreadth" doctrine—that requires a plaintiff to show that "a substantial number of [a law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 450 (quoting *Ams. for Prosperity Found. v. Bonta*, 141

S. Ct. 2373, 2387 (2021)). "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *Hansen*, 599 U.S. at 770. "In the absence of a lopsided ratio, courts must handle unconstitutional applications as they usually do—case-by-case." *Id.*

Because the "[o]verbreadth doctrine has a 'tendency . . . to summon forth an endless stream of fanciful hypotheticals,'" the Supreme Court has instructed courts to "avoid 'speculat[ing] about "hypothetical" or "imaginary" cases'" and instead focus on "the statute's facial requirements." *NetChoice*, 49 F.4th at 452 (quoting *Wash. State Grange*, 552 U.S. at 449-50). "The Court has also instructed that the overbreadth doctrine is strong medicine that should be employed only as a last resort." *Id.* at 450 (quotations omitted).

**2.** Plaintiffs cannot prevail on their facial challenge under these "daunting" standards. *Ostrewich v. Tatum*, 72 F.4th 94, 107 (5th Cir. 2023). At the outset, Plaintiffs do not appear to "dispute that [S.B. 12's reach] encompasses a great deal of nonexpressive conduct—which does not implicate the First Amendment at all." *Hansen*, 599 U.S. at 782. Indeed, not even Plaintiffs argue that each of the definitions of "sexual conduct" in S.B. 12 regulates conduct that is *categorically* "inherently expressive." Instead, the most that Plaintiffs can speculate is that certain hypothetical applications of the statute's definition of "sexual conduct" might cover some inherently expressive conduct. But the fact that each of the statute's definitions of "sexual conduct" can be constitutionally applied to a whole host of "visual performances"—for example, ones involving "the exhibition or representation . . . of

sexual acts, including vaginal sex, anal sex, and masturbation" or of "male or female genitals" in "a state of sexual stimulation or arousal," Tex. Penal Code § 43.28(a)(1)(A), (B)—means that "the 'plainly legitimate sweep' of [S.B. 12] is extensive." *Hansen*, 599 U.S. at 782. And "in the absence of a lopsided ratio" of unconstitutional to constitutional applications, Plaintiffs must wait to bring their challenges as applied. *Id*. at 770.

The district court failed to heed these established standards. Instead of focusing on S.B. 12's text, the court speculated that S.B. 12's prohibitions might apply to "cheerleading, dancing, live theater, and other common public occurrences" and thereby sweep in "a large amount of constitutionally protected conduct." ROA.1288. These are "fanciful," not "realistic," applications of S.B. 12, *Hansen*, 599 U.S. at 770, and S.B. 12's "language renders implausible many of the[se] . . . extreme hypothesized applications of the law," *NetChoice*, 49 F.4th at 452. No evidence at trial even hinted that "cheerleading, dancing, [and] live theater," ROA.1288, is typically (or even frequently) performed in the "nude" or that it meets any of the statute's definitions of "[s]exual conduct," Tex. Penal Code § 43.28(a)(1).

Moreover, in the rare case where these commonplace activities might theoretically involve sexual conduct, they are only proscribed if they "appeal[] to the prurient interest in sex," Tex. Penal Code § 43.28(a)(2)(B). Again, the trial record is barren of any evidence that cheerleading, dancing, and theater generally "appeals to the prurient interest in sex." For good reason: cheerleading, dancing, and theater are not typically thought of as "erotic," *Ashcroft*, 535 U.S. at 579, "having a tendency to

excite lustful thoughts," *Roth*, 354 U.S. at 487 n.20, or "[c]haracterized by, exhibiting, or arousing inappropriate, inordinate, or unusual sexual desire." Black's, *supra* at 1482.

The district court did not explain why it thought cheerleading, live dancing and theater would constitute "sexual conduct" based on "the statute's facial requirements." *NetChoice*, 49 F.4th at 452. Instead, it focused on the requirement that a sexually oriented performance "appeal[] to the prurient interest in sex," Tex. Penal Code § 43.28(a)(2)(B), and held that it provides no safe harbor from a facial challenge because it does not incorporate each element of the constitutional test for obscenity, and so "it is hard [to] identify" how that clause will be applied in practice. ROA.1287-88. But the fact that that S.B. 12's definition of "sexually oriented performance" does not include each element of the obscenity test is irrelevant where, as here, the Attorney General is defending S.B. 12's constitutionality on the ground that it does not regulate any inherently expressive conduct—not on the ground that Plaintiffs' conduct involves obscene speech unprotected by the First Amendment. *Cf. Ashcroft*, 535 U.S. at 574-75 (defending federal statute regulating internet speech based on argument that it regulates obscene speech).

Nor is it a facial constitutional defect that it is "hard to predict" how the phrase "prurient interest" will be applied in the future. That is the very nature of facial constitutional challenges: the "[o]verbreadth doctrine traffics in hypotheticals," so the Court "cannot" possibly comment on "all future applications" of a statute, which "would require a crystal ball." *Hansen*, 599 U.S. at 783 n.5. Likewise, the district court's uncertainty about how enforcement actors would define the phrase

"prurient sexual interest," ROA.1287-88, was unjustified because in the mine-run of cases, courts will apply that term as case law has defined it for seven decades, *see Ashcroft*, 535 U.S. at 579; *Roth*, 354 U.S. at 487 n.20.

### D.   Any unconstitutional provisions of S.B. 12 are severable.

The district compounded its analytical errors in assessing the merits of Plaintiffs' First Amendment claim when it failed to properly apply S.B. 12's robust severability clause. *See* ROA.1272-73.

"Severability is of course a matter of state law," *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam), and Texas law gives near-dispositive weight to a severability clause, *see, e.g.*, *Builder Recovery Servs., LLC v. Town of Westlake*, 650 S.W.3d 499, 507 (Tex. 2022). In S.B. 12, the Legislature specifically provided a robust severability clause, S.B. 12, § 4, which applies here in at least two ways.

*First*, if the Court were to conclude that certain definitions of "sexual conduct" in S.B. 12 run afoul of the First Amendment (it should not), each one of the definitions of "sexual conduct" is severable from the others, so a conclusion that one definition of "sexual conduct" unconstitutionally regulates expressive conduct should not mean that all definitions do. That is because each definition applies to discrete types of conduct and would remain "complete in" themselves and "capable of being executed" independent of the other definitions. *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 215 (5th Cir. 2011) (citing *Rose v. Drs. Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990)).

*Second*, and at a minimum, Texas Local Government Code section 243.0031(b) can be severed from the age-limitation requirement in other provisions of the statute,

Tex. Health & Safety Code § 769.002(a); Tex. Penal Code § 43.28(b)(1)-(2). After all, while the latter *impose* substantive regulations on the presentation of sexually oriented performances, the former merely *grants authority to impose* substantive regulations on such performances. Here again, each of these provisions is "complete in" themselves and "capable of being executed" "independent" of each other. *Rose*, 801 S.W.2d at 844. Thus, even if one were unconstitutional, it was legal error for the district court to reflexively declare the other necessarily unconstitutional. Remand would be necessary to consider that question in the first instance. *Cf. Montano v. Texas*, 867 F.3d 540, 546 (Tex. 2017) ("[A] court of appeals sits as a court of review, not of first view.") (collecting cases).

## Conclusion

The Court should reverse the trial court's judgment and remand with instructions to dismiss Plaintiffs' claims against, or render judgment in favor of, the Attorney General.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Aaron L. Nielson
Solicitor General

Lanora C. Pettit
Principal Deputy Solicitor General

/s/ William F. Cole
William F. Cole
Assistant Solicitor General
William.Cole@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Benjamin E. Prengler
Assistant Attorney General

Counsel for Attorney General Paxton

49

## CERTIFICATE OF SERVICE

On January 9, 2024, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ William F. Cole
WILLIAM F. COLE

## CERTIFICATE OF COMPLIANCE

This document complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 12,989 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ William F. Cole
WILLIAM F. COLE