No. 23-20480

# IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

THE WOODLANDS PRIDE, INCORPORATED; ABILENE PRIDE
ALLIANCE; EXTRAGRAMS, L.L.C.; 360 QUEEN ENTERTAINMENT, L.L.C.;
BRIGITTE BANDIT,

*Plaintiffs-Appellees*,

v.

WARREN KENNETH PAXTON, IN AN OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF TEXAS; BRETT LIGON, IN AN OFFICIAL
CAPACITY AS DISTRICT ATTORNEY OF MONTGOMERY COUNTY;
MONTGOMERY COUNTY, TEXAS; JAMES HICKS, IN AN OFFICIAL
CAPACITY AS DISTRICT ATTORNEY OF TAYLOR COUNTY; TAYLOR
COUNTY, TEXAS; CITY OF ABILENE, TEXAS,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
Civil Action No. 4:23-cv-02847

## APPELLEES' BRIEF

Brian Klosterboer
Chloe Kempf
Thomas Buser-Clancy
Edgar Saldivar
Adriana Pinon
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288
(713) 942-8146

Derek R. McDonald
Maddy R. Dwertman
Katie Jeffress
BAKER BOTTS L.L.P.
401 South 1st Street, Suite 1300
Austin, TX 78704
(512) 322-2500

Brandt Thomas Roessler
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
(212) 408-2500

Travis Gray
Emily Rohles
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1234

**Attorneys for Appellees**

No. 23-20480

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

THE WOODLANDS PRIDE, INCORPORATED; ABILENE PRIDE
ALLIANCE; EXTRAGRAMS, L.L.C.; 360 QUEEN ENTERTAINMENT, L.L.C.;
BRIGITTE BANDIT,

*Plaintiffs-Appellees*,

v.

WARREN KENNETH PAXTON, IN AN OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF TEXAS; BRETT LIGON, IN AN OFFICIAL
CAPACITY AS DISTRICT ATTORNEY OF MONTGOMERY COUNTY;
MONTGOMERY COUNTY, TEXAS; JAMES HICKS, IN AN OFFICIAL
CAPACITY AS DISTRICT ATTORNEY OF TAYLOR COUNTY; TAYLOR
COUNTY, TEXAS; CITY OF ABILENE, TEXAS,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
Civil Action No. 4:23-cv-02847

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the

outcome of this case. These representations are made in order that the judges of this

court may evaluate possible disqualification or recusal.

1. Defendant-Appellant: Warren Kenneth Paxton, in an Official Capacity
   as Attorney General of Texas.

2. Counsel for Defendant-Appellant: Ken Paxton, Brent Webster, Aaron L. Nielson, Lanora C. Pettit, William F. Cole, and Benjamin E. Prengler of the Office of the Attorney General.

3. Defendants-Appellants: Brett Ligon, in an Official Capacity as District Attorney of Montgomery County; and Montgomery County, Texas.

4. Counsel for Defendants-Appellants: B. D. Griffin and Daniel Plake of the Montgomery County Attorney's Office.

5. Defendants-Appellants: James Hicks, in an Official Capacity as District Attorney of Taylor County; and Taylor County, Texas.

6. Counsel for Defendants-Appellants: Robert B. Wagstaff of McMahon Surovik Suttle, P.C.

7. Defendant-Appellant: City of Abilene, Texas.

8. Counsel for Defendant-Appellant: Ramon Gustave Viada III of Viada & Strayer.

9. Defendant: Delia Garza, in an Official Capacity as County Attorney of Travis County.

10. Counsel for Defendant Delia Garza: Leslie Dippel of the Travis County Attorney's Office.

11. Defendant: Joe D. Gonzales, in an Official Capacity as District Attorney of Bexar County.

12. Counsel for Defendant Joe D. Gonzales: Lisa V. Cubriel of the Bexar County District Attorney's Office.

13. Plaintiff-Appellees: The Woodlands Pride, Inc.; Abilene Pride Alliance; Extragrams, LLC; 360 Queen Entertainment LLC; and Brigitte Bandit.

14. Counsel for Plaintiff-Appellees: Brian Klosterboer, Chloe Kempf, Thomas Buser-Clancy, Edgar Saldivar, and Adriana Pinon of ACLU Foundation of Texas, Inc.; Derek R. McDonald, Maddy R. Dwertman, Travis Gray, Katie Jeffress, Brandt Thomas Roessler, and Emily Rohles of Baker Botts L.L.P.


Dated: April 10, 2024         */s/ Brian Klosterboer*
                                 Brian Klosterboer

                                 *Counsel for Appellees*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Fifth Circuit Rule 28.2.3 and Federal Rule of Appellate Procedure 34(a)(1), Plaintiffs submit that oral argument could be helpful to the Court because this case involves a newly enacted law that targets live performances, was held to be unconstitutional under five independent grounds by the district court, and delegates specific enforcement authority to three distinct types of government actors.

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

STATEMENT OF THE CASE ................................................................................4

    I. Text of S.B. 12 ............................................................................................4

    II. Legislative Background ..............................................................................6

    III. Procedural History ...................................................................................8

SUMMARY OF THE ARGUMENT .......................................................................9

STANDARD OF REVIEW .................................................................................15

ARGUMENT ..................................................................................................15

    I.    Plaintiffs Have Standing to Sue Defendants .......................................15

        A.    Plaintiffs Suffered Injuries-in-Fact Sufficient for a Pre-Enforcement Challenge.........................................................15

            1. Plaintiffs' Performances Are Arguably Affected with a Constitutional Interest ...........................................................16

            2. Plaintiffs' Performances Are Arguably Proscribed by the Statute................................................................................17

            3. The Attorney General's Arguments that Plaintiffs' Performances Are Not Arguably Proscribed by S.B. 12 Are Unavailing .........................................................................28

            4. Plaintiffs Face a Credible Threat of Prosecution .................39

        B.    Plaintiffs' Injuries Are Traceable to the Attorney General ..............................................................................................40

        C.    Plaintiffs Have a Ripe, Justiciable Controversy with the Local Defendants That Is Not Moot ........................................43

            1. There Is a Ripe, Justiciable Controversy .............................43

            2. Plaintiffs' Claims Are Not Moot..........................................47

    II.    Each Defendant Is Properly Named and Not Immune from Suit ..............................................................................................48

        A.    The Attorney General Is Properly Named and Not Immune .......................................................................................48

        B.    The District Attorneys Are Properly Named and Not Immune .......................................................................................49

C.     The City and County Defendants Are Properly Named and Not Immune ....................................................................52

III.    S.B. 12 Is Not Severable ....................................................59

IV.    S.B. 12 Violates the First and Fourteenth Amendments....................63

    A.     Plaintiffs' Performances Are Inherently Expressive and Subject to First Amendment Protections ...................................63

    B.     S.B. 12 Is an Unconstitutional Prior Restraint..........................68

    C.     S.B. 12 Is Unconstitutionally Vague .......................................70

    D.     S.B. 12 Is Unconstitutionally Overbroad.................................75

    E.     S.B. 12 Is an Unconstitutional Content- and Viewpoint-Based Restriction ....................................................................80

    1. S.B. 12 Targets the Content of Performances.......................80

    2. S.B. 12 Also Discriminates Based on Viewpoint ................83

    3. The Attorney General's Attempts to Evade Strict Scrutiny Fail........................................................................86

    4. S.B. 12 Fails Any Level of Scrutiny ....................................99

V.    Plaintiffs Established the Remaining Factors Required for Injunctive Relief..............................................................103

VI.    The District Court Did Not Abuse Its Discretion by Deferring a Decision on Attorneys' Fees and Costs ...........................................104

CONCLUSION ............................................................................105

CERTIFICATE OF SERVICE .......................................................107

CERTIFICATE OF COMPLIANCE ................................................108

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Action for Children's Television v. F.C.C.*,
  58 F.3d 654 (D.C. Cir. 1995)............................................................102

*Anderson v. City of Hermosa Beach*,
  621 F.3d 1051 (9th Cir. 2010) ...........................................................67

*Andrews v. State*,
  652 S.W.2d 370 (Tex. Crim. App. 1983) ..........................................73

*Arnone v. Dallas Cnty.*,
  29 F.4th 262 (5th Cir. 2022) ..............................................................55

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002)..............................................................76, 80, 97

*Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas*,
  83 F.4th 958 (5th Cir. 2023) .................................................92, 95, 103

*Baby Dolls Topless Saloons, Inc. v. City of Dallas*,
  295 F.3d 471 (5th Cir. 2002) .............................................................95

*Barnes v. Glen Theatre, Inc.*,
  501 U.S. 560 (1991)............................................................................65

*Bigford v. Taylor*,
  834 F.2d 1213 (5th Cir. 1988) ...........................................................55

*Book People, Inc. v. Wong*,
  91 F.4th 318 (5th Cir. 2024) ..................................................40, 63, 68

*Boos v. Barry*,
  485 U.S. 312 (1988)................................................................81, 87, 89

*Brewster v. City of Los Angeles*,
  672 F. Supp. 3d 872 (C.D. Cal. 2023) ..............................................56

*Brnovich v. Democratic Nat'l Comm.*,
  141 S. Ct. 2321 (2021).......................................................................82

*Brown v. Ent. Merchants Ass'n*,
  564 U.S. 786 (2011) ...................................................................*passim*

*Builder Recovery Servs., LLC v. Town of Westlake*,
  650 S.W.3d 499 (Tex. 2022), *reh'g denied* (Sept. 2, 2022) ..............60

*Builder Recovery Servs. LLC v. Town of Westlake*,
  No. 02-20-00051-CV, 2023 WL 3878446 (Tex. App.—Fort Worth
  June 8, 2023, no pet.) ........................................................................60

*Buquer v. City of Indianapolis*,
  No. 1:11-CV-00708-SEB, 2013 WL 1332158 (S.D. Ind. Mar. 28,
  2013) ..................................................................................................48

*Butler v. State of Mich.*,
  352 U.S. 380 (1957) .........................................................................100

*Cabrol v. Town of Youngsville*,
  106 F.3d 101 (5th Cir. 1997) ..............................................................66

*Cath. Leadership Coal. of Tex. v. Reisman*,
  764 F.3d 409 (5th Cir. 2014) ..............................................................69

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021) ............................................................................42

*Cheffer v. Reno*,
  55 F.3d 1517 (11th Cir. 1995) ............................................................44

*City of Austin v. Paxton*,
  943 F.3d 993 (5th Cir. 2019) ..............................................................58

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022) ..............................................................................90

*City of Erie v. Pap's A.M.*,
  529 U.S. 277 (2000) ......................................................................82, 95

*City of Los Angeles v. Alameda Books, Inc.*,
  535 U.S. 425 (2002) ..........................................................91, 92, 103

*City of Renton v. Playtime Theatres, Inc.*,
  475 U.S. 41 (1986) ..............................................................................91

*City of San Antonio, Texas v. Hotels.com, L. P.*,
593 U.S. 330 (2021)..................................................................105

*Coleman v. Governor of Mich.*,
413 Fed. App'x. 866 (6th Cir. 2011) .....................................48

*Coleman v. Houston Indep. Sch. Dist.*,
113 F.3d 528 (5th Cir. 1997) ...................................................58

*Connick v. Thompson*,
563 U.S. 51 (2011)....................................................................58

*Consumer Data Indus. Ass'n v. Tex. through Paxton*,
No. 21-51038, 2023 WL 4744918 (5th Cir. July 25, 2023) (per
curiam) .............................................................................43, 44

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
779 F.3d 258 (5th Cir. 2015) ...................................................29

*Cooper v. Dillon*,
403 F.3d 1208 (11th Cir. 2005) ...............................................56

*Crane v. Texas*,
759 F.2d 412 (5th Cir. 1985) ...................................................55

*Daves v. Dallas Cnty.*,
22 F.4th 522 (5th Cir. 2022) (en banc) ..................................55

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019)..............................................................40

*DIRECTV, Inc. v. Budden*,
420 F.3d 521 (5th Cir. 2005) ...................................................78

*Doe I v. Landry*,
909 F.3d 99 (5th Cir. 2018) ...............................................72, 73

*Dow Chem. Co. v. Bright*,
89 S.W.3d 602 (Tex. 2002)......................................................41

*Echols v. Parker*,
909 F.2d 795 (5th Cir. 1990) ...........................................53, 55

*Erznoznik v. City of Jacksonville*,
   422 U.S. 205 (1975)................................................................87, 96

*Esteves v. Brock*,
   106 F.3d 674 (5th Cir. 1997) ...............................................49

*Evers v. Custer Cnty.*,
   745 F.2d 1196 (9th Cir. 1984) .............................................56

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
   545 U.S. 546 (2005)...........................................................82

*F.C.C. v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012)...........................................................74

*F.C.C v. Pacifica Found.*,
   438 U.S. 726 (1978)...........................................................102

*Familias Unidas v. Briscoe*,
   619 F.2d 391 (5th Cir. 1980) ...............................................55

*Fantasy Ranch, Inc. v. City of Arlington*,
   459 F.3d 546 (5th Cir. 2006) .........................................86, 90

*Fla. Pawnbrokers & Secondhand Dealers Ass'n, Inc. v. City of Fort
   Lauderdale*,
   699 F. Supp. 888 (S.D. Fla. 1988) .......................................57

*Ford v. Potter*,
   354 F. App'x 28 (5th Cir. 2009) (per curiam) .....................94

*Forsyth Cty. v. Nationalist Movement*,
   505 U.S. 123 (1992).......................................................69, 83

*Free Speech Coal. v. Paxton*,
   95 F.4th 263 (5th Cir. 2024) ......................................97, 98, 99

*Friends of Georges, Inc. v. Mulroy*,
   675 F. Supp. 3d 831 (W.D. Tenn. 2023) .............................101

*FW/PBS, Inc. v. City of Dallas*,
   493 U.S. 215 (1990)...........................................................69

*Galassini v. Town of Fountain Hills*,
No. CV-11-02097-PHX-JAT, 2013 WL 5445483 (D. Ariz. Sept.
30, 2013) ...............................................................................................56

*Ginsberg v. New York*,
390 U.S. 629 (1968)................................................................*passim*

*Harris Cnty. v. CarMax Auto Superstores Inc.*,
177 F.3d 306 (5th Cir. 1999) ...............................................................47

*HM Fla.-ORL, LLC v. Griffin*,
No. 6:23-cv-950, 2023 WL 4157542 (M.D. Fla. June 23, 2023),
*appeal filed*, No. 23-12160 (11th Cir. June 28, 2023).......................29

*Hollis v. Lynch*,
827 F.3d 436 (5th Cir. 2016) ...............................................................61

*Hudson v. City of New Orleans*,
174 F.3d 677 (5th Cir. 1999) ...............................................................49

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995)..............................................................................66

*Iancu v. Brunetti*,
588 U.S. 388 (2019)........................................................................83, 85

*Jett v. Dallas Indep. Sch. Dist.*,
491 U.S. 701 (1989)..............................................................................53

*Johnson Cnty. Sheriff's Posse, Inc. v. Endsley*,
926 S.W.2d 284 (Tex. 1996) ...............................................................42

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952)..............................................................................64

*Kolender v. Lawson*,
461 U.S. 352 (1983)..............................................................................75

*Lewis v. Scott*,
28 F.4th 659 (5th Cir. 2022) ................................................................51

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..............................................................................15

*Matal v. Tam,*
    582 U.S. 218 (2017).................................................................83, 85

*McMillian v. Monroe Cnty.,*
    520 U.S. 781 (1997).................................................................55

*Miller v. California,*
    413 U.S. 15 (1973)..............................................................*passim*

*Monell v. Dep't of Soc. Servs. of City of New York,*
    436 U.S. 658 (1978)...........................................................*passim*

*Morris v. Livingston,*
    739 F.3d 740 (5th Cir. 2014) ...................................................52

*N.Y. Republican State Comm. v. SEC,*
    799 F.3d 1126 (D.C. Cir. 2015)................................................52

*Nat'l Fed'n of the Blind Tex., Inc. v. Abbott,*
    647 F.3d 202 (5th Cir. 2011) ...................................................59

*Nat'l Press Photographers Ass'n v. McCraw,*
    90 F.4th 770 (5th Cir. 2024) ..............................................*passim*

*Ohio C.R. Comm'n v. Dayton Christian Sch., Inc.,*
    477 U.S. 619 (1986)................................................................44

*Opulent Life Church v. City of Holly Springs,*
    697 F.3d 279 (5th Cir. 2012) .................................................104

*Ostrewich v. Tatum,*
    72 F.4th 94 (5th Cir. 2023) .....................................................51

*Pembaur v. City of Cincinnati,*
    475 U.S. 469 (1986)..........................................................57, 58

*Peterson v. City of Fort Worth,*
    588 F.3d 838 (5th Cir. 2009) ..................................................58

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992)................................................................80

*Red Bluff Drive-In, Inc. v. Vance*,
  648 F.2d 1020 (5th Cir. Unit A June 1981) ..................................................72

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ..................................................................................*passim*

*Reno v. Am. C.L. Union*,
  521 U.S. 844 (1997) ..................................................................................*passim*

*Rios v. Blackwelder*,
  No. CV H-13-3457, 2016 WL 8794467 (S.D. Tex. Apr. 27, 2016) ................105

*Roark & Hardee LP v. City of Austin*,
  522 F.3d 533 (5th Cir. 2008) .................................................................71, 75

*Roise v. State*,
  7 S.W.3d 225 (Tex. App.—Austin 1999, pet. ref'd) .........................................74

*Roman Cath. Diocese v. Cuomo*,
  592 U.S. 14 (2020) .........................................................................................104

*Rose v. Drs. Hosp.*,
  801 S.W.2d 841 (Tex. 1990) ..............................................................59, 60, 61

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) .........................................................................................83

*Roth v. United States*,
  354 U.S. 476 (1957) .........................................................................................80

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006) ...........................................................................................66

*Sable Commc'ns of California, Inc. v. F.C.C.*,
  492 U.S. 115 (1989) ...............................................................................11, 65, 97

*Sandifer v. Hoyt Archery, Inc.*,
  907 F.3d 802 (5th Cir. 2018) ...........................................................................94

*Schad v. Borough of Mount Ephraim*,
  452 U.S. 61 (1981) ....................................................................................64, 88

*Schenck v. Pro-Choice Network of Western New York*,
  519 U.S. 357 (1997)................................................................88

*Se. Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975).............................................................63, 65, 69

*Seals v. McBee*,
  898 F.3d 587 (5th Cir. 2018), *as revised* (Aug. 9, 2018) ..................................76

*Sierra Club v. United States Env't Prot. Agency*,
  939 F.3d 649 (5th Cir. 2019) ......................................................15

*Slaven v. Engstrom*,
  710 F.3d 772 (8th Cir. 2013) ......................................................57

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) .................................................*passim*

*State v. Stephens*,
  663 S.W.3d 45 (Tex. Crim. App. 2021) ..........................................51

*Surplus Store & Exch., Inc. v. City of Delphi*,
  928 F.2d 788 (7th Cir. 1991) ....................................................56, 57

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)..........................................................28, 29, 34, 43

*Tex. Democratic Party v. Abbott*,
  978 F.3d 168 (5th Cir. 2020) ....................................................52

*Tex. Ent. Ass'n, Inc. v. Hegar*,
  10 F.4th 495 (5th Cir. 2021) ....................................................65, 81

*Thomas v. Union Carbide Agric. Prods. Co.*,
  473 U.S. 568 (1985)..............................................................44

*Tovar v. State*,
  165 S.W.3d 785 (Tex. App.—San Antonio 2005, no pet.) ..............................74

*Turner Broad. Sys., Inc. v. F.C.C.*,
  512 U.S. 622 (1994)..............................................................86

*Turtle Island Foods, S.P.C. v. Strain*,
    65 F.4th 211 (5th Cir. 2023) ........................................................*passim*

*United Scaffolding, Inc. v. Levine*,
    537 S.W.3d 463 (Tex. 2017) ........................................................42

*United States v. Edwards*,
    231 F.3d 933 (5th Cir. 2000) ........................................................36

*United States v. Hansen*,
    599 U.S. 762 (2023) ........................................................38, 79

*United States v. O'Brien*,
    391 U.S. 367 (1968) ........................................................82, 102, 103

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ........................................................*passim*

*United States v. Richards*,
    755 F.3d 269 (5th Cir. 2014) ........................................................82

*United States v. Stevens*,
    559 U.S. 460 (2010) ........................................................75

*United States v. Tansley*,
    986 F.2d 880 (5th Cir. 1993) ........................................................72

*United States v. Wiegand*,
    812 F.2d 1239 (9th Cir. 1987) ........................................................74

*United States v. Williams*,
    553 U.S. 285 (2008) ........................................................70

*Valentine v. Collier*,
    993 F.3d 270 (5th Cir. 2021) ........................................................15

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) ........................................................70

*Villas at Parkside Partners v. City of Farmers Branch*,
    726 F.3d 524 (5th Cir. 2013) ........................................................60

*Virginia v. Hicks,*
  539 U.S. 113 (2003)...........................................................................76

*Vives v. City of New York,*
  524 F.3d 346 (2d Cir. 2008) .....................................................56, 57

*W. Hills Bowling Ctr., Inc. v. Hartford Fire Ins. Co.,*
  412 F.2d 563 (5th Cir. 1969) ..........................................................42

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989)...................................................................64, 90

*Whole Woman's Health v. Jackson,*
  595 U.S. 30 (2021)...............................................................*passim*

*Wilcox v. Wild Well Control, Inc.,*
  794 F.3d 531 (5th Cir. 2015) ..........................................................62

*Woodlands Pride, Inc. v. Paxton,*
  No. 4:23-cv-02847, Dkt. 103 (S.D. Tex. Oct. 20, 2023)....................9

*Woodlands Pride, Inc. v. Paxton,*
  No. 4:23-cv-02847, Dkt. 105 (S.D. Tex. Oct. 24, 2023)....................9

*Young Conservatives of Tex. Found. v. Smatresk,*
  73 F.4th 304 (5th Cir. 2023) ..........................................................16

**Statutes**

42 U.S.C. § 1988 ...............................................................................104

Tex. Bus. & Com. Code §102.051(1) .................................................5, 33

Tex. Civ. Prac. & Rem. Code § 129B.001(6)........................................98

Tex. Loc. Gov't Code § 87.011(3)(B) ............................................39, 51

Tex. Penal Code § 6.02 ........................................................................38

Tex. Penal Code § 6.03 ........................................................................39

Tex. Penal Code § 7.02 ..........................................................................6

Tex. Penal Code § 12.21 .........................................................................6

Tex. Penal Code § 43.21 ........................................................4

Tex. Penal Code § 43.23 ....................................................4, 93

Tex. Penal Code § 43.24 ....................................................4, 93

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ....................................36, 41

MERRIAM-WEBSTER (Mar. 26, 2024), https://www.merriam-
    webster.com/dictionary/feature ........................................33

Fed. R. Civ. P. 54(d) ........................................................104

Hearing on S.B. 12 before the S. Comm. on State Affairs, 88th Leg.,
    R.S. (Mar. 23, 2023), http://tinyurl.com/5nrwmbuf .......................93

Hearing on S.B. 12 before the Texas Senate, 88th Leg., R.S. (April 4,
    2023), https://tinyurl.com/ef7u5w2u ....................................7

LGBTQIA+ 101, GENDER+ SEXUALITY RESOURCE CENTER,
    https://www.gsrc.princeton.edu/lgbtqia-101 ............................24

In 2023, the Texas Legislature decided that drag performances are disfavored speech and passed Senate Bill 12 (S.B. 12) to drive those performances from public view. This aim was made explicit in the bill's official statement of intent, which singled out as the law's motivation a purported "recent cultural trend . . . for drag shows to be performed in venues generally accessible to the public, including children." ROA.573, 597.

Eschewing narrow means to achieve this impermissible aim, S.B. 12 sweeps broadly in scope and draconianly in enforcement. The act creates a new category of disfavored speech called "sexually oriented performances" that is expansive enough to encompass many theater, ballet, and cheerleading performances and is so vague that no reasonable person could understand where the line of impermissible conduct begins and ends.

S.B. 12 divides its enforcement scheme among three types of government actors. It tasks the Attorney General with fining and enjoining commercial enterprises that host "sexually oriented performances" in the presence of anyone under the age of 18; it forbids counties and municipalities from authorizing such performances on public property, regardless of whether minors are present, and anywhere at all if minors are present; and it creates a criminal penalty enforced by district and county attorneys for anyone who gives a proscribed performance,

punishable by up to a year in jail.

Plaintiffs in this case are a drag artist, two small businesses, and two civic organizations that host drag performances.[1] Because every aspect of S.B. 12 arguably proscribes their performances, Plaintiffs brought a pre-enforcement challenge before the law took effect. Following a two-day trial, the district court issued a thorough and well-reasoned opinion finding that Plaintiffs have standing; sued the proper defendants who are not immune from suit; and succeeded on the merits because S.B. 12 violates Plaintiffs' constitutional rights under five independent grounds: (1) prior restraint, (2) vagueness, (3) overbreadth, (4) content discrimination, and (5) viewpoint discrimination.

Far from "disclaim[ing] any desire to engage in conduct falling within the statutory definition[s]" of the act, AG Br. 8 (emphasis omitted), Plaintiffs established at trial that their performances are arguably proscribed by every aspect of S.B. 12. Even though Plaintiffs do not believe their performances are "highly sexualized"— an undefined term absent from the statute that the Attorney General repeatedly invokes—their performances include, for instance, performers wearing breastplates and packers[2] to exaggerate male or female sexual characteristics, costumes that may

---

[1]    Drag is a type of "performance art" that involves "the overdramatization of a character or a gender." ROA.1374:24-25. Drag artists create an "illusion[]" of performing as someone they are not, including "celebrity lookalikes" or presenting as a gender different from (or the same as) their sex assigned at birth. ROA.1374:25-1375:3.

[2]    A packer "give[s] the appearance of a penis" beneath someone's clothing, ROA.1453:9-11, and is used to present the "illusion" that a performer is male. ROA.1391:4-10.

expose parts of performers' buttocks, and dance moves that involve close contact between performers. Even if Plaintiffs do not subjectively intend for their drag shows to "appeal[] to the prurient interest in sex," the plain text of S.B. 12 still **arguably** proscribes their performances and chills their speech, which is a critical element in establishing injury-in-fact in a First Amendment pre-enforcement challenge.

The district court correctly found all Plaintiffs have standing and all Defendants are properly named and not immune from suit. The City of Abilene, Taylor County and its District Attorney, and Montgomery County and its District Attorney (collectively, "Local Defendants") complain that they are not properly named because they have not yet enforced S.B. 12 against Plaintiffs, but this is a pre-enforcement challenge to a newly enacted law. All Defendants have a specific statutory duty to enforce this new law; and under this Court's precedent, they are not immune from a pre-enforcement challenge for injunctive and declaratory relief. And, even if certain Defendants are not properly subject to suit, so long as there is one Defendant that allows the Court to reach the merits, it is proper to declare the entirety of S.B. 12 unconstitutional because the law is not severable.

On the merits, the Attorney General rewrites S.B. 12 to claim that the statute regulates only "graphic sexually explicit conduct." AG Br. 1. But S.B. 12's plain text forbids vast amounts of constitutionally shielded expression far beyond this narrow

reading. Critically, existing Texas laws already prohibit the kind of "highly sexualized" performances that the Attorney General invokes because obscene performances and those harmful to minors are already banned in Texas.[3] But, unlike those existing laws, S.B. 12 discards the guardrails required by *Miller v. California*'s well-established balancing of First Amendment rights and state interest in regulating obscenity, 413 U.S. 15 (1973), as well as the state's interest in regulating obscenity for minors, established in *Ginsberg v. New York*, 390 U.S. 629 (1968).[4] This renders S.B. 12 unconstitutional on multiple grounds. As the district court correctly held, S.B. 12 is an unconstitutional prior restraint, is vague and overbroad, and impermissibly targets the content and viewpoint of performances without meeting strict scrutiny. Because the Attorney General's arguments do not disturb these findings—and no other Appellant defends the constitutionality of S.B. 12—the district court's decision should be affirmed.

## STATEMENT OF THE CASE

### I. Text of S.B. 12

S.B. 12 creates a new category of disfavored speech called "sexually oriented performance." ROA.169-72. The act defines this category as a "visual performance"

---

[3]     *See, e.g.*, Tex. Penal Code § 43.21 (defining "obscenity"); Tex. Penal Code § 43.23 (prohibiting obscenity, including obscene performances); Tex. Penal Code § 43.24 (prohibiting the sale, distribution, or display of harmful material to minors).

[4]     On appeal, the Attorney General expressly disclaims defending S.B. 12 on the grounds that Plaintiffs' performances "involve[] obscene speech unprotected by the First Amendment." AG Br. 46.

that (A) features (i) a performer who is nude or (ii) a performer who engages in "sexual conduct;" and (B) appeals to the prurient interest in sex. ROA.172.

The law does not define "prurient interest in sex," and it borrows a definition of "nude" from the Texas Business and Commerce Code, ROA.172, which includes anyone who is "entirely unclothed" or "clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks." Tex. Bus. & Com. Code § 102.051(1).

S.B. 12 proscribes five categories of "[s]exual conduct" during performances: (1) "the exhibition or representation, actual or simulated, of sexual acts, including vaginal sex, anal sex, and masturbation;" (2) "the exhibition or representation, actual or simulated, of male or female genitals in a lewd state, including a state of sexual stimulation or arousal;" (3) "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals;" (4) "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person;" and (5) "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics." ROA.171.

Section 1 of S.B. 12 authorizes the Attorney General to seek a fine of up to $10,000 and injunctive relief against any "person who controls the premises of a

commercial enterprise" where a sexually oriented performance is performed "on the premises in the presence of an individual younger than 18 years of age." ROA.169-70.

Section 2 states that municipalities and counties "may not authorize a sexually oriented performance: (1) on public property; or (2) in the presence of an individual younger than 18," and it grants local governments the authority to "regulate" all such performances, regardless of their audience or where they occur. ROA.170-71.

Section 3 creates a criminal offense for any person who "engages in a sexually oriented performance: (1) on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child; or (2) in the presence of an individual younger than 18." ROA.171-72. This is a Class A misdemeanor punishable by up to a year in jail, a fine not to exceed $4,000, or both. ROA.172; Tex. Penal Code § 12.21. Texas law criminalizes anyone who "solicits, encourages, directs, aids, or attempts to aid" S.B.12's criminal offense. Tex. Penal Code § 7.02.

## II. Legislative Background

In enacting S.B. 12, the Texas Legislature wrote in the official statement of intent that the law is aimed at addressing a "recent cultural trend . . . for drag shows to be performed in venues generally accessible to the public, including children." ROA.573, 597. The statement explains: "While drag shows have received the most media attention, S.B. 12 is not limited to this type of sexually oriented

performance . . . S.B. 12 applies to and will protect children from sexually oriented performances in general." ROA.573, 597. The bill analysis before the Texas House of Representatives further cited as the impetus for the law a specific drag performance in Plano, Texas where parents brought a child to a brunch and a performer lifted their skirt while fully clothed underneath as a song containing explicit lyrics played in the background. ROA.583, 601-05.

The Lieutenant Governor announced S.B. 12 as a top legislative priority and stated that it would "Ban[] Children's Exposure to Drag Shows." ROA.622-23. Other lawmakers similarly expressed their intent to target and prohibit drag shows. *See* ROA.634-40. When introducing S.B. 12, its author, Senator Bryan Hughes, said that "[c]hildren should not be exposed to sexually explicit performances like drag shows. I presented SB 12 . . . today to the State Affairs Committee to protect kids from these shows." ROA.625. Senator Hughes acknowledged that the Legislature considered and rejected incorporating the three-part test for obscenity from *Miller*, 413 U.S. at 24, into the law. *See* Hearing on S.B. 12 before the Texas Senate, 88th Leg., R.S. at 7:20 (April 4, 2023), https://tinyurl.com/ef7u5w2u.

After signing the bill into law, Governor Greg Abbott declared, "Texas Governor Signs Law Banning Drag Performances in Public. That's right." ROA.620.

## III. Procedural History

Plaintiffs in this case are Brigitte Bandit ("Bandit"), a drag performer who resides in Travis County; 360 Queen Entertainment ("360 Queen"), a drag production company in Bexar County; Extragrams ("Extragrams"), a drag production business in Travis County; The Woodlands Pride ("TWP"), a nonprofit in Montgomery County; and Abilene Pride Alliance ("APA"), a nonprofit in Taylor County. Plaintiffs filed this lawsuit to declare S.B.12 unconstitutional and to enjoin the Attorney General and seven other Defendants from enforcing it against them. ROA.20-64.

Following a consolidated preliminary injunction hearing and trial on the merits, the district court declared S.B. 12 unconstitutional and permanently enjoined Defendants from enforcing it. ROA.1240-95. The court made extensive findings of fact on standing and determined that "all Plaintiffs partake in conduct arguably proscribed by S.B. 12," and would be harmed if the law takes effect. ROA.1265-72. The court held that all Defendants are properly named and not immune because "the Defendants all have some role to play in enforcing S.B. 12." ROA.1264-65.

The court found S.B. 12 to be unconstitutional under five independent grounds and determined that "the impending chilling effect S.B. 12 will have is an irreparable injury which favors enjoining" the law. ROA.1293. Because "the infringement of the Plaintiffs' First Amendment rights and the impending chilling effect S.B. 12 will

have on speech in general outweigh[] any hardship on the State of Texas," the court permanently enjoined all eight Defendants from enforcing S.B. 12. ROA.1294-95.

Six of eight Defendants appealed the district court's decision. ROA.1296-98 (Attorney General); Dkt. 27 (Montgomery County and District Attorney Ligon); Dkt. 28 (Taylor County and District Attorney Hicks); Dkt. 36 (Abilene). The Attorney General asked both the district court and this Court to stay the injunction pending appeal. ROA.1299-1323; Dkt. 42. The district court denied the Attorney General's motion. *Woodlands Pride, Inc. v. Paxton*, No. 4:23-cv-02847, Dkt. 103 (S.D. Tex. Oct. 20, 2023). On February 20, this Court similarly declined to issue a stay, instead carrying the motion with the case. Dkt. 91-1. The district court also deferred ruling on any future motions for costs or attorneys' fees until 30 days after the conclusion of this appeal. *Woodlands Pride, Inc. v. Paxton*, No. 4:23-cv-02847, Dkt. 105 (S.D. Tex. Oct. 24, 2023).

## SUMMARY OF THE ARGUMENT

The district court correctly found Plaintiffs have standing to bring this pre-enforcement challenge, all Defendants are properly named and not immune, and S.B. 12 is unconstitutional under five independent grounds.

The Attorney General's standing arguments misapply the test for First Amendment pre-enforcement challenges and misconstrue the trial record by distorting the testimony of several Plaintiffs, who never "disclaimed any desire to

9

engage in conduct falling within the statutory definition[s]" of S.B. 12. AG Br. 8 (emphasis omitted). Because terms like "sexual" and "prurient interest" are subjective and undefined, Plaintiffs testified that their performances are "arguably proscribed" by every aspect of S.B. 12. In this pre-enforcement context, Plaintiffs need not establish that they "openly intend[] to violate the Act" or that their interpretation of the statute is the "**best** interpretation, the test doesn't require that." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 217-18 (5th Cir. 2023). Plaintiffs must show only that their performances are **arguably** proscribed, which is readily established by the trial record.

The Attorney General also argues that Plaintiffs' injuries are not traceable to his civil enforcement authority under Section 1 of S.B. 12, but he fails to dispute the clear causal chain that his enforcement triggers against every Plaintiff whose performances will be banned at commercial enterprises. Some Plaintiffs also "control" the premises where their drag shows occur and, therefore, are arguably subject to direct enforcement by the Attorney General.

While two Defendants did not appeal—including one who enforces both Sections 2 and 3 of the law[5]—two counties, one city, and two prosecutors appeal

---

[5]     The Travis County Attorney is charged with enforcing Sections 2 and 3 of S.B. 12 and did not appeal the district court's order and injunction. *See* ROA.1079-80 (noting that the Travis County municipal code specifically authorizes the County Attorney to bring suit to enforce the section of the Local Government Code amended by Section 2, in addition to the County Attorney's role prosecuting misdemeanors).

solely on jurisdictional grounds. Despite being statutorily tasked with enforcing S.B. 12, the Local Defendants contend they are immune from this suit for prospective injunctive relief, Plaintiffs' claims are not ripe, and Plaintiffs lack standing. These arguments are foreclosed by binding case law on *Ex parte Young*, ripeness, and standing from this Court and the Supreme Court, which routinely allow plaintiffs to bring pre-enforcement First Amendment challenges against government actors tasked with enforcing new laws. The Counties and Abilene raise an additional concern that because they have not yet enforced S.B. 12 against Plaintiffs, there is not yet a final policy or policymaker for purposes of municipal liability, but that argument is not grounded in controlling precedent and does not render them immune. Thus, all Defendants are properly named and not immune from suit.

Only the Attorney General defends the merits of S.B. 12. He contends the law applies only to "highly sexualized conduct" that falls beyond the First Amendment's protective scope, but the text of S.B. 12 itself applies only to **performances** that have long been shielded by the First Amendment. The Attorney General does not dispute the district court's factual findings that **Plaintiffs'** performances are inherently expressive. Instead, he asserts that some conduct hypothetically impacted by S.B. 12 might not be constitutionally protected, but he ignores established precedent that even performances that are "indecent but not obscene" remain shielded by the First Amendment. *See, e.g.*, *Sable Commc'ns of California, Inc. v.*

*F.C.C.*, 492 U.S. 115, 126 (1989). Accordingly, the district court's five independent reasons for striking down S.B. 12 should be affirmed.

First, the Attorney General belatedly challenges the district court's finding that Section 2 of S.B. 12 operates as an unconstitutional prior restraint, and his arguments raised for the first time on appeal are waived. Section 2 is a prior restraint because the law prohibits all "sexually oriented performances" on public property, even solely among adults, while also granting unbridled authority to counties and municipalities to "regulate" these performances for all audiences in any location, including people's homes.

Second, the district court correctly held the law is unconstitutionally vague. Where, as here, a statute infringes on free speech and imposes criminal penalties, it is subject to a heightened vagueness standard. S.B. 12 readily fails this test because, among other key terms, the prohibition on "appeal[ing] to the prurient interest in sex" does not provide reasonable notice of what kind of performances are proscribed and will lead to arbitrary and discriminatory enforcement. Although the Attorney General argues that "the prurient interest in sex" is defined in case law, that precedent explicitly incorporates the three-part test for obscenity, and obscenity for minors, established in *Miller*, 413 U.S. at 24, and *Ginsberg*, 390 U.S. at 633. In crafting S.B. 12, the Legislature specifically rejected incorporating the guardrails

those cases require, so the free-roaming "prurient interest" standard in S.B. 12 is unconstitutionally vague when divorced from its broader context.

Third, the district court correctly concluded S.B. 12 is unconstitutionally overbroad because it sweeps within its orbit huge swaths of constitutionally protected performances compared with those that are within the government's power to regulate. S.B. 12's overbreadth is underscored by its considerable departure from *Miller* and *Ginsberg*. Those cases require safeguards to prevent the unconstitutional suppression of speech, including requiring that potentially censored works be evaluated as a whole based on a reasonable person standard, be patently offensive, and receive an exception for significant artistic, scientific, or other value. S.B. 12 lacks each of these protections and sweepingly prohibits a broad range of performances.

Fourth and fifth, S.B. 12 also facially discriminates based on content and viewpoint and fails strict scrutiny. The Texas Legislature's "overriding justification for the regulation is [a purported] concern for the effect of the subject matter on young viewers." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 811 (2000). The law's stated purpose is to "protect children from sexually oriented performances," including "drag shows." ROA.573, 597. Preventing minors from seeing certain performances based on their content and viewpoint is the **primary** purpose of S.B. 12—not a secondary effect—and the Attorney General's attempts

to sidestep strict scrutiny fail. Because the law explicitly targets content and does not leave open sufficient alternative channels for performances, it is also not a content-neutral time, place, or manner restriction.

Although no one disputes that protecting minors from harm is a valid state interest,[6] S.B. 12 is wildly overinclusive in relation to this interest. Among other infirmities, it contains no exception for parents who seek to take minors to a performance; it has no *mens rea* for its civil penalties; there is no affirmative defense for performers who experience wardrobe malfunctions (which the Attorney General said at trial would be prosecuted under the law, ROA.1734:18-1735:25); it contains no exception for performances with artistic or other value; it does not require that performances be evaluated as a whole or under a reasonable person standard; it bans all performances on public property even when performed solely among adults; and it treats 17-year-olds the same as 5-year-olds with no room to differentiate based on age. Thus, the statute fails strict and even intermediate scrutiny.

S.B. 12 is an unconstitutional attempt to suppress speech under all five grounds found by the district court, and this Court may affirm on any ground. Because the law is not severable, the Court should affirm that the entirety of S.B. 12

---

[6] On this point, Plaintiffs agree with the separate writing regarding the motion to stay, Dkt. 91-1 at 3 (Ho, J.); however, this valid interest "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011). As further discussed below, the government may not suppress free speech based solely on what might "appeal[] to the prurient interest in sex" divorced from the other constitutional safeguards that *Miller* and *Ginsberg* require. *See infra* Section IV.B-E.3.

is unconstitutional, even if its decision does not reach every Defendant or every provision of the law.

<h2 style="text-align:center">STANDARD OF REVIEW</h2>

A permanent injunction is reviewed for abuse of discretion. *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021). A district court abuses its discretion when it "(1) 'relies on clearly erroneous factual findings' or 'erroneous conclusions of law' when deciding to grant the injunction, or (2) 'misapplies the factual or legal conclusions when fashioning its injunctive relief.'" *Id.* (citation omitted).

<h2 style="text-align:center">ARGUMENT</h2>

## I.  Plaintiffs Have Standing to Sue Defendants

The district court correctly found that Plaintiffs have Article III standing because Plaintiffs demonstrated (1) an injury in fact that is (2) fairly traceable to Defendants' actions, and (3) likely to be redressed by a favorable decision. *See Turtle Island Foods*, 65 F.4th at 215 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Although the presence of "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," *Sierra Club v. United States Env't Prot. Agency*, 939 F.3d 649, 664-65 (5th Cir. 2019) (citation omitted), all Plaintiffs satisfy every element necessary to establish standing.

### A. Plaintiffs Suffered Injuries-in-Fact Sufficient for a Pre-Enforcement Challenge

All parties agree that, in this pre-enforcement free speech challenge, "chilled

speech or self-censorship is an injury sufficient to confer standing." *Turtle Island Foods*, 65 F.4th at 215 (citation omitted).[7] Plaintiffs "need not have experienced an actual arrest, prosecution, or other enforcement action," *id.* (cleaned up), especially since "standing rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief," *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir. 2024) (citation omitted). To demonstrate injury-in-fact, Plaintiffs "must show [] that: (1) [they] intend[] to engage in a course of conduct arguably affected with a constitutional interest; (2) that the course of action is arguably proscribed by statute; and (3) that there exists a credible threat of prosecution under the statute." *Turtle Island Foods*, 65 F.4th at 215-16.

### 1. Plaintiffs' Performances Are Arguably Affected with a Constitutional Interest

No Defendant refutes that Plaintiffs' performances are affected with a constitutional interest for standing purposes. Indeed, when analyzing standing, courts "assume that [Plaintiffs are] correct on the merits." *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 309 (5th Cir. 2023). That framework requires the assumption that Plaintiffs' conduct—their artistic, social, and political

---

[7]     AG Br. 11-12; Montogomery Br. 21; Taylor Br. 8. Abilene does not cite this test but also does not point to any contrary authority. *See generally* Abilene Br.

expression through drag performance—is protected by the First and Fourteenth Amendments.

### 2. Plaintiffs' Performances Are Arguably Proscribed by the Statute

To show that their speech is "**arguably** proscribed," Plaintiffs are not required to show that their understanding of S.B. 12 is "the **best** interpretation" or that their conduct is "**in fact** proscribed" by the statute. *Turtle Island Foods*, 65 F.4th at 218. Instead, as long as Plaintiffs' "reading is **arguable**, it satisfies this prong." *Id.*

Here, Plaintiffs must show their performances arguably meet S.B. 12's definition of a "[s]exually oriented performance"—*i.e.*, a "visual performance" that (A) features (i) a performer who is nude or (ii) a performer who engages in "sexual conduct"; and (B) appeals to the prurient interest in sex. ROA.172. Each Plaintiff arguably meets this definition, even if they would not subjectively describe their performances as "sexually oriented" or "appeal[ing] to the prurient interest in sex."

### i. Brigitte Bandit

Bandit is a drag artist who performs in and hosts drag shows in many spaces, including restaurants, bars, private residences, and public parks. ROA.1566:24-1568:5.[8] Drag is Bandit's full-time job, and it provides her "a space where [she] can be [her] most authentic self" "outside of . . . gender expectations and norms within our society" and where she can express messages of "kindness and respect and

---

[8] Bandit is proceeding under a pseudonym in this case. ROA.302-03.

accepting of other people." ROA.1563:13, 1564:5-13, 1565:12-17.

Bandit often impersonates Dolly Parton, for which she wears prosthetic breasts, wigs, and corsets as she lip syncs to prerecorded music. ROA.1572:13-24. Bandit changes her performances and appearance based on her expected audience. ROA.1569:5-18. When performing for young audiences, she tailors her shows to be age-appropriate, but some people nevertheless view all drag shows as inherently sexual. ROA.1569:10-12, 1581:19-1582:9. Bandit also performs shows primarily for adults. *See, e.g.*, ROA.1566:24-1567:9. For these shows, she works with venues to provide a content warning similar to movie ratings. ROA.1663:5-1664:13. Some parents have brought 17-year-olds to Bandit's adult-focused shows, ROA.1570:3-9, and she cannot guarantee that minors will not see her performances, particularly those at outdoor bars. ROA.1571:1-13, 1578:23-1579:4. At these shows, un-ticketed observers, including families, are sometimes in such close proximity to Bandit's performances that they can speak and interact with her. ROA.1570:3-23, 1571:5-10, 1578:23-1579:4.

Bandit's performances arguably meet all of S.B. 12's sub-categories of "sexual conduct." During her performances, she typically wears prosthetic breast plates and accessories like wigs, false eyelashes, high heels, and corsets. ROA.1572:11-17. She often shakes her hips and executes other dance moves such that her performances arguably include "sexual gesticulations using accessories or

18

prosthetics that exaggerate . . . female sexual characteristics." ROA.1577:2-9, 1579:4-10.

Bandit sometimes dances closely with other performers and audience members, which arguably constitutes "actual or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person." ROA.1575:20-1577:9. At her shows oriented towards adults, Bandit also allows audience members to tip her by placing cash in her cleavage, ROA.1576:1-7, and she sometimes thrusts her hips, simulates "making out with somebody," touches her "breast or . . . butt," and "caress[es]" and "play[s] with" a dildo for comedic effect, which all arguably "represent[] . . . simulated . . . sexual acts." ROA.1578:12-19, 1580:4-1581:7. Bandit's use of a dildo as a prop or a pretend microphone also constitutes the "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals." ROA.1577:24-1578:25 (referencing Plaintiffs' Trial Exhibit 56). And her use of the dildo, as well as her prosthetic breast plate, arguably constitute the "exhibition or representation, actual or simulated, of male or female genitals in a lewd state." ROA.1579:17-1580:3.

Because Bandit sometimes performs with her prosthetic breasts exposed and wears revealing clothing during some performances, such as garments that expose portions of her buttocks, ROA.1582:10-23, 1659:20-22, her expressive activity is

also arguably proscribed by S.B. 12's prohibition of nudity. Bandit testified about accidental wardrobe malfunctions she has experienced in the past, once revealing her nipple, and noted that she cannot guarantee that a wardrobe malfunction will not occur in the future. ROA.1582:24-1583:9. Bandit also testified that her performances arguably "appeal[] to the prurient interest in sex" because that term is "vague and open to interpretation"; government officials have claimed that S.B. 12 is a "drag ban"; and other people view drag as inherently sexual. ROA.1581:12-1582:9.

Bandit testified that S.B. 12 would chill her expressive activity and "push drag and queer artistry out of public spaces." ROA.1583:11-12. She fears that she could be exposed to fines and jail time under the law and that venues will refuse to hire her if it takes effect. ROA.1584:1-25.

### ii. 360 Queen Entertainment

360 Queen is a drag production company that produces drag shows on the outdoor patio of a family-owned restaurant in San Antonio. ROA.1414:10-1415:23. While 360 Queen sells tickets only to adults, it occasionally allows minors to attend its shows with parental consent and wants to have the ability to allow such exceptions in the future. ROA.1416:23-1417:13, 1445:24-1446:4. These shows are also performed in the presence of other minors that may be in the restaurant dining room or in the adjoining parking lot and neighboring businesses. ROA.1414:19-22,

1415:2-16, 1416:6-15.

360 Queen's performers engage in numerous examples of "sexual conduct" arguably proscribed by S.B. 12. For example, performers wear accessories and prosthetics like breastplates and butt pads that "exaggerate female sexual characteristics." ROA.1425:24-1426:1. Performers wear these while engaging in dance moves that are arguably "sexual gesticulations," such as twerking, and, in one instance, a performer "puls[ing]" their "chest in front of people's faces" while wearing a breastplate. ROA.1428:25-1429:13, 1430:17-20. These same movements also "represent[] . . . simulated . . . sexual acts," while breastplates arguably "represent . . . simulated . . . female genitals in a lewd state." 360 Queen's performers also physically interact with audience members, and occasionally sit in audience members' laps, causing "actual . . . or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person." ROA.1430:8-14, 1442:22-25.

As to nudity, 360 Queen testified that a performer inadvertently exposed a breastplate during a show and that other performers wear leotards, thongs, and other clothing, like "string bikinis that . . . [are] very, very revealing around the buttocks." ROA.1425:24-25, 1430:2-5. These examples arguably violate S.B. 12's proscription of visible "breasts below the top of the areola" or "portion[s] of . . . the buttocks." 360 Queen also testified that its performances arguably appeal to the

prurient interest in sex because that term is subjective, and some people believe its performances are sexualized, which has resulted in complaints to the venue and calls to the police. ROA.1431:2-13.

360 Queen testified that S.B. 12 had already chilled—and in fact completely halted—its expressive activity. After S.B. 12 passed, 360 Queen made changes to its shows in an unsuccessful attempt to comply with the law: "So we moved the time of our show. We moved the day of our show. But at the end of the day we just don't see a way forward because there will always be children around. That's the nature of the restaurant where we host our shows." ROA.1435:23-1437:1. These modifications, while ultimately abandoned as ineffective, chilled 360 Queen's expressive activity: "I think [attempting to comply with S.B. 12] . . . prevents us from being able to articulate the message that we want through these performances." ROA.1437:13-16. By the time of trial, 360 Queen had entirely "ceased booking shows" past S.B. 12's scheduled effective date, ROA.1435:22-1436:2, because of its fear of S.B. 12's criminal penalties and civil fines. ROA.1435:4-13, 1436:9-11.

### iii. Extragrams

Extragrams is a drag entertainment company that produces drag performances on public and private property, with minors often in attendance. ROA.1374:8-12, 1387:7-1388:5. Initially, the company provided old-fashioned singing and dancing telegrams, delivered by drag queens, and has since expanded to other types of drag

performances such as weddings, parties, and corporate events. ROA.1375:13-1376:9.

Extragrams testified that its performers often engage in "[t]wisting, shaking, body waves, splits, [and] shimmying"—while "using accessories or prosthetics"—like wigs, body padding, corsets, push-up bras, breastplates, and crotch packers—that "exaggerate male or female sexual characteristics." ROA.1389:23, 1390:14-1391:10. Some of its performers' choreography, like body waves and the splits, arguably constitute "representation[s] [of] . . . simulated . . . sexual acts." ROA.1389:23. Extragrams' performances arguably include "actual . . . or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person" when its performers dance with, hug, or sit in the laps of audience members. ROA.1393:7-18. Extragrams' performers use prosthetic breasts and prosthetic bulges, or "packers," which arguably result in "the exhibition or representation, actual or simulated, of male or female genitals in a lewd state." ROA.1392:25-1393:6.

Extragrams testified that, during its performances, wardrobe malfunctions "happen[] often" and that performers accidentally reveal portions of their cleavage and buttocks when they "jump into a split" or when their "leotard[s] in the back . . . ride up the buttocks." ROA.1392:14-24. Extragrams' performances also could be accused of "appeal[ing] to the prurient interest in sex," especially because the term

is "vague" and "open for interpretation." ROA.1391:21-1392:9.

Extragrams fears that S.B. 12 will chill its expressive conduct by triggering criminal liability and making it impossible to ensure compliance with the law: "I fear that due to the vagueness of this law and with it being open to interpretation that I will not be able to clearly direct my performers on what exactly to do or not to do and even to the best of my ability there's still a risk depending on how someone wants to see it." ROA.1394:7-11.

### iv. The Woodlands Pride

TWP's drag performances are also arguably proscribed by S.B. 12. TWP is an LGBTQIA+ community organization founded to promote and celebrate acceptance and equality.[9] ROA.1507:24-1508:16. TWP hosts an annual Pride Festival that features drag shows and takes place on public property in Montgomery County with minors in attendance. ROA.1508:17-1510:21. It also plans to host a fundraiser featuring drag performances on private property, which will likely be in public view. ROA.1513:3-9, 1529:1-1530:11.

TWP's drag performers often use choreography—such as dances that involve touching each other's hips and butts—which arguably "represent . . . simulated . . . sexual acts." ROA.1525:16-1526:6. Combined with performers' costuming,

---

[9] LGBTQIA+ refers to people who are lesbian, gay, bisexual, transgender, queer or questioning, intersex, asexual, or another sexual orientation or gender identity beyond the heterosexual and cisgender majority. *See* LGBTQIA+ 101, GENDER+ SEXUALITY RESOURCE CENTER, https://www.gsrc.princeton.edu/lgbtqia-101 (last visited Apr. 9, 2024).

which includes wigs, makeup, high heels, and panty hose, these dance moves arguably constitute "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate . . . sexual characteristics." ROA.1520:13-19, 1524:16-21.

Performers and attendees at past TWP Festivals have sometimes danced with each other during performances and have pretended to, or actually, touched each other's butts or hips, causing "actual . . . or simulated contact occurring between one person and the buttocks . . . of another person." ROA.1525:16-1526:6. At its Pride Festival, TWP allows exhibitors to hand out condoms and sexual lubricant to attendees—products that are arguably "device[s] designed and marketed as useful primarily for the sexual stimulation of male or female genitals." ROA.1530:13-1531:4.

As to nudity, TWP testified that its performers have worn costumes that arguably violate S.B. 12's nudity provision, including garments that reveal portions of performers' butts. ROA.1559:6-14, 1560:17-19; s*ee also* ROA.1522:19-1523:7, 1524:18-1525:10 (referencing Plaintiffs' Trial Exhibit 47). TWP's testimony demonstrates that its drag performances arguably appeal to the prurient interest in sex because the perception of whether a performance is "sexual" is subjective and "based on someone's independent moral code." ROA.1544:24-1545:13.

Finally, TWP testified that it fears S.B. 12 would be enforced against it and

that the law would chill its expressive activity. ROA.1532:18-1533:15. For example, before S.B. 12 was enjoined, TWP made contingency plans for a "festival that either excludes [drag] completely or the same festival where we end up hiring an inflatable room which could costs upwards of 5- to $10,000 that would block off [the drag performances] and we would make it, you know, 21 up." ROA.1532:3-10. But these plans would have diminished TWP's ability to express its message because "drag is a part of the LGBTQ+ community. And restricting that is restricting our voice . . . is restricting us as people." ROA.1532:11-17.

### v. Abilene Pride Alliance

APA is a non-profit organization focused on supporting Abilene's LGBTQIA+ community. ROA.1448:22-23, 1450:5-11. It often holds events that feature drag performers who serve as "a nexus of belonging . . . [and] a way for people in [the] community to see themselves represented on a larger scale." ROA.1450:17-1451:6. APA's drag shows are held on public and private property in Taylor County and in Abilene. ROA.1452:9-17, 1453:12-1454:24.

APA's performances are arguably proscribed by S.B. 12. APA's drag artists give front-facing hugs and hip-bumps to audience members or occasionally sit in their laps. ROA.1451:15-22, 1468:15-24. They also wear wigs, breastplates, hip pads, and crotch packers to "exaggerate male or female sexual characteristics." ROA.1451:7-14, 1453:3-11. At its Pride Festival, APA has allowed the public health

department to hand out condoms and sexual lubricant to attendees, products that are arguably "device[s] designed and marketed as useful primarily for the sexual stimulation of male or female genitals." ROA.1456:3-5.

APA's drag performances arguably appeal to the prurient interest in sex because that term is open to varying interpretations and opinions. ROA.1458:13-16. APA believes that other people view its performances as sexual, which has resulted in protests and complaints to the police. ROA.1466:20-1467:2.

After S.B. 12 was passed but before it was enjoined, APA planned to cancel its drag parade float and arrange a back-up venue for its drag performance that would have otherwise occurred at its all-ages festival, in an attempt to comply with the law. ROA.1457:11-17, 1479:20-24. This secondary venue would have limited the performance's potential audience, and the contingency plan would have "greatly hamper[ed] [APA's] ability as an organization to maintain the safe spaces that [it] ha[s] already created." ROA.1457:20-21. S.B. 12 would cause APA to restrict or completely stop utilizing drag performers at its events, "in order to keep [its performers] as safe as [possible]," which would "ultimately prevent [its] drag artists from being able to convey their art in the way that is necessary to represent the communities that they do." ROA.1458:17-1459:3.

### 3. The Attorney General's Arguments that Plaintiffs' Performances Are Not Arguably Proscribed by S.B. 12 Are Unavailing

#### i. Plaintiffs' Performances Arguably Contain "Sexual Conduct"

The Attorney General argues Extragrams, TWP, and APA's performances do not contain "sexual conduct." *See, e.g.*, AG Br. 13. He asserts that because these Plaintiffs personally believe their performances are not "sexual in nature" and testified that they do not "intend" for their shows to be sexual, these performances cannot arguably represent sexual conduct. *Id.* But this argument distorts the applicable standing test and omits critical context of these Plaintiffs' testimony.[10]

When determining whether a plaintiff's conduct is arguably proscribed by a law, courts look to the breadth of the law's potential sweep, not the plaintiff's subjective beliefs about their conduct. In *Susan B. Anthony List v. Driehaus*, the Supreme Court held that the plaintiff's conduct was arguably proscribed by a law prohibiting certain false statements, "notwithstanding [the plaintiff]'s belief in the truth of its allegations." 573 U.S. 149, 163 (2014). The Court looked not to the

---

[10]     The Attorney General's argument that TWP and APA disclaimed the desire to engage in sexual performances relies on several instances in which the Attorney General misstated or modified the text of S.B. 12. *See, e.g.*, ROA.1472:13-1473:23 (asking whether APA's performers "should be permitted to sexually gesticulate with an exaggerated prosthetic penis **for a sexual purpose** at all-age events") (emphasis added); ROA. 1549:19-1550:7 (asking whether TWP's performers "should be permitted to exhibit their genitals in a lewd state **for a sexual purpose** at all-ages events") (emphasis added). Similarly, the portions of Extragrams' testimony cited by the Attorney General fail to show that its performers do not engage in "sexual" performances, *see* ROA.1391-92—conversely, Extragrams testified that "[s]omething that we do would not be intentional or sexual but someone could perceive that." ROA.1391:21-1392:9.

plaintiff's subjective characterization of its own conduct but to whether the law's sweep could arguably implicate the plaintiff's conduct. *Id.* at 162-63; *accord Turtle Island Foods*, 65 F.4th at 217-18 (finding standing if a law "arguably sweeps broadly enough to capture [plaintiff]'s conduct," even if the plaintiff does "not establish that it openly intends to violate" it).

So, Plaintiffs "need not establish that [they] openly intend[] to violate" S.B. 12. *Turtle Island Foods*, 65 F.4th at 217. Just like in *Driehaus*, where plaintiffs believed their allegations to be true but feared application of the law, here, some Plaintiffs testified that they do not subjectively believe that their drag shows are overtly sexual but nevertheless have a credible fear that the **arguable** sweep of the law encompasses their performances. *See, e.g.*, ROA.1391:21-1392:9, 1396:12-1397:15, 1428:22-1429:8, 1431:4-13, 1466:4-1467:2, 1544:24-1545:13, 1547:17-1548:1.

That S.B. 12 uses unconstitutionally vague, undefined terms renders it impossible to determine what conduct is proscribed, further compounding Plaintiffs' reasonable fear of subjective enforcement by authorities. *See, e.g.*, *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 267-68 (5th Cir. 2015) (claim justiciable when challenged law had "broad reach" due to "significant difficulties distinguishing violators from non-violators," even where plaintiffs did not purport to violate the law); *HM Fla.-ORL, LLC v. Griffin*, No. 6:23-cv-950, 2023 WL

4157542, at *5 (M.D. Fla. June 23, 2023) (plaintiff's drag performances arguably proscribed by "vague statutory language," such as "lewd exhibition of prosthetic genitals or breasts"), *appeal filed*, No. 23-12160 (11th Cir. June 28, 2023).

The Attorney General also asserts that because "S.B. 12 does not ban dancing while in costume," it does not arguably proscribe Plaintiffs' drag performances and that to hold otherwise requires the conclusion that "all types of 'dancing' [are] inherently sexual." AG Br. 14-15. But this Court need not conclude that **all** dances are inherently sexual to recognize that S.B. 12 arguably prohibits Plaintiffs' performances that contain certain dance elements. Indeed, by its plain text, S.B. 12 prohibits "sexual[ ]gesticulations" that occur while a performer "us[es] accessories or prosthetics that exaggerate male or female sexual characteristics." ROA.171. Although the Attorney General does not contest that the costuming utilized by Extragrams, TWP, and APA's performers constitutes "accessories or prosthetics," he erroneously relies on Plaintiffs' testimony that they subjectively do not believe their performers' gesticulations are "sexual" in nature. *See* AG Br. 15. Critically, each of these Plaintiffs testified they have a credible fear that their performances will be considered "sexual" by others.[11] The trial record establishes that Plaintiffs' performances include the touching of butts and hips, close-contact dancing, lap-

---

[11] *See, e.g.*, ROA.1391:21-1392:9, 1396:12-1397:15, 1428:22-1429:8, 1431:4-13, 1466:4-22, 1544:24-1545:13, 1547:17-1548:1.

sitting, the splits, body rolls, and shimmying—which, under the objective standard required for standing purposes, are arguably "sexual." In fact, the Attorney General calls some of the dance moves at Extragrams, TWP, and APA's shows "risqué," Dkt. 42 at 8, suggesting that at least some enforcement authorities could view their performances as violating S.B. 12.[12]

The Attorney General further asserts that Extragrams, TWP, and APA's performances do not contain actual contact or "simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person." AG Br. 14. But the record contains testimony from all three Plaintiffs describing multiple instances of actual or simulated contact between the buttocks or breasts of their performers and another person. ROA.1393:7-18, 1451:16-22, 1468:15-24, 1526:1-6.[13]

As to S.B. 12's prohibition on "the exhibition or representation, actual or simulated, of male or female genitals in a lewd state," the Attorney General does not contest that packers and breastplates represent simulated male or female genitals. Instead, he calls the use of packers to give the appearance of a male bulge

---

[12]    These same "risqué" dance moves and touching arguably bring Plaintiffs' conduct within S.B. 12's prohibition on "the exhibition or representation, actual or simulated, of sexual acts, including vaginal sex, anal sex, and masturbation." ROA.171.

[13]    Although the Attorney General claims that Plaintiffs have not asserted an intention to exhibit "device[s] designed and marketed as useful primarily for the sexual stimulation of male or female genitals," AG Br. 14, he fails to address the record evidence that TWP and APA's performances include vendor provision of condoms and sexual lubricant, which is arguably proscribed by that provision. ROA.1459:11-15, 1530:13-1531:4.

"provocative," while asserting that they are categorically not "grossly improper or offensive" under his chosen definition of the term "lewd." AG Br. 15-16 (citing *Lewd*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 632 (11th ed. 2003)). But the test for standing is not the Attorney General's *ipse dixit* about where packers fall on the highly subjective spectrum of "provocative" to "grossly improper or offensive"; the test is whether the text arguably prohibits Plaintiffs' expressive conduct. Because Plaintiffs have a credible fear that enforcement authorities will consider their breastplates and packers to be "lewd," ROA.1392:25-1393:6, they have standing to challenge this prohibition.[14]

### ii. The Attorney General Is Incorrect that Plaintiffs' Performances Do Not Arguably Contain Nudity

The Attorney General asserts that Plaintiffs offered no evidence that their shows arguably contain "nudity." AG Br. 13-14, 18-19. Yet the trial record contains undeniable evidence of "nudity," as broadly defined by S.B. 12, during Plaintiffs' performances. S.B. 12 borrows its definition of "nude" from the Business and Commerce Code, which includes anyone who is "clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or **any**

---

[14]    The evidence also rebuts the Attorney General's assertion that packers cannot be lewd because they are not a "conspicuous, animating feature of any performance." AG Br. 16. APA testified that packers allow performers to "present a fully male illusion," ROA.1469:8-13, which requires that they be noticeable and conspicuous.

**portion of the** genitals or **buttocks**." Tex. Bus. & Com. Code § 102.051(1) (emphases added). Bandit, 360 Queen, Extragrams, and TWP all testified that their performances arguably meet that definition, wardrobe malfunctions notwithstanding. For example, each of these Plaintiffs' performances have included the use of leotards, thongs, or string bikinis, which expose portions of performers' buttocks and are common throughout our society. ROA.1392:20-22, 1425:24-25, 1430:3-10, 1524:18-1525:10, 1582:20-23.

Additionally, the Attorney General admitted at trial that performers should and would be prosecuted for wardrobe malfunctions under S.B. 12. ROA.1734:18-1735:25. The Attorney General cannot walk that concession back by claiming that S.B. 12's prohibition on performances that "feature[]" nudity would not apply to wardrobe malfunctions. AG Br. 18-19. The word "feature" does not create an implied "intent" requirement, especially when S.B. 12 contains no explicit *mens rea* requirement.[15] And contrary to the Attorney General's cherry-picked definition of "feature," that term can just as easily be defined as "to have as a characteristic." *Feature*, MERRIAM-WEBSTER (Mar. 26, 2024), https://www.merriam-webster.com/dictionary/feature. Thus, a performance given by a performer wearing a leotard that rides up and reveals part of their buttocks has, "as a characteristic," a

---

[15]     *See infra* Section I.A.3. Further, the Attorney General's assertion of an implied "intent" standard is contradicted by his own argument that S.B. 12 contains a *mens rea* requirement of mere criminal negligence. AG Br. 17.

performer who is "nude," in arguable violation of S.B. 12.[16]

### iii. Plaintiffs' Performances Arguably Appeal to the Prurient Interest in Sex

The Attorney General argues that Plaintiffs' performances do not appeal to the prurient interest in sex because "Plaintiffs have repeatedly disclaimed that their performances are sexual in nature." AG Br. 19. As discussed above, this misstates Plaintiffs' testimony,[17] and, regardless, their subjective beliefs and intent as to the "sexual" nature of their performances are not dispositive of whether their conduct is **arguably** implicated by S.B. 12's sweep. *See, e.g.*, *Driehaus*, 573 U.S. at 163; *Turtle Island Foods*, 65 F.4th at 217-18. In fact, Plaintiffs repeatedly testified that their performances are arguably proscribed by S.B. 12's prohibition on conduct that "appeals to the prurient interest in sex" because this term is vague and undefined. ROA.1391:21-1392:9, 1397:5-13, 1431:2-13, 1458:13-16, 1581:12-18. At trial, even the Attorney General conceded that the phrase was subject to multiple interpretations. ROA.1527:2-4. The Attorney General tries to tie the definition of the phrase to case law, but as discussed *infra* Section IV.C, those cases rely on the *Miller* definition for obscenity that the Legislature rejected in enacting S.B. 12.

---

[16]     Similarly, S.B. 12 lacks a *mens rea* requirement for its civil prohibition on "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person." Therefore, even "accidental physical contact," AG Br. 18-19, arguably violates this provision. Further, a performance given by a performer who makes accidental physical contact with the buttocks or breast of another person has, "as a characteristic," actual physical contact, in arguable violation of S.B. 12.

[17]     *See supra* note 10.

The record evidence demonstrates that S.B. 12 chills Plaintiffs' performances, in part because whether some aspect of a show "appeals to the prurient interest in sex" is a wholly subjective determination. ROA.1391:21-1392:9, 1397:5-13, 1400:12-15, 1431:2-13, 1458:13-16, 1545:7-13, 1581:12-18. Plaintiffs credibly fear that S.B. 12, including its prohibition on appealing to the prurient interest in sex, will be enforced against them because of the law's text, its statement of intent, and government officials' public comments claiming to have banned all drag performances in public. ROA.573, 597, 620, 1582:2-9. Plaintiffs' fears are not simply subjective or fanciful—two of them already had the police called on their performances because people complained that their shows are "sexual" and "illegal." ROA.1431:4-13, 1466:20-1468:7.

### iv. The Attorney General Incorrectly Asserts that Bandit and 360 Queen's Performances Are Not in the Presence of Minors

The Attorney General acknowledges that performances by Bandit and 360 Queen arguably include sexual conduct as defined by S.B. 12. AG Br. 16. However, the Attorney General argues that these shows are not implicated by the law because they do not occur in the "presence" of minors and that "unwitting" exposure to minors would not meet S.B. 12's implied *mens rea* requirement. *Id.* at 16-17. These arguments misconstrue the trial record and Texas law.

The Attorney General appears to argue that a minor must be an attendee of a performance in order to be in the "presence" of that performance. *Id.* at 17. Even if that were the only arguable meaning of "presence"—which it is not—both Bandit and 360 Queen have made exceptions to their general rules by allowing minors to attend their age-restricted shows with parental consent. ROA.1416:25-1417:13, 1445:24-1446:4, 1570:3-23.

Further, the Attorney General's proposed definition of "presence" is not supported by the term's plain meaning or the case law on which the Attorney General relies. The argument that "presence" means "[c]lose physical proximity coupled with awareness," is not the only, nor the best, interpretation of the term. *See* AG Br. 17 (alteration in original). "Presence" can also mean "[t]he quality, state, or condition of being in a particular time and place." *Presence*, BLACK'S LAW DICTIONARY (11th ed. 2019). In a case relied upon by the Attorney General, this Court reviewed as persuasive authority a line of vehicle theft cases where vehicles parked outside of buildings from victims were still "in the presence of" those victims. *United States v. Edwards*, 231 F.3d 933, 936-37 (5th Cir. 2000) (citation omitted).

The trial record establishes that even Plaintiffs' shows that do not make exceptions for minors with parental consent still may occur in the "presence" of a minor, under reasonable interpretations of that term. Bandit testified that non-

ticketed observers can easily view her otherwise age-restricted performances from a close distance and can even interact with her through a gate on the premises of her shows. ROA.1578:25-1579:4, 1670:16-18. And 360 Queen, which hosts performances on the outdoor patio of a restaurant, testified that minors can view its performances from the restaurant itself and from the parking lot it shares with other businesses. *See* ROA.1415:2-16, 1428:16-20. 360 Queen further testified that it cannot fully prevent minors from entering the patio, and there have been instances where minors cut across the patio during performances to get to other areas of the premises. ROA.1416:6-15.

Because Bandit's shows can be viewed by people under 18 that are close enough to speak with her and watch her performances with the naked eye, and 360 Queen's performances can be viewed by minors on the same premises, including on the patio where performances take place, Plaintiffs' shows arguably occur "in the presence of" minors.

Unable to refute this record evidence, the Attorney General suggests that the "unintentional" presence of minors at Bandit and 360 Queen's shows prevents them from arguably violating the statute. AG Br. 17. Again, this ignores the testimony that both plaintiffs have intentionally allowed minors to be present with parental consent and wish to do so in the future. ROA.1416:25-1417:13, 1445:24-1446:4, 1565:4-7, 1566:19-23, 1570:3-23. Regardless, S.B. 12 contains no explicit *mens rea*

requirement, and the Attorney General's urging of an "intent" requirement is contradicted by his asserted implied *mens rea* of "negligence." *See* AG Br. 17.

The Attorney General cannot impute an implied *mens rea* for criminal negligence from the Penal Code to the civil offenses in Section 1 of S.B. 12—the only provision of S.B. 12 the Attorney General is tasked with enforcing. Section 6.02 of the Penal Code, the statute relied on by the Attorney General, implies a *mens rea* only for criminal offenses. Section 1 of S.B. 12 does not contain a criminal offense. While Section 1 incorporates the definition of "sexually oriented performances," from Section 3, ROA.169, it does not incorporate the actual criminal offense of that section, ROA.172. Thus, the implied *mens rea* of Section 3's criminal offense is not transplanted into Section 1.[18]

Even assuming an implied *mens rea* of criminal negligence applies to Section 1, the statute still arguably proscribes Bandit and 360 Queen's performances. Plaintiffs testified to their actual knowledge that minors are sometimes present at their age-restricted drag shows, ROA.1415:2-6, 1416:6-1417:13, 1570:3-23, 1578:25-1579:4, 1670:3-18, which could arguably satisfy a *mens rea* of criminal negligence.[19]

---

[18]     *United States v. Hansen*, 599 U.S. 762 (2023), is inapposite. There, the Supreme Court held that a criminal statute incorporated the *mens rea* of a common-law criminal offense, *id.* at 778-79, which does not support the Attorney General's argument that a civil law provision necessarily incorporates the *mens rea* of a criminal offense.

[19]     Before the trial court, the Attorney General argued that a *mens rea* of recklessness could be implied, ROA.749-50, and actual knowledge would arguably meet or exceed this standard. *See*

#### 4. Plaintiffs Face a Credible Threat of Prosecution

Plaintiffs face a credible threat of prosecution because Defendants have not disavowed any intention of enforcing S.B. 12 against them. The Local Defendants argue that Plaintiffs lack standing because they failed to show a credible threat of enforcement. Abilene Br. 12; Taylor Br. 5, 9; Montgomery Br. 21. The Attorney General does not share this viewpoint. Regardless, "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, **courts will assume a credible threat of prosecution in the absence of compelling contrary evidence**." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (emphasis added) (citation omitted). The district court correctly found that Defendants did not present any "compelling contrary evidence" that they would not enforce S.B. 12 against Plaintiffs. ROA.1267-69. During trial, all Defendants declined to disavow future enforcement. *See* ROA.1772:18-1773:6.

Texas Local Government Code Section 87.011(3)(B) strengthens the presumption that prosecutors must enforce S.B. 12 because they may be removed from office if they adopt a policy "refusing to prosecute a class or type of criminal offense under state law." Counties and municipalities also are statutorily required to

---

Tex. Penal Code § 6.03.

enforce S.B. 12 through the mandatory language of Section 2(c). ROA.170-71. Thus, Plaintiffs face a credible threat of enforcement and Defendants failed to present any "compelling contrary evidence." *Speech First*, 979 F.3d at 335.

### B. Plaintiffs' Injuries Are Traceable to the Attorney General

The Attorney General argues that Plaintiffs' injuries are not traceable to him because he can only enforce Section 1 against owners and proprietors of commercial enterprises. AG Br. 20-23. This argument is flawed for at least two reasons.

First, this argument is based on the false premise that only those persons whom the Attorney General can directly enjoin and fine under Section 1 suffer an injury traceable to him. But the Attorney General's authority to force commercial enterprises to cease hosting Plaintiffs' performances directly harms all Plaintiffs. These injuries flow not from "the independent action of some third party not before the court," *id.* at 20 (citation omitted), but predictably, and inevitably, from the Attorney General's enforcement of S.B. 12. Thus, Plaintiffs easily establish *de facto* causality, which is all Article III requires.

The Fifth Circuit recently held that plaintiffs had standing to sue a state official even though plaintiffs' injuries were one step removed from that official, reasoning that: "Courts have found that plaintiffs have standing to sue government entities that injure them through another entity." *Book People, Inc. v. Wong*, 91 F.4th 318, 330-31 (5th Cir. 2024) (collecting cases); *see also Dep't of Commerce v. New*

*York*, 139 S. Ct. 2551, 2566 (2019) (distinguishing standing theories that "rest on mere speculation about the decisions of third parties" from those that rely "on the predictable effect of Government action on the decisions of third parties").

Second, the Attorney General is wrong that only owners are subject to his enforcement power under Section 1. S.B. 12 prohibits any "person" who "controls" a commercial enterprise from allowing a minor to be present during a sexually oriented performance. ROA.169-70. If the Legislature wanted to limit liability to "owners and proprietors," it could have said so; instead, it broadly assigned liability to any "person" who "controls" the premises, including arguably Plaintiffs here.

S.B. 12 does not define "control," and the dictionary definitions relied on by the Attorney General are much broader than being limited to ownership. *See, e.g.*, AG Br. 20 ("[t]o regulate or govern") (quoting *Control*, BLACK'S LAW DICTIONARY (11th ed. 2019)). As the district court concluded, considering the same Black's Law definition, "[t]he plain meaning of the term is not limited to owners of property." ROA.1269 at n.82.

The Attorney General's argument also finds no support in Texas law, which is clear that ownership and control are not coterminous concepts. *See, e.g.*, *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002) (holding that owner did not control premises sufficient to establish liability). Accordingly, Texas courts routinely hold that individuals and entities other than an owner "control" a premises.

*See, e.g.*, *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 475 (Tex. 2017) (temporary third-party contractor can "control" site for premises liability); *Johnson Cnty. Sheriff's Posse, Inc. v. Endsley*, 926 S.W.2d 284, 286 (Tex. 1996) (single-day rodeo lessee had "control" of arena for premises liability); *W. Hills Bowling Ctr., Inc. v. Hartford Fire Ins. Co.*, 412 F.2d 563, 567 (5th Cir. 1969) (insurance company had "effective control" over property during temporary investigation).

The Attorney General appears to argue that only owners and proprietors can "control" an enterprise because they retain the right to exclude, even when they rent out their premises. AG Br. 20-22. The Attorney General relies on *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149-50 (2021), but that case stands for the uncontroversial proposition that the right to exclude is part of the bundle of property ownership rights. It does not stand for the proposition that **only owners** can allow or disallow others from entering a commercial premises. Nor does anything about the text of S.B. 12 indicate that **only** owners or proprietors may allow or disallow a sexually oriented performance to be presented in the presence of a minor.

Notably, 360 Queen, which produces drag shows on a restaurant patio (and therefore allows those shows to be presented), has "an agreement with the restaurant that the day of the show . . . **we control the space**. We sell tickets, **we decide who goes in and out from . . . the show**." ROA.1415:17-22 (emphases added). Similarly, TWP testified that it is "responsible for regulating who comes in and out"

of its "private" events. ROA.1557:15-19. And APA testified that the all-ages events it holds at local businesses are "ticketed event[s]" during which it has "exclusive use" of the premises. ROA.1452:9-17. The Attorney General's claims that 360 Queen does not hire the waitstaff and that APA is a "business invitee" of the coffee shop are irrelevant to the facts that both organize and host drag shows at commercial enterprises, where they have the right to exclude patrons from their events, such that they arguably "control" the premises.

## C. Plaintiffs Have a Ripe, Justiciable Controversy with the Local Defendants That Is Not Moot

### 1. There Is a Ripe, Justiciable Controversy

The thrust of the Local Defendants' standing arguments is that because Plaintiffs have not shown direct enforcement action by them, Plaintiffs have failed to show a ripe, justiciable controversy. *See, e.g.*, Taylor Br. 8. This argument misunderstands S.B. 12 and case law concerning pre-enforcement challenges.

For the same reasons that Plaintiffs have established standing, they have a ripe and justiciable controversy with the Local Defendants. *Driehaus*, 573 U.S. at 158 n.5 (in case raising pre-enforcement challenge, standing and ripeness "boil[ed] down to the same question" (citation omitted)); *Consumer Data Indus. Ass'n v. Tex. through Paxton*, No. 21-51038, 2023 WL 4744918, at *7 (5th Cir. July 25, 2023) (per curiam) ("[O]ur reasons for affirming the district court's 'standing' ruling likewise control our assessment of Paxton's sovereign immunity and ripeness

43

challenges.").

Plaintiffs have properly brought a pre-enforcement challenge to Section 2 of S.B. 12, which expressly prohibits local governments from authorizing "sexually oriented performances" on public property—**regardless of whether any minors will be present**—and on **any property** when minors will be present. ROA.170-71 (emphases added). Plaintiffs TWP and APA host events that require county and city authorizations. ROA.1453:22-24, 1454:18-22, 1513:10-1514:20. S.B. 12 prohibits such authorizations, and, absent disavowal, the presumption is that municipalities will enforce S.B. 12. *Speech First*, 979 F.3d at 335. Plaintiffs need not "await the consummation of threatened injury to obtain preventive relief." *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985) (citation omitted); *Ohio C.R. Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 625 n.1 (1986) ("[A] reasonable threat of prosecution for conduct allegedly protected by the Constitution gives rise to a sufficiently ripe controversy.").

The fact that Plaintiffs' dispute with Defendants is legal in nature and concerns Plaintiffs' First Amendment rights weighs in favor of finding that Plaintiffs' claims are ripe. *Cheffer v. Reno*, 55 F.3d 1517, 1523 n.12 (11th Cir. 1995) ("[T]he doctrine of ripeness is more loosely applied in the First Amendment context."); *Consumer Data Indus. Ass'n*, 2023 WL 4744918, at *7 ("Generally, a case is ripe when any

remaining questions are purely legal ones and no further factual development is required.").

The Local Defendants' arguments to the contrary are unavailing.

First, Montgomery County argues that Section 2's permitting prohibition applies only if it first adopts a regulatory scheme for such performances. Montgomery Br. 13. This is an atextual reading of the statute. By its plain language, subsection (c) states that municipalities and counties "**may not** authorize a sexually oriented performance (1) on public property; or (2) in the presence of an individual younger than 18 years of age." ROA.170-71 (emphasis added). This is an absolute prohibition on all Texas municipalities and counties, regardless of whether they take any other regulatory action.[20] *See also* ROA.171 (Section 2, subsection (d) notes that a municipality's ordinary authority "to license, tax, suppress, prevent, or otherwise regulate theatrical or other exhibitions, shows, or amusements" is also limited by subsection (c)'s permitting prohibition). Thus, S.B. 12 mandates that the prohibitory language of subsection (c) takes effect regardless of whether a county chooses to take any action under subsection (b).

Second, Abilene argues that there is no controversy between it and Plaintiffs because the permitting prohibition is a state law. Abilene Br. 21. But S.B. 12

---

[20] Abilene seems to share Plaintiffs' reading of the statute. Abilene Br. 27 (Section 2 "prohibit[s] Texas municipalities from permitting 'sexually oriented activities' in certain contexts.").

specifically delegates enforcement authority to municipalities and counties. Under S.B. 12, Abilene and Taylor County must refuse any attempt by APA to obtain necessary permits or authorization for events that arguably violate S.B. 12. The statute's required refusal creates a justiciable controversy, especially since Abilene has not disavowed enforcement of S.B. 12.

Montgomery County further argues that TWP's injuries are not attributable to it because it is not involved in any permitting decision concerning TWP, Montgomery Br. 21-22, but the evidence at trial was to the contrary. There is no dispute that TWP operates in Montgomery County, ROA.1508:17-1510:21, and therefore is subject to County regulations. TWP detailed numerous instances which require it to gain permits or authorizations from Montgomery County to host its events. ROA.1514:8-12 (noting need for TABC licensing from Montgomery County); ROA.1514:17-20 (testifying that it contracts with Montgomery County for off-duty sheriffs' deputies).[21]

Abilene and Taylor County also rely on the fact that they have not denied APA a permit. Abilene Br. 4-7, 28, 43; Taylor Br. 4. But this is a pre-enforcement challenge, and all the permits APA has received were authorized before S.B. 12's

---

[21] The district court's findings of fact on this issue are reviewed for clear error; regardless, Montgomery County's view of the testimony is not persuasive. TWP testified it contracted with the County for its off-duty officers, ROA.1514:17-20, and clarified that it didn't have any other contracts for officers, ROA.1556:9-24. Even if the location of TWP's future gala was not firmly established, the record shows that TWP intends to hold future events in Montgomery County and is subject to the County's enforcement, which the County has not disavowed.

enactment. *See* ROA.1456:11-22. Neither the City nor County has disavowed future enforcement of S.B. 12. And, despite Defendants' attempts to portray APA's 2023 activities as unchanged by S.B. 12, the testimony established that APA planned to alter its speech and dilute its message during its 2023 parade and festival had S.B. 12 gone into effect. *See* ROA.1457:10-21.

Thus, in a pre-enforcement challenge to a law that was not in effect, Plaintiffs' claims are ripe and justiciable.

### 2. Plaintiffs' Claims Are Not Moot

The Local Defendants argue that the claims against them are moot because the district court's injunction against the Attorney General binds them under theories of res judicata and virtual representation. Montgomery Br. 33-35; Abilene Br. 30-33; Taylor Br. 13-15. Although these are attractive theories to Plaintiffs—who would prefer to sue just one Defendant—they are unsupported by the cases Local Defendants cite. Their primary case, *Harris County v. CarMax Auto Superstores Inc.*, holds only that one county is not bound by an injunction issued against another county when the Attorney General was notified of the lawsuit but did not participate. 177 F.3d 306, 313-14 (5th Cir. 1999). The case did not address the question of mootness at all. Defendants' argument that an injunction concurrently issued against State and local actors immediately becomes moot as to the local actors unfortunately

finds no support in the case law.[22]

## II. Each Defendant Is Properly Named and Not Immune from Suit

As the district court noted, S.B. 12 has a "complex enforcement mechanism, spreading the responsibility to enforce amongst different officials and levels of government." ROA.1263. The Attorney General is tasked with enforcing Section 1; local government entities with Section 2; and prosecutors with Section 3. Plaintiffs brought their pre-enforcement suit against the actors that S.B. 12 "charge[s] with enforcing '[the] law[].'" *Whole Woman's Health v. Jackson*, 595 U.S. 30, 46 (2021) (citation omitted). As explained below, each defendant is properly named, and, even if this Court finds that some are not, because S.B. 12's provisions are inextricably tied to the definition of "sexually oriented performances," so long as there is one properly named entity (including the two non-appealing Defendants), the district court's declaration that the entirety of S.B. 12 is unconstitutional should be upheld. *See infra* Section III.

### A. The Attorney General Is Properly Named and Not Immune

The Attorney General does not seriously contest that his direct enforcement authority of Section 1 renders him subject to suit under the *Ex parte Young* exception

---

[22] Defendants' other non-binding cases similarly fail to support their argument. *Buquer v. City of Indianapolis*, No. 1:11-CV-00708-SEB, 2013 WL 1332158, at *15 (S.D. Ind. Mar. 28, 2013), concerned ripeness and federal preemption, not mootness. *Coleman v. Governor of Michigan*, 413 Fed. App'x. 866, 873 n.5 (6th Cir. 2011), notes that not every county needs to be sued in a facial challenge but does not hold that it is improper to sue the county that will enforce the statute against a plaintiff.

to sovereign immunity. In a footnote, he relies on his flawed traceability arguments to argue that he does not have the requisite connection to the challenged act. AG Br. 23 n.1. This argument fails for the same reason as his traceability arguments. *See supra* Section I.B.

### B.  The District Attorneys Are Properly Named and Not Immune

The appealing district attorneys argue that they are state actors and immune from suit, *see, e.g.*, Montgomery Br. 30; Taylor Br. 12, but that argument is unavailing.

In *McCraw*, this Court recently held that a county district attorney is not entitled to sovereign immunity when enforcing a state law. 90 F.4th at 787. This decision undercuts the district attorneys' arguments. *See also Hudson v. City of New Orleans*, 174 F.3d 677, 682 (5th Cir. 1999) ("Texas district attorneys [are] not protected by the Eleventh Amendment."). The district attorneys argue that *McCraw* appears to be in tension with other decisions of this Court, *see, e.g.*, *Esteves v. Brock*, 106 F.3d 674, 678 (5th Cir. 1997). Even if the district attorneys are correct that they should be considered state actors who might generally be entitled to sovereign immunity, here, the *Ex parte Young* exception applies.

In *Whole Woman's Health*, the Supreme Court held that, with respect to a pre-enforcement challenge, *Ex parte Young* requires nothing more than the defendant having a specific duty to enforce the challenged statute. 595 U.S. at 45-48. There,

"[e]ight Members of the Court agree[d] that sovereign immunity does not bar" a pre-enforcement challenge against licensing officials who had a duty to enforce part of the challenged law. *Id.* at 48-49. The Court explained that *Ex parte Young* applied because "[e]ach of these individuals is an executive licensing official who **may or must take enforcement actions** against the petitioners if they violate the terms of Texas's Health and Safety Code, including [the challenged law]." *Id.* at 45-46 (emphasis added).[23]

The Court reached this conclusion even though no licensing official had taken any "affirmative action" towards enforcement, as the district attorneys demand here. *See id.* In rejecting the dissent's argument that more was required for *Ex parte Young* to apply, the Court concluded that:

> [P]etitioners have plausibly alleged that [the challenged law] has already had a direct effect on their day-to-day operations. And they have identified provisions of state law that appear to impose a duty on the licensing-official defendants to bring disciplinary actions against them if they violate [the challenged law]. In our judgment, this is enough . . . to suggest the petitioners will be the target of an enforcement action and thus allow this suit to proceed.

*Id.* at 47-48 (citation omitted). This holding is consistent with Fifth Circuit standing precedent regarding pre-enforcement challenges to newly enacted laws—which does not require the defendant to take an affirmative step of enforcement. *Speech*

---

[23]    *See also id.* at 46 n.3 ("The petitioners may proceed against [the executive commissioner of the Texas Health and Human Services Commission] **solely based on her authority** to supervise licensing of abortion facilities and ambulatory surgical centers." (emphasis added)).

*First*, 979 F.3d at 335; *Ostrewich v. Tatum*, 72 F.4th 94, 102 (5th Cir. 2023).

Under *Whole Woman's Health* and *Speech First*, the district attorneys have a sufficient connection to the enforcement of S.B. 12 because the law amends the Texas Penal Code to create a new criminal offense that the district attorneys have a specific duty to enforce. In *State v. Stephens*, the Texas Court of Criminal Appeals held that enforcing criminal law is "the specific duty of county and district attorneys." 663 S.W.3d 45, 52 (Tex. Crim. App. 2021). The district attorneys conceded as much below. *See* ROA.649 n.4 (noting the district and county attorneys' role in representing the State "in all criminal cases").

Recent Fifth Circuit decisions reflect local prosecutors' duty to enforce criminal laws. *McCraw*, 90 F.4th at 785 ("As the district attorney, he is charged with prosecuting individuals who violate criminal laws."); *Lewis v. Scott*, 28 F.4th 659, 664 (5th Cir. 2022) ("[I]t is local prosecutors, not the Secretary, who are specifically charged with enforcement of the criminal prohibition on possessing a voter's mail-in ballot."). Further, as established above, Local Government Code Section 87.011 3(B) emphasizes the duty of district attorneys to enforce criminal laws. *See supra* Section I.A.4.

The Taylor County district attorney argues that *Whole Woman's Health* is distinguishable because it does not involve free speech claims or criminal prosecution. Taylor Br. 12-13. If anything, given courts' "special solicitude to pre-

enforcement challenges brought under the First Amendment," *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135 (D.C. Cir. 2015), these distinctions weigh against holding that the district attorneys are immune from this suit.

The district attorneys also rely on *McCraw*'s holding that the "scintilla of enforcement" standard was not met because, in that case, the state actors had not enforced the law. *McCraw*, 90 F.4th at 786.[24] But *McCraw* is readily distinguishable because that statute had never been enforced despite being on the books for approximately a decade. *Id.* Conversely, S.B. 12 has never been on the books. As in *Whole Woman's Health*, this is a challenge to a newly enacted law before it has gone into effect. Requiring evidence of enforcement in this context would gut pre-enforcement challenges and cannot be squared with the Supreme Court's holding in *Whole Woman's Health*.

## C. The City and County Defendants Are Properly Named and Not Immune

Section 2 of S.B. 12 forbids municipalities and counties from authorizing "sexually oriented performances." ROA.170-71. Plaintiffs have sued the entities that enforce this prohibition against them and are authorized to further regulate such

---

[24] The district attorneys' other cases are not to the contrary. The *Texas Democratic Party* cases ultimately concluded that the Secretary of State satisfied the *Ex parte Young* exception to sovereign immunity precisely because she was statutorily tasked with enforcement. *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 180 (5th Cir. 2020). *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014), rejected a suit against the governor because a different agency was statutorily "responsible for the section's administration and enforcement."

performances. Attempting to evade pre-enforcement review, the Counties and Abilene argue that they are acting for the State and, alternatively, that theories of *Monell* liability foreclose suit. Both arguments fail.

Abilene argues that it is not properly named because it is acting for the State when enforcing S.B. 12. *See, e.g.*, Abilene Br. 22 (citing *Echols v. Parker*, 909 F.2d 795, 799 (5th Cir. 1990)). If this argument is correct, then *Monell* defenses do not apply, and the Counties and Abilene have made no claim to sovereign immunity. *See McCraw*, 90 F.4th at 787; Abilene Br. 14 ("[T]he court correctly pointed out that cities . . . lack the sovereign immunity enjoyed by the State of Texas."). And, even if these Defendants could claim sovereign immunity in some situations, for the reasons discussed above with respect to the district attorneys, the *Ex parte Young* exception applies in this case.

To the extent the Counties and Abilene are considered local actors, they are still properly subject to suit. As the district court correctly noted, counties and municipalities are "persons" under Section 1983 and not immune from suit when they "cause[] the particular constitutional or statutory violation at issue." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Here, because S.B. 12 specifically delegates enforcement authority to counties and municipalities and they have not disavowed enforcement, the presumption is that they will enforce the statute and violate Plaintiffs' constitutional rights unless enjoined.

Although given the chance, the Counties and Abilene have not disavowed S.B. 12, ROA.1772:24-1773:7, much less put forth compelling evidence to show that they will not comply with it. In a pre-enforcement challenge to a newly enacted law, the absence of disavowal establishes the inference that defendants will take unconstitutional enforcement action. *Speech First*, 979 F.3d at 335. For the Counties and Abilene, enforcement action will occur through their final policymakers, including their commissioners courts or city council, *see, e.g.*, ROA.1362, 1368, and their decision to enforce will constitute final policy that is the moving force of constitutional violations against TWP and APA.

That the Counties and Abilene have not yet enforced S.B. 12 through their final policymakers is no defense to a pre-enforcement challenge when First Amendment rights are at stake because they have not disavowed complying with the unequivocal statutory requirement that these entities must enforce S.B. 12, which is what chills Plaintiffs' speech and causes them harm. Under these unique circumstances, the requirements of *Monell* are satisfied because unlike an action "inflicted solely by its employees or agents," municipalities and counties **themselves** are specifically tasked with enforcing S.B. 12 and are the moving force of constitutional violations in Section 2 of the law. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).

Abilene also asserts that *Monell* precludes its liability for enforcing state law. Abilene Br. 34-43. To Plaintiffs' knowledge, no decision of this Circuit has weighed in on the unique question of assessing *Monell* defenses to a pre-enforcement challenge of a newly enacted state law that mandates unconstitutional action by municipalities themselves.

The Fifth Circuit cases cited by Defendants do not address this scenario. Instead, they involve judges, prosecutors, or sheriffs whose duty to enforce the law has allegedly harmed plaintiffs. Importantly, these cases do not hold that municipalities are immune from liability; rather, they hold that under a state's constitutional structures, certain officials in the judicial or criminal system, such as judges, prosecutors, or sheriffs, wear "two hats" and at times are acting for the state. *See, e.g.*, *Arnone v. Dallas Cnty.*, 29 F.4th 262, 266 (5th Cir. 2022) (referring to the "dual-hat problem"). When these officials act for the state, they are not properly named under a *Monell* liability theory. *See, e.g.*, *Daves v. Dallas Cnty.*, 22 F.4th 522, 533 (5th Cir. 2022) (en banc) (judges that set bail schedules were acting for the state); *McMillian v. Monroe Cnty.*, 520 U.S. 781, 784-85 (1997) (sheriffs act for the state when executing specific duties under Alabama law).[25]

---

[25]     *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (county judge acted for the state in issuing disclosure demands); *Bigford v. Taylor*, 834 F.2d 1213, 1223 (5th Cir. 1988) (magistrate acts for the state in setting bond); *Echols*, 909 F.2d at 800-01 (district attorney and county attorney were acting for state in enforcing law); *Crane v. Texas*, 759 F.2d 412, 430 (5th Cir. 1985) (discussing whether district attorney acted for State).

Here, the Counties and Abilene have not argued that their relevant policymakers, *e.g.*, City Council, are subject to a "dual-hat problem." And, even if they were state actors, as established above, that would not mean they are immune from suit under a state sovereign immunity theory.

Defendants cite opinions from other circuits for the proposition that municipalities cannot be liable for enforcing mandatory state laws. *See, e.g.*, *Surplus Store & Exch., Inc. v. City of Delphi*, 928 F.2d 788, 791 (7th Cir. 1991); *Vives v. City of New York*, 524 F.3d 346, 351 (2d Cir. 2008). However, other Circuits have found the opposite. *See Cooper v. Dillon*, 403 F.3d 1208, 1223 (11th Cir. 2005) (police chief's "decision to enforce an unconstitutional statute against Cooper constituted a 'deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy.'" (citation omitted));[26] *Evers v. Custer Cnty.*, 745 F.2d 1196, 1203 (9th Cir. 1984) (rejecting argument that because County was following state law it was immune from suit for its unconstitutional actions).[27] As the Eighth Circuit has noted,

---

[26] The distinction drawn by *Vives* between state statutes that mandate and authorize municipal action is illusory; in *Cooper,* for instance, the "choice" referred to by the Court is the choice not to enforce the unconstitutional state law. *Cooper*, 403 F.3d at 1223; *see also Brewster v. City of Los Angeles,* 672 F. Supp. 3d 872, 991 (C.D. Cal. 2023) (discussing *Cooper* and noting "[v]irtually by definition of enforcing a [state] statute in an unconstitutional manner against an individual, then, the Eleventh Circuit held that a municipality could be liable."). Here too, Abilene could disavow S.B. 12.

[27] *See also Galassini v. Town of Fountain Hills*, No. CV-11-02097-PHX-JAT, 2013 WL 5445483, at *27 (D. Ariz. Sept. 30, 2013) ("If a policymaker deprives a person of their constitutional rights as a result of the application of a state statute, without regard to the application's constitutionality, the municipality could be subject to *Monell* liability.") (citation

"[w]hether, and if so when, a municipality may be liable under § 1983 for its enforcement of state law has been the subject of extensive debate in the circuits." *Slaven v. Engstrom*, 710 F.3d 772, 781 n.4 (8th Cir. 2013).

This Court should decline to follow Defendants' preferred line of cases because they are inconsistent with *Monell* and its progeny, which have repeatedly held that municipalities are not immune when they are the moving force of constitutional violations. Here, because municipalities and counties are directly tasked with enforcing Section 2 of S.B. 12, the district court's decision enjoining them from enforcement and declaring the statute unconstitutional achieves the aims of *Monell* and *Ex parte Young* by allowing Plaintiffs to vindicate their constitutional rights and seek prospective relief.[28]

While *Monell* sought to guard against vicarious liability from the unsanctioned actions of employees or agents, it did not preclude liability of municipalities enforcing state law. *Monell*, 436 U.S. at 694 ("We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."). Similarly, *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), noted that "[t]he 'official policy' requirement was

---

omitted); *Fla. Pawnbrokers & Secondhand Dealers Ass'n, Inc. v. City of Fort Lauderdale*, 699 F. Supp. 888, 890 (S.D. Fla. 1988) (city policy of enforcing state statute triggered *Monell* liability).

[28] While most cases that Defendants cite on this issue focus on damages claims, that is not at issue in this case, which seeks only prospective and injunctive relief. *Surplus Store*, 928 F.2d at 789-90; *Vives*, 524 F.3d at 349.

intended to distinguish **acts of the municipality** from acts of **employees** of the municipality." *Id.* at 479 (citation omitted) (emphases added). Abilene also quotes *Connick v. Thompson*, 563 U.S. 51 (2011), Abilene Br. 60, but fails to include the subsequent contextualizing sentence: "[Municipalities] are not vicariously liable under § 1983 for their employees' actions." *Connick*, 563 U.S. at 60.

Defendants' Fifth Circuit cases fare no better. *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009), concerns only respondeat superior and specifically notes: "[a] municipality is almost never liable for an isolated unconstitutional act on the part of an employee." *Id.* at 847. *Coleman v. Houston Independent School District*, 113 F.3d 528 (5th Cir. 1997), is inapposite as it concerns a respondeat inferior theory with respect to a discriminatory intent claim involving a school principal and a district superintendent.

None of these cases hold that a municipality is immune from liability in a pre-enforcement challenge seeking prospective injunctive relief where the text of the challenged statute makes clear that the municipality will be the moving force behind Plaintiffs' deprivation of constitutional rights, and the municipality has not disavowed enforcement.

While other circuits may permit other avenues of relief, in this Circuit, a state official cannot be sued merely because they promulgate a law or have general duties related to it—specific enforcement is required. *City of Austin v. Paxton*, 943 F.3d

993, 1000 (5th Cir. 2019) ("The required 'connection' [for *Ex parte Young*] is not merely the general duty to see that the laws of the state are implemented.") (citation omitted). Thus, although Abilene contends that the harms caused by S.B. 12 are "traceable to the state law itself," Abilene Br. 27, it is the City and Counties' **enforcement** of the law that threatens Plaintiffs' First Amendment rights, so they are proper defendants in this pre-enforcement challenge.

## III.   S.B. 12 Is Not Severable

As established above, all Defendants are correctly named and subject to federal court jurisdiction, and Plaintiffs have standing against each Defendant. However, even if this Court were to conclude that certain Defendants are not subject to suit, so long as one Defendant remains to reach the merits of this case, the district court still correctly declared the entirety of S.B. 12 unlawful because its provisions are not severable in relevant part.

"Whether unconstitutional provisions of a state statute are severable 'is of course a matter of state law.'" *Nat'l Fed'n of the Blind Tex., Inc. v. Abbott*, 647 F.3d 202, 210 (5th Cir. 2011) (citation omitted). Under Texas law, provisions of a statute are not severable when "they are essentially and inseparably connected in substance." *Rose v. Drs. Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990) (citation omitted). The test is whether "when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the

apparent legislative intent, wholly independent of that which was rejected." *Id.*

Contrary to the Attorney General's assertions, this test applies even where the statute contains a severability clause. *See Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 538 (5th Cir. 2013) (determining an ordinance was inseverable despite severability clause); *Builder Recovery Servs. LLC v. Town of Westlake*, No. 02-20-00051-CV, 2023 WL 3878446, at *8 (Tex. App.—Fort Worth June 8, 2023, no pet.) (same).

The case relied on by the Attorney General is not to the contrary. In *Builder Recovery Servs., LLC v. Town of Westlake*, 650 S.W.3d 499 (Tex. 2022), *reh'g denied* (Sept. 2, 2022), the Texas Supreme Court expressed skepticism about the severability of the provisions at issue. *Id.* at 507 ("[T]he prospect that the licensing requirement remains viable in the absence of its accompanying fee seems remote."). Because neither side briefed the issue of severability, the court remanded the case, while acknowledging the possibility that the lower court would find the provisions inseverable. *Id.* at 507-08.

On remand, the court of appeals held that the severability clause was not dispositive and found the statute to be inseverable. The court reasoned that treating severability clauses as dispositive would lead to absurd results that defy legislative intent. *Builder Recovery Services LLC*, 2023 WL 3878446, at *8 (treating a severability clause as dispositive would "preserve provisions that would never have

been enacted had the enacting body known that an integral part of what it had enacted was invalid").

Here, the district court correctly concluded that S.B. 12 is not severable in relevant part because each section is inseparably connected to the creation of a new category of regulated expressive activity called "sexually oriented performances." ROA.1272-73. S.B. 12 places the definition of "sexually oriented performances" in Section 3, and Sections 1 and 2 explicitly incorporate that definition in their proposed regulations. ROA.169-72. As discussed below, the vague, overbroad, and content and viewpoint-based definition of "sexually oriented performances" renders S.B. 12 unconstitutional. *See infra* Section IV. Accordingly, the district court correctly concluded that S.B. 12 is not severable because: "If Section Three is unconstitutional, then the remaining provisions will be 'incomplete and incoherent.'" ROA.1273 (quoting *Rose*, 801 S.W.2d at 844.).

The Attorney General does not contest, and therefore waives on reply,[29] the district court's conclusion that striking the unconstitutional provisions of Section 3 would render Section 1 and Section 2 incoherent.

Instead, the Attorney General makes two new arguments concerning severability. The State argues (1) the different subsections of the definition of

---

[29]     *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) ("Reply briefs cannot be used to raise new arguments.").

"sexually oriented performances" are severable because a court could find one part of the definition unconstitutional but another part not, and (2) subsection (b) of Section 2 can be severed because it merely grants counties the authority to create regulations. AG Br. 47-48. Neither argument was raised below and, therefore, both are waived. *Wilcox v. Wild Well Control, Inc.*, 794 F.3d 531, 539 (5th Cir. 2015) ("A party preserves an argument only if it is raised to such a degree that the trial court may rule on it." (citations omitted)).[30]

The Attorney General's new severability arguments are also incorrect. First, every aspect of the definition of "sexually oriented performances" is unconstitutional because it is a content-based regulation that fails strict scrutiny, and the entirety of the definition is overly broad. *See infra* Section IV. Second, subsection (b) of Section 2 is not severable for the same reason Sections 1 and 2 are not—it incorporates the definition of "sexually oriented performances" set forth in Section 3 such that striking that section would render subsection (b) "incomplete and incoherent."

Thus, the district court correctly found that all three Sections inextricably rely on the unconstitutional definition of "sexually oriented performances." Accordingly, so long as one Defendant remains to reach the merits of this case, it is proper to strike down the entirety of the law.

---

[30] Before the district court, the Attorney General did not raise severability in his motion to dismiss or proposed findings of fact. At trial, the Attorney General asserted that S.B. 12 was not severable without further detail, explanation, or authority. ROA.1355:14-17. That is not sufficient to preserve the specific arguments presented on appeal.

## IV. S.B. 12 Violates the First and Fourteenth Amendments

The district court held that S.B. 12 is unconstitutional under five independent grounds because the law is (1) a prior restraint on speech, (2) vague, (3) overbroad, (4) content discrimination, and (5) viewpoint discrimination. ROA.1273-93. The Attorney General attempts to avoid binding precedent that renders S.B. 12 unconstitutional by suggesting that performances targeted by this law fall entirely beyond the scope of the First Amendment. This argument strays from the text of S.B. 12 and contradicts settled case law. While the Court may affirm on any ground, *Book People, Inc.*, 91 F.4th at 340, S.B. 12 is unconstitutional under all five grounds and should remain permanently enjoined.

### A. Plaintiffs' Performances Are Inherently Expressive and Subject to First Amendment Protections

The Attorney General concedes that Plaintiffs' "types of drag-show performances might well constitute 'inherently expressive conduct' protected by the First Amendment." Dkt. 42 at 14. These performances are subject to First Amendment protection because they are inherently expressive and convey various messages. Like other types of live entertainment, Plaintiffs' drag shows are a constitutionally protected medium of expression that "mixes speech," such as "the acting out—or singing out—of the written word," with dancing and "live action or conduct." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557-58 (1975). Far from being "pure conduct," AG Br. 25, these performances fall within the First

Amendment's protective scope in the same way as theater and live entertainment, *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65-66 (1981), music, *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989), and movies, *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952). Like other types of performances, the district court found that Plaintiffs' drag shows "express a litany of emotions and purposes, from humor and pure entertainment to social commentary on gender roles." ROA.1276.

As described above, Plaintiffs' performances **are** arguably proscribed by every aspect of S.B. 12. Although Plaintiffs do not characterize their performances as "highly sexualized," AG Br. 1—a term nowhere to be found in the statute—their shows contain expressive elements that Plaintiffs fear will be considered to "appeal[] to the prurient interest in sex" and arguably fall within the statute's definitions of "nudity" and "sexual conduct." *See supra* Section I.A.

Instead of challenging the district court's factual findings regarding the inherently expressive nature of Plaintiffs' performances, the Attorney General builds a strawman to suggest that other hypothetical "highly sexualized performances that S.B. 12 regulates" might not be constitutionally protected. AG Br. 26-27. But, as discussed above with respect to standing, this argument misunderstands the nature of pre-enforcement First Amendment challenges, since Plaintiffs' performances—

and countless other performances—**are** impacted and arguably proscribed by every aspect of S.B. 12, which chills their speech.

Nothing in the statute supports the Attorney General's cramped interpretation that S.B. 12 applies only to "pure conduct" and "highly 'sexual **conduct.**'" AG Br. 25-26. By its express terms, the law regulates "sexually oriented **performances**" and prohibits nudity and five broad categories of "sexual conduct" only if they are included in a "**visual performance**." ROA.169-72 (emphasis added).

Under binding precedent, performances containing nudity or sexual content are inherently expressive and subject to First Amendment protection. *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 509 (5th Cir. 2021) ("[N]ude dancing constitutes expressive conduct and is given First Amendment protection.") (citing *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991)). In *Southeastern Promotions*, the Supreme Court held that a municipality could not prohibit the musical "Hair" even though scenes contained nudity and simulated sex that might be considered "pure conduct" if they took place outside of a performance. 420 U.S. at 550-52. Similarly, S.B. 12 targets conduct only to the extent it is included within a performance, thereby triggering constitutional safeguards since "[s]exual expression which is indecent but not obscene is protected by the First Amendment." *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989). Even television programs that consist almost entirely of "sexually explicit material" but are not obscene are still subject to First

Amendment protections. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 807, 811 (2000).

The Attorney General does not cite a single case that would place the inherently expressive performances targeted by S.B. 12 beyond the scope of the First Amendment.[31] The argument that expressive performances cannot be understood as conveying messages if they are not "accompanied . . . with speech explaining it," AG Br. 26 (quoting *FAIR*, 547 U.S. at 66), conflicts with established precedent that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995) (citation omitted);

---

[31]     The Attorney General relies on *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ("*FAIR*"), to suggest that some conduct lies beyond the First Amendment's protective scope, but that case is inapposite. *FAIR* rejected a challenge to the Solomon Amendment, which allows the Department of Defense to deny federal funds to law schools prohibiting military representatives from participating in on-campus recruiting. 547 U.S. at 55. The Court found that because no observer could possibly know that the reason military recruiters were not present on campus was an expressive choice of the law school absent accompanying speech, the law schools' decision to exclude them was pure conduct and not an inherently expressive activity. *Id.* at 64-66. A decision not to allow recruiters on campus is vastly different from Plaintiffs' performances here, which are filled with messages, meaning, and creative and expressive elements regardless of any accompanying speech.

    Likewise, the Attorney General leans on *Cabrol v. Town of Youngsville*, 106 F.3d 101, 109 (5th Cir. 1997), but that case involves a plaintiff who kept chickens in his yard and argued that the act of chicken-raising constituted expressive conduct. *Id.* This Court rejected that contention, finding no expressive message in keeping chickens in someone's yard, *id.* at 109-10, which is demonstrably different from a state law facially regulating live performances like S.B. 12.

*see also Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010) (collecting cases).

The only way that performances regulated by S.B. 12 could fall beyond First Amendment protection is if those performances are obscene under *Miller v. California*, 413 U.S. 15 (1973), or obscene for minors under *Ginsberg v. New York*, 390 U.S. 629 (1968). But such performances are already prohibited by other Texas laws,[32] which provide the critical guardrails that *Miller* and *Ginsberg* require. In contrast, the Legislature specifically rejected these safeguards when crafting S.B. 12 so that this law is not aimed at performances that are obscene or obscene for minors. *See infra* Section IV.E.3. Indeed, the Attorney General disclaims defending S.B. 12 "on the ground that Plaintiffs' conduct involves obscene speech unprotected by the First Amendment." AG Br. 46. Although the trial record establishes that Plaintiffs' performances arguably meet the definitions of S.B. 12 and could be considered "prurient" by others, their performances do not come close to being obscene, or obscene for minors; and the same is true for countless other performances impacted by S.B. 12, *see infra* Section IV.D. Thus, their performances are constitutionally protected, and S.B. 12 is subject to the constitutional scrutiny required for prohibitions on inherently expressive live performances.

---

[32]     *See supra* note 3.

## B. S.B. 12 Is an Unconstitutional Prior Restraint

The Attorney General argues for the first time on appeal that S.B. 12 does not operate as a prior restraint on First Amendment activity. AG Br. 42-43. Because the Attorney General failed to raise this argument below, it is waived. As a threshold matter, the district court noted that "[n]one of the Defendants expressly address[ed] whether S.B. 12 is an impermissible prior restraint on speech." ROA.1292. Thus, the Attorney General's argument that S.B. 12 is not a prior restraint comes too late, and this Court should decline to consider it. *Book People*, 91 F.4th at 336 n.103.

As to the merits, the district court correctly concluded that "section two of S.B. 12 is an impermissible prior restraint on speech." ROA.1292-93. This section acts as a prior restraint in at least two ways. First, S.B. 12 prohibits municipalities and counties from authorizing any "sexually oriented performances" on public property or anywhere that an individual younger than 18 years of age is present. ROA.170-71 (subsection 2(c)). Second, S.B. 12 grants municipalities and counties limitless authority to "regulate" all other such performances, even in adults-only venues, people's private homes, or any other location. ROA.170 (subsection 2(b)).

On appeal, the Attorney General addresses only subsection 2(b). The Attorney General does not challenge Plaintiffs' argument that subsection 2(c) operates as a prior restraint—indeed, it completely prohibits "sexually oriented performances" on all public property, even when performed solely among adults.

The Attorney General also fails to rebut the district court's findings with regards to subsection 2(b), since an authorization of unbridled regulatory authority with no guardrails is an unconstitutional prior restraint that bears a "heavy presumption against its constitutional validity." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (quoting *Se. Promotions*, 420 U.S. at 558). As the Attorney General acknowledges, a law regulating speech imposes an unconstitutional prior restraint in violation of the First Amendment when it either prohibits certain expression before it occurs or allows for excessive discretion in regulating speech. AG Br. 42 (citing *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014)). "[N]arrowly drawn, reasonable, and definite standards" must be established to avoid "unbridled discretion" that might permit an official to "encourag[e] some views and discourag[e] others through the arbitrary application" of the law. *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992) (citation omitted). Prior restraints targeting the content of speech must contain at least the following three procedural protections: (1) be limited to a specified brief period during which the status quo is maintained; (2) allow for prompt judicial review; and (3) impose on the censor the burdens of going to court and providing the basis to suppress speech. *See Se. Promotions*, 420 U.S. at 560.

S.B. 12 fails these standards and unconstitutionally authorizes municipalities and counties to impose prior restraints on inherently expressive performances. The

Attorney General is mistaken that S.B. 12 does not "'forbid' Plaintiffs from doing anything" because they can simply choose not "to obtain prepublication approval or a license from any municipal or county actor before engaging in 'expressive conduct.'" AG Br. 42-43. Plaintiffs testified at trial that they are often required to seek permits for holding their events. *See, e.g.*, ROA.1453:22-24, 1454:18-22, 1513:10-1514:20. If enacted, S.B. 12 would prohibit municipalities and counties from authorizing "sexually oriented performance[s]" and give them free reign to regulate all such performances. Section 2 thereby operates as a prior restraint and lacks critical safeguards required by the First Amendment because it (1) disrupts the status quo and allows for the censorship of free expression for a boundless amount of time; (2) lacks any provision for judicial review; and (3) places the burden on performers, not municipalities or counties, to seek judicial review.

## C. S.B. 12 Is Unconstitutionally Vague

The law is also unconstitutionally vague because it (1) "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and (2) "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). A "more stringent vagueness test" applies where a law "interferes with the right of free speech," *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982), and vagueness is especially concerning where a law contains criminal penalties, *Reno v. Am. C.L.*

*Union*, 521 U.S. 844, 872 (1997). Such vague laws "have the capacity 'to chill constitutionally protected conduct.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008) (citation omitted).

As the district court found, "it is not readily known to someone of 'ordinary intelligence' how S.B. 12 will be enforced" because the statute fails to define many of its key terms and "does not provide any guidance or standard in determining what is . . . barred." ROA.1291. A "main issue of concern relates to the term 'prurient interest in sex,'" ROA.1290, since S.B. 12 cherry-picks that term from *Miller*, 413 U.S. at 24, while jettisoning the other requirements that the Supreme Court and this Court have found to guard against unconstitutional suppression of speech. The three-part *Miller* test allows the government to regulate obscene material based on three factors: "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.* (citation omitted).

In enacting S.B. 12, the Legislature specifically rejected incorporating these guardrails of the *Miller* test.[33] But the statute's free-floating use of the term "prurient

---

[33]      *See supra* Statement of the Case Section II.

interest"—divorced from these other factors—renders it overbroad, *see infra* Section IV.D, and impermissibly vague. This deliberate omission "suggests that S.B. 12 is a wider interpretation of 'prurient sexual interest'" than how courts have construed it in context of the *Miller* test and thus, "it is not readily known . . . how S.B. 12 will be enforced." ROA.1291.

The Attorney General contends that the term "prurient interest in sex" is a "legal term of art whose meaning has been developed over decades." AG Br. 41. But the case law the Attorney General cites uses this phrase only within the full context of the *Miller* test. *See, e.g.*, *Red Bluff Drive-In, Inc. v. Vance*, 648 F.2d 1020, 1026 (5th Cir. Unit A June 1981) (analyzing "prurient interest" within *Miller*'s three-part obscenity test). Because the Legislature deliberately chose not to include this broader test in S.B. 12, the Attorney General cannot now fall back on *Miller* and its progeny to salvage the statute's constitutionality.

*Reno* directly undermines the Attorney General's argument. 521 U.S. at 873-74. There, the Supreme Court held that a statute incorporating only **part** of the *Miller* test was unconstitutionally vague because of its "greater threat of censoring speech that, in fact, falls outside the statute's scope." *Id.*[34] Just like the law in *Reno*, S.B. 12

---

[34] Instead of acknowledging *Reno*, the Attorney General cites to cases that are inapposite to this context, including *United States v. Tansley*, which explicitly stated that it was not determining vagueness in the context of the First Amendment. 986 F.2d 880, 886 (5th Cir. 1993).

The Attorney General's most analogous case, *Doe I v. Landry*, 909 F.3d 99 (5th Cir. 2018), deals with a much narrower and more precisely defined statute than S.B. 12. There, the Court rejected a facial vagueness challenge to a law requiring erotic dancers to be age 21 or up if their

uses one phrase from the *Miller* test divorced from its broader context, which renders that phrase unconstitutionally vague. *Id.* at 873 ("Just because a definition including three limitations is not vague, it does not follow that one of those limitations, standing by itself, is not vague.").

The key case that the Attorney General cites for the proposition that the "prurient interest . . . need not even be defined in a jury charge" further dispels his argument. AG Br. 41 (citing *Andrews v. State*, 652 S.W.2d 370, 376-77 (Tex. Crim. App. 1983)). In *Andrews*, the Texas Court of Criminal Appeals noted that the term "prurient interest . . . **is essentially circular**" and held that it "**should not be singled out**," but could go to the jury only when included in the full context of *Miller*'s obscenity test. *Andrews*, 652 S.W.2d at 376-77, 380 (emphases added). The Attorney General does not cite any authority for the proposition that the phrase "prurient interest in sex" has any clear meaning divorced from the broader context that S.B. 12 has abandoned.

Similarly, the cases the Attorney General relies on to defend the term "lewd" explicitly follow *Miller* or are limited to the specific context of child pornography.

---

"breasts or buttocks are exposed to view." *Id.* at 105. While emphasizing the narrowness of the statute that only applied to "sexually-oriented businesses that are . . . licensed to serve alcohol," *id.* at 116, the Court interpreted the statute to survive a vagueness challenge because "the natural understanding of an obligation to cover a person's buttocks is that they must be covered entirely," *id.* at 117. Far from that single provision concerning nudity, S.B. 12 is replete with terms that fail to give guidance as to what is prohibited.

AG Br. 41-42.[35] The Attorney General does not identify any case that grants the state free-roaming power to restrict the "**simulated** [exhibition] of male or female genitals in a lewd state" in a performance, ROA.172 (emphasis added), nor any case that gives performers reasonable notice of whether exhibiting a packer or prosthetic breasts on stage could be considered "lewd" under the statute. *See, e.g.*, ROA.1392:25-1393:6, 1579:19-25.

Because the term "performer" is also undefined and includes people who do not "expect[] or receive[]" "compensation for the performance," ROA.172, Plaintiffs have no way of knowing if they are liable for how festival attendees act during a performance. *See, e.g.*, ROA.1465:5-24 (describing unplanned audience touching of performers). The Attorney General does not challenge the district court's holding that the term "performer" as used in the statute is vague. *See* AG Br. 40-42; ROA.1291. And, coupled with other undefined terms in the statute, such "ambiguity" in the law "chill[s] protected speech," since it objectively fails to give "fair notice of what [i]s forbidden." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012).

---

[35]    The cases cited by the Attorney General on the term "lewd" all concern statutes involving child pornography, which is not constitutionally protected like the performances at issue in this case. *See United States v. Wiegand*, 812 F.2d 1239, 1243 (9th Cir. 1987); *Tovar v. State*, 165 S.W.3d 785 (Tex. App.—San Antonio 2005, no pet.); *Roise v. State*, 7 S.W.3d 225 (Tex. App.—Austin 1999, pet. ref'd).

The record evidence also demonstrates that S.B. 12's vagueness will lead to "arbitrary and discriminatory applications." *Roark*, 522 F.3d at 551. Plaintiffs testified at trial that "protestors frequent [some of Plaintiffs'] events and apparently find the performances lewd and inappropriate." ROA.1291 (citing ROA.1466:20-25, 1528:6-20). The district court therefore concluded it is "obvious [that] opinions on what is lewd and inappropriate is a matter of great divergence amongst the population." ROA.1291-92. It is precisely this "great divergence," coupled with S.B. 12's omission of critical definitions and guardrails, which leads to "arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Because of S.B. 12's vagueness, Plaintiffs are unable to give guidance to their performers on how to avoid criminal liability. *See, e.g.*, ROA.1393:19-1394:11, 1458:24-1459:3. Thus, the only way for Plaintiffs to confidently avoid running afoul of S.B. 12 is to stop their drag performances entirely. *See, e.g.*, ROA.1435:22-1436:11, 1458:17-1459:3.

### D. S.B. 12 Is Unconstitutionally Overbroad

The district court correctly concluded that S.B. 12 is facially unconstitutional due to its disproportionate overbreadth and chilling of entire genres of speech. ROA.1286-89. The "substantial overbreadth doctrine" requires courts to invalidate a statute if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S.

460, 473 (2010). Showing "a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep,' suffices to invalidate all enforcement of that law." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (citation omitted). The Attorney General contends that the district court erred in its application of the overbreadth doctrine by stating that it is "strong medicine," AG Br. 44, but this Court has not hesitated to invoke the doctrine when necessary to defend First Amendment rights. *See, e.g.*, *Seals v. McBee*, 898 F.3d 587, 600 (5th Cir. 2018), *as revised* (Aug. 9, 2018).

As discussed above, S.B. 12 excludes critical language from *Miller* in ways that substantially sweep in non-obscene, First Amendment-protected works. S.B. 12 does not require "the average person, applying contemporary standards" to evaluate the work "taken as a whole" and contains no requirement that the performance be patently offensive. *See* ROA.169-72. It also does not shield works that have serious literary, artistic, political, or scientific value. *See* ROA.169-72. Without these vital limitations, S.B. 12 is unconstitutionally overbroad. *See Reno*, 521 U.S. at 872-74 (explaining that each *Miller* factor "critically limits the uncertain sweep" of an overbroad law); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 246-47, 256 (2002) (finding a law unconstitutionally overbroad where it regulates speech without *Miller*'s guardrails, including lacking an exception for content with "serious literary, artistic, political, or scientific value").

Like other laws that the Supreme Court and this Court have found to be overbroad, S.B. 12 lacks key definitions, which amplifies the statute's expansive reach. S.B. 12 applies to any type of "visual performance," including, but not limited to theater, dancing, television, art, or sports; and it applies to any type of "performer," "regardless of whether compensation for the performance is expected or received." ROA.172. The district court correctly found that there is "no way to read the provisions of S.B. 12 without concluding that a large amount of constitutionally protected conduct can and will be wrapped up" by the law. ROA.1288.

S.B. 12's scope is so broad that it encompasses performances on all public property regardless of the presence of minors and anywhere that someone under the age of 18 is present. ROA.170-72. The district court correctly found that a "plain reading of this could virtually ban any performance in public that is deemed to violate S.B. 12, including drag shows." ROA 1289.

The Attorney General contends that "[t]o justify facial invalidation, a law's unconstitutional applications must be realistic" and "not fanciful," but he wrongly claims that the "district court failed to heed these established standards." AG Br. 44-45. The district court found that "[i]t is not unreasonable to read S.B. 12 and conclude that activities such as cheerleading, dancing, live theater, and other common public occurrences could possibly become a civil or criminal violation of

S.B. 12." ROA.1288. The district court grounded this conclusion not in any "fanciful" application of the statute, but in the law's expansive text.

To demonstrate, S.B. 12's non-exhaustive prohibition on "the exhibition **or representation**, actual **or simulated**, of sexual acts, **including** vaginal sex, anal sex, and masturbation," ROA.171 (emphases added), evinces a clear legislative intent to sweep in representations beyond these actual enumerated sex acts, so that even kissing on stage or simulating a lap dance could arguably violate the law. *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 528 (5th Cir. 2005) ("[T]he use of the word 'include' is non-limiting and indicates that it is a non-exclusive description.") (citation omitted). Similarly, the open-ended restriction against "the exhibition **or representation**, actual **or simulated**, of male or female genitals in a lewd state, **including** a state of sexual stimulation or arousal," ROA.171 (emphases added), reasonably bars using a packer, dildo, or breastplate during a performance. The law's prohibition of the "exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals," ROA.171, would proscribe the display of a sex toy on stage, or condoms or sexual lubricant provided at Plaintiffs' festivals. S.B. 12's restriction of "actual contact **or simulated** contact occurring between one person and the buttocks, breast, or any part of the genitals of another person," ROA.171 (emphasis added), could apply to a butt slap among athletes or many types of dancing among performers. And the prohibition of "sexual

gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics," ROA.171, reasonably applies to dance moves commonly performed by professional singers or cheerleaders, as well as drag performers. *See, e.g.*, ROA.1430:15-20, 1580:16-18.

The Attorney General tries to save S.B. 12 from its facially unconstitutional overbreadth by claiming without citation that "Plaintiffs do not appear to 'dispute that [S.B. 12's reach] encompasses a great deal of nonexpressive conduct—which does not implicate the First Amendment at all.'" AG Br. 44 (citation omitted). Plaintiffs never made this concession, nor do they agree with this assertion. As described above, the plain language of S.B. 12 applies only to "performances," and this Court has held that even nude dancing is subject to First Amendment protections. S*upra* Section IV.A. The Attorney General does not point to any examples of "performances" prohibited by S.B. 12 that fall entirely beyond the First Amendment's reach, and he does not contend that the statute is aimed at obscenity. AG Br. 46; *see infra* Section IV.E.3. Thus, the "ratio" between the statute's constitutional and unconstitutional applications is as "lopsided" as can be. *See United States v. Hansen*, 599 U.S. 762, 770 (2023). Even under the Attorney General's argument, any kind of cheerleading, live dancing, or theater performed in an "erotic" way, AG Br. 45-46, is arguably proscribed by S.B. 12, despite such performances' clear First Amendment protection.

Similarly, the Attorney General asserts that the phrase "prurient interest in sex" narrows S.B. 12's scope, but, as discussed above, this phrase when divorced from the broader *Miller* test only amplifies S.B. 12's overbreadth. As with vagueness, the Attorney General's cases have only upheld the use of the phrase "prurient interest in sex" within the broader test for obscenity. AG Br. 45-47 (citing *Ashcroft*, 535 U.S. at 579; *Roth v. United States*, 354 U.S. 476, 487 n.20 (1957)). Here, the Legislature specifically rejected that test, and invoking the term "prurient interest" without other constitutional safeguards renders S.B. 12 facially overbroad. *See Ashcroft*, 535 U.S. at 584-85; *Reno*, 521 U.S. at 872-74.

### E. S.B. 12 Is an Unconstitutional Content- and Viewpoint-Based Restriction

#### 1. S.B. 12 Targets the Content of Performances

Because S.B. 12 regulates non-obscene performances based on content, the district court correctly held that it is subject to strict scrutiny. ROA.1279. "The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (citations omitted). "[S]trict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based[.]" *Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015). Here, S.B. 12 is content

80

based on its face, and the legislative history demonstrates the law is aimed at restricting the content of speech.

### i. The Text of S.B. 12 Is Content Based

A law is content based if it "'on its face' draws distinctions based on the message a speaker conveys." *Id.* at 163 (citation omitted). In *Playboy*, the Supreme Court found a restriction on television broadcasting to be content based because it targeted "sexually explicit adult programming or other programming that is indecent" and "[t]he overriding justification for the regulation [was] concern for the effect of the subject matter on young viewers." 529 U.S. at 811. Because the law "focuse[d] **only** on the content of the speech and the direct impact that speech has on its listeners," the Supreme Court determined it to be "the essence of content-based regulation." *Id.* at 811-12 (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)). Similarly, in *Texas Entertainment Association, Inc. v. Hegar*, this Court held that a rule interpretating the Business and Commerce Code's definition of "nudity" to include "[p]aint, latex, wax, gel, foam, film, coatings, and other substances applied to the body in a liquid or semi-liquid state" was subject to strict scrutiny because it was "directed at the essential expressive nature of the latex clubs' business, and thus . . . a content[]based restriction." 10 F.4th 495, 502, 511 (5th Cir. 2021).

Like the restrictions in those cases, S.B. 12 facially regulates performances based on content and prohibits performances that include "nudity" or five broad

categories of "sexual conduct" while "appeal[ing] to the prurient interest in sex." ROA.169-72. The district court correctly concluded that "S.B. 12 targets the content of speech, i.e., 'sexual oriented performances,' . . . and is subject to strict scrutiny." ROA.1281.

### ii. S.B. 12's Legislative History Underscores It Is Content Based

In determining whether a law is content based, courts look both to the statute's text and its legislative history to ascertain whether "the purpose and justification for the law are content based." *Reed*, 576 U.S. at 166 (collecting cases); *United States v. Richards*, 755 F.3d 269, 277 (5th Cir. 2014).[36]

The legislative history of S.B. 12 evinces a clear intent to regulate the content of performances. *See supra* Statement of the Case, Section II. The law's statement of intent expresses concerns about a "recent cultural trend" of "drag shows . . .

---

[36] The Attorney General urges this Court to ignore clear evidence of legislative intent for S.B. 12 while relying on his own preferred quotes from S.B. 12's legislative hearings. AG Br. 30, 33. As the Attorney General's own use of legislative history demonstrates, courts routinely look to the legislative record in determining whether a law is content or viewpoint-neutral after starting with the text itself. *Reed*, 576 U.S. at 166 (collecting cases).

The cases the Attorney General cites are inapposite. AG Br. 33. *United States v. O'Brien* in fact permitted courts to "look to statements by legislators for guidance as to the purpose of the legislature," but chose not to invalidate a facially neutral law based on "what fewer than a handful of Congressman said about it." 391 U.S. 367, 383-84 (1968). The Court in *City of Erie v. Pap's A.M.* did not prohibit analyzing legislative intent in upholding a law where the "predominate" purpose of the statute was to target secondary effects. 529 U.S. 277, 292 (2000). The Attorney General's remaining two cases do not concern the First Amendment and nevertheless allow the use of legislative history in examining legislative intent. *See Brnovich v. Democratic Nat'l Comm*., 141 S. Ct. 2321, 2349 (2021); *Exxon Mobil Corp. v. Allapattah Servs., Inc*., 545 U.S. 546, 569 (2005).

performed in venues generally accessible to the public, including children" and explains that "S.B. 12 **applies to and will protect** children from sexually oriented performances in general"—a clear targeting of the content of performances. ROA.573, 597 (emphasis added); *see Forsyth Cnty.*, 505 U.S. at 134 ("Listeners' reaction to speech is not a content-neutral basis for regulation.").

## 2. S.B. 12 Also Discriminates Based on Viewpoint

The statute is also subject to strict scrutiny because it discriminates based on viewpoint. Targeting expressive conduct "based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *Reed*, 576 U.S. at 168-69 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). A law is viewpoint based if "within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed," *Matal v. Tam*, 582 U.S. 218, 221 (2017), or if it "discriminate[s] against an entire class of viewpoints," *Rosenberger*, 515 U.S. at 831.

S.B. 12 is viewpoint based because it "disfavors certain ideas," *Iancu v. Brunetti*, 588 U.S. 388, 390 (2019), and types of performances. It does so by prohibiting "sexual gesticulations using accessories or prosthetics **that exaggerate** male or female sexual characteristics." ROA.171 (emphasis added). The district court found that this language "goes beyond mere content-based discrimination"

because it is "directed at the specific act of impersonating or exaggerating" sexual characteristics. ROA.1285.

The law's focus on the **exaggeration** of male or female sexual characteristics means that it does not target performers who naturally exhibit male or female characteristics, but only performers who use devices to amplify such characteristics. For instance, an Elvis impersonator who uses a "packer," which "give[s] the appearance of a penis" beneath someone's clothing, ROA.1453:9-11, while dancing promiscuously would violate S.B. 12; whereas someone who naturally has a male silhouette and dances similarly would not.

S.B. 12 therefore restricts a "class of viewpoints" that takes aim at drag performances and also extends beyond them. Because drag involves the "overdramatization of a character or a gender," ROA.1374:25, drag artists often wear "[l]ots of sequins, big hair, wigs, breastplates, [] hip pads, packers, [and] exaggerated jewelry," ROA.1451:9-14, to exaggerate male or female sexual characteristics. Bandit impersonates Dolly Parton as part of her drag routine; and even though she was assigned female at birth and has breasts, Bandit wears a breastplate to "enhance [her] chest" and "give that Dolly Parton silhouette."[37]

---

[37] The Attorney General complains that the district court mentioned that this language targets performers who "exaggerate[] a sex other than the one a performer is assigned." AG Br. 32 (quoting ROA.1285). While the language of the statute is not limited to someone who "exaggerate[s]" characteristics of a sex different than their own, that does not salvage the law's constitutionality, since it still targets a class of viewpoints exaggerating sexual characteristics. ROA.171.

ROA.1572:12-20. Similarly, drag kings sometimes wear packers in order "to present a fully male illusion." ROA.1469:8-13.

Prohibiting such "exaggerated" performances crosses the "line between viewpoint-based and viewpoint-neutral content discrimination," *Iancu*, 588 U.S. at 418 (Sotomayor, J., concurring). The fact that this provision prohibits performers other than drag artists from "exaggerating" male or female sexual characteristics does not render it viewpoint neutral. The Supreme Court has explained that First Amendment cases interpret "the term 'viewpoint' discrimination in a broad sense[.]" *Matal*, 582 U.S. at 243. Even when a law "evenhandedly prohibits disparagement of all groups" it still constitutes viewpoint discrimination because the broad category of "[g]iving offense is a viewpoint." *Id*.

Building on the viewpoint discrimination inherent in the text itself, the district court found "the legislative history and public statements by legislators purport[ed] that S.B. 12 is at least in part a ban on drag shows." ROA.1285. Indeed, the law's legislative history demonstrates that it is intended to target drag performances and limit them from public view. *Supra* Statement of the Case, Section II. The Court should not ignore S.B. 12's legislative history, as the Attorney General suggests,[38] when that history confirms that S.B. 12 specifically targets the "exaggerat[ion]" of sexual characteristics commonly associated with drag. This viewpoint

---

[38] *See supra* note 36.

discrimination requires strict scrutiny because it "reflect[s] the Government's preference for . . . or aversion to" certain types of performances. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 658 (1994).

### 3. The Attorney General's Attempts to Evade Strict Scrutiny Fail

### i. S.B. 12 Is Not a Time, Place, or Manner Restriction

The Attorney General attempts to characterize S.B. 12 as a "modest age limitation[]" and a "content-neutral 'manner' or 'place' restriction," AG Br. 27, but this argument is refuted by the cases upon which the Attorney General relies. Intermediate scrutiny applies only if "the government's predominate purpose in enacting the regulation is [not] related to the suppression of expression itself." AG Br. 28 (quoting *Fantasy Ranch, Inc. v. City of Arlington*, 459 F.3d 546, 554 (5th Cir. 2006)). "If the government's interest is indeed related to the suppression of content, then that regulation . . . is subject to strict scrutiny." *Id.* (quoting *Fantasy Ranch*, 459 F.3d at 554). And if the law cannot be "justified without reference to the content of the regulated speech," then strict scrutiny applies. *Id.* (quoting *Fantasy Ranch*, 459 F.3d at 554).

Here, both the text and legislative history demonstrate that S.B. 12 can be justified only by referencing the content and viewpoint of inherently expressive performances. A law is not a time, place, or manner restriction when it "focuses **only** on the content of [] speech and the direct impact that speech has on its listeners."

*Playboy*, 529 U.S. at 811 (quoting *Boos*, 485 U.S. at 321). Like the law seeking to limit times when "sexually explicit channels" could be broadcast on TV, the purported justification for S.B. 12 is "concern for the effect of the subject matter on young viewers." *Id.*

The fact that the Attorney General frames S.B. 12 as an "age limitation" does not render it content neutral, since "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975). The Attorney General's argument that the state can age-limit certain performances that are not obscene or obscene for minors is foreclosed by *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011), where the Supreme Court struck down a California law prohibiting the sale of violent video games only to minors and not adults. The Court reiterated that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213-14).

Similarly, in *Reno,* the Supreme Court struck down a statute prohibiting indecent telecommunications with minors as a content-based restriction on free speech and specifically rejected the argument that the statute's focus on indecent

communications received by minors did not burden adult speech. 521 U.S. at 875-78.

S.B. 12 is also not a permissible time, place, manner restriction because it fails to "leave open adequate alternative channels of communication." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 76 (1981) (concluding ordinance that "totally [banned] all live entertainment" was not a reasonable time, place, or manner restriction). Like the complete prohibition declared unconstitutional in *Schad*, S.B. 12 prohibits targeted performances on all public property, including traditional public forums, regardless of whether minors are present. *Id.*

The statute is also broader and more indeterminate than zoning ordinances, which are often based on fixed distances from schools or other locations. In *Schenck v. Pro-Choice Network of Western New York*, the Supreme Court declared unconstitutional a "floating buffer zone[]" that prohibited protesters from being within 15 feet of people entering an abortion clinic, because the "lack of certainty" about where people could move made it "quite difficult for a protester who wishes to engage in peaceful expressive activities to know how to remain in compliance[.]" 519 U.S. 357, 377-78 (1997). Similarly, S.B. 12 is not tethered to a fixed location and prohibits performances on all public property and anywhere that somewhere under 18 is present. ROA.169-72. This creates the same "lack of certainty" declared unconstitutional in *Schenck*, since minors move around and can watch and enter

Plaintiffs' shows, even when Plaintiffs choose to sell tickets only to adults. *See, e.g.*, ROA.1416:6-15, 1434:2-4, 1569:23-1570:9.

### ii. The Secondary Effects Doctrine Does Not Apply

Although the Attorney General claims that S.B. 12 is "aimed at combatting . . . secondary effects," AG Br. 30, the Supreme Court has consistently "made clear that the lesser scrutiny afforded regulations targeting **the secondary effects of crime or declining property values** has no application to content-based regulations targeting the primary effects of protected speech." *Playboy*, 529 U.S. at 815 (citing *Reno*, 521 U.S. at 867-68) (emphasis added); *see also Boos*, 485 U.S. at 321 (secondary effects doctrine does not apply when a law's **primary effect "focuses . . . on** the content of the speech and **the direct impact that speech has on its listeners**").

Here, the text and legislative history of S.B. 12 demonstrate that, like the law in *Playboy*, "[t]he overriding justification" for S.B. 12 is a purported "concern for the effect of the subject matter on young viewers." 529 U.S. at 811. Under binding precedent, this is a **primary effect** of the law and not a secondary effect, like "crime or declining property values." *Id.* at 815. The district court therefore correctly concluded that the secondary effects doctrine is inapplicable to S.B. 12. ROA.1285-86 n.98.

The Attorney General seeks to repackage the alleged primary effects of certain performances on young viewers as "downstream effects that may manifest later in

time, such as possible criminal and antisocial behavior and sexual deviancy." AG Br. 30. But these "downstream effects" are identical to the "primary effects" on listeners that the Supreme Court considered and rejected as a valid reason to evade strict scrutiny in *Playboy* and *Reno*. *Playboy*, 529 U.S. at 811 (citing *Reno*, 521 U.S. at 867-68). Indeed, accepting the Attorney General's verbal sleight of hand would transform nearly any government regulation on speech into a "secondary effect" because the consequences of speech on a listener often "manifest later in time" from the speech itself.

The Attorney General argues that it is permissible for a content-neutral regulation's applicability to depend on an evaluation of content, yet he concedes this aspect of the secondary effects doctrine applies only if the regulation can be "justified without reference to the content of the regulated speech." AG Br. 29 (citing *Ward*, 491 U.S. at 791). Here, the purported justification for S.B. 12 is the belief that performances' content is harmful to particular listeners. This stands in stark contrast to the cases relied on by the Attorney General, which all invoke justifications unrelated to the speech itself. *Ward*, 491 U.S. at 792 (upholding noise ordinance based on interest in preserving character of nearby areas); *Fantasy Ranch*, 459 F.3d at 559-61 (upholding ordinances justified by crime prevention); *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73-74 (2022) (holding that regulation of off-premises signs was not concerned with the content of the signs).

Nor is this case similar to the foundational cases on secondary effects. This doctrine emerged from *City of Renton v. Playtime Theatres, Inc*., which upheld an ordinance "prohibit[ing] adult motion picture theaters from locating within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school." 475 U.S. 41, 43 (1986). Before issuing the ordinance, the city made factual findings that the regulation would help "prevent crime, protect the city's retail trade, maintain property values, and generally 'protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life[.]'" *Id.* at 48. Critically, the Court found that the ordinance was not aimed at "suppress[ing] the expression of unpopular views." *Id.* Thus, the Court held that "zoning ordinances designed to combat the undesirable secondary effects" of certain businesses are subject to intermediate scrutiny and must be "designed to serve a substantial governmental interest and allow[] for reasonable alternative avenues of communication." *Id.* at 49-50; *see also City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 429-30 (2002) (upholding an ordinance after the city conducted a "comprehensive study of adult establishments" and found them to be "associated with higher rates of prostitution, robbery, assaults, and thefts in surrounding communities").

Unlike these cases on secondary effects, S.B. 12 fails to leave open "reasonable alternative avenues of communication," *City of Renton*, 475 U.S. at 50,

since it prohibits performances anywhere that minors may be present and on all public property, regardless of whether minors are present. In *Association of Club Executives of Dallas, Inc. v. City of Dallas*, this Court applied intermediate scrutiny to an ordinance slightly reducing businesses' hours that was not "so costly as to drive [the plaintiffs] out of business." 83 F.4th 958, 966, 969 (5th Cir. 2023). In contrast, S.B. 12 threatens to stop Plaintiffs' performances entirely. *See, e.g.*, ROA.1435:22-1436:11.

Further, in applying intermediate scrutiny to laws targeting secondary effects, the Supreme Court has cautioned against allowing "shoddy data or reasoning" to justify restrictions on speech. *Alameda Books*, 535 U.S. at 438 (noting that a legislative body's "evidence must fairly support [its] rationale for its ordinance."). This Court affirmed that "shoddy data or reasoning" is insufficient when it upheld a Dallas ordinance that cited three academic studies linking sexually oriented businesses with increased crime rates. *Ass'n of Club Execs. of Dallas*, 83 F.4th at 966, 969.

Conversely, the legislative record for S.B. 12 is devoid of any mention of secondary effects, or any specific study or research. Even if the "downstream" consequences of speech on listeners could be considered a valid secondary effect— which they cannot—the evidence advanced by the Attorney General is the type of "shoddy data or reasoning" that the Supreme Court and this Court have cautioned

against. The only evidence of supposed "downstream" effects that the Attorney General points to in the lengthy legislative record comes from a witness who claimed that "research" shows that children's exposure to "very sexual content" will lead to "issues later on in life." *See* Hearing on S.B. 12 before the S. Comm. on State Affairs, 88th Leg., R.S. at 1:04:16-33 (Mar. 23, 2023), http://tinyurl.com/5nrwmbuf. That witness did not name any study or specific research and did not explain what "very sexual content" was, including, critically, whether it was broader than already-banned obscenity.[39] Even if such "research" were presented to the Legislature, it would only bear on the purported **primary effects** of performances on viewers—not any secondary effect that this Court or the Supreme Court have recognized.[40]

In an attempt to bolster this barren legislative record, the Attorney General proffered an expert witness at trial to opine on the supposed "downstream" consequences of "sexually oriented performances," but that expert was stricken by the court and his conclusory declaration (upon which the Attorney General attempts to rely on appeal, AG Br. 31 (citing ROA.758)) was neither offered nor admitted into

---

[39] The Attorney General also quotes another witness as stating that when something happens in childhood, it can be a "traumatic experience" that "doesn't go away." AG Br. 4 (quoting Senate Hearing, *supra*, at 1:07:25-58). This conclusory statement was not tied specifically to drag shows or other performances targeted by S.B. 12.

[40] The other examples of "highly graphic and sexualized performances" the Attorney General points to are entirely absent from both the legislative and trial record. AG Br. 2-3. For the first time on appeal, the Attorney General cites a news article regarding a purportedly "shocking" performance in Austin but fails to establish that the Legislature knew about this or that this extreme example would not already be prohibited by existing laws barring obscene performances and distributing material harmful to minors. *See* Tex. Penal Code §§ 43.23-24.

evidence. *See Ford v. Potter*, 354 F. App'x 28, 31 (5th Cir. 2009) (per curiam) ("When reviewing the findings of a district court we will disregard evidence that it did not consider at trial.").

"Because district courts have broad discretion in deciding the admissibility of expert testimony," this Court "will not find error unless the ruling is **manifestly erroneous.**" *Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 807 (5th Cir. 2018) (citation omitted). No such manifest error exists here. The Attorney General proffered this expert to discuss "secondary effects," ROA.1483:17-20, but the expert's opinion largely concerned exposure to obscene materials already regulated by law and not at issue in the case. *See generally* ROA.1492-97. He testified that his primary experience concerned "sexually violent predators" who were exposed to "sexually explicit material"—by which he meant predominantly "pornography" and "sexual abuse." ROA.1491:7-1493:3. When asked about activities that directly mirrored S.B. 12's statutory language, he demurred. ROA.1494:12-1496:6. And, upon direct questioning as to whether he had experience regarding exposure to the sort of drag shows put on by Plaintiffs, the expert testified that his assessments involved individuals who were subject to "sexual exploitation." ROA.1496:3-6.

Based on this testimony, the district court correctly excluded the expert based on relevance.[41]

The Attorney General incorrectly argues that, in excluding the expert, the district court relied on a false premise that the secondary effects doctrine applied only to zoning regulations.[42] But the district court correctly excluded the expert because he could testify only about exposure to obscenity already regulated by state law and not the more typical drag performances that S.B. 12 arguably prohibits. Further, although the Attorney General offered the expert purportedly to establish secondary effects, the expert's testimony was limited to the direct effects of extreme content on an observer, which, as discussed above, is a primary effect. *See, e.g.*, ROA.1492-97.

---

[41] The subsequent offer of proof confirmed that the expert's testimony was limited to the harmful effects of exposure to extreme, obscene materials. The expert testified that exposure to "a performer flashing her anus" or a "young child strok[ing] the genitals of a drag performer" would be harmful. ROA.1500:10-1503:7. When asked about a video of a performer lifting their skirt in front of minors while wearing underwear, the expert declined to state that such conduct would harm minors and stated instead that the behavior was not "pushing the envelope." ROA.1503:18-23.

[42] Although the secondary effects doctrine is not applicable only to zoning ordinances, it is limited to similar statutes that are justified by concerns distinct from the speech itself such as "the secondary effects of crime or declining property values[.]" *Playboy*, 529 U.S. at 815. The Attorney General's cases only confirm this. *See, e.g.*, *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 481 (5th Cir. 2002) (requirement that dancers wear bikinis justified by crime prevention rationale); *Ass'n of Club Execs. of Dallas, Inc.*, 83 F.4th at 966 (evaluating regulation that required sexually oriented business to close from 2 a.m. to 6 a.m. in order to reduce crime); *Pap's A.M.*, 529 U.S. at 296 (upholding ordinance banning public nudity enacted for public health and safety concerns).

### iii. S.B. 12 Does Not Target Obscenity, Even for Minors

In this case, the Attorney General does not contend that S.B. 12 is meant to cover obscenity or obscenity for minors. Instead, the Attorney General disclaims that he is "defending S.B. 12's constitutionality . . . on the ground that Plaintiffs' conduct involves obscene speech unprotected by the First Amendment." AG Br. 46.

It is well-established that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213-14. Moreover, laws aimed at restricting obscene materials for minors may not include "an unnecessarily broad suppression of speech addressed to adults. As we have explained, the Government may not 'reduc[e] the adult population . . . to . . . only what is fit for children.'" *Reno*, 521 U.S. at 875 (citations omitted). Here, S.B. 12 fails these tests because it does not target material that is obscene or obscene for minors, and it broadly suppresses speech among only adults—including the prohibition of performances on all public property. ROA.170.

Thus, S.B. 12 is distinct from the narrow universe of cases that have not applied strict scrutiny to content-based regulations of speech—namely, cases involving obscenity or obscenity for minors. In *Ginsberg*, the Supreme Court upheld a New York law criminalizing the sale of so-called "girlie" picture magazines by applying the obscenity standard, modified for minors. 390 U.S. at 631-33. Unlike

S.B. 12, the law at issue in *Ginsberg* did not prohibit the sale or distribution of magazines in all public places nor diminish the free speech rights of adults in any way other than requiring them to present identification when buying the proscribed magazines from the store. *See id.* at 631 n.1, 633. Also, unlike S.B. 12, the statute at issue in *Ginsberg* closely tracked *Miller*'s three-part test for obscenity and required that nudity in the prohibited magazines must: "(i) predominantly appeal[] to the prurient, shameful or morbid interest of minors, and (ii) [be] patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and (iii) [be] utterly without redeeming social importance for minors." *Id.* at 33. *Ginsberg* also pre-dates numerous other Supreme Court cases that have consistently applied strict scrutiny to legislative regulations aimed at restricting content to minors. *See, e.g.*, *Ashcroft*, 535 U.S. at 245; *Reno*, 521 U.S. at 875; *Sable*, 492 U.S. at 131.

Recently, this Court invoked *Ginsberg* and *Miller* to apply rational basis review to a new Texas law, H.B. 1181, specifically targeting "materials obscene for minors." *Free Speech Coal. v. Paxton*, 95 F.4th 263, 269 (5th Cir. 2024). That law creates civil penalties for any "commercial entity" that publishes content online while failing to verify the age of website visitors if more than a third of the content on a site is "sexual material harmful to minors." *Id.* at 267. H.B. 1181 defines "sexual material harmful to minors" by following *Ginsberg* and requiring all three prongs of

the *Miller* obscenity test adapted for minors. H.B. 1181, 88(R) (codified as Tex. Civ. Prac. & Rem. Code § 129B.001(6)).

H.B.1181 and *Free Speech Coalition* differ from S.B. 12 and this appeal in many key respects. First, the Attorney General explicitly argued in *Free Speech Coalition* that H.B. 1181 regulates material that is "obscene as to youths." Motion for Stay, No. 23-50627 (Dkt. 12, 5th Cir. Sept. 7, 2023), at 7-8. Here, the Attorney General has not made that argument and disclaims defending S.B. 12 "on the ground that Plaintiffs' conduct involves obscene speech." AG Br. 46.

Second, H.B. 1181 does not jettison the second and third parts of the *Miller* test, as S.B. 12 does. H.B. 1181 requires that material harmful to minors must be "patently offensive" and lack "serious literary, artistic, political, or scientific value," *Free Speech Coal*, 95 F.4th at 267 n.3, but S.B. 12 omits these critical safeguards. H.B. 1181 also requires that the "prurient interest" be based on "an average person applying contemporary community standards" who must examine "the material as a whole," and material is only deemed harmful to minors if it "**is designed** to appeal to or pander to the prurient interest." *Id.* In contrast, S.B. 12 fails to specify who must determine whether a performance "appeals to the prurient interest," fails to require that performances be considered as a whole, and fails to include any *mens rea* for its civil penalties.

Third, in *Free Speech Coalition*, this Court noted the importance of the fact that "[p]arental participation or consent could" circumvent H.B. 1181. *Id.* at 272. This stands in juxtaposition to S.B. 12, which makes no allowance for the "role of a parent or the parent's ability to consent to and control their child seeing a performance[.]" ROA.1282.[43] Thus, even if the Attorney General invokes the Court's decision in *Free Speech Coalition* regarding obscenity as to youths—a theory he has disavowed—the statutes are starkly different and binding precedent still requires strict scrutiny to be applied to S.B.12.

### 4. S.B. 12 Fails Any Level of Scrutiny

### i. The Law Fails Strict Scrutiny

Content and viewpoint-based regulations must satisfy strict scrutiny. *Reed*, 576 U.S. at 163, 167-68. Thus, it is the Attorney General's burden to prove that S.B. 12's regulation of "sexually oriented performances" is narrowly tailored to serve a compelling government interest, *id.* at 163, and the district court correctly found that the Attorney General failed to meet this burden, ROA.1281-84.

Although it is not disputed that Texas has a "compelling interest in protecting children," AG Br. 7, the statute must be "narrowly tailored" to that end. Narrow tailoring requires means that are neither seriously underinclusive nor seriously

---

[43] The Court also found that H.B. 1181 "covers only commercial enterprises," *Free Speech Coal*, 95 F.4th at 272, whereas here S.B. 12 applies to all persons and entities statewide. H.B. 1181 also "specifically define[d] the proscribed material," *id.*, which S.B. 12 does not for the reasons explained above. *See supra* Section IV.C.

overinclusive. *Brown*, 564 U.S. at 805. Here, the district court found that S.B. 12 is seriously overinclusive in several ways. First, it "fails to provide any affirmative defenses, such as consent by a parent or a mistake on the part of the performer." ROA.1282. More generally and consistent with Supreme Court precedent, the district court found the lack of allowance for parental consent to be especially problematic because "parental rights, while not absolute, are rights that should not be taken for granted." ROA.1282; *see also Reno*, 521 U.S. at 878-79.[44]

S.B. 12 is also not narrowly tailored because it restricts and prohibits many performances that are not obscene and are constitutionally protected. *See supra* Section IV.D. To the extent that some obscene performances fall within S.B. 12's scope, Texas law already prohibits them.[45] Moreover, S.B. 12 proscribes "sexually oriented performances" on all public property, even solely among adults. ROA.170. In this way, the law restricts content for all audiences on public property based solely on what the Legislature thinks is appropriate for minors, thereby "burn[ing] the house to roast the pig." *Butler v. State of Mich.*, 352 U.S. 380, 383 (1957). The law also "does not distinguish children by the age of a child" and "treats an older teenager the same as a much younger child, which is problematic considering that the 'appeal

---

[44]  The Attorney General characterizes the district court's findings about the lack of parental exception as being "underinclusive," AG Br. 39, but this lack of parental exception primarily renders the statute overinclusive by making the statute sweep more broadly and prohibiting performances that are viewed by teenagers with parental consent.

[45]  *See supra* note 3.

to a prurient interest in sex' is not defined or supported by the rest of the *Miller* test."
ROA.1282.

The Legislature could have narrowed S.B. 12's broad sweep by including the other critical safeguards of the *Miller* test, adding an explicit *mens rea* requirement, or creating affirmative defenses. It declined to do any of these things, and the "lack of a textual scienter requirement," the "breadth" of the law, and "lack of affirmative defenses" all demonstrate that S.B. 12 is not narrowly tailored. *Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 866 (W.D. Tenn. 2023) (permanently enjoining a law targeting drag performances under the guise of "adult entertainment" as failing strict scrutiny).

In addition to being profoundly overinclusive, S.B. 12 is also underinclusive because it does not target all performances containing the sexual content it purportedly aims to restrict. For example, the law does not prohibit "sexual gesticulations," even if they "appeal[] to the prurient interest in sex," as long as someone does not "exaggerate male or female sexual characteristics" while making such gesticulations. ROA.171. Like the prohibition on violent video games declared unconstitutional in *Brown*, S.B. 12's prohibition of only certain types of performances based on content and viewpoint—but not all sexual performances—

renders the statute underinclusive, 564 U.S. at 804, further making it fail strict scrutiny.[46]

### ii. S.B. 12 Also Fails Intermediate Scrutiny

Even if the Court applies the framework that the Attorney General urges, S.B. 12 still would not survive intermediate scrutiny, as the district court found. ROA.1285-86 n.98.[47] To satisfy intermediate scrutiny, the government must show the statute furthers a substantial or important government interest; that interest must be unrelated to the suppression of free expression; and incidental restrictions on alleged First Amendment freedom must be no greater than essential to the furtherance of the governmental interest. *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

First, the Attorney General has not established that S.B. 12 furthers a substantial government interest. Even though the governmental interest itself is not in dispute, the Attorney General has not shown that this law "furthers" it because the only evidence of any possible harm to minors in the legislative or trial record is based

---

[46] The cases the Attorney General relies on to argue that the law survives strict scrutiny are unavailing. AG Br. 39-40. The Supreme Court in *F.C.C v. Pacifica Foundation* "emphasize[d] the narrowness of [its] holding" in upholding a restriction on "indecent" communications in radio broadcasting. 438 U.S. 726, 750 (1978). Similarly, *Action for Children's Television v. F.C.C.* hinged its tailoring analysis in the "unique context" of public broadcasting where listeners might be "confronted without warning with offensive material." 58 F.3d 654, 659 (D.C. Cir. 1995).

[47] The Attorney General does not contend that the law can be subject to rational basis review.

on "shoddy data or reasoning" that is insufficient to restrict free speech. *Ass'n of Club Execs. of Dallas*, 83 F.4th at 965-66; *Alameda Books*, 535 U.S. at 451-52.[48]

Second, S.B. 12 fails intermediate scrutiny because it is not "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377. Both the text and legislative history make clear that the law is aimed at suppressing the content and views of certain performances. *See supra* Section IV.E.

Lastly, S.B. 12 imposes far greater restrictions than are essential to further the government's alleged interests. As the district court found, S.B. 12 could have been more narrowly drawn in many ways—such as by creating a parental exception, establishing affirmative defenses, allowing performances on public property solely among adults, or more closely following the *Miller* test and incorporating constitutional safeguards. ROA.1281-84. Because the law does none of these things, it fails intermediate scrutiny.

## V. Plaintiffs Established the Remaining Factors Required for Injunctive Relief

As the district court correctly found, Plaintiffs established (1) a substantial threat of irreparable harm absent a permanent injunction; (2) the balance of equities

---

[48]  The Attorney General's urging that a "single study and common experience" can satisfy this prong, AG Br. 35 (quoting *Alameda Books, Inc*., 535 U.S. at 451 (Kennedy, J., concurring)), only applies when a law is aimed at secondary effects. Here, there is no evidence that S.B. 12 "furthers" any governmental interest other than the impermissible goal of restricting certain content. And, even under the test the Attorney General urges, he does not point to a single study showing any purported consequences of the performances S.B. 12 restricts.

tips in Plaintiffs' favor; and (3) the public interest supports permanently enjoining S.B. 12. ROA.1293-94.

No Defendant contests that, if Plaintiffs prevail on the merits, the remaining factors for a permanent injunction are met. Any challenge to these factors is waived and would necessarily fail, since the loss of First Amendment rights establishes irreparable harm, *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14 (2020), and "[i]njunctions protecting First Amendment freedoms are always in the public interest," *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012).

## VI. The District Court Did Not Abuse Its Discretion by Deferring a Decision on Attorneys' Fees and Costs

Unlike the other Defendants, Abilene urges this Court to rule that Abilene is immune from Plaintiffs' entitlement to attorneys' fees under 42 U.S.C. § 1988. Abilene Br. 43-45. Because Plaintiffs have not yet moved for attorneys' fees, this issue is not ripe for review.

Abilene contends that the "District Court erred in deferring its decision" regarding attorneys' fees, Abilene Br. 43-45, but fails to demonstrate how deferring constitutes abuse of discretion. Even if Plaintiffs had already filed a motion for attorneys' fees, the district court "**may defer its ruling** on the motion" and "direct a new period for filing after the appeal has been resolved." Fed. R. Civ. P. 54(d) advisory committee note to 1993 amendment (emphasis added). Because this

Court's ruling may affect or even moot the determination of attorneys' fees, district courts have consistently recognized that judicial economy is best served by deferring ruling on fees until an appeal on the merits has been resolved. *See, e.g.*, *Rios v. Blackwelder*, No. CV H-13-3457, 2016 WL 8794467, at *1 (S.D. Tex. Apr. 27, 2016). There is no benefit to considering Abilene's fee argument for the first time on appeal, and Abilene is not prejudiced by having to wait until the final disposition of this appeal to raise any issues relating to attorneys' fees before the district court.[49]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to affirm.

---

[49] Abilene and Montgomery County also seek to be awarded costs on appeal without citing any basis for this request. Abilene Br. 46; Montgomery Br. 35. In this pre-enforcement challenge to vindicate First Amendment rights, where Plaintiffs prevailed at trial, it would be inequitable to require Plaintiffs to bear the costs of appeal. *See City of San Antonio, Texas v. Hotels.com, L. P.*, 593 U.S. 330, 342 (2021) (court of appeals has equitable discretion in awarding costs and may defer to the district court).

Respectfully submitted,

By: */s/ Brian Klosterboer*
Brian Klosterboer
   Texas Bar No. 24107833
Chloe Kempf
   Texas Bar No. 24127325
Thomas Buser-Clancy
   Texas Bar No. 24078344
Edgar Saldivar
   Texas Bar No. 24038188
Adriana Pinon
   Texas Bar No. 24089768
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288
Tel. (713) 942-8146
Fax (713) 942-8966
bklosterboer@aclutx.org
ckempf@aclutx.org
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
apinon@aclutx.org

Derek R. McDonald
   Texas Bar No. 00786101
Maddy R. Dwertman
   Texas Bar No. 24092371
Katie Jeffress
   Texas Bar No. 24126527
BAKER BOTTS L.L.P.
401 South 1st Street, Suite 1300
Austin, TX 78704
Tel. (512) 322-2500
Fax (512) 322-2501
derek.mcdonald@bakerbotts.com
maddy.dwertman@bakerbotts.com
katie.jeffress@bakerbotts.com

Travis Gray
   Texas Bar No. 24101824
Emily Rohles
   Texas Bar No. 24125940
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
Tel. (713) 229-1234
Fax (713) 229-1522
emily.rohles@bakerbotts.com
travis.gray@bakerbotts.com

Brandt Thomas Roessler
   Texas Bar No. 24127923
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
Tel. (212) 408-2500
Fax (212) 408-2501
brandt.roessler@bakerbotts.com

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I certify that on April 10, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I also certify that service will be accomplished on all registered CM/ECF users by the appellate CM/ECF system.

*/s/ Brian Klosterboer*
Brian Klosterboer

*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and this Court's Order granting Appellees' unopposed motion to file a brief in excess of the word count limitation, Dkt. 105-2, because this brief contains 25,633 words, excluding the portions exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Microsoft Word in Times New Roman 14 pt. font for text and 12 pt. font for footnotes.

Dated: April 10, 2024                    _/s/ Brian Klosterboer_____
                                         Brian Klosterboer

                                         *Counsel for Appellees*