No. 23-20480

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

THE WOODLANDS PRIDE, INCORPORATED; ABILENE PRIDE ALLIANCE; EXTRAGRAMS, L.L.C.; 360 QUEEN ENTERTAINMENT, L.L.C.; BRIGITTE BANDIT,

*Plaintiffs-Appellees*,

v.

WARREN KENNETH PAXTON, IN AN OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS; MONTGOMERY COUNTY, TEXAS; BRETT LIGON, IN AN OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF MONTGOMERY COUNTY; CITY OF ABILENE; TAYLOR COUNTY, TEXAS; JAMES HICKS, IN AN OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF TAYLOR COUNTY,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
Civil Action No. 4:23-cv-02847

**AMICUS BRIEF OF 62 CURRENT AND FORMER CHIEF PROSECUTORS AND LAW ENFORCEMENT LEADERS, AND FORMER ATTORNEYS GENERAL, STATE AND FEDERAL JUDGES, U.S. ATTORNEYS, AND U.S. DEPARTMENT OF JUSTICE OFFICIALS IN SUPPORT OF APPELLEES**

*Counsel for Amici Curiae*

**REED SMITH LLP**
Omar J. Alaniz (TX Bar No. 24040402)
Anthony Todd
David G. Murphy
2850 N. Harwood St., Ste. 1500
Dallas, TX 75201
Telephone: (713) 469-3800
Email: oalaniz@reedsmith.com
Email: atodd@reedsmith.com
Email: dmurphy@reedsmith.com

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
Amalia Y. Sax-Bolder
Craig M. Finger
Denver E. Donchez
675 15th Street, Ste. 2900
Denver, CO 80202
Telephone: (303) 223-1100
Email: asax-bolder@bhfs.com
Email: cfinger@bhfs.com
Email: ddonchez@bhfs.com

# <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that—in addition to the persons and entities listed in the appellees Certificate of Interested Persons—the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

### *<u>Plaintiffs-Appellees</u>*
The Woodlands Pride, Inc.
Abilene Pride Alliance
Extragrams LLC
360 Queen Entertainment, LLC
Brigitte Bandit

### *<u>Attorneys for Plaintiffs-Appellees</u>*
Brian Klosterboer
Chloe Kempf*
Edgar Saldivar*
Thomas Paul Buser-Clancy
Adriana Cecilia Pinon
ACLU Foundation of Texas, Inc.
Alison Dawn Andrews
Derek Raymond McDonald
Madeleine Rose Dwertman
Travis Gray*
Katherine Elise Jeffress
Brandt Thomas Roessler
Emily Rholes
Baker Botts LLP

### *<u>Defendants-Appellants</u>*
Under Fifth Circuit Rule 28.2.1, a certificate of interested persons is not required with respect to defendants-appellants as governmental parties.

**_Attorneys for Defendants-Appellants_**
Non-governmental counsel are:
Robert Burgess Wagstaff
McMahon Surovik Suttle, PC
Ramon G. Viada, III
Viada & Strayer

**_Amici Curiae_**
List of members of Fair and Just Prosecution in Appendix.

**_Attorneys for Amici Curiae_**
Omar J. Alaniz
Anthony R. Todd
David G. Murphy
Reed Smith LLP
Denver E. Donchez
Amalia Y. Sax-Bolder
Craig M. Finger
Brownstein Hyatt Farber Schreck, LLP

*Indicates counsel has withdrawn

Respectfully submitted,

REED SMITH LLP

BROWNSTEIN HYATT
FARBER SCHRECK, LLP

/s/ Omar J. Alaniz
Omar J. Alaniz
Anthony R. Todd
David G. Murphy
(TX Bar No. 24040402)
2850 N. Harwood St., Ste. 1500
Dallas, TX 75201
Telephone: (713) 469-3800
oalaniz@reedsmith.com
atodd@reedsmith.com
dmurphy@reedsmith.com

Amalia Y. Sax-Bolder
Craig M. Finger
Denver E. Donchez
675 15th Street, Ste. 2900
Denver, CO 80202
Telephone: (303) 223-1100
asax-bolder@bhfs.com
cfinger@bhfs.com
ddonchez@bhfs.com

_Counsel for Amici Curiae_

- ii -

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................1

INTEREST OF AMICI CURIAE ............................................................1

ARGUMENT ..........................................................................................3

I.     S.B. 12 is Too Vague and Overbroad to be Consistently and Fairly
       Enforced.........................................................................................3

       A.     Due to its Vagueness, Attempting to Enforce S.B. 12 Would
              Lead to Arbitrary and Problematic Enforcement ...................3

       B.     S.B. 12's Overbreadth Necessarily Calls for Officials to
              Suppress Protected First Amendment Speech.......................8

II.    Enforcement of S.B. 12 Diverts Finite Resources from Important
       Public Safety Priorities ...............................................................10

III.   S.B. 12 Politicizes the Justice System And Will Thus Erode Trust And
       Adversely Impact Public Safety ..................................................13

       A.     S.B. 12 Specifically Targets the LGBTQ+ Community .....14

       B.     S.B. 12's Discriminatory Politicization of the Justice System
              Negatively Impacts the LGBTQ+ Community ...................16

       C.     Discriminatory and Unconstitutional Laws, such as S.B. 12,
              have Adverse Consequences for Public Safety Generally ..................21

CONCLUSION .....................................................................................23

CERTIFICATE OF SERVICE .............................................................24

CERTIFICATE OF COMPLIANCE.....................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Erznoznik v. Jacksonville,*
    422 U.S. 205 (1975)...................................................................................8

*FCC v. Fox TV Stations, Inc.*,
    567 U.S. 239 (2012)...................................................................................7

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)...............................................................................4, 9

*Interstate Cir. v. Dallas*,
    390 U.S. 676 (1968)...................................................................................5

*Miller v. California*,
    413 U.S. 15 (1973).....................................................................................4

*Rabeck v. New York*,
    391 U.S. 462 (1968)...................................................................................5

*Sable Comm'ns of Cal. v. FCC*,
    492 U.S. 115 (1989)...................................................................................8

**Other Authorities**

2021 Federal Bureau of Investigation Uniform Crime Report.................................10

Andrew Goldsmith, Police Reform and the Problem of Trust,
    9 THEORETICAL CRIMINOLOGY 443 (2005).....................................................7, 22

Andrew R. Flores et al., *Victimization Rates and Traits of Sexual and
    Gender Minorities in the United States: Results from the National
    Crime Victimization Survey, 2017*, SCI ADV. 6, 40 (2020),
    https://www.science.org/doi/10.1126/sciadv.aba6910?fbclid=IwA
    R01oLZW1XfpYlZIif_XRxOTzgBjmddp6ML9zTl6URfqFYCw6
    vL88CwguHc.............................................................................................17

Anna Lvovsky, VICE PATROL: COPS, COURTS, AND THE STRUGGLE
    OVER URBAN GAY LIFE BEFORE STONEWALL (2021)..........................................19

Annie Wells, *Don't Be a Drag Just Be a Queen: Legislating Gender Representation*, YWCA (Feb. 22, 2023), https://ywcaaustin.org/dontbeadrag/ ............................................................20, 21

*Building Community Trust: Key Principles and Promising Practices in Community Prosecution and Engagement*, Fair & Just Prosecution (Mar. 2018), https://www.fairandjustprosecution.org/staging/wp-content/uploads/2018/03/FJP_Brief_CommunityProsecution.pdf.................................7, 21

Caroline Harris (@CarolineForTX), Twitter (May 22, 2023, 4:09 PM), https://twitter.com/carolinefortx/status/1660754742639837184?s=12&t=PdsS2XI_vKHecU3T2VPeyw .....................15

Caroline Medina & Lindsay Mahowald, *Discrimination and Barriers to Well-Being: The State of the LGBTQI+ Community in 2022*, Ctr. for Am. Progress (Jan. 12, 2023), https://www.americanprogress.org/article/discrimination-and-barriers-to-well-being-the-state-of-the-lgbtqi-community-in-2022/ ..................21

Carrie Isaac (@CarrieIsaac), Twitter (May 19, 2023, 11:11 PM) https://twitter.com/carrieisaac/status/1659773848676450304?s=12&t=PdsS2XI_vKHecU3T2VPeyw ................................................................ 15-16

Christopher A. Pierce, The Strong Medicine of the Overbreadth Doctrine: When Statutory Exceptions Are No More Than a Placebo, 64 Fed. Comm's L. Journal 176 (2011) ................................................7

Debra Livingston, *Gang Loitering, the Court, and Some Realism About Police Patrol*, 1999 Sup. Ct. Rev. 141 .....................................................10

Ella Wiley & John Guzman, *Rebellion and Pride: How Police Have Failed LGBTQ+ Communities*, Legal Defense Fund, https://www.naacpldf.org/pride-history-police-violence/ ....................................19

Emma Keith et al., *Lack of Trust in Law Enforcement Hinders Reporting of LBGTQ Crimes*, The Center for Public Integrity (Aug. 24, 2018), https://publicintegrity.org/politics/lack-of-trust-in-law-enforcement-hinders-reporting-of-lbgtq-crimes/ .....................................19

Greg Abbott (@GregAbbott_TX), TWITTER (June 24, 2023, 10:03
    PM), https://twitter.com/gregabbott_tx/status/
    1672817859729162240?s=12&t=PdsS2XI_vKHecU3T2VPeyw .................... 15

Greg Abbott (@GregAbbott_TX), TWITTER (Sep. 4, 2023, 9:58 AM),
    https://twitter.com/GregAbbott_TX/status/1698727195416338452 .................. 15

H.B. 17, 88th Leg., Reg. Sess. (Tex. 2023) ............................................................ 12

Henry Berg-Brousseau, *Digital Hate: Social Media's Role in
    Amplifying Dangerous Lies About LGBTQ+ People*, CENTER FOR
    COUNTERING DIGITAL HATE (Aug. 10, 2022),
    https://counterhate.com/research/digital-hate-lgbtq/ ........................................ 18

Jeffrey Brown & Alison Thoet, *Drag Performer Sasha Velour
    Explains What the Art Form Means to Her*, PBS NEWS HOUR (Jun.
    20, 2023, 6:20 PM), https://www.pbs.org/newshour/show/drag-
    performer-sasha-velour-explains-what-the-art-form-means-to-her .................. 14

*LGBT People Nearly Four Times More Likely Than Non-LGBT
    People To Be Victims of Violent Crime*, WILLIAMS INST. (Oct. 2,
    2020), https://williamsinstitute.law.ucla.edu/press/ncvs-lgbt-
    violence-press-release/ ...................................................................................... 16

*Lt. Gov. Dan Patrick: Statement on the Passage of Senate Bill 12 –
    Banning Children's Exposure to Drag Shows*, OFF. OF THE
    LIEUTENANT GOVERNOR (Apr. 5, 2023),
    https://www.ltgov.texas.gov/2023/04/05/lt-gov-dan-patrick-
    statement-on-the-passage-of-senate-bill-12-banning-childrens-
    exposure-to-drag-shows/ .................................................................................... 15

Melissa Block, *Accusations of 'grooming' are the latest political
    attack - with homophobic origins*, NATIONAL PUBLIC RADIO (May
    11, 2022, 5:27 AM),
    https://www.npr.org/2022/05/11/1096623939/accusations-
    grooming-political-attack-homophobic-origins .................................................. 18

NAT'L ACAD. OF SCI., ENG'G, & MED., ET AL., UNDERSTANDING THE
    WELL-BEING OF LGBTQI+ POPULATIONS (Charlotte J. Patterson,
    Martin-Jose Sepulveda, and Jordyn White, eds., 2020),
    https://nap.nationalacademies.org/catalog/25877/understanding-
    the-well-being-of-lgbtqi-populations ................................................................ 20

- iv -

S.B. 12, 88th Leg., Reg. Sess. (Tex. 2023) at § 43.28(b) .........................................6

S.B. 12, 88th Leg., Reg. Sess. (Tex. 2023) at § 769.002(a) ....................................6

Senator Bryan Hughes (@SenBryan Hughes),
    TWITTER (May 28, 2023, 8:02 PM), https://twitter.com/
    SenBryanHughes/status/1663002830691524609 ...............................................16

Sunny Tsai, *Texas Ranks 11th Most Dangerous State in the U.S.,
    Study Finds*, SPECTRUM NEWS (Oct. 18, 2022, 7:18 AM),
    https://spectrumlocalnews.com/tx/south-texas-el-
    paso/news/2022/10/18/texas-ranks-11th-most-dangerous-state-in-
    the-u-s---study-finds ......................................................................................10

Thomas C. O'Brien & Tom R. Tyler, *Rebuilding Trust Between Police
    & Communities Through Procedural Justice & Reconciliation*, 5
    BEHAV. SCI. & POL'Y 35 (2019). ....................................................................22

Tom R. Tyler & Jonathan Jackson, Popular Legitimacy and the
    Exercise of Legal Authority: Motivating Compliance, Cooperation
    and Engagement, 20 PSYCH., PUB. POL'Y & L. 78 (2013) ...................................21

Tyler Hicks, *Despite Legislation and Funding, Texas Still Has
    Thousands of Untested Rape Kits*, DALLAS OBSERVER (Aug. 9,
    2022), https://www.dallasobserver.com/news/texas-still-faces-
    backlog-in-rape-kit-tests-despite-reform-effort-14510578 ...............................11

*Updated Gladd Report: Drag Events faced at least 141 protest and
    significant threats in 2022,* GLAAD (Nov. 21, 2022),
    https://glaad.org/glaad-report-drag-events-faced-least-125-protests-
    and-significant-threats-2022/...........................................................................19

*What is "Grooming?" The Truth Behind the Dangerous, Bigoted Lie
    Targeting the LGBTQ+ Community*, ANTI-DEFAMATION LEAGUE
    (Sept. 16, 2022), https://www.adl.org/resources/blog/what-
    grooming-truth-behind-dangerous-bigoted-lie-targeting-lgbtq-
    community ....................................................................................................18

William Melhado & Alex Nguyen, *Texas House passes bill aimed at keeping kids from seeing sexually explicit performance*, THE TEXAS TRIBUNE (May 19, 2023, Upd. May 26, 2023), https://www.texastribune.org/2023/05/19/texas-house-drag-performers/ ........................................................................................................4

## **INTRODUCTION**

*Amici* — a bipartisan group of 62 current and former elected prosecutors and law enforcement leaders, and former Attorneys General, judges, U.S. Attorneys, and U.S. Department of Justice officials[1] — file this brief in support of Appellees, who ask this Court to affirm the lower court's entry of a permanent injunction restraining Appellants from enforcing Texas Senate Bill 12[2] (hereinafter, "S.B. 12"), which creates a broad and vague category of disfavored speech called "sexually oriented performances" and penalizes performers and business owners that host performances where anyone 17-years-old or younger might be present.

## **INTEREST OF AMICI CURIAE**

*Amici curiae* are current and former prosecutors and law enforcement leaders, and former Attorneys General, judges, U.S. Attorneys, and U.S. Department of Justice officials, all of whom are committed to protecting the integrity of the justice system, upholding the Constitution and rule of law, and promoting the safety and well-being of their communities.[3]

---

[1] A list of *amici* is attached as Appendix A.

[2] 88th Leg., Reg. Sess. (2023), https://legiscan.com/TX/text/SB12/id/2737927. This Bill was introduced on March 10, 2023.

[3] No person was paid a fee for preparation of this brief, and no party to the case participated in drafting it. Per Federal Rule of Appellate Procedure 29(a)(2), amici have obtained the consent of all parties to the filing of this brief.

*Amici* have decades of experience safeguarding public safety as well as the integrity of the American criminal justice and legal systems. They are united in the conviction that a core tenet of the pursuit of justice is the furtherance of fair and equitable policies and practices that comport with constitutional law and protect the safety and well-being of members of their community.

Drawing on their collective experiences, *amici* recognize that trust in the rule of law and the justice system is the foundation for keeping communities safe. When anyone — let alone an already vulnerable group of individuals — is excluded from the law's protections and is instead criminalized through vague laws that allow for arbitrary and subjective enforcement, all members of our communities lose trust that the law is being applied uniformly and fairly. This loss of trust inhibits the ability of law enforcement and stakeholders in the justice system to protect public safety.

S.B. 12's criminalization of drag performances under the disingenuous guise of child protection deeply concerns *amici*. Targeting members of the LGBTQ+ community erodes public trust in, and distorts, the justice system. Policies such as those underlying S.B. 12 create troubling and destructive barriers between members of the LGBTQ+ community and law enforcement and will only increase the risk of discrimination, threats, and violence that these individuals face. S.B. 12 also strains already overtaxed enforcement resources.

# **ARGUMENT**

## I.    S.B. 12 is Too Vague and Overbroad to be Consistently and Fairly Enforced

Overbroad and vague laws place law enforcement officials in precarious and confusing positions. S.B. 12 is littered with undefined terms and nebulous principles, calling on law enforcement to determine what is a "sexually oriented performance" that "appeals to the prurient interest in sex" without any clear, objective delineation of what constitutes a criminal offense, let alone who is a "performer" against whom the law should be enforced and what level of intent justifies intervention or an arrest. S.B. 12 enlists law enforcement to regulate culture and taste, and it will lead to wildly arbitrary and inconsistent enforcement against what many consider not only to be free and protected speech, but also matters of personal opinion and preference.

### A.    Due to its Vagueness, Attempting to Enforce S.B. 12 Would Lead to Arbitrary and Problematic Enforcement

The district court correctly found that S.B. 12 is unconstitutionally vague and overbroad.[4] Indeed, S.B. 12 leaves several important terms undefined. Specifically, the law creates a criminal punishment for "sexually oriented performances" which is defined as a "visual performance" that (A) features (i) a performer who is nude; or (ii) a performer who engages in "sexual conduct"; and (B) appeals to the prurient interest in sex." But notably, "visual performance" and "prurient interest in sex" are

---

[4] Findings of Fact & Conclusions of Law & Order of Permanent Inj., Doc. No. 94 ("Order"), at ¶¶ 136–151.

undefined terms, and, unlike the longstanding definition of obscenity, the statute

does not include important exceptions for performances or acts with artistic, literary,

political or scientific value.[5]

"A vague law impermissibly delegates basic policy matters to policemen,

judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant

dangers of arbitrary and discriminatory application."[6] Though the intent of S.B. 12

is to target "drag shows" and suppress the LGBTQ+ community, as noted in the

district court's Order, "it is not unreasonable to read S.B. 12 and conclude that

activities such as cheerleading, dancing, live theater, and other common public

occurrences could possibly become a civil or criminal violation."[7] Indeed, during a

S.B. 12 house debate, Representative Julie Johnson asked if a Miley Cyrus concert

would violate the law if the singer had sexually suggestive dancing in her

performance, to which Rep. Matt Shaheen, a proponent of S.B. 12, responded that if

the performance could be classified as sexually explicit under the bill's definition,

then children should not be present.[8]

---

[5] *See Miller v. California*, 413 U.S. 15, 39 (1973).

[6] *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

[7] Order, ₱ 141.

[8] William Melhado & Alex Nguyen, *Texas House passes bill aimed at keeping kids from seeing sexually explicit performance*, THE TEX. TRIB. (updated May 26, 2023), https://www.texastribune.org/2023/05/19/texas-house-drag-performers/.

A major sporting event or performance by a major popular performer, which could take place at venues intended to hold tens of thousands of spectators, would necessarily have law enforcement officials stationed to ensure that patrons are protected from threats and comply with laws designed to ensure public safety. Yet, should the "visual performance" at the concert strike any one of those hundreds of officers as appealing to a "prurient interest in sex" so as to be unsuitable for children of whatever undefined age, the officer may believe that intervention or an arrest is warranted and necessary in order to enforce the law—all while other officers certainly may not.

Additionally, it is well-recognized that laws regulating dissemination of content to children must have "narrowly drawn, reasonable and definite standards for officials to follow," but officials are provided with no such guidance in S.B. 12.[9] Using the same major spectator event as an example, such a concert or sporting event would have children of various ages present. Not only would a five-year old and a seventeen-year old's subjective interpretations of a "sexually oriented performance" be vastly different, but law enforcement officials would then be charged with making judgments as to whether the performance is suitable for each of the children present, a judgment that is best left to the children and their parents.  In this scenario, it is

---

[9] *Interstate Cir. v. Dallas*, 390 U.S. 676, 690 (1968); *accord Rabeck v. New York*, 391 U.S. 462, 462 (1968).

clear to see how law enforcement officers are placed in a completely untenable position. And with hundreds of officers in attendance, observing thousands of different children, there will be unavoidable discrepancies in subjective interpretation and enforcement of S.B. 12.

Beyond lacking any concrete or objective standards for determining whether activities appeal to the "prurient interest in sex" or to which children said activities are or are not appropriate, S.B. 12 makes it difficult for law enforcement officials to determine if there is probable cause for an arrest. S.B. 12 contains *no* exception for performances having artistic merit, as is the case with longstanding obscenity definitions. Nor does it provide any exceptions for parental consent or approval, so an officer may arrest a performer or host even if a seventeen-year-old's parent brings them to the performance and is watching it with them. S.B. 12 imposes liability on any "performer" or person who controls the premises of a commercial enterprise if he or she "allows" a violative act to take place "in the presence of an individual younger than 18 years of age."[10] Due to the lack of an exception for artistic performances, everything from a high school musical to a college performance art exhibition could violate the law and subject its performers or hosts to criminalization. Relying on the same major-event example, performances may involve hundreds (if not thousands) of individuals, yet under S.B. 12's overreaching

---

[10] S.B. 12, 88th Leg., Reg. Sess. (Tex. 2023) at §§ 769.002(a), 43.28(b).

definitions, any undefined participant in the performance could be criminally liable in the event one performer, whether intentional or not, engages in an activity appealing to the "prurient interest in sex." Those who engage in drag performances, host them, and other members of the community will be unable to determine which performances cross the line.

Not only will individuals be unable to locate the line between legal and illegal actions under S.B. 12, law enforcement officials will be unable to determine if that line is crossed. Absent clear delineation of what constitutes criminal conduct, differences in judgment and sensibilities amongst officials would lead to arbitrary outcomes, and, worse, invite abuse by bad actors within law enforcement. "Narrowly tailored laws limit the discretion and potential corruption of overzealous or improperly-motivated law enforcement."[11] Plainly, S.B. 12 lacks the "precision and guidance necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."[12]

---

[11] Christopher A. Pierce, *The Strong Medicine of the Overbreadth Doctrine: When Statutory Exceptions Are No More Than a Placebo*, 64 FED. COMM'S L.J. 176, 197–98 (2011); *see generally* Andrew Goldsmith, *Police Reform and the Problem of Trust*, 9 THEORETICAL CRIMINOLOGY 443 (2005); *Building Community Trust: Key Principles and Promising Practices in Community Prosecution and Engagement*, FAIR & JUST PROSECUTION (Mar. 2018), https://www.fairandjustprosecution.org/staging/wp-content/uploads/2018/03/FJP_Brief_CommunityProsecution.pdf.
[12] *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012).

**B.    S.B. 12's Overbreadth Necessarily Calls for Officials to Suppress Protected First Amendment Speech**

Restrictions on protected speech purportedly aimed at protecting minors are permitted only "in relatively narrow and well-defined circumstances."[13] But S.B. 12, passed on the pretense of protecting children, is far too sweeping. The district court, in correctly holding that S.B. 12 is unconstitutionally overbroad, recognized that due process requires that a law provide "persons of ordinary intelligence a reasonable opportunity to know what is prohibited, so that [they] may act accordingly," and "explicit standards" to law enforcement officials, judges, and juries so as to avoid "arbitrary and discriminatory application."[14] S.B. 12 meets none of these criteria, and because of its vagueness and overbreadth, does not provide law enforcement officials with sufficient objective criteria to determine when prohibited conduct has occurred. As set forth above, this defect will lead to arbitrary charging practices. In turn, arbitrary charging practices will inevitably infringe on protected speech.

The district court aptly noted S.B. 12's obvious proximity to regulating matters of artistic, personal, and cultural preference. "Not all people will like or condone certain performances. This is no different than a person's opinion on certain comedy or genres of music, but that alone does not strip First Amendment

---

[13] *Erznoznik v. Jacksonville*, 422 U.S. 205, 212–13 (1975); *Sable Comm'ns of Cal. v. FCC*, 492 U.S. 115, 131 (1989).
[14] Order, ⁋ 147.

protection. However, in addition to the pure entertainment value, there are often political, social, and cultural messages involved in drag performances which strengthen the Plaintiff's position."[15] Any enforcement of S.B. 12, however, would necessarily call on law enforcement officials to infringe "upon sensitive areas of basic First Amendment freedoms," and "operate[] to inhibit the exercise of [those] freedoms."[16] Further, "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked[,]" thereby calling on law enforcement to unintentionally police "legal" conduct, as well as protected speech.[17]

S.B. 12's lack of delineation calls on law enforcement to regulate conduct at every single venue in the state that hosts "cheerleading, dancing, live theater, and other common public occurrences."[18] Under S.B. 12, any "visual performance" in Texas calls for police surveillance, intrusion, and intervention, and invites punishment not only of the true target of the law—drag shows and the LGBTQ+

---

[15] *Id.* at ⁋ 113.
[16] *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (citations and quotation marks omitted).
[17] *Id.*
[18] Order, ⁋ 141.

community—but also for "innocent" conduct that would technically and constantly violate the law.[19]

## II. Enforcement of S.B. 12 Diverts Finite Resources from Important Public Safety Priorities

Police and prosecutors are committed to pursuing public safety and the well-being of their communities, and, as part of the justice system, they are essential components of a fair and just society. However, each has limited, finite resources to serve their important missions. S.B. 12 undermines the efficacy of prosecutorial and law enforcement officials and diverts limited criminal justice resources that could otherwise be used to address real harm and promote public safety.

Law enforcement and prosecutors must confront significant public safety challenges with inherently limited resources. Many communities in Texas struggle with high rates of violent crime, including rape, aggravated assault, robbery, and homicide.[20] Texas has also been under heavy scrutiny for the past several years due

---

[19] Debra Livingston, *Gang Loitering, the Court, and Some Realism About Police Patrol*, 1999 SUP. CT. REV. 141, 166 ("[T]he prevalence in certain domains of numerous narrow and specific, but commonly violated, low-level statutes and ordinances . . . creates opportunities for abusive police enforcement.").

[20]  The report categorized offenses into rape, aggravated assault, robbery, and homicide. *See* Sunny Tsai, *Texas Ranks 11th Most Dangerous State in the U.S., Study Finds*, SPECTRUM NEWS (Oct. 18, 2022, 7:18 AM), https://spectrumlocalnews.com/tx/south-texas-el-paso/news/2022/10/18/texas-ranks-11th-most-dangerous-state-in-the-u-s---study-finds (citing the 2021 Federal Bureau of Investigation Uniform Crime Report).

to its backlog—ranging in the thousands—of untested rape kits.[21] In order to fulfill their commitments to the public, law enforcement must prioritize these types of significant threats to public safety.

If allowed to go into effect, S.B. 12 will open the door to criminalizing drag performances and thereby strain an already overburdened system by diverting scarce resources away from prosecuting far more serious and dangerous crimes that actually impact public safety. Instead, resources will be directed toward targeting LGBTQ+ community members and trampling on protected speech. Texas law enforcement already have their hands full upholding the law with the limited resources they currently have without the additional burden of enforcing this wholly unnecessary and impracticable law.

Unlike other new criminal statutes that have clearly defined elements and mens rea requirements, the vagueness and overbreadth of S.B. 12 creates the possibility of so many violations that nearly every gathering or performance will invite police presence and investigation, and inevitably there will be far too many potential violations to pursue. In addition, community members will likely call police to investigate activities that do not come close to appealing in the "prurient

---

[21] Tyler Hicks, *Despite Legislation and Funding, Texas Still Has Thousands of Untested Rape Kits*, DALLAS OBSERVER (Aug. 9, 2022), https://www.dallasobserver.com/news/texas-still-faces-backlog-in-rape-kit-tests-despite-reform-effort-14510578.

interest in sex" or are otherwise protected speech but simply offend the caller for personal reasons. Emergency response systems and law enforcement will waste valuable resources dispatching officers to locations based on activities that do not threaten the safety of children or the community generally.

In addition to an intense strain on law enforcement officers, prosecutors will be forced to use their offices' limited resources to sift through arrest reports and attend to the arrests of individuals who do not threaten public safety, and whose prosecutions do not promote the safety and well-being of the community.[22] The pursuit of cases involving violence and threats to harm to the community will inevitably suffer. The wise exercise of discretion suggests focusing prosecutorial resources on violent crimes that impact public safety the most. Under S.B. 12,

---

[22] Last year, a new Texas law went into effect that amends the definition of "official misconduct" by district and county attorneys to include the "adoption or enforcement of a policy of refusing to prosecute a class or type of criminal offense under state law or instructing law enforcement to refuse to arrest individuals suspected of committing a class or type of offense under state law." H.B. 17, 88th Leg., Reg. Sess. (Tex. 2023), https://capitol.texas.gov/tlodocs/88R/billtext/html/HB00017I.htm. Under this new law, evidence of an adoption or enforcement of such a policy creates a rebuttable presumption of official misconduct, and if there is a belief that a prosecuting attorney committed official misconduct, a petition to remove the prosecuting attorney may be filed against them. Coupled with the drag ban, this new law could put prosecutors in the untenable position of choosing between pursuing prosecutions against people who have engaged in protected First Amendment activity or declining to pursue such prosecutions and facing the threat of a complaint and possible removal from office for failing to pursue every arrest under the law.

prosecutors will be required to expend limited time and resources exploring misdemeanor prosecutions–even if the case implicates protected speech. Thus, S.B. 12 will inevitably strain an already over-burdened judicial system and consume the limited resources of law enforcement to enforce a law that will not improve public safety and further divide the community.

In sum, law enforcement resources are much better utilized to prevent and address serious crimes that impact society rather than enforcing laws that divide communities, limit First Amendment rights, and erode trust in the justice system.

## III.  S.B. 12 Politicizes the Justice System And Will Thus Erode Trust And Adversely Impact Public Safety

A core tenet of the pursuit of justice is the furtherance of impartial policies and practices that protect the well-being and safety of communities. For the justice system to maintain its credibility and efficacy, it is critical that the public have confidence in the integrity of the rule of law and the justice system. The community must trust officials in the criminal legal system—including prosecutors and law enforcement officials—to be fair, independent, and unbiased actors who collectively strive to uphold public safety and protect society as a whole. S.B. 12 subverts these important principles by specifically targeting the LGBTQ+ community, which is already at a higher risk of violent victimization.

## A.     S.B. 12 Specifically Targets the LGBTQ+ Community

The legislative history of S.B. 12 makes clear that the law is meant to target members of the LGBTQ+ community, especially those who host, perform, or participate in drag performances. Although the text of S.B. 12 does not explicitly mention "drag shows," the intention behind the law and the ripple effects of its enforcement are readily apparent. As the district court noted, "the legislative history shows legislative intent to target drag shows."[23] Indeed, from the bill's inception, the Author's Statement of Intent noted concerns about a "recent cultural trend" of "drag shows."[24]

The text of S.B. 12 confirms that the intention of the law is to target drag performances. S.B. 12's definition of "sexual conduct" includes "sexual conduct" to include "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics." A cornerstone of drag entertainment is the heightened performance and exaggeration of female signifiers and gender roles.[25]

---

[23] Order, ¶ 133.

[24] Pl's Req. for Judicial Notice, Doc. No. 47, Ex. 6 at 1-3 (Bill Analysis).

[25] *See* Jeffrey Brown & Alison Thoet, *Drag Performer Sasha Velour Explains What the Art Form Means to Her*, PBS NEWS HOUR (Jun. 20, 2023, 6:20 PM), https://www.pbs.org/newshour/show/drag-performer-sasha-velour-explains-what-the-art-form-means-to-her.

In addition to S.B. 12's telling legislative history and text, the statements made by various public officials and Texas lawmakers further indicate that S.B. 12 targets drag performances. For example, following the passage of S.B. 12, Lieutenant Governor of Texas, Dan Patrick, released an official statement touting the law as a "top priority" and citing "harmful drag performances" as the rationale.[26] The day S.B. 12 was signed into law, Governor Abbott tweeted, "Texas Governor Signs Law Banning Drag Performances in Public. That's Right."[27] When the law was subsequently blocked from taking effect, Governor Abbott tweeted, "Federal judge in Texas blocks a law I signed that bans sexually explicit drag shows in front of children. This is absurd. We will fight to have this overturned & to protect our children from this indoctrination."[28] Several other legislators have referred to S.B. 12 as a ban targeting drag shows in particular.[29]

---

[26] *Lt. Gov. Dan Patrick: Statement on the Passage of Senate Bill 12 – Banning Children's Exposure to Drag Shows*, OFF. OF THE LIEUTENANT GOVERNOR (Apr. 5, 2023), https://www.ltgov.texas.gov/2023/04/05/lt-gov-dan-patrick-statement-on-the-passage-of-senate-bill-12-banning-childrens-exposure-to-drag-shows/ (last visited Dec. 1, 2023).

[27] Greg Abbott (@GregAbbott_TX), TWITTER (June 24, 2023, 10:03 PM), https://twitter.com/gregabbott_tx/status/1672817859729162240?s=12&t=PdsS2XI_vKHecU3T2VPeyw.

[28] Greg Abbott (@GregAbbott_TX), TWITTER (Sep. 4, 2023, 9:58 AM), https://twitter.com/GregAbbott_TX/status/1698727195416338452.

[29] Caroline Harris (@CarolineForTX), TWITTER (May 22, 2023, 4:09 PM), https://twitter.com/carolinefortx/status/1660754742639837184?s=12&t=PdsS2XI_vKHecU3T2VPeyw; Carrie Isaac (@CarrieIsaac), TWITTER (May 19, 2023, 11:11 PM) https://twitter.com/carrieisaac/status/1659773848676450304?s=12&t=PdsS2

The legislative history and public statements about the law not only make it clear that the purpose of S.B. 12 is to ban drag performances; these statements also communicate to the LGBTQ+ community that the government and, consequently, the people who enforce the law have chosen them as a target for ostracization and criminalization. Indeed, Section II of S.B. 12 bans any performances on government property that could meet the vague "prurient interest" appeal test, thereby further driving this community away from public spaces, traditionally available to all citizens. By forcing performers within the LGBTQ+ community back into the shadows, S.B. 12 attempts to marginalize a community that has fought for decades for visibility and representation in the public sphere.

### B.     S.B. 12's Discriminatory Politicization of the Justice System Negatively Impacts the LGBTQ+ Community

The discriminatory and arbitrary enforcement of S.B. 12 will directly harm members of the LGBTQ+ community and have broader negative impacts on the community. Members of the LGBTQ+ community are significantly more likely to be violently victimized than their non-LGBTQ+ peers.[30] A recent study found that sexual and gender minorities ("SGMs") in the United States are four times more

---

XI_vKHecU3T2VPeyw; Senator Bryan Hughes (@SenBryan Hughes), TWITTER (May 28, 2023, 8:02 PM), https://twitter.com/SenBryanHughes/status/1663002830691524609.

[30] *LGBT People Nearly Four Times More Likely Than Non-LGBT People To Be Victims of Violent Crime*, WILLIAMS INST. (Oct. 2, 2020), https://williamsinstitute.law.ucla.edu/press/ncvs-lgbt-violence-press-release/.

likely to experience violent victimization than non-SGMs and six times more likely to experience violence by someone they know.[31] Only about half of all victimizations are reported to police.[32] One of the authors of the report stated that a possible cause of the higher rates of abuse is the "anti-LGBT prejudice at home, work, or school, which would make LGBT people particularly vulnerable to victimization in numerous areas of their everyday life."[33]

Appellants' actions make it significantly more difficult for law enforcement to protect an already vulnerable population and are harmful in a number of ways.

*First,* there is a strong correlation between the spread of harmful, public misinformation and the passage of these types of laws that target members of minority demographics—like the LGBTQ+ community. For example, a recent report by the Center for Countering Digital Hate and the Human Rights Campaign, showed that immediately following Florida's "Don't Say Gay or Trans" Law, dangerous anti-LGBTQ communications and "grooming" rhetoric surged by over

---

[31] Andrew R. Flores et al., *Victimization Rates and Traits of Sexual and Gender Minorities in the United States: Results from the National Crime Victimization Survey, 2017*, Sci Adv. 6, 40 (2020), https://www.science.org/doi/10.1126/sciadv.aba6910?fbclid=IwAR01oLZW1XfpYlZIif_XRxOTzgBjmddp6ML9zTl6URfqFYCw6vL88CwguHc.
[32] *Id.*
[33] *Id.*

400% across social media platforms.[34] Indeed, bills like S.B. 12 target a particular community, potentially imprinting a state-sanctioned bullseye on members of that community and tacitly giving public approval to hateful acts. Specifically, the LGBTQ+ community has often been attacked in the past under the rubric of "protecting children" from "grooming" with devastating consequences, including efforts to ban LGBTQ+ individuals from teaching in schools.[35]

Put into this context, the inflammatory rhetoric of Governor Abbott and others that characterizes S.B. 12 as protecting children from abuse is just the latest in a long line of attempts to characterize anti-LGBTQ+ laws as morally and politically acceptable.[36] Unfortunately, significant segments of the media and the public appear to accept this rhetoric at face value. This inevitably will have a negative impact on public safety and the effectiveness of law enforcement, because some in the community may feel the law creates a permissive environment to target the

---

[34] Henry Berg-Brousseau, *Digital Hate: Social Media's Role in Amplifying Dangerous Lies About LGBTQ+ People*, CTR. FOR COUNTERING DIGIT. HATE (Aug. 10, 2022), https://counterhate.com/research/digital-hate-lgbtq/.

[35] Melissa Block, *Accusations of 'grooming' are the latest political attack – with homophobic origins*, NPR (May 11, 2022, 5:27 AM), https://www.npr.org/2022/05/11/1096623939/accusations-grooming-political-attack-homophobic-origins.

[36] *See What is "Grooming?" The Truth Behind the Dangerous, Bigoted Lie Targeting the LGBTQ+ Community*, ANTI-DEFAMATION LEAGUE (Sept. 16, 2022), https://www.adl.org/resources/blog/what-grooming-truth-behind-dangerous-bigoted-lie-targeting-lgbtq-community.

LGBTQ+ community. A recent study by GLAAD of 2022 found that Texas led the nation in anti-LGBTQ+ protests and threats targeting specific drag events.[37]

*Second*, members of the LGBTQ+ community will be less likely to report crimes or allow law enforcement into their spaces generally because of a lack of trust in the justice system, whether they are the target of these crimes or they simply witness or are aware of them. Members of the LGBTQ+ community are already significantly less likely to report crimes than the public as a whole, largely because of a lack of trust in law enforcement and doubts as to the interest of the police in protecting them.[38] Law enforcement has a long history of targeting the LGBTQ+ community, going back to the days of vice squad raids on queer spaces[39] and the prosecution of sodomy as a crime.[40] Any law that targets the LGBTQ+ community will further erode this already-troubled relationship between the LGBTQ+ community and law enforcement, and, as a result, have an adverse effect on the

---

[37] *Updated Gladd Report: Drag Events faced at least 141 protest and significant threats in 2022,* GLAAD (Nov. 21, 2022), https://glaad.org/glaad-report-drag-events-faced-least-125-protests-and-significant-threats-2022/.

[38] Emma Keith et al., *Lack of Trust in Law Enforcement Hinders Reporting of LBGTQ Crimes*, THE CTR. FOR PUB. INTEGRITY (Aug. 24, 2018), https://publicintegrity.org/politics/lack-of-trust-in-law-enforcement-hinders-reporting-of-lbgtq-crimes/.

[39] *See generally* ANNA LVOVSKY, VICE PATROL: COPS, COURTS, AND THE STRUGGLE OVER URBAN GAY LIFE BEFORE STONEWALL (2021).

[40] *See, e.g.*, Ella Wiley & John Guzman, *Rebellion and Pride: How Police Have Failed LGBTQ+ Communities*, LEGAL DEF. FUND, https://www.naacpldf.org/pride-history-police-violence/.

community's safety and well-being. Further, LGBTQ+ community spaces will also potentially be more vulnerable to a wide variety of other crimes because owners and employees may not wish to have any involvement with law enforcement at all. Fear and mistrust of law enforcement inevitably has a negative impact on public safety and the prosecution of crime.

*Third*, S.B. 12 contributes to the negative mental health impacts on LBGTQ+ community members and makes them feel less safe. When a group is targeted and marginalized, especially by law enforcement, it can lead to feelings of isolation and shame, which facilitate poor health outcomes like anxiety, depression, and substance abuse.[41] LGBTQ+ people experience structural discrimination that adversely affects their well-being and drives disparate outcomes across crucial areas of life.[42] A recent Center on American Progress survey showed that more than half of LGBTQ+ adults (51%) reported that recent debates about anti-LGBTQ+ state laws had affected their mental health, physical health, financial health, or made them feel less safe to a

---

[41] Annie Wells*, Don't Be a Drag Just Be a Queen: Legislating Gender Representation*, YWCA (Feb. 22, 2023), https://ywcaaustin.org/dontbeadrag/.

[42] *See* NAT'L ACAD. OF SCI., ENG'G, & MED., ET AL., UNDERSTANDING THE WELL-BEING OF LGBTQI+ POPULATIONS (Charlotte J. Patterson, Martin-Jose Sepulveda, and Jordyn White, eds., 2020), https://nap.nationalacademies.org/catalog/25877/understanding-the-well-being-of-lgbtqi-populations.

moderate or significant degree.[43] Legislation banning drag shows reinforces negative attitudes about LGBTQ+ community members and makes it more difficult for them to feel safe in their communities.[44]

Simply put, S.B. 12 has the potential to undermine trust in law enforcement both within and outside of Texas and further contribute to poor health outcomes for an at-risk community. Enforcement of S.B. 12 diminishes the moral weight of the rule of law and jeopardizes the ability of government actors and law enforcement officers to act as protectors of vulnerable groups.

### C. Discriminatory and Unconstitutional Laws, such as S.B. 12, have Adverse Consequences for Public Safety Generally

Prosecutors and law enforcement officials rely on community trust and faith in the integrity of our legal system to perform their duties. When the integrity of the rule of law—and people's belief in its even-handed application and enforcement—is undermined, it becomes more difficult for law enforcement officials and criminal justice leaders to maintain community trust and protect public safety.[45] Unfair,

---

[43] Caroline Medina & Lindsay Mahowald, *Discrimination and Barriers to Well-Being: The State of the LGBTQI+ Community in 2022*, CTR. FOR AM. PROGRESS (Jan. 12, 2023), https://www.americanprogress.org/article/discrimination-and-barriers-to-well-being-the-state-of-the-lgbtqi-community-in-2022/.

[44] Wells, *supra* note 41.

[45] *See, e.g.*, Tom R. Tyler & Jonathan Jackson, *Popular Legitimacy and the Exercise of Legal Authority: Motivating Compliance, Cooperation and Engagement*, 20 PSYCH., PUB. POL'Y & L. 78, 78–79 (2013); FAIR & JUST PROSECUTION, *supra* note 11, at 1 ("Trust between the community and the prosecutor's office is essential to maintain the office's legitimacy and credibility.").

discriminatory, and arbitrary practices by government officials erode essential community confidence and trust in law enforcement and our justice system as a whole.[46]

As discussed above, S.B. 12 will potentially cause community members to avoid the presence of law enforcement in community spaces whenever possible in order to prevent any police actions. This will have an impact not only on potential prosecutions under S.B. 12, but more importantly, on the proper investigation and prosecution of other crimes that may take place in these spaces. If a business owner, for example, is not sure whether a drag show taking place in their business is in violation of S.B. 12, they may not feel safe or comfortable contacting law enforcement for help even if a crime has taken place, such as a burglary or assault.

In sum, *Amici* have significant concerns as to the long-term impact S.B. 12 will have on our legal system and public safety. The ripple effects of this bill will be a loss of trust in law enforcement and further division in the broader community.

---

[46] *See* Goldsmith, *supra* note 11, at 452–57; *see generally* Thomas C. O'Brien & Tom R. Tyler, *Rebuilding Trust Between Police & Communities Through Procedural Justice & Reconciliation*, 5 BEHAV. SCI. & POL'Y 35 (2019).

## <u>CONCLUSION</u>

For the reasons set forth above, *Amici* ask this Court to affirm the lower court's entry of a permanent injunction restraining Appellants from enforcing S.B. 12. The law is too vague and overbroad to be fairly enforced, it politicizes the criminal justice system at the expense of the LGBTQ+ community, and it diverts resources from already overburdened law enforcement officials and the judicial system.

<u>/s/ Omar J. Alaniz</u>
Omar J. Alaniz                                    Amalia Y. Sax-Bolder
Anthony R. Todd                                Craig M. Finger
David G. Murphy                                Denver E. Donchez
**REED SMITH LLP**                      **BROWNSTEIN HYATT**
(TX Bar No. 24040402)                   **FARBER SCHRECK, LLP**
2850 N. Harwood St., Ste. 1500    675 15th Street, Ste. 2900
Dallas, TX 75201                             Denver, CO 80202
Telephone: (713) 469-3800            Telephone: (303) 223-1100
oalaniz@reedsmith.com                  asax-bolder@bhfs.com
atodd@reedsmith.com                    cfinger@bhfs.com
dmurphy@reedsmith.com              ddonchez@bhfs.com

- 23 -

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2024, I caused the foregoing Brief of *Amicus Curiae* Institute for Justice in Support of Plaintiffs-Appellees to be filed electronically with the Clerk of the Court using the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Omar J. Alaniz
Omar J. Alaniz

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation in Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,159 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fifth Circuit Rule 32.2.

2. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

<u>/s/ Omar J. Alaniz</u>
Omar J. Alaniz

**APPENDIX**

# APPENDIX
# LIST OF *AMICI CURIAE*

**Roy L. Austin, Jr.**
Former Deputy Assistant Attorney General, Civil Rights Division, U.S. Department of Justice
Former Deputy Assistant to President Obama for the Office of Urban Affairs, Justice, and Opportunity (White House Domestic Policy Council)

**Wesley Bell**
Prosecuting Attorney, St. Louis County, Missouri

**Buta Biberaj**
Former Commonwealth's Attorney, Loudoun County, Virginia

**Shay Bilchik**
Former Associate Deputy Attorney General, U.S. Department of Justice
Former Administrator of the Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice

**Chesa Boudin**
Former District Attorney, City and County of San Francisco, California

**RaShall Brackney**
Former Chief, Charlottesville Police Department, Virginia

**Joseph Brann**
Former Chief, Hayward Police Department, California
Former Director, Community Oriented Policing Services (COPS Office), U.S. Department of Justice

**Bobbe J. Bridge**
Former Justice, Washington Supreme Court

**Jim Bueermann**
Former Chief, Redlands Police Department, California
Former President, National Police Foundation

**Chris Burbank**
Former Chief, Salt Lake City Police Department, Utah

**Douglas Chin**
Former Attorney General, Hawaii
Former Lieutenant Governor, Hawaii

**John Choi**
County Attorney, Ramsey County (St. Paul), Minnesota

**Jerry Clayton**
Sheriff, Washtenaw County (Ann Arbor), Michigan

**Dave Clegg**
Former District Attorney, Ulster County, New York

**Laura Conover**
County Attorney, Pima County (Tucson), Arizona

**Brendan Cox**
Former Chief, Albany Police Department, New York
Director of Policing Strategies at LEAD National Support Bureau

**Kara Davis**
District Attorney, Gilliam County, Oregon

**Parisa Dehghani-Tafti**
Commonwealth's Attorney, Arlington County and the City of Falls Church, Virginia

**Michael Dougherty**
District Attorney, Twentieth Judicial District (Boulder), Colorado

**Matt Ellis**
District Attorney, Wasco County, Oregon

**Ramin Fatehi**
Commonwealth's Attorney, City of Norfolk, Virginia

**William Royal Furgeson, Jr.**
Former Judge, U.S. District Court, Western District of Texas

**Gil Garcetti**
Former District Attorney, Los Angeles County, California

**Stan Garnett**
Former District Attorney, Twentieth Judicial District (Boulder), Colorado

**George Gascón**
District Attorney, Los Angeles County, California
Former District Attorney, City and County of San Francisco, California
Former Chief, San Francisco Police Department, California
Former Chief, Mesa Police Department, Arizona

**Sarah F. George**
State's Attorney, Chittenden County (Burlington), Vermont

**Sim Gill**
District Attorney, Salt Lake County, Utah

**Deborah Gonzalez**
District Attorney, Western Judicial Circuit (Athens), Georgia

**Kimberly Graham**
County Attorney, Polk County (Des Moines), Iowa

**Kristin Graziano**
Sheriff, Charleston County, South Carolina

**David J. Hickton**
Former U.S. Attorney, Western District of Pennsylvania

**Elizabeth K. Humphries**
Commonwealth's Attorney, City of Fredericksburg, Virginia

**Natasha Irving**
District Attorney, Sixth Prosecutorial District, Maine

**Justin F. Kollar**
Former Prosecuting Attorney, County of Kaua'i, Hawaii

**Lawrence S. Krasner**
District Attorney, Philadelphia, Pennsylvania

**Miriam Aroni Krinsky**
Former Assistant U.S. Attorney, Criminal Appellate Chief, and General Crimes Chief,
U.S. Attorney's Office for the Central District of California
Former Chair, Solicitor General's Advisory Group on Appellate Issues

**Patricia Madrid**
Former Attorney General, New Mexico

**Chris Magnus**
Former Chief, Tucson Police Department, Arizona

**Brian Mason**
District Attorney, Seventeenth Judicial District, Colorado

**Beth McCann**
District Attorney, Second Judicial District (Denver), Colorado

**Garry L. McFadden**
Sheriff, Mecklenburg County (Charlotte), North Carolina

**Mary Moriarty**
County Attorney, Hennepin County (Minneapolis), Minnesota

**Richard Pocker**
Former U.S. Attorney, District of Nevada

**Josh Pond**
District Attorney, Columbia County, Oregon

**Abdul Pridgen**
Former Chief, San Leandro Police Department, California
Former Chief, Seaside Police Department, California

**Ira Reiner**
Former District Attorney, Los Angeles County, California
Former City Attorney, Los Angeles, California

**Eric Rinehart**
State's Attorney, Lake County (Waukegan), Illinois

**Jeff Rosen**
District Attorney, Santa Clara County, California

**Stephen Rosenthal**
Former Attorney General, Virginia

**Marian Ryan**
District Attorney, Middlesex County, Massachusetts

**Jacqueline Sartoris**
District Attorney, Cumberland County (Portland), Maine

**Dan Satterberg**
Former Prosecuting Attorney, King County (Seattle), Washington

**Eli Savit**
Prosecuting Attorney, Washtenaw County (Ann Arbor), Michigan

**Mike Schmidt**
District Attorney, Multnomah County (Portland), Oregon

**Carol Siemon**
Former Prosecuting Attorney, Ingham County (Lansing), Michigan

**Eric Sparr**
District Attorney, Winnebago County, Wisconsin

**Norm Stamper**
Former Chief, Seattle Police Department, Washington

**Darrel Stephens**
Former Executive Director, Major City Chiefs Association
Former Chief, Charlotte-Mecklenburg Police Department, North Carolina

**Matthew Van Houten**
District Attorney, Tompkins County (Ithaca), New York

**Cyrus R. Vance**
Former District Attorney, New York County (Manhattan), New York

**T. John Ward**
Former Judge, U.S. District Court, Eastern District of Texas

**Law Enforcement Action Partnership (LEAP)**