IN THE

# United States Court of Appeals

## FOR THE FIFTH CIRCUIT

◆◆

THE WOODLANDS PRIDE, INCORPORATED;
ABILENE PRIDE ALLIANCE; EXTRAGRAMS, L.L.C.;
360 QUEEN ENTERTAINMENT, L.L.C.; BRIGITTE BANDIT,

*Plaintiffs-Appellees,*

—v.—

WARREN KENNETH PAXTON, IN AN OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF TEXAS; BRETT LIGON, IN AN OFFICIAL
CAPACITY AS DISTRICT ATTORNEY OF MONTGOMERY COUNTY;
MONTGOMERY COUNTY, TEXAS; JAMES HICKS, IN AN OFFICIAL
CAPACITY AS DISTRICT ATTORNEY OF TAYLOR COUNTY; TAYLOR
COUNTY, TEXAS; CITY OF ABILENE, TEXAS,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

## BRIEF FOR *AMICUS CURIAE* THE CHILDREN'S DEFENSE FUND IN SUPPORT OF PLAINTIFFS-APPELLEES

JANICE MAC AVOY
SAMUEL M. LIGHT
EMMA KOLESAR
MORGAN HUMPHREY
ANTONIO J. DELGRANDE
LAURA BRAWLEY
JULIANA D'ALLEVA
ELENA PRIETO
FRIED, FRANK, HARRIS,
  SHRIVER & JACOBSON LLP
One New York Plaza
New York, New York 10004
(212) 859-8000

*Attorneys for Amicus Curiae
  The Children's Defense Fund*

## <u>SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that—in addition to the persons and entities listed in the Plaintiffs'-Appellees' Certificate of Interested Persons—the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

1. **Amici Curiae**

   - Children's Defense Fund
     840 First Street NE, Suite 300
     Washington, DC 20002

2. **Counsel for Amici Curiae**

   - Janice Mac Avoy
     Samuel M. Light
     Emma Kolesar
     Morgan Humphrey
     Antonio J. DelGrande
     Laura Brawley
     Juliana DAlleva
     Elena Prieto
     Fried, Frank, Harris, Shriver & Jacobson LLP
     One New York Plaza
     New York, NY 10004

# **TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ........................................................................1

SUMMARY OF ARGUMENT ............................................................................2

ARGUMENT ....................................................................................................6

I.  S.B. 12 targets speech that is not obscene and is therefore protected by the First Amendment............................................................................................7

II. S.B. 12 violates the First Amendment because it is not narrowly tailored. .........9

    A.    S.B. 12 is not narrowly tailored because it deprives youth of opportunities to observe and participate in expression that is beneficial. .........................................................................................13

    B.    S.B. 12 is not narrowly tailored because it prohibits drag performances in the presence of minors, whether or not the minor's parents have provided consent.............................................16

    C.    S.B. 12 is not narrowly tailored because it fails to distinguish among children of different age groups. ............................................19

CONCLUSION ................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Civil Liberties Union v. Ashcroft*,
  322 F.3d 240 (3d Cir. 2003) ....................................................20, 21

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011)..................................................................*passim*

*Doe ex rel. Doe v. Governor of New Jersey*,
  783 F.3d 150 (3d Cir. 2015) ...............................................................12

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975)..............................................................................12

*Ezell v. City of Chicago*,
  846 F.3d 888 (7th Cir. 2017) .............................................................21

*Fayetteville Pub. Library v. Crawford County, Arkansas*,
  No. 23-cv-05086, 2023 WL 4845636 (W.D. Ark. July 29, 2023) ..............19, 20

*Free Speech Coalition, Inc. v. Paxton*,
  95 F. 4th 263 (5th Cir. 2024) ...........................................................9, 19

*Ginsberg v. State of N.Y.*,
  390 U.S. 629 (1968)..................................................................*passim*

*Interstate Circuit v. Dallas*,
  390 U.S. 676 (1968)..............................................................................13

*Lamont v. Postmaster Gen. of U.S.*,
  381 U.S. 301 (1965)..............................................................................12

*Miller v. California*,
  413 U.S. 15 (1973).....................................................................*passim*

*Moore v. City of Kilgore*,
  877 F.2d 364 (5th Cir. 1989) .............................................................12

*Nat'l Press Photographers Assoc. v. McCraw*,
  90 F.4th 770 (5th Cir. 2024) .............................................................11

*Packingham v. North Carolina*,
582 U.S. 98 (2017)..........................................................................11

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992)............................................................................5

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367 (1969)........................................................................12

*Reno v. American Civil Liberties Union*,
521 U.S. 844 (1997)...............................................................*passim*

*S. Utah Drag Stars v. City of St. George*,
677 F. Supp. 3d 1252 (D. Utah 2023)..............................................3

*Sable Commc'ns of California, v. F.C.C.*,
492 U.S. 115 (1989).....................................................................8, 10

*Stanley v. Georgia*,
394 U.S. 557 (1969)........................................................................12

*United States v. O'Brien*,
391 U.S. 367 (1968)........................................................................11

*United States v. Playboy Entm't Grp.*,
529 U.S. 803 (2000)........................................................................11

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)........................................................................12

**Statutes**

Fla. Stat. Ann. § 1003.21(2)(c)........................................................23

Ga. Code Ann. § 20-2-690.1(a).........................................................23

Miss. Code Ann. § 37-13-91(2)(f)....................................................23

Tex. Penal Code § 21.11(a)..............................................................23

# Other Authorities

Charlotte Lett, *Drag Shows Are Acts of Protest and Self-Expression for LGBTQIA+ Communities of Color* (2023), https://www.aclutx.org/en/news/drag-shows-are-acts-protest-and-self-expression-lgbtqia-communities-color ..................................................4, 15

Clare Wilson & Laura A. Cariola, *LGBTQI+ Youth and Mental Health: A Systematic Review of Qualitative Research* .......................................14

Marianne Sharko et al., *State-by-State Variability in Adolescent Privacy Laws*, 149 PEDIATRICS, June 2022 ........................................23

Press Release, GLAAD, Equality Texas and GLAAD Release Updated Findings on Attacks and Threats Targeting Drag Events in 2022 (December 21, 2022) https://glaad.org/releases/equality-texas-and-glaad-release-updated-findings-attacks-and-threats-targeting-drag-events ...........................................................16

*The Roots of Anti-Trans Violence*, TRANSGENDER L. CTR. (2021), https://transgenderlawcenter.org/regional-reports-texas ...................................15

THE TREVOR PROJECT, THE TREVOR PROJECT RESEARCH BRIEF: ACCEPTING ADULTS REDUCE SUICIDE ATTEMPTS AMONG LGBTQ YOUTH 1 (2019) ...........................................................14

Trevor Project, *2022 National Survey on LGBTQ Youth Mental Health* (2022), https://www.thetrevorproject.org/survey-2022 .................4, 5, 14

Stephen T. Russell & Jessica N. Fish, Mental Health in Lesbian, Gay, Bisexual, and Transgender (LGBT) Youth, 12 Annual Review of Clinical Psychology 465 (2016). .........................................................14

The Children's Defense Fund ("CDF") is a 50-year-old national racial justice nonprofit organization born in the Civil Rights Movement, whose mission is to build community so young people grow up with dignity, hope, and joy. Operating at the intersection of well-being and racial justice for children and youth, CDF envisions a nation where marginalized children flourish, leaders prioritize their well-being, and communities wield the power to ensure they thrive.

Since its founding in 1973, CDF strives to improve policies and programs for children across the country through advocacy, community organizing, direct service, and public policy. CDF also spearheads important research relating to children's survival, protection, and development in all racial and income groups, as well as analyses of how federal and state policies affect children, their families, and their communities. Through this work, CDF has influenced the nation's child policy agenda, including in Texas where it has had an office for over 20 years leading statewide advocacy and local programming for youth and families across the state.

---

[1] Consent to file this *amicus curiae* brief in support of Plaintiffs-Appellees was sought from Plaintiffs-Appellees and Defendants-Appellants. All parties have consented to the filing of this brief.
In accordance with Federal Rule of Appellate Procedure 29, the undersigned counsel for CDF certifies that: no party's counsel authored this amicus brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this amicus brief; and no person or entity, other than CDF, their fellows, or their counsel, contributed money intended to fund the preparation or submission of this amicus brief.

CDF works alongside and amplifies the power of youth and families, representing the distinctive voices and experiences of youth and parents, including LGBTQIA+ youth and youth of color. CDF's work focuses on policies and programs that keep young people and children safe, so that they can experience the joy of growing up. That work necessarily includes creating safe environments where children can play and have unbridled fun.

In Texas, that work includes programming and events where young Texans express themselves through art, film, and advocacy. CDF has also stood with children, youth, and families from their classrooms to the Texas Capitol in firm opposition to the state's ongoing efforts to prohibit resources that provide opportunities for self-expression, reduce stress, and increase community engagement for young Texans. Texas's Senate Bill 12 ("S.B. 12") represents yet another assault on young people's freedom to participate in safe, affirming, and joyful communities.

S.B. 12 affects CDF and those whose interests CDF represents by significantly constraining the First Amendment rights of individuals who wish to participate in drag performances as well as the rights of those who wish to observe them.

## SUMMARY OF ARGUMENT

"The First Amendment of the United States Constitution ensures that all citizens, popular or not, majority or minority, conventional or unconventional, have

access to public spaces for public expression." *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1262 (D. Utah 2023). S.B. 12 undermines that fundamental right.

S.B. 12 represents an unconstitutional restriction on free speech and expression that disproportionately harms the LGBTQIA+ community, and negatively impacts transgender and nonbinary youth of color in particular. Importantly, the State essentially concedes that S.B. 12 regulates speech that is *not obscene* and is therefore subject to First Amendment scrutiny. CDF submits that S.B. 12 is not narrowly tailored to serve the government's interest in "protecting minors," and therefore cannot survive either intermediate *or* strict scrutiny, for three key reasons. *First*, S.B. 12 would impermissibly restrict the rights of minors to view constitutionally protected expression that is affirming and beneficial to them, thereby negatively impacting youth, rather than protecting them. *Second*, S.B. 12 ignores the well-established rights and responsibilities of parents to determine what material is appropriate for their children to experience. *Third*, S.B. 12 fails to account for the significant differences between young children and older teenagers. As a result, under the guise of "protecting minors," S.B. 12 extinguishes important opportunities for youth, particularly LGBTQIA+ teenagers, to engage in self-expression, have fun, and experience affirming spaces that promote acceptance.

Modern drag was born decades ago, as an act of protest and creative expression by Black and Brown communities. Drag is, above all, a joyful display of people being free and comfortable with who they are and creatively exploring other identities through theater, dance, and comedy—a message and experience young people desperately need in a society bombarding them with so many other harmful messages. Drag performances provide not only an artistic outlet for those facing oppression and adversity, but also important economic opportunities. Bills like S.B. 12 foster a climate of anti-transgender hate that disproportionately harms Black and Brown communities, including the very communities that helped to birth drag in the first place.[2]

While drag can be empowering and entertaining for people of all identities, recognizing and acting against such hate and stigmatization is particularly important given the recent increased rates of attempted suicide of, and bullying and violence against, LGBTQIA+ youth and youth of color.[3] Further, open and accepting communities and LGBTQIA+ affirming spaces—*such as drag shows*—contribute

---

[2] Charlotte Lett, *Drag Shows Are Acts of Protest and Self-Expression for LGBTQIA+ Communities of Color*, ACLU TEX. (Aug. 25, 2023, 8:15AM), https://www.aclutx.org/en/news/drag-shows-are-acts-protest-and-self-expression-lgbtqia-communities-color.

[3] *2022 National Survey on LGBTQ Youth Mental Health*, THE TREVOR PROJECT (2022), https://www.thetrevorproject.org/survey-2022 [hereinafter *The Trevor Project Survey*].

to the mental well-being of LGBTQIA+ youth.[4] Yet, through S.B. 12, Texas specifically intended for access to such spaces to be significantly constrained. The State's blatant discrimination based on its disfavoring drag performances must not be permitted to stand.

In sum, S.B. 12, if not invalidated, would not only restrict the rights of drag performers and related parties, but would impermissibly restrict the rights of minors to view such constitutionally protected expression: expression that is neither obscene nor harmful. It does so not solely because S.B. 12 is not narrowly tailored in any sense, but specifically because it fails to provide an exception for parental consent and fails to distinguish between older and younger minors. S.B. 12, contrary to Texas's purported interest in protecting minors (which all agree is a legitimate interest), will instead *harm* minors by preventing children, especially LGBTQIA+ children, from being able to experience drag performances, which, like other forms of performance art, impart artistic, social, and political value.

For the reasons explained below, the district court properly held that S.B. 12 is a restriction on speech in violation of the First Amendment. This Court should affirm.

---

[4] *Id.*; *see also infra* Section II.A.

# **ARGUMENT**

The government may not regulate speech "based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992). Nor does the government possess a "free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011). S.B. 12 reaches far beyond those guardrails and is an unconstitutional restriction on free speech in violation of the First Amendment. As a threshold matter, S.B. 12 targets speech that is not obscene even to minors, as Appellant Attorney General Paxton ("Paxton") concedes,[5] and is therefore protected by the First Amendment. Accordingly, whether evaluated under strict or intermediate scrutiny, S.B. 12 must be narrowly tailored to further the government's stated interest of protecting minors. S.B. 12, however, is not narrowly tailored—indeed, far from it—including because it deprives youth of opportunities to engage with expression that is beneficial to their well-being, it ignores the well-established rights of parents to guide their children's upbringing, and it fails to account for the significant differences between young children and older teenagers with respect to their ability to process and engage with the targeted speech. While all minors retain

---

[5] *See* Appellant's Br. at 46 ("[T]he Attorney General is defending S.B. 12's constitutionality on the ground that it does not regulate any inherently expressive conduct—not on the ground that Plaintiffs' conduct involves obscene speech unprotected by the First Amendment.").

the right to receive constitutionally-protected information and ideas, it is particularly vital to protect the rights of minors to experience drag performances that promote community, self-expression, and self-acceptance.

Taken together, these flaws demonstrate that S.B. 12 is an overbroad and unconstitutional restriction on free speech.

## I.    S.B. 12 targets speech that is not obscene and is therefore protected by the First Amendment.

S.B. 12 purports to regulate "sexually oriented performances," which the bill defines as "visual performances" that (A) feature (i) a performer who is nude or (ii) a performer who engages in "sexual conduct"; and (B) appeal to the prurient interest in sex. ROA.1244-45.

In *Miller v. California*, 413 U.S. 15 (1973), the Supreme Court set forth a three-part test for determining whether speech is "obscene" and therefore not subject to First Amendment protection. When evaluating whether a regulation permissibly curtails obscene speech, courts must decide:

> (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24 (internal quotations and citations omitted). Speech that does not meet the strict definition set forth in *Miller*—even if sexually oriented—does not fall under

the obscenity exception to the First Amendment. *See, e.g., Sable Commc'ns of Cal., v. FCC*, 492 U.S. 115, 126 (1989) ("Sexual expression which is indecent but not obscene is protected by the First Amendment.").

While S.B. 12 references a performance's "appeal to the prurient interest in sex," ROA.1245, adopted from *Miller*, it neither defines that phrase nor incorporates any other language from any of the three prongs of the *Miller* test. S.B. 12, accordingly, and as the district court recognized, ROA.1281-82, cannot be tailored to target speech that is "obscene," even only with respect to minors. The legislature could have incorporated the well-established *Miller* standard to avoid unnecessarily burdening the rights of performers and their audiences—but indeed deliberately chose not to—demonstrating that S.B. 12 is not sufficiently tailored to withstand First Amendment scrutiny.

For that reason, S.B. 12 lies in stark contrast to laws regulating minors' access to explicit content that have withstood First Amendment scrutiny. For example, in *Ginsberg v. State of New York*, the Supreme Court upheld the constitutionality of a New York statute that prohibited the sale of certain materials "harmful to minors," which was defined by reference to all three elements of the *Miller* analysis. 390 U.S. 629, 641-43 (1968). And more recently, this Court upheld the constitutionality of Texas H.B. 1181, a law requiring age verification for pornographic websites. *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 267 (5th Cir. 2024). There, a panel

of this Court recognized that "H.B. 1181 is restricted to material obscene *for minors*," in light of its incorporation of all three prongs of the *Miller* test, modified to apply to minors. *Id.* at 271. The Court also emphasized, *inter alia*, H.B. 1181's carveout for "[p]arental participation or consent," and the fact that it targets only "distribution to minors," rather than imposing burdens on all speech, in distinguishing H.B. 1181 from laws at issue in other cases in which strict scrutiny was applied. *Id.* at 272, 280. H.B. 1181, therefore, is vastly different from S.B. 12, which restricts minors' ability to view drag performances regardless of whether they are deemed appropriate by their parents (and also restricts *adults'* rights to view drag performances), and cannot support Appellant's position.

In sum, given that S.B. 12 targets a category of speech far broader than only that which is "obscene," it is subject to First Amendment scrutiny and must be narrowly tailored to further the State's interest in "protecting minors."

## II. S.B. 12 violates the First Amendment because it is not narrowly tailored.

S.B. 12 fails the narrow tailoring requirement for content-based speech restrictions under both strict and intermediate scrutiny. The law's age restrictions are fatally overbroad in three ways: (i) the restrictions fail to consider the positive impact drag performances have on LBGTQIA+ youth; (ii) the restrictions ignore parents' well-established rights to determine what material their children are exposed to; and (iii) the restrictions fail to distinguish between young children and older teenagers,

for whom issues of self-expression are especially important. As a result, S.B. 12 specifically and insidiously discriminates against the content and viewpoint of drag performances, and wholesale deprives youth, including LGBTQIA+ youth, of important opportunities for self-expression and to experience affirming spaces that promote acceptance.

Regardless of whether the Court applies intermediate or strict scrutiny,[6] S.B. 12 violates the First Amendment because it is not narrowly tailored to further the State's compelling interest in "safeguarding the physical and psychological well-being of minors," Appellants' Br. at 27, or the State's substantial interest in "combatting the deleterious secondary effects of minors' exposure to sexually explicit conduct," *id.* at 35.

"If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. If a *less restrictive alternative* would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000) (emphasis added) (citation omitted). Indeed, as the Supreme Court has recognized, "even where speech is

---

[6] Although S.B. 12 cannot survive either intermediate or strict scrutiny, S.B. 12 is a content-based and viewpoint-based restriction on speech, and the district court therefore correctly concluded that strict scrutiny applies. *See, e.g.*, *Sable Commc'ns*, 492 U.S. at 127. On its face, S.B. 12 seeks to regulate performances based on their content and messages, and its legislative history and lawmakers' public statements regarding the bill confirm the same. ROA.1247-48.

indecent and enters the home, the objective of shielding children does not suffice to support a blanket ban if the protection can be accomplished by a less restrictive alternative." *Id.* at 814. In other words, "the governmental interest in protecting children from harmful materials . . . *does not justify an unnecessarily broad suppression of speech addressed to adults.*" *Reno v. ACLU*, 521 U.S. 844, 875 (1997) (emphasis added).

To withstand intermediate scrutiny, a restriction on speech must "further[] an important or substantial governmental interest," be "unrelated to the suppression of free expression," and the "incidental restriction on alleged First Amendment freedoms" must be "*no greater than is essential to the furtherance of that interest.*" *United States v. O'Brien*, 391 U.S. 367, 377 (1968) (emphasis added). In other words, narrow tailoring in the context of intermediate scrutiny requires that "the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Nat'l Press Photographers Ass'n. v. McCraw*, 90 F.4th 770, 793 (5th Cir. 2024) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994)). *See also Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017) (law prohibiting sex offenders from accessing social media sites burdened far more speech than necessary, failing intermediate scrutiny).

Here, equally as important as individuals' First Amendment rights to express themselves is the reciprocal right of individuals, including youth, to *receive*

information and ideas. *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas."); *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them."); *Moore v. City of Kilgore*, 877 F.2d 364, 370 (5th Cir. 1989) ("A listener's interest enjoys protection just as the speaker's interest finds refuge behind the shield of the First Amendment."). A recipient's right to receive information therefore is subject to the same protections as a speaker's right to disseminate that information. *See Doe ex rel. Doe v. Governor of New Jersey*, 783 F.3d 150, 155 (3d Cir. 2015) (citing *Va. State Bd. of Pharmacy*, 425 U.S. at 756-57; *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982)). This right extends not only to information, but also encompasses "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969).

Minors "are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials" to them. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975) (citations omitted); *see also Brown*, 564

U.S. at 794 ("No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed.") (citations omitted). Regulations restricting minors' rights to receive information must therefore contain "narrowly drawn, reasonable and definite standards for [administering] officials to follow," *Interstate Circuit v. Dallas*, 390 U.S. 676, 690 (1968) (quoting *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951)).

**A. S.B. 12 is not narrowly tailored because it deprives youth of opportunities to observe and participate in expression that is beneficial.**

As an initial matter, S.B. 12's blanket restrictions with respect to individuals under eighteen cannot be narrowly tailored to protect minors in light of the *positive effects* drag performances have on LGBTQIA+ youth, and the role drag performances play in combatting discrimination and hate. Indeed, a recent national survey indicated that nearly 1 in 5 transgender and nonbinary youth attempted suicide in the last year, and LGBTQIA+ youth of color reported higher rates of attempted suicide than their white peers.[7] The survey also determined that "LGBTQ youth who live in a community that is accepting of LGBTQ people reported significantly lower rates of attempting suicide than those who do not."[8] Consistent

---

[7] *The Trevor Project Survey*, *supra* note 3.
[8] *Id. See also* THE TREVOR PROJECT, THE TREVOR PROJECT RESEARCH BRIEF: ACCEPTING ADULTS REDUCE SUICIDE ATTEMPTS AMONG LGBTQ YOUTH 1 (2019)

with those findings, researchers have identified that "the sense of solidarity and friendship in the face of isolation and a physical place such as [a gender and sexuality alliance] or community group, where sexual and gender minority youth can be physically and mentally safe while forging connections with peers, was found to be a vital protective factor for LGBTQI+ youth."[9] Another analysis determined that "studies show that youth who live in communities that are generally supportive of LGBT rights . . . are less likely to attempt suicide even after controlling for other risk indicators, such as a history of physical abuse, depressive symptomatology, drinking behaviors, and peer victimization . . . ."[10] Such data demonstrates that representation and acceptance are crucial to mental well-being. As the district court correctly concluded, drag shows "express a litany of emotions and purposes, from humor and pure entertainment to social commentary on gender roles." ROA.1276. One of those purposes is to foster community, acceptance, and self-expression.[11] A law that excludes the vast majority of teenagers—for whom issues of self-identity are particularly salient—from attending (non-obscene) drag performances that

(finding that "LGBTQ youth who report having at least one accepting adult were 40% less likely to report a suicide attempt in the past year.").

[9] Clare Wilson & Laura A. Cariola, *LGBTQI+ Youth and Mental Health: A Systematic Review of Qualitative Research*, 5 ADOLESCENT RSCH. REV. 187, 202 (2020).

[10] Stephen T. Russell & Jessica N. Fish, Mental Health in Lesbian, Gay, Bisexual, and Transgender (LGBT) Youth, 12 ANN. REV. OF CLINICAL PSYCH. 465, 472-473 (2016).

[11] *E.g.*, LETT, *supra* note 2.

provide creative outlets and safe spaces simply cannot be narrowly tailored to "protect minors."

On the contrary, the endorsement of legislation like S.B. 12, specifically designed to target expression like drag shows, contributes to the climate of anti-LGBTQIA+ discrimination that is already pervasive in society and *negatively* affects youth. The Transgender Law Center reported that between 2017 and 2020, fourteen Texans were the victims of fatal transphobic violence.[12] And Equality Texas, in partnership with GLAAD, has released research regarding the increased attacks and threats targeting drag events. Sarah Ellis, GLAAD's president and CEO, aptly noted that "attacks against drag events and performers are part of a truly alarming trend of targeting LGBTQ people and youth through baseless legislation, vile rhetoric, school censorship, book bans and intimidation. Extremists are increasingly emboldened by reckless politicians who smear LGBTQ people and our allies."[13] In the face of such facts and data, the government's stated interest in protecting minors from harm rings hollow—S.B. 12 in fact has the potential to inflict far greater harm than it purports to protect against.

---

[12] *The Roots of Anti-Trans Violence*, TRANSGENDER L. CTR. (2021), https://transgenderlawcenter.org/regional-reports-texas.
[13] Press Release, GLAAD, Equality Texas and GLAAD Release Updated Findings on Attacks and Threats Targeting Drag Events in 2022 (December 21, 2022) https://glaad.org/releases/equality-texas-and-glaad-release-updated-findings-attacks-and-threats-targeting-drag-events.

**B.    S.B. 12 is not narrowly tailored because it prohibits drag performances in the presence of minors, whether or not the minor's parents have provided consent.**

As the district court correctly noted, "S.B. 12 is completely silent on the role of a parent or the parent's ability to send to and control their child seeing a performance that—while it may offend some—does not rise to the definition of obscenity as contemplated by *Miller*." ROA.1282. Society has historically recognized the *right* and, indeed, *responsibility* of parents to regulate the material to which their children are exposed as they see fit. *See, e.g.*, *Brown*, 564 U.S. at 837-38 (Thomas, J., dissenting). And "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Ginsberg*, 390 U.S. at 639.

In *Ginsberg*, the Supreme Court upheld the constitutionality of a New York statute that prohibited the sale to individuals under the age of seventeen of certain materials defined to be obscene to them.[14] *Id.* at 631. In doing so, the Court noted that "the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children," *id.* at 639, and explained the difference between laws that "impose a morality on children" and those that "support the right

---

[14] In stark contrast to S.B. 12, the statute at issue in *Ginsberg* also included a scienter requirement, and only restricted material that was "utterly without redeeming social importance for minors." *Ginsberg*, 390 U.S. at 643, 646.

of parents to deal with the morals of their children as they see fit," *id.* at 639 n.7 (citing Louis Henkin, *Morals and the Constitution: The Sin of Obscenity*, 63 COLUM. L. REV. 391, 413, n.68 (1963)).

Years later, in *Reno*, the Supreme Court invalidated a statute purporting to protect minors from "indecent" and "patently offensive" communications over the internet. 521 U.S. at 849. The Court contrasted the statute upheld in *Ginsberg*, in part because "neither the parents' consent—nor even their participation—in the communication would avoid the application of the statute" at issue in *Reno*. *Id.* at 865.

And decades later, consistent with the principles relating to parents' rights it acknowledged in *Ginsberg* and *Reno*, the Supreme Court held in *Brown* that a law that prohibited the sale or rental of "violent" video games to minors could not withstand strict scrutiny, in part because:

> Not all of the children who are forbidden to purchase violent video games on their own have parents who *care* whether they purchase violent video games. While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want. This is not the narrow tailoring to "assisting parents" that restriction of First Amendment rights requires.

564 U.S. at 804 (emphasis in original).[15] The Court further noted its "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802 (emphasis in original). It is not.

Here, moreover, the issue is not simply that there are parents who may not "care"—as the Supreme Court in *Brown* put it—whether their children observe drag performances. Instead, some parents may value, for example, the artistic and creative expression of such performances, and the affirming and accepting spaces they create. This is especially true for older youth, for whom issues relating to self-expression and gender expression are particularly salient, and whom S.B. 12 makes no effort to distinguish from younger children (*see infra* Section II.C).

S.B. 12 is not narrowly tailored because it is overbroad, including because it restricts protected expression in the presence of minors even if a minor's parent or guardian has made the judgment that such expression would *promote* the minor's well-being, rather than harm it, as Texas claims.[16]

---

[15] Justice Thomas, moreover, in his dissenting opinion in *Brown*, emphasized that "[t]he Court's constitutional jurisprudence 'historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children.'" *Brown*, 564 U.S. at 837 (Thomas, J., dissenting) (quoting *Parham v. J.R.*, 442 U.S. 584, 602 (1979)).

[16] *See also Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 267 (5th Cir. 2024) (noting that "[p]arental participation or consent . . . can circumvent H.B. 1181," upholding law at issue and distinguishing it from other cases in which strict scrutiny applied).

**C.    S.B. 12 is not narrowly tailored because it fails to distinguish among children of different age groups.**

Even more absurdly, as the district court correctly pointed out, S.B. 12 "does not distinguish children by the age of a child" and "treats an older teenager the same as a much younger child, which is problematic . . . ." ROA.1282. Simply put, while drag shows are neither inherently obscene nor harmful for children of any age, what may be "harmful" or inappropriate to a six-year-old child may not be to a seventeen-year-old teenager. Courts across the country have acknowledged this commonsense principle in various contexts.

For example, recently, in *Fayetteville Public Library v. Crawford County*, the court preliminarily enjoined an Arkansas law aimed at, *inter alia*, penalizing librarians and booksellers for making available materials "deemed obscene as to minors." No. 5:23-cv-05086, 2023 WL 4845636, at *1 (W.D. Ark. July 29, 2023). In determining that the statute's "restrictions on constitutionally protected speech [we]re . . . unjustified," the court explained that "the only way librarians and booksellers could comply with the law would be to keep minors away from any material considered obscene as to the youngest minors—in other words, any material with any amount of sexual content," which would burden "*any older minor's ability to access free library books appropriate to his or her age and reading level.*" *Id.* at *16 (emphasis added). *See also id.* at *19 (noting that "the term 'harmful to minors'

would sweep in materials that are constitutionally protected as to older minors and place unjustified burdens on their access").

As another example, in *American Civil Liberties Union v. Ashcroft*, the Court of Appeals for the Third Circuit determined that a statute purporting to regulate material transmitted over the internet considered "harmful to minors" was not narrowly tailored, in part because the statute did not "limit the term minor in any way," apart from defining "minor" as "any person under 17." 322 F.3d 240, 253 (3d Cir. 2003). While the statute incorporated the *Miller* three-part test for determining whether material is obscene and therefore not subject to First Amendment protection,[17] the Third Circuit reasoned that because "minor" as used in the statute could apply to both an infant and a person just under seventeen, web publishers would not know which "'minors' should be considered in deciding the particular

---

[17] The statute at issue in *Ashcroft* restricted material which:

> (A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;
>
> (B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and
>
> (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

322 F.3d at 246 (quoting 47 U.S.C. § 231(e)(6)).

content of their Internet postings," and would be forced to "guess at the potential audience of minors and their ages so that [they could] refrain from posting material that will trigger the prurient interest, or be patently offensive with respect to those minors who may be deemed to have such interests." *Id.* at 254.[18] The court further noted that "materials that have 'serious literary artistic political or scientific value for a sixteen-year-old'" could not "have the same value for a minor who is three years old." *Id.* at 253–54.

S.B. 12's age restrictions are even more troubling, given the bill's vague attempt to define the "sexually oriented performances" it restricts as those that "appeal[] to the prurient interest in sex." The bill does not address to *whose* "interest" such performances must appeal to be considered "sexually oriented," nor does it consider appropriateness of performances in relation to a minor's age.[19]

For the same reasons, Appellant's reliance on the general proposition that "most States have laws penalizing persons who disseminate sexually explicit

---

[18] *Cf. Ezell v. City of Chicago*, 846 F.3d 888, 896, 898 (7th Cir. 2017) (invalidating regulation regarding firing range facilities because "[b]anning *anyone* under age 18 from entering a firing range prevents older adolescents and teens from accessing adult-supervised firearm instruction in the controlled setting of a range," and therefore regulation "*completely extinguish[ed]* the right of older adolescents and teens in Chicago to learn how to shoot in an appropriately supervised setting at a firing range") (emphasis in original).

[19] Such definitions are even more puzzling in light of S.B. 12's authorizing local governments to regulate "sexually oriented performances" on public property regardless of whether minors are present. ROA.1292–93.

materials to children ages 17 and under; and several Supreme Court decisions have sustained the constitutionality of statutes protecting children ages 17 and under" is misplaced. Appellant's Br. at 40 (quoting *Action for Children's Television v. FCC*, 58 F.3d 654, 664 (D.C. Cir. 1995) (en banc)). Paxton fails to identify any analogous statute the constitutionality of which was upheld, and, in any event, the constitutionality of *other laws* with *different provisions* in *different contexts* says nothing about the constitutionality of S.B. 12. And the Supreme Court has recognized the significance of even the difference between seventeen- and eighteen-year-olds in the context of restrictions on speech. *See Reno*, 521 U.S. at 865-66 (contrasting statute at issue from that at issue in *Ginsberg*, because in *Ginsberg* the "statute defined a minor as a person under the age of 17, whereas the [the statute here], in applying to all those under 18 years, includes an additional year of those nearest majority").

In addition to courts, legislatures across the country have recognized that older teenagers (under the age of eighteen) are entitled to make decisions regarding their own well-being. For example, several states permit sixteen- and seventeen-year-olds to decide to stop attending school. *See, e.g.*, FLA. STAT. ANN. § 1003.21(2)(c); GA. CODE ANN. § 20-2-690.1(a); MISS. CODE ANN. § 37-13-91(2)(f). In nearly every state, those under the age of eighteen may consent to medical services, including

contraceptive-related services, without parental consent.[20] And, importantly, in Texas, an individual may consent to engage in sexual activity with another person at the age of seventeen, rendering S.B. 12's restricting of "sexually oriented performances" to those eighteen and older completely contradictory and unreasonable. Tex. Penal Code § 21.11(a).

*     *     *

In sum, S.B. 12 "lacks the precision that the First Amendment requires when a statute regulates the content of speech." *Reno*, 521 U.S. at 874.

<h2 style="text-align:center"><u>CONCLUSION</u></h2>

For these reasons, CDF requests that this Court affirm the district court's Order.

Dated: April 17, 2024

Respectfully submitted,

*/s Janice Mac Avoy*
Janice Mac Avoy
Samuel M. Light
Emma Kolesar (admission pending)

**FRIED, FRANK, HARRIS,**
**   SHRIVER & JACOBSON LLP**
One New York Plaza
New York, New York 10004

---

[20] *See* Marianne Sharko et al., *State-by-State Variability in Adolescent Privacy Laws*, 149 Pediatrics, June 2022, at 1, 3-6.

(212) 859-8000
janice.macavoy@friedfrank.com
samuel.light@friedfrank.com
emma.kolesar@friedfrank.com

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5409 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

*/s Samuel M. Light*
Samuel M. Light

*Counsel for Amicus Curiae*
*Children's Defense Fund*