**23-20480**

# United States Court of Appeals for the Fifth Circuit

THE WOODLANDS PRIDE, INCORPORATED; ABILENE PRIDE ALLIANCE; EXTRAGRAMS L.L.C.; 360 QUEEN ENTERTAINMENT, L.L.C.; BRIGITTE BANDIT,

*Plaintiffs-Appellees*,

*v.*

WARREN KENNETH PAXTON, IN AN OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS; BRETT LIGON, IN AN OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF MONTGOMERY COUNTY; MONTGOMERY COUNTY, TEXAS; JAMES HICKS, IN AN OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF TAYLOR COUNTY; TAYLOR COUNTY, TEXAS; CITY OF ABILENE, TEXAS,

*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION
Case No. 4:23-cv-02847

**BRIEF OF AMICUS CURIAE ACTORS' EQUITY ASSOCIATION IN SUPPORT OF PLAINTIFFS-APPELLEES**

Megan Stater Shaw
Cohen, Weiss and Simon LLP
909 Third Avenue, 12th Floor
New York, NY 10022
(212) 356-0205

Andrea Hoeschen
Actors' Equity Association
557 Randolph Street
Chicago, IL 60661
(212) 869-8530

*Counsel for Actors' Equity Association*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

I, the undersigned counsel of record, pursuant to Fifth Circuit Rule 29.2, certifies that—in addition to the persons and entities listed in the Appellees' Certificate of Interested Persons—the following list of persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case.   These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Amicus Curiae: Actors' Equity Association.

2. Counsel for Actors' Equity Association: Megan Stater Shaw of Cohen, Weiss and Simon LLP; Andrea Hoeschen of Actors' Equity Association.

Dated:  April 17, 2024                    */s Megan Stater Shaw*
                                           Megan Stater Shaw

                                           *Counsel for Actors' Equity*
                                           *Association*

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Actors' Equity Association does not have any parent corporation and no publicly held corporation holds 10% or more of its stock because it is an unincorporated voluntary association.

Dated:  April 17, 2024

*/s Megan Stater Shaw*
Megan Stater Shaw

*Counsel for Actors' Equity Association*

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ................................................................ 1

INTRODUCTION ............................................................................... 2

ARGUMENT ..................................................................................... 6

I.  THE ACT IS UNCONSTITUTIONALLY OVERBROAD AND
    VAGUE ..................................................................................... 6

    A.  The Act is Impermissibly Overbroad .................................. 7

        1.  The Act Applies to a Wide Swathe of Protected Speech.......... 7

        2.  The Act Lacks Geographical Limitations or a Parental
        Consent Defense. ............................................................ 9

    B.  The Act is Vague and Insufficiently Definite ..................... 12

II. THE ACT DETERS LIVE THEATRICAL PRODUCTIONS
    PERFORMED BY EQUITY MEMBERS IN TEXAS ................................ 16

    A.  The Controversial Live Theatrical Productions Performed by
        Equity Members are Indistinguishable from Drag Shows, Use
        Prosthetics, and Include Nudity. ...................................... 17

    B.  By Covering Equity Productions, the Act will Chill Protected
        Speech in Texas. ............................................................. 21

    C.  A Chill on Live Theatrical Productions will have a Significant
        Economic Impact on the State of Texas. ............................. 22

CONCLUSION ................................................................................. 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Free Speech Coalition*,
  535 U.S. 234 (2002).........................................................................7, 9

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973)..............................................................................6

*City of Houston v. Hill*,
  482 U.S. 451 (1987)..............................................................................7

*Cohen v. California*,
  403 U.S. 15 (1971)................................................................................7

*Ginsberg v. New York*,
  390 U.S. 629 (1968)............................................................................11

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018)............................................................................12

*Kolender v. Lawson*,
  461 U.S. 352 (1983)..............................................................................6

*Members of City Council v. Taxpayers for Vincent*,
  466 U.S. 789 (1984)..............................................................................6

*Miller v. California*,
  413 U.S. 15 (1973).............................................4, 7, 8, 9, 13, 14, 15

*New York v. Ferber*,
  458 U.S. 747 (1982)..............................................................................7

*Reno v. American Civil Liberties Union*,
  521 U.S. 844 (1997)...................................................................6, 12, 13

*Sable Commc'ns of Cal., Inc. v. F.C.C.*,
  492 U.S. 115 (1989)............................................................................10

*Schacht v. United States*,
  398 U.S. 58 (1970)................................................................................8

*Schad v. Borough of Mt. Ephraim*,
    452 U.S. 61 (1981) ..................................................................................8

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) ...........................................................................8, 20

*Smith v. Goguen*,
    415 U.S. 566 (1974) ...............................................................................12

*Stanley v. Georgia*,
    394 U.S. 557 (1969) ...............................................................................11

*United States v. Hansen*,
    599 U.S. 762 (2023) .................................................................................6

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000) .................................................................................6

**Constitutional Authorities**

U.S. CONST., amend. I ....................................................................*passim*

**Statutes**

S.B. No. 12, 88th Leg., R.S. (2023), *available at*
    https://capitol.texas.gov/tlodocs/88R/billtext/pdf/SB00012I.pdf#na
    vpanes=0 ...................................................................................................3

Tex. Bus. & Com. Code § 102.051 ...........................................................4

Tex. Health & Safety Code §§ 769.001-769.002 ....................................3

Tex. Penal Code § 12.21 ...........................................................................3

Tex. Penal Code § 43.21 ...........................................................13, 14, 15

Tex. Penal Code § 43.28 ...........................................2, 3, 4, 10, 14, 15

**Other Authorities**

*2013 Grammy Winners*, RECORDING ACADEMY GRAMMY AWARDS,
    https://www.grammy.com/awards/56th-annual-grammy-awards
    (last visited Oct. 27, 2023) .......................................................................2

*Compare 'Rent' Controversy in Idaho: LGBT Content in Lake City Playhouse Musical Sparks Backlash* (Dec. 23, 2011, 1:36 P.M.), https://www.huffpost.com/entry/rent-controversy-in-idaho_n_1167896; ..............................................................................20

*Everybody Say Yeah! Kinky Boots is Available for Licensing*, MUSIC THEATRE INT'L (Feb. 17, 2022), https://www.mtishows.com/news/everybody-say-yeah-kinky-boots-is-available-for-licensing ...........................................................2

Greg Abbott (@GregAbbott_TX), Twitter (June 25, 2023 at 12:03 A.M.), https://twitter.com/GregAbbott_TX/status/1672817859729162240....................3

Jeff Lunden, *In the Broadway Musical '1776,' the Revolution is in the Casting*, NPR (Oct. 15, 2022, 5:00 AM), https://www.npr.org/2022/10/15/1128740858/broadway-musical-1776-gender-race#:~:text=Roundabout%20Theatre%20Company-,Elizabeth%20A.,as%20John%20Adams%20in%201776 .................................18

*Kinky Boots' Walks Tall in Macy's After Parade Controversy*, PAGE SIX (Nov. 30, 2013, 3:29 AM), https://pagesix.com/2013/11/30/kinky-boots-walks-tall-in-macys-after-thanksgiving-parade-controversy/.............................................................21

Marc Hershberg, *Musicals Make More Money on the Road than on Broadway*, FORBES (Feb. 3, 2019, 6:00 PM), https://www.forbes.com/sites/marchershberg/2019/02/03/musicals-make-more-money-on-the-road-than-on-broadway/?sh=211799f8a111 ...............................................................22

Marybeth Hamilton, *Mae West Live: "SEX, The Drag, and 1920s Broadway"*, 36 The MIT Press 82 (1992) ...........................................................20

Nancy Roberts Trott, *School District Anti-Gay Policy Splits N.H. Town*, L.A. TIMES (Mar. 17, 1996, 12:00 AM), https://www.latimes.com/archives/la-xpm-1996-03-17-mn-47986-story.html ......................................................................................18

*Past Shows*, Zilker Theatre Productions, https://zilker.org/about-ztp/past-shows/ (last accessed Apr. 16, 2024) ...................................................10

*The Economic Impact of Touring Broadway 2016-2017 Season*, THE
    BROADWAY LEAGUE (Aug. 2020),
    https://www.broadwayleague.com/research/research-reports/ ..........................23

*Don't Say Gay? Students Say Bucks School District Killed Musical
    'Rent' Because It Has Queer Relationships*, THE MORNING CALL
    (Apr. 19, 2022, 7:56 AM) ..................................................................................20

WILLIAM SHAKESPEARE, TWELFTH NIGHT ...............................................................18

*Winners / Kinky Boots*, THE AM. THEATRE WING'S TONY AWARDS,
    https://www.tonyawards.com/winners/year/any/category/any/show
    /kinky-boots/ (last visited Apr. 17, 2023) ...........................................................2

## **STATEMENT OF INTEREST**[1]

Actors' Equity Association ("Equity"), a labor organization that represents live theatrical actors and stage managers, is devoted to protecting live theatre as an essential component of a thriving civil society and the basis of its members' livelihoods.  Since 1913, Equity has fought to win its members a dignified workplace at the theatre, from pay guarantees and pension and welfare benefits to the rules governing auditions.  With more than 51,000 members across the nation, Equity is among the oldest and largest labor unions in the performing arts in America.  Broadway tours of America's favorite musicals come to Texas each year, and approximately 1,042 Equity members permanently reside in Texas, where they can perform in 149 Equity-affiliated theatres.  Preserving the First Amendment right to perform in uncensored, controversial works of art in the public sphere is essential to Equity's mission.  It is in defense of this freedom, and for the reasons set out in this brief, that Equity now urges this Court to affirm the ruling of the district court.

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), amicus certifies that no counsel for any party authored this brief in whole or in part and no person or entity other than amicus or its counsel made any monetary contribution towards its preparation or submission.  Under Federal Rule of Appellate Procedure 29(a)(2), all parties to this appeal have been asked to consent to the filing of this brief, and all parties consent.

## **INTRODUCTION**

The audience's first introduction to Lola, a principal character in the hit Broadway musical *Kinky Boots*, is in an alleyway. Charles, the inheritor of a bankrupt family shoe business, chances upon an alleyway assault: a group of men hassling a woman in high-heeled shoes. The woman uses one of her shoes to knock one man unconscious before Charles can intervene. "He wasn't the first man to fall for me," she says, slipping out of her coat and breaking into song. This is Lola, a drag queen with prosthetic breasts who performs with a retinue of Angels, all in drag. She inspires Charles to revitalize his shoe factory by manufacturing high heels for her underserved niche.[2]

*Kinky Boots* is a heartwarming comedy that won six Tony Awards and a Grammy.[3] It also may be prohibited by Texas's recent enactment of Senate Bill 12 (the "Act"). *See* Tex. Penal Code. § 43.28.

---

[2] *See Everybody Say Yeah! Kinky Boots is Available for Licensing*, MUSIC THEATRE INT'L (Feb. 17, 2022), https://www.mtishows.com/news/everybody-say-yeah-kinky-boots-is-available-for-licensing (providing copy of libretto which describes scene at pp. 16-20).

[3] *Winners / Kinky Boots*, THE AM. THEATRE WING'S TONY AWARDS, https://www.tonyawards.com/winners/year/any/category/any/show/kinky-boots/ (last visited Oct. 27, 2023); *2013 Grammy Winners*, RECORDING ACADEMY GRAMMY AWARDS, https://www.grammy.com/awards/56th-annual-grammy-awards (last visited Oct. 27, 2023).

In March 2023, Texas Senator Bryan Hughes proposed legislation to prohibit—and criminalize—drag performances.  S.B. No. 12, 88th Leg., R.S. (2023), *available at* https://capitol.texas.gov/tlodocs/88R/billtext/pdf/SB00012I.pdf#navpanes=0 (adding Texas Penal Code § 43.28).  Although the final version of the Act did not include an explicit reference to drag shows, Governor Greg Abbott of Texas left no ambiguity when he tweeted:  "Texas Governor Signs Law Banning Drag Performances in Public.  That's right."  Greg Abbott (@GregAbbott_TX), Twitter (June 25, 2023 at 12:03 A.M.), https://twitter.com/GregAbbott_TX/status/1672817859729162240.

The Act prohibits "sexually oriented performance[s]" "on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child" or "in the presence of an individual younger than 18 years of age." *Id.* § 43.28(b); Tex. Loc. Gov't § 243.0031.  Any person who engages in such a performance commits a Class A misdemeanor, which entails possible jail time.  Tex. Penal Code § 12.21.  Any person or entity who "controls the premises of a commercial enterprise" and "allow[s] a sexually oriented performance to be presented on the premises in the presence of an individual younger than 18 years of age" may be civilly liable for up to $10,000 for each alleged violation.  Tex. Health & Safety Code §§ 769.001-769.002.

3

Despite over fifty years of caselaw since the Supreme Court's decision in *Miller v. California*, 413 U.S. 15 (1973), the State of Texas decided to reach beyond the limits of the First Amendment to ban protected speech. Not one complete element of the *Miller* test is incorporated into the Act. Rather, the Act's definition of a "sexually oriented performance" vaguely targets non-obscene, protected speech with no regard for safeguards to shelter artistic expression. The Act defines "sexually oriented performance[s]" as performances that "appeal[] to the prurient interest in sex" and "feature" (a) "a performer who is nude" (which includes someone who is actually unclothed and someone who leaves "visible" "any portion of the breasts below the top of the areola of the breasts . . . or any portion of the genitals or buttocks" (Tex. Bus. & Com. Code § 102.051(1))), (b) a performer who "exhibit[s] or represent[s]" "sexual acts" whether "actual or simulated," (c) a performer who "exhibit[s] or represent[s]" "male or female genitals in a lewd state" whether "actual or simulated," (d) a performer who "exhibit[s]" "a device . . . for the sexual stimulation of male or female genitals," (e) a performer who makes actual or simulated "contact" with the "buttocks, breast, or any part of the genitals" of another person, or (f) a performer who "exhibit[s] . . . sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics." Tex. Penal Code § 43.28(a). Each of these definitions is either unconstitutionally overbroad or vague.

4

While it cannot be doubted that the Texas Legislature passed the Act to ban drag shows, the Act's language far exceeds the Legislature's discriminatory purposes.  Equity submits this brief because it fears that the Act could be read to impact both adults' and children's access to a wide swathe of live theatre performances protected by the First Amendment.  If that is not the case, then Equity cannot determine what conduct the Act prohibits.  From Euripides' *Bacchae* to *Mrs. Doubtfire*, theatrical productions frequently resemble a drag show.  Even more shows require actors to stage raunchy and controversial scenes or use prosthetics to enhance their breasts or buttocks in doing so.  Beyond a script's requirements, directors may also take creative license to change the gender presentation of any role or require scanty and risqué costuming.  As a result, Equity members cast in potentially affected roles are left with a Hobson's choice: risk criminal sanctions or the loss of income from a producer's decision to cancel a production, or decline to perform and breach their contract with the producer.  These unacceptable possibilities hinder Equity's ability to adequately advise its members and will chill protected theatrical expression in Texas.

Equity contends that the Act is unconstitutionally overbroad and vague, covers a wide range of live theatrical performances in which Equity members perform, and will deter the expression of protected speech in Texas.  The First Amendment exists to protect the arts and literature from the Government as

5

censor, even if that censorship has "the mandate or approval of a majority."
*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 818 (2000).  For these
reasons, Equity argues that this Court should affirm the district court's ruling.

## ARGUMENT

## I.   THE ACT IS UNCONSTITUTIONALLY OVERBROAD AND VAGUE

The First Amendment shelters the American people from overbroad
laws that prohibit a substantial amount of protected expression and vague laws that
fail to give adequate notice concerning the conduct they proscribe.  *Broadrick v.
Oklahoma*, 413 U.S. 601, 615 (1973); *Kolender v. Lawson*, 461 U.S. 352, 358
(1983).  A statute is unconstitutionally overbroad if there is "a realistic danger that
the statute itself will significantly compromise recognized First Amendment
protections of parties not before the Court[.]"  *Members of City Council v.
Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).  In an overbreadth challenge, the
question is whether the statute reaches protected speech and, if so, whether the
statute restricts a substantial amount of such speech in relation to the statute's
legitimate sweep.  *United States v. Hansen*, 599 U.S. 762, 770 (2023); *Stevens*, 559
U.S. at 473.  A statute is unconstitutionally vague if it ties criminal culpability to
enforcement standards that fail to communicate what, specifically, they prohibit.
*Reno v. American Civil Liberties Union*, 521 U.S. 844, 872-73 (1997).  Criminal

statutes, like the Act at issue here, "must be scrutinized with particular care[.]" *City of Houston v. Hill*, 482 U.S. 451, 459 (1987).

Equity contends that the Act will have an inevitable chilling effect on an entire category of protected expression, risqué or provocative live theater, and fails to give adequately specific guidance regarding what kinds of activities are prohibited. This overbreadth and vagueness will only deter Equity members, and other professional artists, from performing in Texas.

## A.     The Act is Impermissibly Overbroad

### 1.     The Act Applies to a Wide Swathe of Protected Speech.

The First Amendment protects Americans' right to see, speak, read, and hear what they want. If offended, one may "simply . . . avert[] their eyes." *Cohen v. California*, 403 U.S. 15, 21 (1971). There are limits—defamation, threats, obscenity, child pornography—but those limits are tightly constrained. *Compare New York v. Ferber*, 458 U.S. 747 (1982) (holding that child pornography is unprotected speech), *with Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002) (protecting simulated child pornography). In *Miller*, the Supreme Court defined obscenity as speech which (1) "the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest," (2) "depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law," and (3)

"lacks serious literary, artistic, political, or scientific value" as a whole. 413 U.S. at 24. As a result, Americans have a constitutional right to view and express sexually charged or explicit entertainment, so long as it is not constitutionally obscene. *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61 (1981) (invalidating total ban on nude dancing).

Non-obscene theatrical performances are undoubtedly protected speech. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557-58 (1975) ("By its nature, theater usually is the acting out—or singing out—of the written word, and frequently mixes speech with live action or conduct. But that is no reason to hold theater subject to a drastically different standard [than other forms of protected speech]."). Yet the Act, to the extent it can be parsed (see *infra* Section I(B)), captures any "visual performance" that features full or partial nudity (which, as defined, includes the wearing of transparent or translucent clothing or the exposure of the underside of the female breast), the simulation of genitalia "in a lewd state," the simulation of sexual acts, the display of dildos or other sexual devices, the use of prosthetic breasts, or even a simulation of someone slapping another's buttocks, all of which, as will be discussed further below, are commonplace in mainstream American musicals and plays. And the First Amendment does not just protect Shakespeare; it protects all performances, from the beloved to the infamous, and from the professional to the enthusiast. *Schacht v. United States*, 398 U.S. 58, 60-

8

62 (1970) (finding that a "crude and amateurish and perhaps unappealing" skit featuring performers wearing U.S. military and Viet Cong costumes is protected speech).

Further, while the Statute's definition of "sexually oriented performance" resembles the first prong of the *Miller* test by mentioning a "prurient interest in sex," it fails to define that prurient interest by reference to the work as a whole or by reference to community standards, much less by incorporating the second and third prongs from *Miller*. Instead, the Act reaches beyond *Miller*'s narrow obscenity test to ban speech which may not be prurient to the community, may not be prurient when taken as a whole, may not be patently offensive for adults or children, or may have artistic or other value. This alone implicates a host of popular theatrical productions which nonetheless may be construed to appeal to "prurient" sensibilities. *See infra* Section II(B).

### 2. The Act Lacks Geographical Limitations or a Parental Consent Defense.

As an initial matter, states may only restrict minors' access to protected speech "in relatively narrow and well-defined circumstances[.]" *Erznoznik*, 422 U.S. at 206-07, 213 (invalidating ordinance that prohibited drive-in theaters from showing films containing nudity when their screens were visible from a public place). This power cannot be used to totally eliminate expression appropriate for adults just because children might see or hear it. *Ashcroft*, 535 U.S.

9

at 252; *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 131 (1989)

(disallowing a ban on "dial-a-porn" messages that improperly "limit[ed] the

content of adult telephone conversations to that which is suitable for children to

hear").

      The Act's provisions sweep without geographical limitation,

extending from public property to commercial establishments and even private

residences.  The Act's provisions encroach upon constitutionally protected speech

by prohibiting "sexually oriented performances" on public property when it could

"reasonably be expected to be viewed by a child," even if a minor is not, in fact,

present.  Tex. Penal Code § 43.28(b)(1).  This would ban performances deemed

provocative, even if age restrictions were advertised, in places like the City of

Austin's Beverly S. Sheffield Zilker Hillside Theater in Zilker Park, which as

recently as 2021 hosted *Little Shop of Horrors*, a musical which includes partial

nudity.  *Past Shows*, Zilker Theatre Productions, https://zilker.org/about-ztp/past-

shows/ (last accessed Apr. 16, 2024); *see also infra* Section II(B) (discussing how

*Little Shop of Horrors* arguably runs afoul of the Act).

      The Act then extends anywhere that a criminalized performance

occurs "in the presence of a minor."  Tex. Penal Code § 43.28(b)(2).  It is, of

course, possible for minors, most especially teenagers, to be present anywhere,

regardless of whether they are authorized to do so by their parents, the Texas

legislature, or the proprietor of a theater that hosts Broadway shows. As a result, this provision results effectively in a total ban of all covered "sexually oriented performances" in Texas.

Further, as the Supreme Court stated in *Stanley v. Georgia*, 394 U.S. 557, 565 (1969), "If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch." It is also undoubted that "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Ginsberg v. New York*, 390 U.S. 629, 639 (1968). Indeed, although the *Ginsberg* Court approved of a statute which prohibited the knowing sale of nude or sexually explicit pictures and magazines to minors, that statute did not prevent parents from purchasing the explicit materials themselves for their children. *Id.* Here, the Act provides no such carve-out. As a result, the other, extreme implication of the Act's prohibition of sexually oriented performances "in the presence of a minor" is that the state of Texas could arrest a parent for allowing their child to sit in their backyard while they and their actor friends perform scenes from *Cabaret*, the popular musical which features drag, prosthetics, and partial nudity.

11

In other words, the Act's lack of geographical limitation and failure to include a parental consent exception restricts Texan adults' access to protected speech by forcing them to consume art approved by the Texas legislature for the consumption of children and is, therefore, impermissibly overbroad. The only way to rehabilitate the Act would be to rewrite it altogether, a project which is outside the bounds of what the constitutional avoidance canon permits. *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018) (Alito, J.) ("a court relying on [the constitutional-avoidance] canon still must *interpret* the statute, not rewrite it").

### B.    The Act is Vague and Insufficiently Definite

Vague statutes, especially when coupled with the specter of criminal enforcement, raise "special First Amendment concerns because of [their] obvious chilling effect on free speech." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871-72 (1997). In the First Amendment context, too, the void-for-vagueness "doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). The Act fails to define what it means by a "performance" or "performer" or "the exhibition or representation, actual or simulated, of male or female genitals in a lewd state", and requires Texans to engage in uncertain, production-by-production determinations of what conduct is proscribed based on whether the Act seems to implicate an undefined "prurient interest in sex."

A statute can be unconstitutionally vague if it uses language similar, but not identical, to legal terms of art.  In *Reno*, the Supreme Court found that the statute at issue was vague because it adopted only one prong of the *Miller* test for obscenity ("depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law") and deleted the constraining element of that prong ("specifically defined by the applicable state law").  *Id.* at 872-74.  As discussed above, the Act's definition of "sexually oriented performance" does not track *Miller*'s definition of obscenity because it incorporates the term "prurient interest in sex" without incorporating any other aspect of the *Miller* test.  *See supra* Section I(A).  This alone makes the Act unacceptably vague.

Second, the Act purports to ban or regulate certain "performances" and applies criminal sanctions to the "performers" of said performances without defining either term.  The "Definitions" section of the Act's subchapter in the Texas Penal Code defines a "performance" as "a play, motion picture, dance, or other exhibition performed before an audience."  Tex. Penal Code § 43.21(a)(3).  That definition of "performance" is given in the context of defining what is "obscene," using *Miller*'s three-prong test.  *Id.* § 43.21(a)(1) ("'Obscene' means material or a *performance* that . . .").  Here, the Act defines a "sexually oriented performance" as a specific subset of "visual performance."  *Id.* § 43.28(a)(2).  It is

13

unclear what a "visual performance" in Section 43.28 would entail, as opposed to a "performance" in Section 43.21, especially given that Section 43.28 does not include the definition of obscenity and the *Miller* test codified in Section 43.21.

While these contrasting uses of the word "performance" create ambiguity, the Act provides no definition whatsoever of who a "performer" is and who, therefore, is subject to criminal penalties.  The Act explicitly sanctions people who "engage[] in a sexually oriented performance" even if they are uncompensated.  *Id.* § 43.28(b).  Separately, the Act defines a sexually oriented performance as one that features certain "performers."  *Id.* § 43.28(a)(2)(A).  The Act fails to explain whether there is any difference between those "performers" and the "people" who "engage in a sexually oriented performance" and can be criminally sanctioned.  For example:  Could an actor (a "person"?) be criminally liable for acting in a production of the famed musical *Rent*, which includes a mock orgy scene, even if they were not one of the specific actors ("performers"?) who acted in that scene?  The Act's text cannot answer that question.

Likewise, while Section 43.28 governs obscene performances, as defined, that "depict or describe" conduct exceeding the bounds of permissiveness established in *Miller*, the Act proscribes visual performances that "feature" a nude performer or a performer who engages in sexual conduct.  *Id.* §§ 43.21(a)(1)(B), 43.28(a)(2)(A).  The word "feature" can either mean something which "give[s]

special prominence to" an attribute or something that simply has an attribute "as a characteristic." *Compare* Appellant's Br. at 19 (citing Merriam-Webster's Collegiate Dictionary 458 (11th ed. 2003)), *with* Appellee's Br. at 33 (citing Merriam-Webster (Mar. 26, 2024), https://www.merriam-webster.com/dictionary/feature). Regardless of which competing dictionary definition is used, a potential "performer" within the Act's meaning must either be engaged in the risky endeavor of evaluating how "prominent" a particular scene may seem to the audience on a case-by-case basis, or must self-censor to avoid any risk that their work appear "characteristic" of the production as a whole.

Finally, the omission of *Miller*'s guardrails leave the Act's definition of sexual conduct, which includes "the exhibition or representation, actual or simulated, of male or female genitals in a lewd state," up to the eye of the beholder, rather than subject to an objective test of obscenity. *See* Tex. Penal Code § 43.28(a)(1)(B). The use of the word "lewd" in this context is without definition or limitation, much like the Act's use of the phrase "prurient interest in sex." By contrast, Texas' preexisting obscenity statute in Section 43.21 of the Penal Code only proscribes the "lewd exhibition of genitals" (actual, not simulated) if that exhibition is "patently offensive" and otherwise meets the statutory test for obscenity modeled after *Miller*. *Id.* § 43.21(a)(1)(B)(ii). Indeed, the Supreme Court in *Miller* approved of just such language. *Miller v. California*, 413 U.S. 15,

15

25 (1973) (approving of potential statutory language which regulates "[p]atently offensive representations or descriptions of . . . lewd exhibition of the genitals"). The Act falls outside these narrow confines to capture any representations of simulated genitals "in a lewd state," even if not constitutionally obscene. The definition of the word "lewd," therefore, is left to the viewer's subjective determination. This poses a problem because, as will be discussed further in Section II(B), popular musicals and plays include scenes using props to imitate erect male genitalia.

Equity can only conclude that the Act would leave producers and actors unable to determine how the Act would apply to their work and would therefore chill productions in Texas, especially those which include drag roles. This makes the Act unconstitutionally overbroad and vague and implicates a host of both Equity and non-Equity productions performed in Texas. *See infra* Section II(C).

## II. THE ACT DETERS LIVE THEATRICAL PRODUCTIONS PERFORMED BY EQUITY MEMBERS IN TEXAS

The Act's overbreadth and vagueness will have a direct impact on all actors, including Equity members, in Texas. Equity submits that live theatre has a long history of controversial and sometimes risqué gender-bending performances which are impossible to distinguish from the shows that the Legislature evidently intended to target with the Act. Because of this, Equity cannot advise its members

16

to perform in such productions in Texas if the Act goes into effect, a result with

consequences for the local economy.

      A.     **The Controversial Live Theatrical Productions Performed by Equity Members are Indistinguishable from Drag Shows, Use Prosthetics, and Include Nudity.**

The use of drag has historical antecedents back to the time of

Shakespeare.  Yet drag in Shakespearean drama was not just a historical accident,

but a theme throughout his oeuvre.  Seven of Shakespeare's 37 extant plays

involve gender-bending as a plot point.  In *Twelfth Night*, Viola disguises herself as

Cesario, with whom the Countess Olivia promptly falls in love.  Similarly, in *As

You Like It*, Rosalind flees to the Forest of Arden disguised as Ganymede, with

whom the shepherdess Phoebe falls in love.  Gender-switching plays a role in

*Cymbeline*, one of Shakespeare's last plays, and Act 4, scene 2 of *The Merry Wives

of Windsor* features a memorable Falstaff in drag.  Given the esteem in which

Shakespeare is now held today, perhaps one may be inclined to argue that

Shakespeare could never fall under moral controversy.  One wonders.  A school in

New Hampshire withdrew *Twelfth Night* from instruction for "portraying

17

homosexuality" in 1996.[4]  And Shakespeare loved bawdy jokes.  *See* WILLIAM SHAKESPEARE, TWELFTH NIGHT act 2, sc. 5, v. 78-79.

Shakespeare aside, musical theatre is full of gender-nonconforming roles.  *Kinky Boots* features a drag queen, as does *Rent*.  The musical *Priscilla, Queen of the Desert* is a story about two drag queens and a trans woman who perform a drag show in the Australian Outback.  Edna Turnblad, Tracy's mother in *Hairspray*, is a drag role, as is the journalist Mary Sunshine in *Chicago*, Mrs. Doubtfire in *Mrs. Doubtfire*, and Ms. Trunchbull in *Matilda*.  Peter Pan is, traditionally, a "trousers role" (where a woman dresses as a man).  Trousers roles are integral to the plots of *The Mystery of Edwin Drood* and *Victor/Victoria*. Directors also choose to cast men as women, or vice versa, based on their creative vision for a particular production.  In 2022, the producers of *1776* cast women for all of its Founding Father roles.[5]  Each of these productions feature sets, costumes, dance, and song difficult to distinguish from the sets, costumes, dance, and song of

---

[4] Nancy Roberts Trott, *School District Anti-Gay Policy Splits N.H. Town*, L.A. TIMES (Mar. 17, 1996, 12:00 AM), https://www.latimes.com/archives/la-xpm-1996-03-17-mn-47986-story.html.

[5] Jeff Lunden, *In the Broadway Musical '1776,' the Revolution is in the Casting*, NPR (Oct. 15, 2022, 5:00 AM), https://www.npr.org/2022/10/15/1128740858/broadway-musical-1776-gender-race#:~:text=Roundabout%20Theatre%20Company-,Elizabeth%20A.,as%20John%20Adams%20in%201776.

a drag show.  Three of these examples, *Kinky Boots*, *Priscilla*, *Queen of the Desert*, and *Rent*, feature drag show performers as part of their story.  Many of these productions require the use of prosthetic breasts and some include raunchy or provocative scenes that arguably include "sexual conduct" as defined by the Act.

Many much-beloved theatrical performances feature conduct that the Act seems to encompass: full or partial nudity, prosthetics of female breasts or male genitals, props to simulate male genitals "in a lewd state," prop sex toys, slapping of buttocks, groping of breasts, and simulated sex acts.  The current Broadway staging of *The Book of Mormon* includes a dance scene where multiple actors exhibit imitation male genitalia.  Both *Hair* and *Cabaret* include drag roles and nudity, which can be actual or simulated.  *South Pacific* and *Chicago* cast drag roles and require prosthetic breasts.  One scene in *Grease* includes "mooning," where a character may pull down their pants and expose their buttocks (actual or simulated), and most stagings of *Spring Awakening* include a scene where a female's buttocks are exposed to be whipped.  In *Carrie*, the female ensemble showers behind translucent screens in one scene, staged either in the nude or while wearing nude-illusion skin parts.  In *Hedwig and the Angry Inch*, the genderqueer protagonist strips down to their underwear, removing prosthetic breasts in the process and is typically staged with suggested fellatio.  Stage directions require nudity or partial nudity (which may be actual or simulated) in *Legally Blonde*,

*Venus in Fur*, *Cabaret*, *The Graduate*, *Midsummer Night's Dream*, *POTUS*, *Rent*, *Heathers*, *Gypsy*, *Hair*, *The Rocky Horror Show*, and *The Fully Monty*—to name only a few. Even more shows, like *Little Shop of Horrors* and *A Funny Thing Happened on the Way to the Forum*, require the use of accessories or prosthetics to enhance male or female actor characteristics. *Cabaret*, *Guys and Dolls*, *Gypsy*, and *Flashdance* each include "stripping" scenes; the director may choose whether the stripping is to pasties, risqué lingerie, or partial nudity. *Debbie Does Dallas, The Musical* displays sex toys on stage, as does *Venus in Fur* and the play *Trust*.

Just as a drag queen and a musical about a drag queen, or a stripper and a musical about a stripper, are formally indistinguishable, live theatre is no stranger to controversy. Mae West never premiered *The Drag* in New York after the police charged her with public obscenity in 1927. Marybeth Hamilton, *Mae West Live: "SEX, The Drag, and 1920s Broadway"*, 36 THE MIT PRESS 82, 84 (1992). Tennessee municipal officials banned the rock musical, *Hair*, from its public theater in 1971, a decision which the Supreme Court invalidated. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975). More recently, the public backlash to children seeing *Rent* is well-documented[6] and, in 2013, critics on

---

[6] *Compare 'Rent' Controversy in Idaho: LGBT Content in Lake City Playhouse Musical Sparks Backlash*, HUFFPOST.COM (Dec. 23, 2011, 1:36 P.M.), https://www.huffpost.com/entry/rent-controversy-in-idaho_n_1167896; *Don't Say Gay? Students Say Bucks School District Killed Musical 'Rent' Because It Has Queer Relationships*, THE MORNING CALL (Apr. 19, 2022, 7:56 AM),

Twitter of the Macy's Thanksgiving Day Parade went viral, lambasting it for featuring a set piece from *Kinky Boots*.[7]

In sum, many live theatre productions feature drag, prosthetics, and sexual content, and there are commentators aplenty who accuse such productions of being inappropriate for children to see. Given the Act's overbreadth and vagueness, Equity has reason to fear that many of the productions listed above, if not all, would fall within the Act's scope.

### B. By Covering Equity Productions, the Act will Chill Protected Speech in Texas.

In 2024, there are 149 employers in Texas that hire Equity members. Additional theaters may play shows that hire Equity members via what Equity terms its guest artist contract. Since the Act's passage, Equity has received inquiries from members about "what to do" if cast in a Texas production that features gender-nonconforming or drag roles, or features the conduct explicitly proscribed by the Act.

In the face of this overbroad and vague statute, Equity members face a Hobson's choice. If a member has already accepted a role in Texas, Equity is

---

https://www.mcall.com/2022/04/19/dont-say-gay-students-say-bucks-school-district-killed-production-of-musical-rent-because-it-has-queer-relationships/.

[7] *'Kinky Boots' Walks Tall in Macy's After Parade Controversy*, PAGE SIX (Nov. 30, 2013, 3:29 AM), https://pagesix.com/2013/11/30/kinky-boots-walks-tall-in-macys-after-thanksgiving-parade-controversy/.

forced to advise them to either work and risk potential criminal prosecution or not work and risk a producer's breach of contract claim. The only alternative for Equity's members is to decline potentially affected roles in Texas altogether. The only alternative for Equity members' employers who cannot determine whether a production could violate the Act or not is to cancel it. This will chill protected theatrical expression in the state.

### C.    A Chill on Live Theatrical Productions will have a Significant Economic Impact on the State of Texas.

Broadway tours are a boon for local economies. In one week in 2019, the musical *Waitress* made over $1.4 million in ticket sales in Texas, *Miss Saigon* made nearly $1.5 million in North Carolina, *The Phantom of the Opera* made nearly $1.4 million in Detroit, and the musical *Dear Evan Hansen* netted nearly $1.5 million.[8] The Broadway League's 2019 report for the 2016-2017 touring season found that "[o]n average, Broadway tours contributed an economic impact of 3.27 times the gross ticket sales to the economy of the metropolitan areas in

---

[8] Marc Hershberg, *Musicals Make More Money on the Road than on Broadway*, FORBES (Feb. 3, 2019, 6:00 PM), https://www.forbes.com/sites/marchershberg/2019/02/03/musicals-make-more-money-on-the-road-than-on-broadway/?sh=211799f8a111.

which they played."[9]  By this rough calculus, those shows introduced over $4.5 million dollars into each local economy in a single week.

Since 2019, including the hiatus in performances due to the COVID-19 pandemic, there have been at least 41 theatrical productions in Texas performed, or scheduled for this upcoming year, which cast Equity members and would arguably run afoul of the Act.  These productions all include full or partial nudity (both actual and simulated), the use of prosthetic breasts or genitals or other accessories to enhance female or male characteristics, contact between one performer and another's buttocks, breasts, or genitals, or the performance of sexual acts, whether actual or simulated.  Many of these productions also feature drag roles, which are marked with an asterisk:

(1) *Between Riverside and Crazy* (4th Wall Theatre Co., 2020 and 2022)
(2) *A Pin Up Girls Christmas* (Casa Manana, 2023)
(3) *Noises Off* (Alley Theatre, 2024)
(4) *Between Riverside and Crazy* (Allied Theatre Group, 2022)
(5) *The Play That Goes Wrong* (Allied Theatre Group, 2023)
(6) *Cruel Intentions* (Allied Theatre Group, 2023-2024)
(7) *Indecent* (Austin Playhouse, 2023-2024)*
(8) *Back To You* (Austin Rainbow Theatre, 2024)
(9) *Miss Saigon* (Casa Manana, 2023)*
(10) *Grease* (Casa Manana, 2024)
(11) *Young Frankenstein* (Circle Theatre, 2022)
(12) *Lysistrata* (Classical Theatre Company, 2019)
(13) *The Taming of the Shrew* (Classical Theatre Company, 2024)

---

[9] *The Economic Impact of Touring Broadway 2016-2017 Season*, THE BROADWAY LEAGUE (Aug. 2020), https://www.broadwayleague.com/research/research-reports/.

(14) *The Rocky Horror Show* (Dallas Theater Center, 2023)*
(15) *Pippin* (Entr'acte, 2024)
(16) *Gary: A Sequel to Titus Andronicus* (Kitchen Dog Theater, 2022)
(17) *R&J* (Allied Theatre Group, 2022)*
(18) *Cabaret* (San Antonio Broadway Theatre, 2022)*
(19) *Rent* (San Antonio Broadway Theatre, 2023)*
(20) *Pippin* (St. Edward's University, 2020)*
(21) *Hedwig and the Angry Inch* (Stageworks Theatre, 2023)*
(22) *9 to 5: The Musical* (Texarts Association, 2023)
(23) *Cruel Intentions* (The Garden Theatre, 2022)
(24) *Gypsy* (Theatre Arlington, 2023)
(25) *Noises Off* (Theatre Arlington, 2023)
(26) *Avenue Q* (Theatre Arlington, 2023)
(27) *Cabaret* (Theatre Arlington, 2024)*
(28) *Young Frankenstein* (Theatre Three, 2022)
(29) *Noises Off* (Theatre Three, 2019)
(30) *Spring Awakening* (Theatre Under the Stars, 2019)
(31) *Rent* (Theatre Under the Stars, 2023)*
(32) *When Pigs Fly* (Uptown Players, 2021)*
(33) *Torch Song* (Uptown Players, 2022)*
(34) *The Little Dog Laughed* (Uptown Players, 2022)
(35) *Cruel Intentions* (Uptown Players, 2023)
(36) *The Boys in the Band* (Uptown Players, 2024)*
(37) *The Play That Goes Wrong* (WaterTower Theatre, 2023)
(38) *Noises Off* (Zachary Scott Theatre, 2023)
(39) *The Rocky Horror Show* (Zachary Scott Theatre, 2022)*
(40) *The Inheritance Part 1* (Zachary Scott Theatre, 2022)
(41) *The Inheritance Part 2* (Zachary Scott Theatre, 2022)

Musicals featuring drag, nudity, and prosthetics are neither few nor far

between.  A chill on their performance would not only impact the civil liberties of

actors in Texas but dampen a profitable sector of Texas's economy.

## **CONCLUSION**

The theater provides a venue for works of undoubted artistic and

socially redeeming significance.  Broadway performances depict the issues roiling

contemporary society, from the acceptance of a drag queen in *Kinky Boots* to the

dangers of political apathy in *Cabaret*. To protect the freedom of expression, this

Court should refuse the Texas legislature's desire to prioritize one vision of the

social good over many and affirm the ruling of the district court.

Dated: April 17, 2024                          Respectfully submitted,

                                               */s/ Megan Stater Shaw*
                                               Megan Stater Shaw
                                               COHEN, WEISS AND SIMON LLP
                                               909 Third Avenue, 12th Floor
                                               New York, NY 10022
                                               Telephone: (212) 356-0205
                                               Email: MShaw@cwsny.com

                                               */s/ Andrea Hoeschen*
                                               Andrea Hoeschen
                                               ACTORS' EQUITY ASSOCIATION
                                               557 Randolph Street
                                               Chicago, Illinois 60661
                                               Telephone: (212) 869-8530
                                               Email: ahoeschen@actorsequity.org

                                               *Counsel for Actors' Equity*
                                               *Association*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 5,535 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

*/s/ Megan Stater Shaw*
Megan Stater Shaw

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that on April 17, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Megan Stater Shaw*
Megan Stater Shaw
