No. 23-20480

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

THE WOODLANDS PRIDE, INCORPORATED; ABILENE PRIDE
ALLIANCE; EXTRAGRAMS, L.L.C.; 360 QUEEN ENTERTAINMENT, L.L.C.;
BRIGITTE BANDIT,

*Plaintiffs-Appellees*,

v.

WARREN KENNETH PAXTON, IN AN OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF TEXAS; BRETT LIGON, IN AN OFFICIAL
CAPACITY AS DISTRICT ATTORNEY OF MONTGOMERY COUNTY;
MONTGOMERY COUNTY, TEXAS; JAMES HICKS, IN AN OFFICIAL
CAPACITY AS DISTRICT ATTORNEY OF TAYLOR COUNTY; TAYLOR
COUNTY, TEXAS; CITY OF ABILENE, TEXAS,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
Civil Action No. 4:23-cv-02847, Judge David Hittner

**BRIEF OF *AMICI CURIAE* NATIONAL COALITION AGAINST
CENSORSHIP, AMERICAN BOOKSELLERS FOR FREE EXPRESSION,
AUTHORS GUILD, COMIC BOOK LEGAL DEFENSE FUND, FASHION
LAW INSTITUTE, AND WOODHULL FREEDOM FOUNDATION
IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Peter B. Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, TX 75275-0116
(214) 768-4077
psteffensen@smu.edu

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

**Counsel for *Amici Curiae***

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

1. No. 23-20480, *The Woodlands Pride, Incorporated, et al. v. Paxton, et al.*

2. The undersigned counsel of record certifies that—in addition to the persons and entities listed in Appellees' Certificate of Interested Persons and in the Certificates of Interested Persons of the other *Amici Curiae*—the following listed persons or entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

***Amici Curiae***
National Coalition Against Censorship
American Booksellers for Free Expression
Authors Guild
Comic Book Legal Defense Fund
Fashion Law Institute
Woodhull Freedom Foundation

***Attorneys for Amici Curiae***
Peter Steffensen
SMU Dedman School of Law
First Amendment Clinic
P.O. Box 750116
Dallas, TX  75275-0116

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305

Pursuant to Fed. R. App. P. 26.1(a), the undersigned counsel certifies that none of the Amici Curiae listed above is a publicly held corporation, none of the Amici Curiae listed above has a parent corporation, and that no publicly held corporation owns 10 percent or more of any corporation's stock.

*/s/ Peter B. Steffensen*
Counsel for *Amici Curiae*

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS .......................i

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF AMICI CURIAE .....................................................1

SUMMARY OF ARGUMENT ..............................................................4

ARGUMENT .........................................................................................6

I.    S.B. 12 is a Prior Restraint on Speech because it Requires Local Governments, Acting as the State's Censors, to Prohibit "Sexually Oriented Performances" before they are Ever Performed. ....................................................8

    a.    Prior Restraints on Speech Presumptively Violate the First Amendment...8

    b.    The Performance Art Targeted by S.B. 12 is Speech Fully Protected Against Prior Restraint. .....................................................................................10

    c.    S.B. 12 Operates as a Prior Restraint on Speech. .....................................11

    d.    S.B. 12 Gives the State's Censors Unbridled Discretion to Ban Speech and Must be Facially Invalidated. ..........................................................................13

    e.    S.B. 12's Unconstitutionality is Accentuated by its Lack of Procedural Safeguards. ....................................................................................................19

II.    S.B. 12 Discriminates on the Basis of Viewpoint because it Singles Out Particular Artistic Choices for Censorship. ........................................................20

CONCLUSION .....................................................................................28

CERTIFICATE OF SERVICE................................................................29

CERTIFICATIONS UNDER ECF FILING STANDARDS .................................30

CERTIFICATE OF COMPLIANCE ....................................................31

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. United States*,
  509 U.S. 544 (1993)................................................................11

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963)................................................9, 12, 15, 21

*Blue Canary Corp. v. City of Milwaukee*,
  251 F.3d 1121 (7th Cir. 2001) ..............................................14

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011).........................................................passim

*Cath. Leadership Coal. of Tex. v. Reisman*,
  764 F.3d 409 (5th Cir. 2014) ................................................11

*Chiu v. Plano Indep. Sch. Dist.*,
  339 F.3d 273 (5th Cir. 2003) ................................................24

*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988)..................................................12, 13, 17

*Freedman v. Maryland*,
  380 U.S. 51 (1965)..................................................9, 10, 12, 15

*Freedom From Religion Found. v. Abbott*,
  955 F.3d 417 (5th Cir. 2020) ...............................13, 18, 24, 26

*Friends of Georges, Inc. v. Mulroy*,
  675 F. Supp. 3d 831 (W.D. Tenn. June 2, 2023), *appeal filed*, No. 23-5611 (6th
  Cir. 2023) .............................................................................5

*Good News Club v. Milford Cent. Sch.*,
  533 U.S. 98 (2001)..................................................................27, 28, 29

*HM Florida-ORL, LLC v. Griffin*,
  679 F. Supp. 3d 1332 (M.D. Fla. June 23, 2023), *appeal filed*, No. 23-12160
  (11th Cir. 2023)....................................................................................5

*Hustler Mag., Inc. v. Falwell*,
  485 U.S. 46 (1988)..............................................................................31

*Imperial Sovereign Ct. v. Knudsen*,
  --- F. Supp. 3d ----, 2023 WL 6794043 (D. Mont. Oct. 13, 2023), *appeal filed*,
  No. 23-3581 (9th Cir. 2023) ...............................................................6

*Kingsley Int'l. Pictures Corp. v. Regents of Univ. of State of N.Y.*,
  360 U.S. 684 (1959).......................................................................14, 19

*Matal v. Tam*,
  582 U.S. 218 (2017).......................................................................30, 31

*Miller v. California*,
  413 U.S. 15 (1973).............................................................................27

*Missouri v. Biden*, 83 F.4th 350
  (5th Cir. 2023), *cert. granted sub nom. Murthy v. Missouri*, 601 U.S. ----, 144 S.
  Ct. 7 (2023) ......................................................................................12

*Near v. Minn. ex rel. Olson*,
  283 U.S. 697 (1931)...........................................................................14

*NetChoice, L.L.C. v. Paxton*,
  49 F.4th 439 (5th Cir. 2022), *cert. granted*, 144 S. Ct. 477 (2023). ....................14

*New York Times Co. v. United States*,
  403 U.S. 713 (1971)...........................................................................12

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992)............................................................26

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
    515 U.S. 819 (1995)............................................................26

*S. Utah Drag Stars v. City of St. George,*
    677 F. Supp. 3d 1252 (D. Utah June 16, 2023) ....................6

*Schacht v. U.S.,*
    398 U.S. 58 (1970)..............................................................27

*Se. Promotions, Ltd. v. Conrad,*
    420 U.S. 546 (1975).....................................................passim

*Shuttlesworth v. City of Birmingham,*
    394 U.S. 147 (1969)............................................................13

*Snyder v. Phelps,*
    562 U.S. 443 (2011)............................................................29

*Spectrum WT v. Wendler,*
    No. 23-10994 (5th Cir. filed 2023) ..............................23, 24

*Texas v. Johnson,*
    491 U.S. 397 (1989).............................................................6

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969)............................................................22

*Woodlands Pride, Inc. v. Paxton,*
    2023 WL 6226113 (S.D. Tex. Sept. 26, 2023) .............28, 29

**Statutes**

Tex. Local Gov't Code § 243.010 ..........................................................24

**Other Authorities**

ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures in 2023*
(Dec. 21, 2023), https://www.aclu.org/legislative-attacks-on-lgbtq-rights-2023 ..4

Anthony Lewis, *Londoners Cool To Hair's Nudity*, N.Y. Times (Sept. 29, 1968),
https://www.nytimes.com/1968/09/29/archives/londoners-cool-to-hairs-nudity-fourletter-words-shock-few-at.html ..................................................19

Bob Mondello, *'Hair' At 50: Going Gray, But Its Youthful Optimism Remains
Bouncy and Full-Bodied*, NPR (May 1, 2018),
https://www.npr.org/2018/05/01/607339204/hair-at-50-going-gray-but-its-youthful-optimism-remains-bouncy-and-full-bodied ..........................................18

Carrie Isaac (@CarrieIsaac), Twitter, (May 19, 2023, 11:11 PM)
https://twitter.com/carrieisaac/status/1659773848676450304 ...........................33

CJ Wallace, *The Importance of Drag Queens*, MY RES. CTR. (June 6, 2023),
https://myresourcecenter.org/the-importance-of-drag-queens/ ..........................29

Greg Abbott (@GregAbbott_TX), Twitter (June 24, 2023, 11:03 PM),
https://twitter.com/gregabbott_tx/status/1672817859729162240 .......................33

Kiana Shelton, *The Joy of Drag*, PSYCHIATRIC TIMES (June 29, 2022),
https://www.psychiatrictimes.com/view/the-joy-of-drag ....................................29

Matt Shaheen (@MattShaheen), Twitter, (June 8, 2023, 7:48 AM),
https://twitter.com/MattShaheen/status/1666789387005222912 ........................32

Sarah Lee, *Hair: The musical that 'changed theater for ever'*, BBC (Sept. 26, 2018), https://www.bbc.com/news/uk-england-london-45625785......................19

Solcyré Burga, *Tennessee Passed the Nation's First Law Limiting Drag Shows. Here's the Status of Anti-Drag Bills Across the U.S.*, Time (Apr. 3, 2023, 2:43 P.M.), https://time.com/6260421/tennessee-limiting-drag-shows-status-of-anti-drag-bills-u-s/...........................................................................................4

Virginia Chamlee, *Anti-Drag Legislation is Sweeping the Nation: Here's Where Each State Stands on Drag Bans*, People (June 6, 2023, 2:30 P.M.), https://people.com/politics/anti-drag-legislation-united-states/............................4

William Blackstone, Commentaries on the Laws of England (1769)......................8

<u>STATEMENT OF *AMICI CURIAE*</u>[1]

**The National Coalition Against Censorship** is a coalition of sixty national non-profit organizations representing artistic, educational, religious, and labor communities and bound by a collective interest in protecting the principles of free expression. Groups under the NCAC umbrella include artists, dramatists, filmmakers, and creators of other forms of art and cultural production. The NCAC was founded in direct response to the 1973 Supreme Court decision in *Miller v. California*, which narrowed First Amendment protections for sexual expression and opened the door to obscenity prosecutions. As such, the NCAC has a special interest in preventing the further erosion of First Amendment rights, especially as they relate to performers' ability to express protected viewpoints.

**The American Booksellers for Free Expression** ("ABFE") is the free speech initiative of the American Booksellers Association ("ABA"). ABA was founded in 1900 and is a national not-for-profit trade organization that works to help independently owned bookstores grow and succeed. ABA represents 2,178 bookstore companies operating in 2,593 locations. ABA's core members are key participants in their communities' local economy and culture. To assist them, ABA provides education, information dissemination, business products, and services;

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), all parties consent to the filing of this brief. Pursuant to Fed. R. App. P 29(a)(4)(E), no party or party's counsel authored this amicus brief in whole or in part or contributed money toward the preparation of this brief.

creates relevant programs; and engages in public policy, industry, and local first advocacy.

**The Authors Guild** was founded in 1912, and is a national non-profit association of more than 14,000 professional, published writers of all genres. The Guild counts historians, biographers, academicians, journalists, poets, translators, and other writers of non-fiction and fiction as members. The Guild works to promote the rights and professional interest of authors in various areas, including copyright, fighting censorship, and taxation. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. One of the Authors Guild's primary areas of advocacy is to protect the free expression rights of authors.

**The Comic Book Legal Defense Fund** is a nonprofit organization dedicated to protecting the legal rights of the comic arts community. With a membership that includes creators, publishers, retailers, educators, librarians, and fans, the CBLDF has defended dozens of First Amendment cases in courts across the United States and led important educational initiatives promoting all forms of free expression through the comic arts, including the right to cosplay.

**The Fashion Law Institute**, a nonprofit organization and the world's first academic center dedicated to the law and business of fashion, was founded by Professor Susan Scafidi with the assistance of the Council of Fashion Designers of America and its then president, Diane von Furstenberg, and is headquartered at Fordham Law School.

**The Woodhull Freedom Foundation** is a non-profit organization that works to advance the recognition of sexual freedom, gender equality, and free expression. The Foundation's name was inspired by the Nineteenth Century suffragette and women's rights leader, Victoria Woodhull. The organization works to improve the well-being, rights, and autonomy of every individual through advocacy, education, and action. Woodhull's mission is focused on affirming sexual freedom as a fundamental human right. The Foundation's advocacy has included a wide range of human rights issues, including reproductive justice, anti-discrimination legislation, comprehensive nonjudgmental sexuality education, and the right to define one's own family. Woodhull is particularly concerned with government censorship of disfavored speakers based on their viewpoint or the content of their speech, as such actions often target those with nonconforming views on human sexuality.

## SUMMARY OF ARGUMENT

Drag performance has a long and varied history, tracing its roots from Ancient Egypt and Greece, through the Shakespearean era in Europe and Kabuki art in Japan. As modern forms of drag performance have evolved to serve as explicitly political art—expressing solidarity for queer communities and standing against censorship and rigid gender roles—so, too, have unlawful attempts to silence or ban them.

S.B. 12 is the State of Texas's contribution to a wave of unconstitutional state and local legislation targeting drag show performers and performances. In 2023, at least 15 other states proposed anti-drag bills.[2] Four of those laws—S.B. 12 in Texas, and similar laws passed in Tennessee, Florida, and Montana—were held unconstitutional by federal courts and consequently enjoined. *See Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 861–77 (W.D. Tenn. June 2, 2023), *appeal filed*, No. 23-5611 (6th Cir. 2023); *HM Florida-ORL, LLC v. Griffin*, 679 F.

---

[2] *See* S.B. 1028, 56th Leg., Reg. Sess. (Ariz. 2023); S.B. 43, 94th Gen. Assemb., Reg. Sess. (Ark. 2023); S.B. 1438, 2023 Leg., 94th Sess. (Fla. 2023); H.B. 265, 67th Leg., Reg. Sess. (Idaho 2023); S.B. 115, 2023 Leg., Reg. Sess. (Ky. 2023; H.F. 1903, 93d Gen. Assemb., Reg. Sess. (Minn. 2023); H.B. 494, 102nd Gen. Assemb., Reg. Sess. (Mo. 2023); H.N. 359, 68th Leg., Reg. Sess. (Mont. 2023); L.B. 371, 108th Leg., Reg. Sess. (Neb. 2023); H.B. 1333, 68th Gen. Assemb., Reg. Sess. (N.D. 2023); H.B. 2736, 2023 Leg., 59th Sess. (Okla. 2023); H.B. 245, 135th Gen. Assemb., Reg. Sess. (Ohio 2023); H.B. 3616, 125th Gen. Assemb., Reg. Sess. (S.C. 2023); S.B. 3, 113th Gen. Assemb., Reg. Sess. (Tenn. 2023); *see also* Solcyré Burga, *Tennessee Passed the Nation's First Law Limiting Drag Shows. Here's the Status of Anti-Drag Bills Across the U.S.*, Time (Apr. 3, 2023, 2:43 P.M.), https://time.com/6260421/tennessee-limiting-drag-shows-status-of-anti-drag-bills-u-s/; ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures in 2023* (Dec. 21, 2023), https://www.aclu.org/legislative-attacks-on-lgbtq-rights-2023; Virginia Chamlee, *Anti-Drag Legislation is Sweeping the Nation: Here's Where Each State Stands on Drag Bans*, People (June 6, 2023, 2:30 P.M.), https://people.com/politics/anti-drag-legislation-united-states/.

Supp. 3d 1332, 1339–45 (M.D. Fla. June 23, 2023), *appeal filed*, No. 23-12160 (11th Cir. 2023); *Imperial Sovereign Ct. v. Knudsen*, --- F. Supp. 3d ----, 2023 WL 6794043, at *20–21 (D. Mont. Oct. 13, 2023), *appeal filed*, No. 23-3581 (9th Cir. 2023); *see also S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1283–86 (D. Utah June 16, 2023) (enforcement of local ordinances to ban drag show). S.B. 12 rightly met the same fate in the District Court below, and this Court should affirm.

S.B. 12's total ban on sexually-oriented performances is a classic system of prior restraint—and a viewpoint-discriminatory one, at that. It targets particular ideas for exclusion from all public spaces in Texas; its definition of "sexually oriented performance" ensures that any work of performance art using certain imagery, props, choreography, or tropes must be formally permitted by the Texas government. In other words, the state has singled out particular speech for censorship, simply because it finds the viewpoints these performers wish to convey "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

# **ARGUMENT**

The Supreme Court has long held that unrestricted government pre-clearance systems for artistic performances are unlawful prior restraints on speech. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 552–62 (1975). Despite this longstanding precedent, the State of Texas passed a sweeping and rudderless prohibition on "sexually oriented performances" that SB 12's author and sponsors, and the Texas Governor and Lt. Governor, all agree is specifically intended to target drag performances. Section 2 of S.B. 12 requires exhibitors of particular kinds of performance art to ask for the State's permission before displaying their work to the public. If the State's censor determines that the proposed performance could contain content which meets the definition of a "sexually oriented performance," S.B. 12 requires the censor to ban the performance from display in any public space, or any place—public *or private*—where a person under the age of eighteen might be. *See* ROA.170–71.

The court below got it right: S.B. 12 is a viewpoint-discriminatory prior restraint on speech that the First Amendment simply does not permit. The Founders would have agreed. They understood prior restraints to be among the worst kinds of burden on speech, because of their prevalence in an English system that "subject[ed] all freedom of sentiment to the prejudices of one man, and ma[d]e him the arbitrary

and infallible judge of all controverted points in learning, religion, and government." 4 William Blackstone, Commentaries on the Laws of England 152 (1769).

The question of the constitutionality of laws like S.B. 12 was asked and answered long ago in *Freedman v. Maryland*. There, the Supreme Court invalidated a statute establishing a government pre-clearance regime for motion pictures, which the Court held was lacking in adequate safeguards to "obviate the dangers of a censorship system." 380 U.S. 51, 58 (1965). Even though Maryland sought to justify its film-licensing process as preventing the distribution of obscenity—an interest the Court did not question—the Court nonetheless explained that States cannot legislate obscenity out of existence without accounting for the consequences to protected speech. *Id.* at 57 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963)).

As a system of prior restraint, S.B. 12 is presumptively unconstitutional. *Freedman*, 380 U.S. at 57 (quoting *Bantam Books*, 372 U.S. at 70). That is because, like the state's film licensing system in *Freedman*, "[t]he administration of a censorship system for [public performance] presents peculiar dangers to constitutionally protected speech." *Id. Freedman* thus requires *at a minimum* that adequate procedural safeguards be put in place to ensure that licensing officials are guided by "narrow, objective, and definite standards" when administering a speech licensing regime. *Conrad*, 420 U.S. at 553.

S.B.12 has no such safeguards. If a performance contains certain "sexually oriented" messages, the reviewing official tasked with administering the state's unlawful censorship scheme must ban the performance. But neither Section 2, nor any other provision of S.B. 12, nor the statutory frameworks into which S.B. 12 is codified, places meaningful constraints to ensure that the licensing of a performance is not a platform for the state's censor to prevent the exhibition of artistic expression they simply dislike. Nor does S.B. 12 ensure—as *Freedman* and *Conrad* both require—prompt judicial review, and that any pre-performance restraint is brief.

As *amici* explain in further detail, the Court should affirm the judgment of the district court and enter a permanent injunction to prevent the enforcement of S.B. 12.

I.  **S.B. 12 is a Prior Restraint on Speech because it Requires Local Governments, Acting as the State's Censors, to Prohibit "Sexually Oriented Performances" before they are Ever Performed.**

   a. **Prior Restraints on Speech Presumptively Violate the First Amendment.**

A prior restraint empowers a public official to silence speech before it even has the opportunity to be expressed. *Conrad*, 420 U.S. 546, 553 (1975). This form of censorship is odious to the First Amendment because it violates our society's preference to let ideas flourish out in the open without fear of censorship or punishment. *See id.* at 559. Prospective restrictions on performance art are especially dangerous because there is often a long way between concept and realization in any

performative work. Requiring a public official to predict in advance how a work of art *will* be performed, to assess whether it *could* constitute "illegitimate speech," makes "the risks of freewheeling censorship formidable." *Id.*

The classic prior restraint is a law that prospectively stops speech or expression in its tracks. *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)). This same result can present in different ways. A government official can affirmatively single out a particular speaker or message for censorship. *E.g.*, *New York Times Co. v. United States*, 403 U.S. 713 (1971). A regulatory body can threaten a speaker or distributor of speech with some form of enforcement power, and consequently chill the efforts of the speaker to further distribute their message. *Bantam Books*, 372 U.S. at 70; *see also Missouri v. Biden*, 83 F.4th 350, 377–78 (5th Cir. 2023), *cert. granted sub nom. Murthy v. Missouri*, 601 U.S. ----, 144 S. Ct. 7 (2023). Or, as particularly relevant here, a potential speaker may be required to seek permission to speak and be denied by an official who dislikes their proposed message. *Freedman*, 380 U.S. at 58; *Conrad*, 420 U.S. at 556.

With respect to speech-licensing regimes, a licensing system which gives a government official "unbridled discretion" to select favored speakers, and suppress disfavored ones, is a particularly troubling form of prior restraint. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988). These systems are

unconstitutional because they make "peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official[.]" *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969). Where it is apparent that a speech licensing system *could* give an official wide discretion to grant or withhold licenses arbitrarily on the basis of their content or viewpoint, the system is presumptively suspect—it "intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020). Prior restraints which fail to place clear limits on official authority to make licensing decisions are facially invalid, and cannot be judicially salvaged, because courts cannot "write nonbinding limits into a silent state statute." *Lakewood*, 486 U.S. at 770.

### b. The Performance Art Targeted by S.B. 12 is Speech Fully Protected Against Prior Restraint.

Since the ratification of the Bill of Rights, the First Amendment has been understood to guard against the "core abuse . . . of licensing laws implemented by the monarch and Parliament" in England. *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 453 (5th Cir. 2022), *cert. granted*, 144 S. Ct. 477 (2023). Though these kinds of licensing laws were frequently directed at the press, other censorial mechanisms operated to suppress acts of artistic expression and performance. For example, "[i]n the England of Shakespeare's day and indeed for centuries afterwards, a play could not be exhibited in a theater without a license from the Lord Chamberlain. That was

a classic prior restraint." *Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1123 (7th Cir. 2001); *see also Near v. Minn. ex rel. Olson*, 283 U.S. 697, 713–14 (1931).

Drawing on these concerns, the Supreme Court has repeatedly held that prior restraints are unconstitutional as applied to different forms of artistic and political expression, including performance art. *See, e.g.*, *Near*, 283 U.S. at 720–23 (newspapers); *Kingsley Int'l. Pictures Corp. v. Regents of Univ. of State of N.Y.*, 360 U.S. 684, 688–89 (1959) (motion pictures); *Bantam Books*, 372 U.S. at 70 (books, pictures, and other printed material); *Freedman*, 380 U.S. at 57–58 (motion pictures); *Conrad*, 420 U.S. at 555–59 (stage performance); *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 801–05 (2011) (video games). The Court in *Conrad* and *Freedman* decried censorship boards which targeted allegedly "obscene" films and stage performances under a review system which lacked procedures to "ensure[] the necessary sensitivity to freedom of expression." *Conrad*, 420 U.S. at 559–60 (quoting *Freedman*, 380 U.S. at 58).

### c. S.B. 12 Operates as a Prior Restraint on Speech.

Section 2 of S.B. 12 acts as an unconstitutional prior restraint for three reasons: (1) it silences particular kinds of performance art the State dislikes; (2) it vests government officials with unbridled discretion to regulate those performances;

and (3) it lacks the bare minimum procedural safeguards needed to ensure the prior restraint does not improperly burden protected speech.

*First*, Section 2 of S.B. 12 establishes a prior restraint by requiring local governments to ban all "sexually oriented performances" from being held on public property, or "in the presence of an individual younger than 18 years of age." *See* Br. for Plaintiffs-Appellees at 4–6; ROA.170–72. There can be little doubt that this directly targets speech and expressive conduct. It has long been settled that performance art—including art that is lewd or potentially obscene—is protected against broad prior restraints. *Conrad*, 420 U.S. at 557-58.

Section 2 enforces its ban through a loose regulatory scheme that deputizes local officials to act as the State's censors. It directs local officials to decline to license any work of theater, dance, or other artistic work that—in the censor's estimation—satisfies the definition of "sexually oriented performance." What's more, a uniquely troubling feature of S.B. 12 is how unusually broad the censorial authority of the law is. Not only does Section 2 require any artist whose performance could contain sexual material to seek the State's permission—through its local censor—to stage their performance on public property, it also intrudes into private spaces as well: a plain reading of Section 2 obligates a performer to seek a license from the State if their performance could be staged *anywhere* "in the presence of an individual younger than 18 years of age." ROA.170–71.

Section 2 of S.B. 12 therefore resembles the regulatory schemes found to be unconstitutional prior restraints in cases like *Bantam Books*, *Freedman*, and *Conrad—while exceeding those restraints in scope and censoriousness*. It resembles them because, as with the regulatory restraints at issue in those cases, "the risks of freewheeling censorship" under Section 2 are "formidable." *Conrad*, 420 U.S. at 559. It surpasses them because Section 2 permits the State to regulate purely private speech as well, if the performance could be displayed in front of a minor.

### d. S.B. 12 Gives the State's Censors Unbridled Discretion to Ban Speech and Must be Facially Invalidated.

*Second*, Section 2 requires the State's censors to subjectively prejudge whether a performance meets the definition of a "sexually oriented performance," potentially well in advance of its staging. It places censors in the position of assessing—perhaps months or years in advance—the possibility that a performance could trigger S.B. 12. If it does, the censor must decline to license the performance for display on public property or in the presence of a minor. The state's licensing scheme thus vests a vast amount of discretion in local officials to apply the definition of "sexually oriented performance" to restrain expressive activity. The Supreme Court has "often and uniformly held" that statutes like S.B. 12, which fail to limit the potential for the exercise of boundless discretion by an official, are unconstitutional, "because without standards governing the exercise of discretion, a

government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *Lakewood*, 486 U.S. at 763–64.

Thus, when a state law places that kind of boundless discretionary authority in the hands of a few officials, without providing "narrow, objective, and definite standards to guide the licensing authority," the "strong medicine" of facial invalidation is warranted. *Freedom From Religion Found.*, 955 F.3d at 427. That result is particularly appropriate here to remedy the censorship caused by Section 2 of S.B. 12. It leaves public officials who are tasked with enforcing the State's censorship regime with no standards by which to apply the definition of "sexually oriented performance," and with no guardrails to ensure that officials cannot use the discretion given them to discriminate based on the content or viewpoint of the proposed performance.

The Supreme Court's decision in *Conrad* illustrates precisely the problems with the application of this kind of unfettered discretion to performance art. In *Conrad*, a Chattanooga, Tennessee municipal board denied an application to perform the musical *Hair* in a theater it managed because the board determined it would be obscene and not "in the best interest of the community." *Conrad*, 420 U.S. at 548. In its time, *Hair* was considered provocative and groundbreaking for the ways in which it portrayed its themes of sexuality, pacifism, and anti-racism—and how it confronted its audiences with those subjects directly. As one accounting of the

original Broadway staging of *Hair* explained, "*Hair* was the generation gap made flesh – and for a few seconds at the end of the first act, made flesh *with* flesh: a nude scene in half-light the show added as it leapt from off-Broadway to a bigger theater on Broadway." Bob Mondello, *'Hair' At 50: Going Gray, But Its Youthful Optimism Remains Bouncy and Full-Bodied*, NPR (May 1, 2018).[3]

    *Hair*'s commentary on topics like sexuality and interracial relationships—and its use of nudity to communicate those themes—provoked a number of efforts to censor the show in the United States and abroad. A production of the musical on London's West End was initially censored by the Lord Chamberlain—the authority granted power under English law dating back to 1737 to screen and censor stage performances for morally objectionable content—shortly before an act of Parliament ended those centuries-old censorial powers for good.[4] *See* Anthony Lewis, *Londoners Cool To Hair's Nudity*, N.Y. Times (Sept. 29, 1968);[5] Sarah Lee, *Hair: The musical that 'changed theater for ever'*, BBC (Sept. 26, 2018).[6]

---

[3] https://www.npr.org/2018/05/01/607339204/hair-at-50-going-gray-but-its-youthful-optimism-remains-bouncy-and-full-bodied

[4] Justice Douglas, concurring in *Kingsley Int'l Pictures Corp.*, noted the importance to the United States' tradition against censorship that there has never been an American equivalent to the Lord Chamberlain in England. *See Kingsley Int'l Pictures Corp.*, 360 U.S. at 699 (Douglas, J., concurring).

[5] https://www.nytimes.com/1968/09/29/archives/londoners-cool-to-hairs-nudity-fourletter-words-shock-few-at.html.

[6] https://www.bbc.com/news/uk-england-london-45625785.

As *Conrad* itself showed, attempts to stage the play throughout the United States were met with similar censorial efforts. Without so much as watching the musical or reading its script, the board in *Conrad* based its decision on "outside reports that the musical, as produced elsewhere, involved nudity and obscenity on stage[.]" *Conrad*, 420 U.S. at 548. Despite not knowing precisely how the version of *Hair* on which they were passing judgment would be performed, the board nonetheless declined to license the performance out of a concern that its staging would not be "in the best interest of the community[.]" *Id.* at 549, 555.

The Supreme Court explained that "[t]he perils of prior restraint are well illustrated by this case, where neither the extent of nudity or simulated sex in the musical, or even that either would appear, before the play was actually performed." *Id.* at 561. Because the prior restraint, the Court held, was "embedded in the licensing system itself," "rigorous procedural safeguards" were necessary so that "'the freedoms of expression [are] ringed about with adequate bulwarks.'" *Id.* at 553, 561 (quoting *Bantam Books*, 372 U.S. at 83).

As in *Conrad*, Section 2 of S.B. 12 operates as a prior restraint by vesting local officials with unbridled discretion to assess whether something will be a "sexually oriented performance" before it is ever performed. The determination that an act is a "sexually oriented performance" depends on the "appraisal of facts, the exercise of judgment, and the formation of an opinion" by local officials. *Id.* at 554.

If a local official thinks that a performance could contain nudity or "sexual conduct" that they subjectively view as appealing to the "prurient interest in sex," S.B. 12 requires the official to prohibit the performance. *See* ROA.170–72.

This kind of judgment requires an official to guess what the performance could contain before it is ever staged and predict whether the definition of "sexually oriented performance" will apply. *See Conrad*, 420 U.S. at 561. For example:

- A censor could determine a drag performer who plans to wear a padded bra while dancing could engage in "sexual conduct"—by exhibiting "sexual gesticulations using accessories or prosthetics that exaggerate . . . female sexual characteristics." ROA.171.

- A censor could determine a drag performance that includes a choreographed scene between multiple performers might engage in "sexual conduct"—by engaging in actual or simulated contact between "one person and the buttocks, breasts, or any part of the genitals of another person." *Id.*

- A censor could ban *Hair*, because its original staging contained nude scenes and incorporated "simulated . . . sexual acts" into its choreography. *Id.*

- A censor who views drag as "inherently sexual" might even apply these definitions to non-sexual events featuring performers in drag, such as a drag queen story hour or author event at a public library or bookstore. *See* Br. for Plaintiffs-Appellees at 18.

Without, at a minimum, robust procedural protections to limit how officials apply the definition of "sexually oriented performance" to drag shows and other works of performance art, a censor could apply S.B. 12 to ban all sorts of artistic expression because of the censor's "undifferentiated fear or apprehension" of the content of the performance—something that the Supreme Court has long held is impermissible. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969).

And in fact, public officials are already using S.B. 12 to achieve their content- and viewpoint-discriminatory aims. Walter Wendler, the President of West Texas A&M University and a defendant in the related drag show case *Spectrum WT v. Wendler*, No. 23-10994 (5th Cir. filed 2023), recently cited S.B. 12 as further justification for his official decision to ban a charity drag show organized by students from being performed on the university's campus. In a March 18, 2024, statement to the University, Wendler once again denied an application from a student group to host a charity drag show "because S.B. 12 went into effect as a Texas law[.]" Rule 28(j) Letter of Plaintiffs-Appellants at 4, *Spectrum WT v. Wendler*, No. 23-10994 (5th Cir. filed 2023), ECF No. 156.

President Wendler's decision there underscores the perils of leaving officials with unfettered discretion to apply S.B. 12 in viewpoint discriminatory ways. The student group there, Spectrum WT, specifically explained to university officials that it was holding a "PG-13" show. Brief for Plaintiffs-Appellants at 5, *Spectrum WT v.*

*Wendler*, No. 23-10994 (5th Cir. filed 2023), ECF No. 48. Spectrum WT instructed performers to "avoid profane or 'lewd' conduct[,]" *id.*, and planned to prevent minors from attending the show "except [for] those accompanied by a parent or guardian so that performers' family members could attend." *Id.* Spectrum WT's own description of its show seemed to disclaim any intent to hold a performance that would have been covered by S.B. 12's definition of "sexually oriented performance."

Wendler's invocation of S.B. 12 to ban a "PG-13" drag performance shows that the risks of viewpoint discrimination posed by S.B. 12 are high—too high for the First Amendment to tolerate. "[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint" is enough to warrant facial invalidation, and to affirm the district court's entry of a permanent injunction here. *Freedom From Religion Found.*, 955 F.3d at 427.

### e. S.B. 12's Unconstitutionality is Accentuated by its Lack of Procedural Safeguards.

*Third*, S.B. 12 lacks *any* safeguards to overcome the "heavy presumption" of its unconstitutionality. *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 281 (5th Cir. 2003). The Supreme Court has repeatedly stressed that a prior restraint is unconstitutional when, as here, it does not contain at least three basic safeguards:

> First, the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. Second, any restraint prior to judicial review can be imposed only for a specified

brief period and only for the purpose of preserving the status quo. Third, a prompt final judicial determination must be assured.

*Conrad*, 420 U.S. at 560.

S.B. 12 lacks any of these safety nets. It contains no provision for judicial review of the denial of a license, and consequently places the burden on the performer to seek court intervention. ROA.170–71. The lone judicial review provision in Chapter 243 of the Local Government Code—where Section 2 is codified—only permits localities to seek an injunction "to prohibit the violation of a *regulation* adopted under this chapter." Tex. Local Gov't Code § 243.010. Because of that legislative gap, the remaining two procedural safeguards required to overcome S.B. 12's presumption of unconstitutionality are absent as well. No aspect of S.B. 12 or other law ensures that the restraint on license applicants will be brief; nor is prompt judicial review assured. Without these limitations, the remedy of facial invalidation is appropriate here to protect drag performers and other artists from the freewheeling censorship that will result. *Conrad*, 420 U.S. at 559; *see Freedom From Religion Found.*, 955 F.3d at 427, 429 (rejecting a reasonableness standard for prior restraints applied to limited public forums).

## II. S.B. 12 Discriminates on the Basis of Viewpoint because it Singles Out Particular Artistic Choices for Censorship.

S.B. 12 further violates the First Amendment because it is viewpoint discriminatory. The statute's definition of "sexually oriented performance" targets

specific views on the expression of sexuality and gender, prohibiting performances that communicate their messages from that standpoint, while leaving other kinds of sexual performance outside of the law's grasp. In effect, S.B. 12 targets certain kinds of speech for exclusion from the public square because of "the specific motivating ideology or the opinion or perspective of the speaker[.]" *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Viewpoint discrimination is a "more blatant" and "egregious form of content discrimination." *Id.* The government is thus more severely limited in its ability to police or restrain speech when it does so "because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *see also Schacht v. U.S.*, 398 U.S. 58, 62–63 (1970) (government cannot prohibit an actor in a dramatic performance from wearing a military uniform while making statements critical of the military). Even in forums over which it has traditionally been permitted to exercise tighter control, the government is generally forbidden from engaging in viewpoint discrimination. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) (viewpoint discrimination not permitted in regulating access to limited public forum).

By targeting "sexually oriented performances," S.B. 12 suppresses speech which is communicated from particular artistic standpoints the State of Texas disfavors. That conclusion becomes particularly apparent by focusing first on what

S.B. 12 does *not* do. For one, the legislature did not limit the expressive conduct singled out by S.B. 12 to the class of material the Supreme Court defined as obscene in *Miller v. California*, 413 U.S. 15, 24 (1973)—and notably, the Attorney General explicitly declined to defend S.B. 12 as an obscenity law. AG Br. at 46. From that lens, "sexually oriented performances" receive no lesser degree of First Amendment protection than other forms of provocative, boundary-pushing, or offensive speech. Nor does S.B. 12 "adjust the boundaries of an existing category of unprotected speech to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794. That much is evident from the fact that S.B. 12 bans "sexually oriented performances" from public spaces entirely, disadvantaging minor and mature listeners to equal degrees. ROA.170–71. With those concerns cast aside, S.B. 12's viewpoint discriminatory goals come into sharper focus. The law prohibits speakers who have an otherwise legitimate message to share from communicating that message from a particular artistic viewpoint. *See Good News Club*, 533 U.S. at 108–09 (it is viewpoint discriminatory to prohibit a religious group from using a limited public forum because the group wanted to teach a "subject otherwise permissible"—family values—from a religious standpoint).

Take Plaintiff Brigitte Bandit, for example. The court below found that Bandit, "[a]s part of her artistic expression . . . uses a prosthetic breastplate and various accessories like wigs, false eyelashes, high heels, corsets, jewelry, and

clothing to perform drag and impersonate female stars like Dolly Parton." *Woodlands Pride, Inc. v. Paxton*, 2023 WL 6226113, at \*7 (S.D. Tex. Sept. 26, 2023). As the Court noted, Bandit once wore a dress with the names of the Uvalde school shooting victims, "to testify before a Texas senate committee. When asked what the message was, she stated, 'I was trying to say that we're sitting here arguing about drag performances and drag queens [] under the concern of safety for kids while kids are being shot in our schools here in Texas.'" *Id.*

If Bandit chose to stand on a soapbox in a public park wearing the very same dress and prosthetic breastplate, to speak the very same message she shared with the Texas Senate, her actions would clearly be protected by the First Amendment. *See Snyder v. Phelps*, 562 U.S. 443, 456 (2011). But if she added provocative choreography that some could interpret as "sexual gesticulations" or "imitating sexual acts," the State claims the authority not only to ban that performance entirely, but also to arrest Bandit if her performance could "reasonably be expected to be viewed by a child[.]" ROA.170–72 (making an offense a Class A misdemeanor). That is viewpoint discriminatory, because it prohibits Bandit from sharing an otherwise permissible political message from an artistic "standpoint" the State finds offensive—one that uses dance instead of the spoken word. *See Good News Club*, 533 U.S. at 109.

Broadly, S.B. 12's definition of "sexually oriented performance" targets the efforts of drag performers to celebrate gender and sexuality, particularly forms of gender and sexual identity that do not conform to traditional notions of gender as a fixed concept, or as part of a male/female binary.[7] To do so, drag performers often use props, prostheses, makeup, and choreography that exaggerate their physical characteristics, and stereotype others. That some of these exaggerations and stereotypes might be perceived by others as offensive, provocative, or overly sexualized does not make them any less deserving of First Amendment protection. To the contrary, that makes them *more* deserving. As the Supreme Court explained in *Matal v. Tam*, the Court takes a "broad" view of viewpoint discrimination to encompass the suppression of particular modes of expression—there, disparaging speech—even if that prohibition applies to all speakers equally. 582 U.S. 218, 243 (2017). Just as "[g]iving offense is a viewpoint[,]" so, too, is performing in drag. *Id.*

Drag performers use their art to communicate their messages in ways that are frequently provocative, push boundaries, and cause offense—as much good art does.

---

[7] *See* Kiana Shelton, *The Joy of Drag*, PSYCHIATRIC TIMES (June 29, 2022), https://www.psychiatrictimes.com/view/the-joy-of-drag ("Drag has many interpretations but is loosely defined as performing in an exaggerated way that caricatures or challenges male or female stereotypes. . . . At its core, drag is a creative act—a powerful and personal form of self-expression. Many performers . . . use [drag] to explore sexual and gender identity and expression."); CJ Wallace, *The Importance of Drag Queens*, MY RES. CTR. (June 6, 2023), https://myresourcecenter.org/the-importance-of-drag-queens/ ("[Drag queens] presence serves as a reminder that everyone deserves to be seen, heard, and celebrated, regardless of gender identity or sexual orientation.").

But just as the federal government cannot ban offensive trademarks, *Tam*, 582 U.S. at 243), the State of Texas cannot ban performances it is offended by—certainly not when the effect of that ban is to eliminate an important means of artistic political expression. Drag, at its core, is a form of visual satire—it relies on the use of exaggeration to offer political commentary about all sorts of important issues. Brigitte Bandit's intentional use of dress and exaggerated physical characteristics to highlight the hypocrisy of legislating to protect children from drag performances, but not gun violence, is satire in its purest form. And it deserves First Amendment protection not just because of what her message communicates, but also because of the particular artistic means she uses to communicate it. *See also Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 53–56 (1988).

The underinclusiveness of S.B. 12 further underscores its viewpoint discriminatory aims. It doesn't prohibit all "exhibition[s] of sexual gesticulations," only those done "using accessories or prosthetics that exaggerate male or female sexual characteristics." ROA.171. It prohibits "actual or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person," but leaves solo performers who might touch the same parts of their own body free from the law's reach. *Id.* By legislating to ban only *particular* types of sexual performance, but not others, Texas's chosen means of protecting children

from exposure to what the Attorney General deems "graphic sexually explicit conduct" can hardly be said to fit that end. AG Br. at 1.

It also leaves entirely untouched other types of artistic content that might implicate the State's concerns were they displayed to children. For example, S.B. 12 does not appear to cover static media such as paintings, drawings, and prints, which might depict its subjects in nude or lewd states. Nor is it clear whether the law applies to films or televised media—such that the public screening of a movie which contained a scene of sexual intercourse between two characters would not be permitted. "The consequence is that [S.B. 12] is wildly underinclusive when judged against its asserted justification[.]" *Brown*, 564 U.S. at 802. It is that underinclusiveness that "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Id.*

S.B. 12's legislative history confirms the State's viewpoint discriminatory intent. The Texas legislature, Governor, and Lt. Governor all espoused beliefs that the views expressed by drag performances are wrong. They described drag shows as

"disgusting,"[8] "hyper-sexualized,"[9] and "harm[ful] to children."[10] *See* Brief for Plainitifs-Appellees at 6–7. For example, Representative Carrie Isaac, a joint sponsor of the bill, explained S.B. 12 "protect[s] our children from being groomed by restricting sexually oriented performances also know[n] as 'drag shows' in the presence of children."[11] Lieutenant Governor Dan Patrick titled the bill "Banning Children's Exposure to Drag Shows" and explained, "I named SB 12 to be one of my top priorities this session because someone must push back against the radical left's disgusting drag performances which harm Texas children."[12] When Governor Abbott signed S.B. 12 into law, he declared: "Texas Governor Signs Law Banning Drag Performances in Public. That's Right."[13] To survive the level of scrutiny that should be applied here, the State "wishes to create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*,

---

[8] Statement on the Adoption of Conference Committee Report for Senate Bill 12, Banning Children's Exposure to Drag Shows, Lieutenant Governor of Tex. Dan Patrick (May 28, 2023), https://www.ltgov.texas.gov/2023/05/28/statement-on-the-adoption-of-conference-committee-report-for-senate-bill-12-banning-childrens-exposure-to-drag-shows/.

[9] Matt Shaheen (@MattShaheen), Twitter, (June 8, 2023, 7:48 AM), https://twitter.com/MattShaheen/status/1666789387005222912.

[10] Statement on the Adoption of Conference Committee Report for Senate Bill 12, Banning Children's Exposure to Drag Shows, *supra* note 8.

[11] Carrie Isaac (@CarrieIsaac), Twitter, (May 19, 2023, 11:11 PM) https://twitter.com/carrieisaac/status/1659773848676450304.

[12] Statement on the Adoption of Conference Committee Report for Senate Bill 12, Banning Children's Exposure to Drag Shows, *supra* note 8.

[13] Greg Abbott (@GregAbbott_TX), Twitter (June 24, 2023, 11:03 PM), https://twitter.com/gregabbott_tx/status/1672817859729162240.

564 U.S. at 794. But given S.B. 12's clear viewpoint-discriminatory aims, the Court should decline the State's invitation.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the court below.

Dated: April 17, 2024                    Respectfully submitted,

*/s/ Peter B. Steffensen*
Peter Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, Texas 75275-0116
(214) 768-4077
psteffensen@smu.edu

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

Counsel for *Amici Curiae*[14]

---

[14] Counsel for *Amici Curiae* thank SMU Dedman School of Law 3L students Suzi Goebel and Emma Creedon for their substantial contributions to this brief.

## CERTIFICATE OF SERVICE

I certify that on April 17, 2024, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the CM/ECF system. I certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Peter B. Steffensen*
Counsel for *Amici Curiae*

## CERTIFICATIONS UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Peter B. Steffensen*
Counsel for *Amici Curiae*

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,493 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rules 32.1 and 32.2 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Peter B. Steffensen*
Counsel for *Amici Curiae*