NO. 23-20480

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

THE WOODLANDS PRIDE, INC., *et al.*,

*Plaintiffs-Appellees,*

v.

WARREN KENNETH PAXTON, *In an official capacity as Attorney General of Texas, et al.*,

*Defendants-Appellants.*

---

## BRIEF OF *AMICUS CURIAE*
## FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

---

On Appeal from the United States District Court for the
Southern District of Texas, Houston Division,
Civil Action No. 4:23-CV-2847

---

JT Morris
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave. S.E.,
   Suite 340
Washington, D.C. 20003
Tel:  (215) 717-3473
jt.morris@thefire.org

Adam Steinbaugh
   *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut St., Suite 900
Philadelphia, PA. 19106
Tel:  (215) 717-3473
adam@thefire.org

*Attorneys for* Amicus Curiae

# SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES

The cause number and style of the case is No. 23-20480, *The Woodlands Pride, Inc., et al., v. Paxton, et al.* (USDC Civil No. 4:23-CV-2847, Southern District of Texas).

The undersigned counsel of record certifies that, in addition to the persons and entities in the parties' Certificates of Interested Persons, the following listed persons or entities described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

| **Person or Entity** | **Connection to Case** |
|---|---|
| Foundation for Individual Rights and Expression (FIRE) | *Amicus curiae* |
| JT Morris | Counsel for *amicus* FIRE |
| Adam Steinbaugh | Counsel for *amicus* FIRE |

Under Federal Rule of Appellate Procedure 26.1(a), counsel for *amicus* certifies that (1) *amicus* does not have any parent corporations,

and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amicus*.

Respectfully,

<u>/s/ Adam Steinbaugh</u>
Adam Steinbaugh
*Counsel of record for* Amicus Curiae

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES...........i

TABLE OF AUTHORITIES.......................................................iv

INTEREST OF *AMICUS CURIAE* ...........................................1

SUMMARY OF ARGUMENT................................................2

ARGUMENT.........................................................................4

I.   S.B. 12 Regulates Inherently Expressive Conduct Because It Targets Only "Performances," Including Drag Shows. ..................4

    A.   Conduct is expressive when its context alerts viewers that it is performative.............................................4

    B.   Theatrical performances like drag shows are inherently expressive, whatever their genre. ..........................6

    C.   Expressive conduct does not require a particularized message. ........................................................9

II.  S.B. 12 Is Subject to—and Fails—Strict Scrutiny Because It Regulates Non-Obscene Expression................................13

    A.   S.B. 12 targets inherently expressive conduct because it singles out "performances" for regulation........................13

    B.   S.B. 12 is a content-based regulation of non-obscene expression, failing strict scrutiny.........................16

    C.   Under the First Amendment, parents—not government officials—make decisions as to protected content. ...............21

CONCLUSION .................................................................23

CERTIFICATE OF SERVICE .............................................24

CERTIFICATE OF COMPLIANCE .....................................25

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Ashcroft,*
  322 F.3d 240 (3d Cir. 2003) ................................................... 17

*Anderson v. City of Hermosa Beach,*
  621 F.3d 1051 (9th Cir. 2010) ................................................. 6

*Bleistein v. Donaldson Lithographing Co.,*
  188 U.S. 239 (1903) ......................................................... 11, 12

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) ........................................................... 3, 21

*Buckley v. Am. Constitutional Law Found.,*
  525 U.S. 182 (1999) ............................................................ 19

*Cabrol v. Town of Youngsville,*
  106 F.3d 101 (5th Cir. 1997) ................................... 5, 7, 9, 12

*Clark v. Cmty. for Creative Non-Violence,*
  468 U.S. 288 (1984) ......................................................... 5, 15

*Cohen v. California,*
  403 U.S. 15 (1971) ............................................................... 3, 9

*Ent. Software Ass'n v. Blagojevich,*
  469 F.3d 641 (7th Cir. 2006) ................................................ 20

*Erznoznik v. Jacksonville,*
  422 U.S. 205 (1975) ..................................................... 3, 19, 21

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,*
  901 F.3d 1235 (11th Cir. 2018) ............................................. 8

*Free Speech Coalition v. Paxton,*
  95 F.4th 263 (5th Cir. 2024) ................................................ 21

*Friends of Georges, Inc. v. Mulroy*,
___ F. Supp. 3d ___, 2023 WL 3790583 (W.D. Tenn. June 2,
2023) ................................................................................. 8

*Ginsberg v. New York*,
390 U.S. 629 (1968)........................................................ 3, 22

*Halsey v. N.Y. Soc'y for Suppression of Vice*,
234 N.Y. 1 (1922) ............................................................... 18

*HM Fla.-ORL, LLC v. Griffin*,
___ F. Supp. 3d ___, 2023 WL 4157542 (M.D. Fla. June 23, 2023) ...... 8

*Holloman ex rel. Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004)......................................... 9, 10

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995)......................................................... 6, 10

*Imperial Sovereign Ct. of Mont. v. Knudsen*,
___ F. Supp. 3d ___, 2023 WL 6794043 (D. Mont. Oct. 13, 2023)......... 8

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
993 F.2d 386 (4th Cir. 1993).................................................. 9

*Joseph Burstyn v. Wilson*,
343 U.S. 495 (1952)................................................................ 5

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
138 S. Ct. 1719 (2018) (Thomas, J., concurring) ............................ 5, 10

*Miller v. California*,
413 U.S. 15 (1973)................................................ 3, 13, 17, 19

*Moore v. Hadestown Broadway LLC*,
___ F. Supp. 3d ___, No. 23-CV-4837 (LAP), 2024 WL 989843
(S.D.N.Y. Mar. 7, 2024) ...................................................... 6

*Norma Kristie, Inc. v. City of Oklahoma City*,
572 F. Supp. 88 (W.D. Okla. 1983)........................................ 8

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ..................................................................... 17, 20

*Reno v. ACLU,*
    521 U.S. 844 (1997) ........................................................................... 19

*Roth v. United States,*
    354 U.S. 476 (1957) ........................................................................... 19

*Rumsfeld v. FAIR,*
    547 U.S. 47 (2006) ............................................................................. 12

*S. Utah Drag Stars v. City of St. George,*
    ___ F. Supp. 3d ___, 2023 WL 4053395 (D. Utah June 16, 2023) ......... 8

*Schad v. Borough of Mount Ephraim,*
    452 U.S. 61 (1981) ............................................................................. 13

*Se. Promotions v. Conrad,*
    420 U.S. 546 (1975) ..................................................................... 2, 6, 7

*Speech First, Inc. v. Sands,*
    69 F.4th 184 (4th Cir. 2023) .............................................................. 7

*Tenafly Eruv Ass'n v. Borough of Tenafly,*
    309 F.3d 144 (3d Cir. 2002) .............................................................. 10

*Texas v. Johnson,*
    491 U.S. 397 (1989) ..................................................................... 4, 9, 12

*United States v. Alvarez,*
    567 U.S. 709 (2012) ........................................................................... 16

*United States v. Eichman,*
    496 U.S. 310 (1990) ........................................................................... 14

*United States v. O'Brien,*
    391 U.S. 367 (1968) ........................................................................... 14

*United States v. One Book Entitled Ulysses,*
    72 F.2d 705 (2d Cir. 1934) ................................................................ 18

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) .................................................................. 9

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) .................................................................. 5

*Willey v. Harris Cnty. D.A.*,
    27 F.4th 1125 (5th Cir. 2022) ............................................. 20

## Statutes

Tex. Health & Safety Code
    § 769.002(a) ............................................................... 3, 14

Tex. Local Gov. Code
    § 243.0031 .................................................................. 3, 14

Tex. Penal Code
    § 43.25(a)(3) ................................................................. 15
    § 43.28(a)(2) ............................................. 3, 14, 17, 18
    § 43.28(b). ................................................................... 14

## Other Authorities

James E. Leahy,
    *Flamboyant Protest, the First Amendment, and the Boston Tea
    Party*, 36 Brook L. Rev. 185, 210 (1970) .............................. 8

Penelope Debelle,
    *Behind That Secret Smile*, The Age (June 25, 2004), ......................... 10

*Performance*, The Oxford English Dictionary (online ed. 2024) ............ 14

Quinn Hough & Stephen Barker,
    *What's Really In The Pulp Fiction Briefcase?*, Screen Rant (Oct.
    13, 2023) ......................................................................... 11

Tony Sarabia,
    *The Story of Dave Brubeck's 'Take Five'*, NPR (Nov. 19, 2000) .......... 11

Tr. of Oral Arg., *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023)
    (No. 21-476) ...................................................................... 12

# INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan, nonprofit organization dedicated to defending the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights on college campuses nationwide through advocacy, litigation,[2] and *amicus curiae* filings in cases that implicate expressive rights. In 2022, FIRE expanded its public advocacy beyond the university setting and now defends First Amendment rights both on campus and in society at large. *See, e.g.*, *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1095 n.40 (5th Cir. 2023) (citing FIRE's "good and related point" in First Amendment matter).

The First Amendment's protection of expressive conduct is vital. People express themselves not only through words, but through action—whether moving a bow across the strings of a violin or kneeling in prayer.

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E), (b)(4); 5th Cir. R. 29.2.

[2] FIRE also represents the Plaintiffs-Appellants in a challenge to a public university president's prior restraint on drag shows. *Spectrum WT v. Wendler*, No. 23-10994 (5th Cir., *docketed* Sept. 27, 2023).

Diluting the First Amendment's potent protection for expressive conduct will imperil not only drag performances, but a vast array of expression far removed from drag performances, and thus FIRE urges the Court to affirm.

## SUMMARY OF ARGUMENT

The First Amendment broadly protects expressive conduct. When the context of an action alerts viewers that it is intended to express something, that conduct is expressive even if audience members might disagree on what it means. That's why ambiguous expression—Baryshnikov's interpretive ballet, Coltrane's instrumental jazz, or Dali's surrealist paintings—is protected, even when few can articulate the precise message conveyed.

Stage performance is inherently expressive because the stage—the traditional locus of expression since the days of ancient Athens—cues the audience that they are witnessing performative expression, not pure conduct. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 549–52 (1975). That expressive nature—and, with it, the First Amendment's protection—does not depend on genre, whether it is opera, ballet, or drag, because the First Amendment makes no distinctions on matters of taste

and style. *Cohen v. California*, 403 U.S. 15, 25 (1971).

S.B. 12 is a content-based regulation of expression. It targets *only* expressive conduct because it applies only to "performances," while conduct that is not performative—that is, expressive—is not affected by the law. Tex. Health & Safety Code § 769.002(a); Tex. Local Gov. Code § 243.0031; Tex. Penal Code § 43.28(a)(2). The State may impose content-based restrictions on obscene expression, including expression that is obscene as to minors. *Erznoznik v. Jacksonville*, 422 U.S. 205, 212–14 & n.10 (1975) (citing *Miller v. California*, 413 U.S. 15, 24 (1973) and *Ginsberg v. New York*, 390 U.S. 629 (1968) (obscenity as to minors)). But S.B. 12 reaches non-obscene, protected expression: It does not require that the performance, "taken as a whole, lack[] serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24.

That Texas believes the statute shields minors from performances it deems offensive does not preclude First Amendment scrutiny. Our Constitution recognizes that parents, not legislatures, raise children. It leaves to parents the decisions about what protected expression is appropriate, and the legislature may not supplant its judgment for that of a parent. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804 (2011) (the

First Amendment bars imposing "what the State thinks parents *ought* to want"). That is particularly so when parents may reasonably decide that expression has artistic or political value.

## ARGUMENT

### I. S.B. 12 Regulates Inherently Expressive Conduct Because It Targets Only "Performances," Including Drag Shows.

The First Amendment's broad protection for expressive conduct embraces a wide range of artistic expression, recognizing that its context will alert viewers that something is being expressed—even if the viewer does not always understand its message. Stage performance, whatever its genre, is inherently expressive, and S.B. 12 regulates *only* performances—including drag shows—in venues set aside for expression.

### A. Conduct is expressive when its context alerts viewers that it is performative.

The Supreme Court has "long recognized" the First Amendment's "protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). As Justice Thomas explained, the First Amendment protects "a wide array of conduct that can qualify as expressive, including nude dancing, burning the American flag . . . wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece*

*Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 657 & n.1 (2018) (Thomas, J., concurring) (collecting cases).

Whether conduct is expressive is informed by its context. If the "conduct . . . is intended to be communicative" and "in context, would reasonably be understood by the viewer to be communicative," the First Amendment protects it. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) (citations omitted). Context may be drawn from its "environment," from "any accompanying conduct or speech or symbol," from "current events or timing," or from anything showing "public consciousness" that the conduct is expressive. *Cabrol v. Town of Youngsville*, 106 F.3d 101, 109 (5th Cir. 1997).

Some media are inherently expressive—that is, they are always accompanied by context that alerts others to their performative nature. Motion pictures, for example, are a "significant medium for the communication of ideas." *Joseph Burstyn v. Wilson*, 343 U.S. 495, 501 (1952). Music, too, is inherently expressive: A violinist can summon the full spectrum of human emotion—melancholy, joy, and more—without a single lyric. *Ward v. Rock Against Racism*, 491 U.S. 781, 790–91 (1989) (music without words). The conduct of "marching" may necessarily

involve action, but context—the familiar history of protest marches, the presence of signs or shirts—allows viewers to distinguish the "inherent expressiveness" of parade marchers from pedestrians merely traveling from one point to the next. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 568 (1995). These "various forms of entertainment and visual expression" are inherently "expressive activities" afforded "full constitutional protection" even if they do not articulate a precise message. *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010) (collecting cases).

**B.   Theatrical performances like drag shows are inherently expressive, whatever their genre.**

These inherently expressive media include the stage, firmly embedded in the public consciousness as a mode of communication. *Se. Promotions*, 420 U.S. at 557–58. *See also, e.g.*, *Moore v. Hadestown Broadway LLC*, ___ F. Supp. 3d ___, No. 23-CV-4837 (LAP), 2024 WL 989843, at *18 (S.D.N.Y. Mar. 7, 2024) (decisions about casting choices in a Broadway musical are inherently expressive because stage performance is "a medium that is inherently expressive").

Stage performance itself is sufficiently imbued with expressive indicia to alert viewers to its nature. Audience members *necessarily*

understand that stage performances are exactly that—performative—because the stage is inseparable from the conduct. By its very "nature, theater usually is the acting out—or singing out—of the written word, and frequently mixes speech with live action or conduct." *Se. Promotions*, 420 U.S. at 557–58. In other words, the "accompanying conduct or speech"—music, lighting, makeup, dress, and a host's commentary—orients viewers to the performance's expressive nature. *See Cabrol*, 106 F.3d at 109.

Even without that context, a reasonable person will necessarily encounter cues alerting them to the expressive nature of the performance even before it begins. Most audiences to a performance are voluntarily and purposefully present *because* they want to see a given performance. Audience members have been prompted by advertisements or word-of-mouth to buy a ticket, and they enter the venue to see that performance.

And history and tradition reinforce the public awareness that theater is performative. *Cabrol*, 106 F.3d at 109. Getting on stage and performing *is* expression, and has been since the Ancient Greeks took to the Athenian stage. *See Speech First, Inc. v. Sands*, 69 F.4th 184, 222 (4th Cir. 2023) (Wilkinson, J., dissenting) ("It is no coincidence that

ancient Athens introduced both dialogue to theater and democracy to the world around the same time."). Expressive conduct off-stage, too, has deep roots in American tradition. "History may have been quite different had the Boston Tea Party been viewed as mere dislike for a certain brew and not a political protest against the taxation of the American colonies without representation." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1241 (11th Cir. 2018) (citing James E. Leahy, *Flamboyant Protest, the First Amendment, and the Boston Tea Party*, 36 Brook L. Rev. 185, 210 (1970)).

These principles do not depend on the genre of a performance, and courts across the country have recognized the First Amendment's protection for drag performance. "Any inequality in aesthetic value between [a drag show] and a musical or play is a distinction without a difference." *Norma Kristie, Inc. v. City of Oklahoma City*, 572 F. Supp. 88, 91 (W.D. Okla. 1983).[3] That is because the First Amendment leaves

---

[3]    *See also, e.g.*, *Friends of Georges, Inc. v. Mulroy*, ___ F. Supp. 3d ___, 2023 WL 3790583 (W.D. Tenn. June 2, 2023) (enjoining Tennessee's statutory drag ban); *Imperial Sovereign Ct. of Mont. v. Knudsen*, ___ F. Supp. 3d ___, 2023 WL 6794043 (D. Mont. Oct. 13, 2023) (enjoining Montana's statutory drag ban); *HM Fla.-ORL, LLC v. Griffin*, ___ F. Supp. 3d ___, 2023 WL 4157542 (M.D. Fla. June 23, 2023) (enjoining Florida's statutory drag ban); *S. Utah Drag Stars v. City of St. George*, ___ F. Supp. 3d ___, 2023 WL 4053395 (D. Utah June 16, 2023) (ordering city to grant

distinctions about "taste and style" to individuals, not government officials. *Cohen*, 403 U.S. at 25; *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000) ("these judgments are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority"). That is true of "high-grade entertainment" just as it is of "crude" and "low-grade entertainment," as the Fourth Circuit explained in upholding as "inherently expressive" a fraternity's "ugly woman contest." *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 390–92 (4th Cir. 1993).

### C.   Expressive conduct does not require a particularized message.

Texas's contention that drag performances do not implicate expressive conduct because they do not send a "particularized message" misstates the law. Br. of A.G. Paxton at 24–26, citing *Cabrol*, 106 F.3d at 109 for its reliance on *Johnson*, 491 U.S. at 404. Instead, the test for expressive conduct is whether a "reasonable person would interpret [the conduct] as <u>some</u> sort of message, not whether an observer would necessarily infer a <u>specific</u> message." *Holloman ex rel. Holloman v.*

permit for drag show on public property). At present, *Friends of Georges*, *HM Fla.-ORL*, and *Imperial Sovereign* are also on appeal.

*Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (emphasis in original); *see also Masterpiece Cakeshop,* 584 U.S. at 657 (Thomas, J., concurring) (*Hurley* confirmed that a "'particularized message' is not required").

That is because the Supreme Court has long renounced the test Texas invokes. Some thirty years ago, the Supreme Court held that "a narrow, succinctly articulable message *is not a condition of constitutional protection.*" *Hurley*, 515 U.S. at 569 (emphasis added); *see also Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 160 (3d Cir. 2002) (*Hurley* "eliminated the 'particularized message' aspect of the Spence-Johnson test."). As the Court explained in *Hurley*, if the First Amendment were "confined to expressions conveying a 'particularized message,' [it] would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." 515 U.S. at 569.

That makes sense. Artistic expression is frequently ambiguous, inviting debate about the artist's meaning. Is Lisa del Giocondo—the Mona Lisa—smiling, and why?[4] What *was* in the briefcase in *Pulp*

---

[4]    Penelope Debelle, *Behind That Secret Smile*, The Age (June 25, 2004), *archived at* https://web.archive.org/web/20131125184249/http://www.theage.com.au/articles/2004/06/24/1088046208817.html.

*Fiction*?[5] What's so special about the Dave Brubeck Quartet's *Take Five*[6]—and could a state ban its performance because the absence of its lyrics deprives it of a particularized message?

The answer must be no: We understand these works as expressive, even if we cannot say what their messages are. If expressive conduct were protected only when it conveys an unambiguous message, a large range of expression—be it orchestral music, surrealist paintings, or abstract sculpture—could be regulated by officials who don't understand it. Or even worse, by officials who dislike it. It is a "dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth" of artistic expression. *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903) (Holmes, J.). The "very novelty" of some works "would make them repulsive until the public had learned the new language in which their author spoke," and even "the etchings of Goya or the paintings of Manet would [not] have been sure of protection when seen for the first time." *Id.* But the "taste of any [segment of] the public

---

5    Quinn Hough & Stephen Barker, *What's Really In The Pulp Fiction Briefcase?*, Screen Rant (Oct. 13, 2023), https://screenrant.com/pulp-fiction-movie-briefcase.

6    Tony Sarabia, *The Story of Dave Brubeck's 'Take Five'*, NPR (Nov. 19, 2000), https://www.npr.org/2000/11/19/1114201/take-five.

is not to be treated with contempt." *Id.* at 252.

The Attorney General invokes *Cabrol*'s citation to *Johnson* for the proposition that expressive conduct requires a "particularized message" to warrant protection. Br. of A.G. Paxton at 24–26, citing *Cabrol*, 106 F.3d at 109 for its reliance on *Johnson*, 491 U.S. at 404. That is wrong. *Johnson* predated *Hurley*'s express rejection of that test, and *Cabrol* referenced—in dicta—*Johnson*'s reference to "particularized message" without addressing *Hurley*'s rejection of that very language less than two years earlier. *Cabrol*, 106 F.3d at 109.

Nor does *FAIR* require a particularized message, as the Attorney General suggests. Br. of A.G. Paxton at 26–27. *FAIR* recognized the truism that conduct does not become expressive through explanation alone. *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006).[7] *FAIR* instead reaffirmed that the First Amendment protects "inherently expressive" conduct. *Id.* And because live entertainment, music, and theatre—all intrinsic to drag shows—are inherently expressive, the First Amendment

---

[7]    As Chief Justice Roberts recently noted during oral argument in *303 Creative*, FAIR "involved [law] schools providing rooms for the military recruiter," and "what the Court said is empty rooms don't speak." Tr. of Oral Arg. at 65:1–9, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (No. 21-476).

protects them, with explanation or without. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65–66 (1981) (collecting cases). These media—of which drag performance is simply one genre—*are* inherently expressive.

## II. S.B. 12 Is Subject to—and Fails—Strict Scrutiny Because It Regulates Non-Obscene Expression.

In singling out "performances" for regulation, Texas's attempt to regulate drag shows is a content-based regulation on expressive conduct. The law fails the strict scrutiny applied to content-based regulations because it is not narrowly tailored to performances that "taken as a whole, lack[] serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24. Lawmakers may not supplant their judgment for a parent in evaluating what protected expression is appropriate for minors, however objectionable others might find that expression.

### A. S.B. 12 targets inherently expressive conduct because it singles out "performances" for regulation.

S.B. 12 regulates expressive conduct because it *says* it regulates *only* expressive conduct. To ascertain whether the law applies, authorities must—to give life to the law's repeated use of the word "performance"—look to the same contextual cues that identify conduct as

13

expressive. As a result, S.B. 12 regulates conduct based on its expressive components.[8]

Each of S.B. 12's provisions—its limits on the use of public property, on commercial organizations, and on individual performers—targets "sexually oriented performance." Tex. Local Gov. Code § 243.0031(a), (c); Tex. Health & Safety Code § 769.002(a); Tex. Penal Code § 43.28(b). To qualify as a prohibited "sexually oriented performance," the "performance" must be a "visual performance." Tex. Penal Code § 43.28(a)(2). While the bill does not define "performance," it is commonly understood—and intended by a legislature targeting drag shows—to mean staged entertainment. *See, e.g.*, *Performance*, The Oxford English Dictionary (online ed. 2024) ("an instance of performing a play, piece of music, etc., in front of an audience; an occasion on which such a work is presented; a public appearance by a performing artist or artists of any kind. Also: an individual performer's or group's rendering or

---

[8] The Attorney General's claim that the law is not limited to "drag shows in particular" is no help. Br. of A.G. Paxton at 25–26. The law still only reaches *performances*, whatever their content. Because it regulates *only* expression, the law cannot be said to be "unrelated to" expression, so it is not subject to intermediate scrutiny. *United States v. O'Brien*, 391 U.S. 367, 377 (1968); *see also United States v. Eichman*, 496 U.S. 310, 315–16 (1990) (to ascertain whether a regulation is related to expression, courts look to both the "asserted" interest and the language of the statute to gauge whether it is based on "content").

interpretation of a work, part, role, etc."). That understanding of the term "performance" conforms to its use in comparable provisions of Texas's penal code, which define performance to broadly reach expressive media. *See, e.g.*, Tex. Penal Code § 43.25(a)(3) (defining "performance" to mean "any play, motion picture, photograph, dance, or other visual representation that can be exhibited before an audience of one or more persons").

Because S.B. 12 applies only to "performances," it applies only where there are sufficient cues to the viewer that the conduct is intended to and likely to be understood as expressive.[9] To know whether it is a "performance," authorities would have to look for the same cues that would alert a reasonable viewer that it is a performance. If a given action is not "intended to be communicative" and, "in context," would not "reasonably be understood by the viewer to be communicative," *Clark*, 468 U.S. at 294, it cannot be said to be a performance.

---

[9] Because "performance" must mean something distinct from other, non-performative conduct, S.B. 12 is underinclusive. A merchant selling a sex toy (which cannot be "exhibited" in a "performance" under S.B. 12) in the lobby of venue hosting a drag show does not violate S.B. 12 because he is only exhibiting, not conducting a "performance." The law's underinclusive focus on "performances" reveals that it deals only with expression.

**B. S.B. 12 is a content-based regulation of non-obscene expression, failing strict scrutiny.**

In applying a quasi-obscenity standard to visual "performances," S.B. 12 is a content-based regulation of expression. Because the Legislature refused to cabin the law to performances that, taken as a whole, lack serious literary, artistic, or political value, the law is not narrowly tailored. It thus fails strict scrutiny.

S.B. 12 is a content-based limitation on expression for three reasons. First, as discussed above, the law singles out "performances" based on their expressive content. Second, S.B. 12 is content-based because it mimics (incompletely) the standard for regulating obscene content, but reaches protected expression by omitting that standard's critical elements. "Obscenity" is a form of content—albeit one that is unprotected when all of its elements are properly met. *See United States v. Alvarez*, 567 U.S. 709, 717 (2012) ("content-based restrictions on speech have been permitted . . . only when confined to" the "historic and traditional categories" of unprotected speech, like "obscenity."). In borrowing—and reaching beyond—the obscenity standard, Texas is regulating expression based on its content. And third, the law requires an evaluation of whether there is a "visual performance," meaning

authorities must look to the content of the expression to determine whether the statute applies. Tex. Penal Code § 43.28(a)(2); *see Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015).

The State may regulate unprotected obscenity, as defined by *Miller* and *Ginsberg*. Under *Miller*, expression is obscene only where (a) "'the average person, applying contemporary community standards' would find that the [expression], taken as a whole, appeals to the prurient interest"; (b) the expression depicts specifically defined sexual conduct in a patently offensive way; and (c) the expression "taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24. That test may be adapted to reach expression that is obscene to minors by applying each of these three prongs "with respect to minors." *ACLU v. Ashcroft*, 322 F.3d 240, 246 (3d Cir. 2003) (citing *Ginsberg*).

A straightforward application of the *Miller* and *Ginsberg* prongs shows that S.B. 12 reaches beyond unprotected obscenity in two significant ways—and, as a result, reaches a swath of speech protected by the First Amendment.

First, in evaluating whether it appeals to prurient interest, S.B. 12 does not require evaluation of the expression "as a whole." *See* Tex. Penal

Code § 43.28(a)(2). But courts have long recognized the danger in allowing officials to isolate a passage or scene from its context to ban the larger work. For example, in refusing efforts to suppress James Joyce's *Ulysses* for exciting "lustful" thoughts, the Second Circuit rejected the notion that "offending paragraphs in a book could be taken from their context and the book judged by them alone." *United States v. One Book Entitled Ulysses*, 72 F.2d 705, 706–08 (2d Cir. 1934). Instead, the Second Circuit recognized that there may be "many paragraphs" in a work which, "taken by themselves" may be "vulgar and indecent," but:

> No work may be judged from a selection of such paragraphs alone. Printed by themselves they might, as a matter of law, come within the prohibition of the statute. So might a similar selection from Aristophanes or Chaucer or Boccaccio, or even from the Bible. The book, however, must be considered broadly, as a whole.

*Id.* at 707 (quoting, in part and with approval, *Halsey v. N.Y. Soc'y for Suppression of Vice*, 234 N.Y. 1, 4 (1922)).

The same danger lurks today. If this Court departed from that century-old wisdom, modern Anthony Comstocks would target expression—in literature, in film, and on stage—far removed from drag performances or school libraries. Accordingly, restrictions on distribution

of sexually explicit materials to youth must evaluate "context" and "pervasiveness" to survive scrutiny. *Erznoznik*, 422 U.S. at 213; *see also Roth v. United States*, 354 U.S. 476, 489–90 (1957) (rejecting examination of "isolated passages" in evaluating obscenity, as it "might well encompass material legitimately treating with sex").

Worse, S.B. 12 entirely omits the third *Miller/Ginsberg* prong, which requires evaluation of whether the expression "taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24. Texas's refusal to limit S.B. 12's reach means the law necessarily regulates speech that *has* social or political value, reaching speech where the First Amendment's protection is "at its zenith." *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 186–87 (1999). And, as with the "prurient interest" prong, S.B. 12 fails to require that the expression be evaluated in its broader context. If states can criminalize expression—on stage, in print, online, or on air—even where it has political, artistic, scientific, or literary value, speech of social value will be chilled to a shocking degree. *Reno v. ACLU*, 521 U.S. 844, 873 (1997) (all three *Miller* prongs are "critically" necessary to limit the otherwise "uncertain sweep" of obscenity regulations).

Those defects doom S.B. 12 under strict scrutiny. When a content-based regulation reaches beyond obscenity's narrow standards, it is subject to strict scrutiny, *Reed*, 576 U.S. at 163, and survives only if it reaches "no more" speech than necessary to further the asserted interest, *Willey v. Harris Cnty. D.A.*, 27 F.4th 1125, 1133–34 (5th Cir. 2022). In *Entertainment Software Association v. Blagojevich*, for example, Illinois sought to criminalize the sale of "sexually explicit" video games to minors. 469 F.3d 641, 643 (7th Cir. 2006). Yet, like Texas, the State of Illinois "[i]nexplicably . . . chose to ignore both *Ginsberg* and *Miller*'s" requirement that works be evaluated as a whole to ensure that works with social value were not swept up in targeting "predominantly" explicit expression. *Id.* at 647–49. In sweeping beyond the confines of the *Miller/Ginsberg* standards, the "State [has] simultaneously failed to narrowly tailor the statute and created a statute that is unconstitutionally overbroad." *Id.* at 649.

This failure also sets this case apart from this Court's recent decision in *Free Speech Coalition*. There, this Court applied rational basis review to a limitation on access to adult websites, urging *Ginsberg* stood for the proposition that the "regulation of the distribution *to minors* of

speech obscene *for minors* is subject only to rational-basis review." *Free Speech Coalition v. Paxton*, 95 F.4th 263, 269 (5th Cir. 2024), *petition for cert. filed*, No. 23-1122 (Apr. 12, 2024). Yet S.B. 12 extends beyond speech obscene for minors, reaching expression that is *not* obscene for minors. By *Free Speech Coalition*'s own terms, S.B. 12 does not fit within this purported exception to First Amendment jurisprudence.

**C.     Under the First Amendment, parents—not government officials—make decisions as to protected content.**

Texas's inexplicable failure to narrow S.B. 12 to the confines of *Miller* and *Ginsberg* implicates not only the expressive rights of performers, but also invades the rights of parents.

While the Legislature may regulate unprotected obscenity, parents' freedom to make decisions about protected expression cannot be subordinated to that of the Legislature. As the Supreme Court recognized in *Erznoznik*, expression that is not "obscene as to youths . . . cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." 422 U.S. at 213–14; *see also Brown*, 564 U.S. at 794 (acknowledging the "legitimate power to protect children from harm," that authority "does not include a free-floating power to restrict the ideas to which children may be exposed").

Indeed, the rights of parents to control the upbringing of youth is such that even the State's judgment about what material is obscene-as-to-minors cannot override that of a parent. In *Ginsberg*, the Court addressed a prohibition on the sale of "explicit" magazines to minors. *Ginsberg*, 390 U.S. at 645–47. The Court upheld the limitation in large part because it facilitated parental choice, recognizing that the Court had "consistently" affirmed that "parents' claim to authority . . . to direct the rearing of their children is basic in the structure of society." *Id.* at 639. Parents, not the State, were entitled to "assess[] sex-related material harmful to minors," and the statute "d[id] not bar parents who so desire from purchasing the magazines for their children." *Id.*

But S.B. 12 makes no allowance for parents to make decisions about what performances are appropriate for their children. That is particularly important where the State has elected not to regulate obscene performances, but has instead chosen to prohibit even those performances a parent could decide have redeeming social, political, or artistic value. Some parents will opt not to allow their children to attend drag performances. Other parents, however, may view drag performances—as a whole—as important artistic expression. The

Constitution defers that choice to them. However offensive the Legislature may find particular expression, it cannot invade parents' prerogative to choose how to navigate subjectively offensive, protected expression.

## CONCLUSION

Texas's attempt to regulate drag shows reaches beyond the boundaries permitted by the First Amendment, and this Court's decision will have ramifications far beyond drag shows. The Court should affirm.

Dated: April 17, 2024

Respectfully submitted,

/s/ Adam Steinbaugh
Adam Steinbaugh
FOUNDATION FOR INDIVIDUAL RIGHTS
  AND EXPRESSION
510 Walnut St., Suite 900
Philadelphia, PA. 19106
Tel:  (215) 717-3473
adam@thefire.org

JT Morris
FOUNDATION FOR INDIVIDUAL RIGHTS
  AND EXPRESSION
700 Pennsylvania Ave., S.E., Suite 340
Washington, D.C. 20003
Tel: (215) 717-3473
jt.morris@thefire.org

*Attorneys for* Amicus Curiae

**CERTIFICATE OF SERVICE**

This certifies that on April 17, 2024, in compliance with Rules 25(b) and (c) of the Federal Rules of Appellate Procedure, the undersigned served the foregoing via the Court's ECF filing system on all registered counsel of record.

/s/ Adam Steinbaugh
Adam Steinbaugh
Attorney for *Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 4,652 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Local Rule 32.2.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Local Rule 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because it is set in proportionally spaced typeface using 14-point Century Schoolbook font for text and 12-point Century Schoolbook font for footnotes.

3.      Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, Local Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.


 Dated: April 17, 2024                    /s/ Adam Steinbaugh
                                          Adam Steinbaugh
                                          Attorney for *Amicus Curiae*