

# KEN PAXTON
## ATTORNEY GENERAL OF TEXAS

WILLIAM F. COLE
Principal Deputy Solicitor General

(512) 936-2725
William.Cole@oag.texas.gov

July 11, 2025

**Via CM/ECF**

Lyle W. Cayce, Clerk
United States Court of Appeals for Fifth Circuit

**Re:   No. 23-20480, *The Woodlands Pride v. Paxton***

Dear Mr. Cayce:

I write to inform the Court of the Supreme Court's recent decision in *Free Speech Coalition, Inc. v. Paxton*, No. 23-1122, 2025 WL 1773625 (U.S. June 27, 2025), in which the Court upheld a Texas law that requires certain commercial websites that publish sexually explicit content to verify the ages of their visitors. Because the law was "an exercise of Texas's traditional power to prevent minors from accessing speech that is obscene from their perspective" and only incidentally "burdens adults' rights to access such speech," the Court subjected it only to intermediate scrutiny. *Id.* at *8. The law "readily survive[d]" that threshold because it "simply requires adults to verify their age before they can access speech that is obscene to children." *Id.* at *19.

Here, the Court need not reach the question of the proper level of constitutional scrutiny to apply to S.B. 12 because Plaintiffs lack standing, cannot overcome the Attorney General's sovereign immunity, and S.B.12 does not regulate protected activity under the First Amendment. AG.Br.11-27; AG.Reply.2-20. But should the Court nevertheless reach this question, *Free Speech Coalition* demonstrates why S.B.12 is subject, at most, to intermediate scrutiny, which it passes.

At the outset, *Free Speech Coalition* confirms that intermediate scrutiny is appropriate: "[a]ge verification laws like [S.B.12] fall within States' authority to shield children from sexually explicit content." *Free Speech Coalition*, 2025 WL 1773625, at *8. And "because accessing material obscene to minors *without verifying one's age* is not constitutionally protected, any burden [S.B.12] imposes on protected activity [for adults] is only incidental, and the statute triggers only intermediate

Page 2

scrutiny." *Id.* at *11; *see also* AG.Reply.21 (explaining why S.B.12 regulates conduct obscene for minors).

*Free Speech Coalition* also confirms that S.B.12 passes intermediate scrutiny. "Texas's interest in shielding children from sexual content is important, even 'compelling.'" *Id.* at *17. And "age verification" "is plainly a legitimate choice" for attaining this end: "States have commonly used age-verification requirements, in the case of in-person access to sexual materials, to reconcile their interest in protecting children with adults' right to avail themselves of such materials." *Id.*

Respectfully submitted.

/s/ William F. Cole

William F. Cole
Principal Deputy Solicitor General

cc: all counsel of record (via CM/ECF)

--- S.Ct. ----
Only the Westlaw citation is currently available.
Supreme Court of the United States.

FREE SPEECH COALITION, INC., et al., Petitioners

v.

Ken PAXTON, Attorney General of Texas

No. 23-1122
|
Argued January 15, 2025
|
Decided June 27, 2025

**Synopsis**
**Background:** Pornography industry trade association, companies that operated pornographic websites, and pornography performer brought action alleging that Texas law requiring commercial pornographic websites to verify age of their visitors and to display health warnings about effects of consumption of pornography violated First Amendment and was preempted by Communications Decency Act (CDA). The United States District Court for the Western District of Texas, David A. Ezra, Senior District Judge, 689 F.Supp.3d 373, granted plaintiffs' motion for preliminary injunction. State appealed. The Court of Appeals for the Fifth Circuit, Smith, Circuit Judge, 95 F.4th 263, affirmed in part and vacated in part. Plaintiffs' petition for certiorari was granted.

**Holdings:** The Supreme Court, Justice Thomas, held that:

age-verification requirement was subject to intermediate scrutiny;

age-verification requirement advanced important governmental interest in shielding children from sexual content; and

age-verification requirement was sufficiently tailored to the State's interest.

Affirmed.

Chief Justice Roberts and Justices Alito, Gorsuch, Kavanaugh, and Barrett joined.

Justice Kagan filed dissenting opinion, in which Justices Sotomayor and Jackson joined.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion for Preliminary Injunction.

**West Codenotes**

**Validity Called into Doubt**
47 U.S.C.A. § 231(a)(1), 231(c)(1), 231(e)(6)

**Negative Treatment Reconsidered**
Tex. Civ. Prac. & Rem. Code Ann. §§ 129B.001, 129B.002, 129B.003, 129B.005, 129B.006

*Syllabus* [*]

**\*1** Texas, like many States, prohibits distributing sexually explicit content to children. In 2023, Texas enacted H. B. 1181, requiring certain commercial websites publishing sexually explicit content that is obscene to minors to verify that visitors are 18 or older. Knowing violations subject covered entities to injunctions and civil penalties.

Petitioners—representatives of the pornography industry—sued the Texas attorney general to enjoin enforcement of H. B. 1181 as facially unconstitutional under the First Amendment's Free Speech Clause. They alleged that adults have a right to access the covered speech, and that the statute impermissibly hinders them. The Fifth Circuit held that an injunction was not warranted because petitioners were unlikely to succeed on their First Amendment claim. The court viewed H. B. 1181 as a "regulatio[n] of the distribution *to minors* of materials obscene *for minors*." 95 F.4th 263, 269, 271. It therefore determined that the law is not subject to any heightened scrutiny under the First Amendment.

*Held*: H. B. 1181 triggers, and survives, review under intermediate scrutiny because it only incidentally burdens the protected speech of adults. Pp. —— – ——.

(a) H. B. 1181 is subject to intermediate scrutiny. Pp. —— – ——.

(1) To determine whether a law that regulates speech violates the First Amendment, the Court considers both the nature of the burden imposed by the law and the nature of the speech at issue. Laws that target protected speech "based on its communicative content" are presumptively unconstitutional and may be justified only if " they satisfy strict scrutiny.

--- S.Ct. ----

*Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S.Ct. 2218, 192 L.Ed.2d 236. Laws that only incidentally burden protected speech are subject to intermediate scrutiny. *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497. And laws that restrict only unprotected speech, such as obscenity, receive rational-basis review. *United States v. Stevens*, 559 U.S. 460, 468, 130 S.Ct. 1577, 176 L.Ed.2d 435. History, tradition, and precedent establish that sexual content that is obscene to minors but not to adults is protected in part and unprotected in part. States may prevent minors from accessing such content, *Ginsberg v. New York*, 390 U.S. 629, 637–638, 88 S.Ct. 1274, 20 L.Ed.2d 195, but may not prevent adults from doing the same, *Butler v. Michigan*, 352 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d 412. Pp. —— – ——.

(2) H. B. 1181 has only an incidental effect on protected speech, and is therefore subject to intermediate scrutiny. The First Amendment leaves undisturbed States' traditional power to prevent minors from accessing speech that is obscene from their perspective. That power includes the power to require proof of age before an individual can access such speech. It follows that no person—adult or child—has a First Amendment right to access such speech without first submitting proof of age.

The power to verify age is part of the power to prevent children from accessing speech that is obscene to them. Where the Constitution reserves a power to the States, that power includes "the ordinary and appropriate means" of exercising it. 1 J. Story, Commentaries on the Constitution of the United States § 430, pp. 412–413. Requiring proof of age is an ordinary and appropriate means of enforcing an age-based limit on obscenity to minors. Age verification is common when laws draw age-based lines, *e.g.,* obtaining alcohol, a firearm, or a driver's license. Obscenity is no exception. Most States require age verification for in-person purchases of sexual material, and petitioners concede that in-person requirements of this kind are "traditional" and "almost surely" constitutional. Tr. of Oral Arg. 17. And as a practical matter, age-verification is necessary for an effective prohibition on minors accessing age-inappropriate sexual content, especially on the internet.

 *2  Because H. B. 1181 simply requires proof of age to access content that is obscene to minors, it does not directly regulate adults' protected speech. Adults have the right to access speech obscene only to minors, see *Butler*, 352 U.S., at 383–384, 77 S.Ct. 524, and submitting to age verification burdens the exercise of that right. But adults have no First Amendment right to avoid age verification. Any burden on adults is therefore incidental to regulating activity not protected by the First Amendment. This makes intermediate scrutiny the appropriate standard under the Court's precedents. Pp. —— – ——.

(3) Applying the more demanding standard of strict scrutiny would call into question *all* age-verification requirements, even longstanding in-person requirements. Although petitioners insist that traditional in-person requirements would survive strict scrutiny, the Court cannot share their confidence. Strict scrutiny is designed to enforce the First Amendment's prohibition on content-based laws, and it succeeds in that purpose only if, as a practical matter, it is almost always fatal in fact. Strict scrutiny is not the appropriate standard for laws that are traditional and widely accepted as legitimate. Pp. —— – ——.

(4) Precedent does not call for the application of strict scrutiny. The Court's decisions applying strict scrutiny in this context all involved laws that *banned* both minors and adults from accessing speech that was at most obscene only to minors. See *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 118, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93; *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 808, 811, 814, 120 S.Ct. 1878, 146 L.Ed.2d 865; *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868, 876, 117 S.Ct. 2329, 138 L.Ed.2d 874; *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 665, 124 S.Ct. 2783, 159 L.Ed.2d 690. The Court has never before considered whether the more modest burden of an age-verification requirement triggers strict scrutiny. Pp. —— – ——.

(5) Texas contends that only rational-basis review applies. This position fails to account for the incidental burden that age verification necessarily has on an adult's First Amendment right to access speech obscene only to minors. Although deferential, intermediate scrutiny plays an important role in ensuring that legislatures do not use ostensibly legitimate purposes to disguise efforts to suppress fundamental rights. Pp. —— – ——.

(b) H. B. 1181 survives intermediate scrutiny because it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369. Pp. —— – ——.

(1) H. B. 1181 furthers Texas's important interest in shielding children from sexual content and is adequately tailored to that interest. States have long used age-verification requirements to reconcile their interest in protecting children from sexual material with adults' right to avail themselves of such material. H. B. 1181 simply adapts this traditional approach to the digital age. The specific verification methods that H. B. 1181 permits—government-issued identification and transactional data—are also plainly legitimate. Both are established methods of verifying age already in use by many pornographic websites and other industries with age-restricted services. Pp. —— – ——.

(2) Petitioners' counterarguments are unpersuasive. Petitioners object that other means of protecting children are more effective and that children are likely to encounter sexually explicit content on other websites subject to H. B. 1181's requirements. But intermediate scrutiny does not require States to adopt the least restrictive means of pursuing their interests, *Ward v. Rock Against Racism*, 491 U.S. 781, 800, 109 S.Ct. 2746, 105 L.Ed.2d 661, or avoid all underinclusiveness, *TikTok Inc. v. Garland*, 604 U.S. ——, ——, 145 S.Ct. 57, 220 L.Ed.2d 319. Pp. —— – ——.

**\*3** 95 F.4th 263, affirmed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. KAGAN, J., filed a dissenting opinion, in which SOTOMAYOR and JACKSON, JJ., joined.

**Attorneys and Law Firms**

David D. Cole, ACLU Foundation, Washington, DC, Vera Eidelman, Brian Hauss, Ben Wizner, ACLU Foundation, New York, NY, Cecilia D. Wang, ACLU Foundation, San Francisco, CA, Brian Klosterboer, Edgar Saldivar, Adriana Piñon, Chloe Kempf, Thomas Buser-Clancy, ACLU Foundation of Texas, Inc., Houston, TX, Derek L. Shaffer, Counsel of Record, Christopher G. Michel, Rachel G. Frank, Quinn Emanuel Urquhart & Sullivan, LLP, Washington, DC, Taylor E. Comerford, Quinn Emanuel Urquhart, & Sullivan, LLP, Boston, MA, Scott L. Cole, Quinn Emanuel Urquhart & Sullivan, LLP, Austin, TX, Daniel F. Mummolo, Max Diamond, Quinn Emanuel, Urquhart & Sullivan, LLP, New York, NY, Michael T. Zeller, Arian J. Koochesfahani, Delaney Gold-Diamond, Quinn Emanuel, Urquhart & Sullivan, LLP,

Los Angeles, CA, Jeffrey K. Sandman, Webb Daniel Friedlander LLP, New Orleans, LA, for Petitioners.

Ken Paxton, Attorney General of Texas, Brent Webster, First Assistant Attorney General, Office of the Attorney General, Austin, TX, Aaron L. Nielson, Solicitor General, Counsel of Record, Lanora C. Pettit, Principal Deputy Solicitor General, Beth Klusmann, Assistant Solicitor General, Eric Abels, John Ramsey, Assistant Attorneys General, for Respondent.

**Opinion**

Justice THOMAS delivered the opinion of the Court.

Texas, like many States, prohibits the distribution of sexually explicit content to children. Tex. Penal Code Ann. § 43.24(b) (West 2016). But, although that prohibition may be effective against brick-and-mortar stores, it has proved challenging to enforce against online content. In an effort to address this problem, Texas enacted H. B. 1181, Tex. Civ. Prac. & Rem. Code Ann. § 129B.001 *et seq.* (West Cum. Supp. 2024), which requires certain commercial websites that publish sexually explicit content to verify the ages of their visitors. This requirement furthers the lawful end of preventing children from accessing sexually explicit content. But, it also burdens adult visitors of these websites, who all agree have a First Amendment right to access at least some of the content that the websites publish. We granted certiorari to decide whether these burdens likely render H. B. 1181 unconstitutional under the Free Speech Clause of the First Amendment. We hold that they do not. The power to require age verification is within a State's authority to prevent children from accessing sexually explicit content. H. B. 1181 is a constitutionally permissible exercise of that authority.

I

A

In 2023, Texas enacted H. B. 1181, a law requiring pornographic websites to verify that their users are adults. H. B. 1181's sponsors proposed the law to address their concern that the internet makes too accessible to minors "hardcore pornographic content and videos," many of which depict "sexual violence, incest, physical aggression, sexual assault, non-consent, and teens." App. 254–255. According to the sponsors, such pornography is "addictive," has harmful "developmental effects on the brain," and leads to "risky sexual behaviors." *Ibid*. The Texas Legislature passed the Act

with only a single opposing vote, and the Governor signed it into law.

The statute applies to any "commercial entity that knowingly and intentionally publishes or distributes material on an Internet website, ... more than one-third of which is sexual material harmful to minors." Tex. Civ. Prac. & Rem. Code Ann. § 129B.002(a). The statute defines " '[s]exual material harmful to minors' " as material that: (1) "is designed to appeal to or pander to the prurient interest" when taken "as a whole and with respect to minors"; (2) describes, displays, or depicts "in a manner patently offensive with respect to minors" various sex acts and portions of the human anatomy, including depictions of "sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, [and] excretory functions"; and (3) "lacks serious literary, artistic, political, or scientific value for minors." § 129B.001(6).

H. B. 1181 requires a covered entity to "use reasonable age verification methods ... to verify that an individual attempting to access the material is 18 years of age or older." § 129B.002(a). To verify age, a covered entity must require visitors to "comply with a commercial age verification system" that uses "government-issued identification" or "a commercially reasonable method that relies on public or private transactional data." § 129B.003(b)(2). [1] The entity may perform verification itself or through a third-party service. § 129B.003(b).

 **\*4**  If a commercial entity knowingly violates H. B. 1181, the Texas attorney general may sue to enjoin the violation. § 129B.006(a). The attorney general may also recover a civil penalty of up to $10,000 per day that the website is noncompliant, as well as an additional penalty of up to $250,000 if any minors access covered sexual material as a result of the violation. § 129B.006(b).

H. B. 1181 is not the only law of its kind. At least 21 other States have imposed materially similar age-verification requirements to access sexual material that is harmful to minors online. [2]

B

Soon after Texas enacted H. B. 1181, a trade association for the pornography industry, a group of companies that operate pornographic websites, and a pornography performer

sued the Texas attorney general. These plaintiffs, petitioners here, sought to enjoin enforcement of the statute as facially unconstitutional under the Free Speech Clause of the First Amendment. They alleged that adults have a right to access the speech covered by H. B. 1181, and that the statute impermissibly hinders them from doing so.

The District Court granted petitioners a preliminary injunction after concluding that they were likely to succeed on their claim. The court held that because H. B. 1181 "restricts access to speech" that is constitutionally protected for adults "based on the material's content," it is subject to "strict scrutiny"—the onerous standard of scrutiny applicable to direct invasions of First Amendment rights. *Free Speech Coalition, Inc. v. Colmenero*, 689 F.Supp.3d 373, 391 (WD Tex. 2023). Under that standard, the law would be constitutional only if Texas could show that it "(1) serve[s] a compelling governmental interest, (2) [is] narrowly tailored to achieve it, and (3) [is] the least restrictive means of advancing it." *Id.,* at 392. The District Court acknowledged Texas's compelling interest in preventing "a minor's access to pornography." *Ibid.* But, it found that Texas had failed to "show that H. B. 1181 is narrowly tailored and the least restrictive means of advancing that interest." *Id.,* at 393. In the District Court's opinion, for example, encouraging parents to install content-filtering software on their children's devices would be a less restrictive means of accomplishing the State's objective. *Id.,* at 401–404.

 **\*5**  The U. S. Court of Appeals for the Fifth Circuit vacated the injunction, holding that petitioners were unlikely to succeed on the merits. The Fifth Circuit viewed H. B. 1181 as a "regulatio[n] of the distribution *to minors* of materials obscene *for minors*," which only incidentally implicates "the privacy of those adults" seeking to access the regulated content. 95 F.4th 263, 269, 271 (2024). And, because minors have no First Amendment right to access such materials, the court held that the law was "subject only to rational-basis review"—the exceedingly deferential standard applicable to laws that do not implicate fundamental rights. *Id.,* at 269. Applying that standard, the court concluded that H. B. 1181 survived petitioners' challenge because its "age-verification requirement is rationally related to the government's legitimate interest in preventing minors' access to pornography." *Id.,* at 267.

Judge Higginbotham dissented in relevant part. Like the District Court, he would have applied strict scrutiny and found that Texas had failed to meet its burden under that

standard. *Id.*, at 299, 303–304 (opinion dissenting in part and concurring in part).

Petitioners sought a stay of the Fifth Circuit's judgment, which this Court denied. 601 U. S. ——, 145 S.Ct. 767, 220 L.Ed.2d 260 (2021). We granted certiorari to determine whether H. B. 1181's age-verification requirement is likely constitutional on its face. 603 U. S. ——, 144 S.Ct. 2714, 219 L.Ed.2d 1318 (2024).


II

To determine which standard of First Amendment scrutiny applies to Texas's age-verification law, we must first review some background principles about the First Amendment. Specifically, we must focus on what the First Amendment generally protects, the extent to which it permits States to restrict minors' access to sexually explicit speech, and how this Court has addressed earlier laws that aimed to prevent children from viewing sexually explicit speech online.


A

The First Amendment, which applies to the States through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." As "a general matter," this provision "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U. S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (internal quotation marks omitted). But, this principle "is not absolute." *Ibid.*

To determine whether a law that regulates speech violates the First Amendment, we must consider both the nature of the burden imposed by the law and the nature of the speech at issue. Our precedents distinguish between two types of restrictions on protected speech: content-based laws and content-neutral laws. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if " they satisfy strict scrutiny. *Reed v. Town of Gilbert*, 576 U. S. 155, 163, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). That standard requires that a law be "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U. S. 464, 478, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014).

Content-neutral laws, on the other hand, "are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broadcasting System, Inc. v. FCC*, 512 U. S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (citation omitted). Under that standard, a law will survive review "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broadcasting System, Inc. v. FCC*, 520 U. S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (*Turner II*).

At the same time, not all speech is protected. " 'From 1791 to the present,' " certain " 'historic and traditional categories' " of speech—such as "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct"— have been understood to fall outside the scope of the First Amendment. *United States v. Stevens*, 559 U. S. 460, 468, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (citations omitted). States generally may prohibit speech of this kind without "rais[ing] any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U. S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Such prohibitions are subject only to rational-basis review, the minimum constitutional standard that all legislation must satisfy. See *District of Columbia v. Heller*, 554 U. S. 570, 628, n. 27, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Under that standard, a law will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis" for its enactment. *FCC v. Beach Communications, Inc.*, 508 U. S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).


B

**\*6** History, tradition, and precedent recognize that States have two distinct powers to address obscenity: They may proscribe outright speech that is obscene to the public at large, and they may prevent children from accessing speech that is obscene to children.

By the 18th century, English common law recognized publishing obscenity as an indictable offense. See *Rex* v. *Wilkes*, 4 Burr. 2527 (K. B. 1770); *Rex* v. *Curl*, 2 Strange 789, 93 Eng. Rep. 849 (K. B. 1727). So too did early American decisions. See *Commonwealth v. Holmes*, 17 Mass. 336, 336–337 (1821); *Commonwealth v. Sharpless*, 2 Serg.&Rawle 91, 100–102 (Pa. 1815); *Knowles v. State*, 3 Day 103, 108 (Conn. 1808). By the end of the Civil War, most States had

prohibited obscenity by statute, and Congress had prohibited sending obscene materials by mail. See An Act Relating to the Postal Laws § 16, 13 Stat. 507; E. Hovey, Stamping Out Smut: The Enforcement of Obscenity Laws, 1872–1915, p. 36 (1998). And, from the late 19th century onward, this Court has consistently recognized the government's power to proscribe obscenity. See, *e.g.*, *Counterman v. Colorado*, 600 U.S. 66, 77, 143 S.Ct. 2106, 216 L.Ed.2d 775 (2023); *Roth v. United States*, 354 U.S. 476, 483, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *Rosen v. United States*, 161 U.S. 29, 42–43, 16 S.Ct. 480, 40 L.Ed. 606 (1896).

Our precedents hold that speech is obscene to the public at large—and thus proscribable—if (a) "the average person, applying contemporary community standards[,] would find that the work, taken as a whole, appeals to the prurient interest"; (b) "the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law"; and (c) "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (internal quotation marks omitted). Our precedents refer to this standard as the "*Miller* test."

*Miller* does not define the totality of States' power to regulate sexually explicit speech, however. In addition to their general interest in protecting the public at large, States have a specific interest in protecting *children* from sexually explicit speech. The earliest obscenity decisions recognized that restricting obscenity served two distinct interests—curbing the "corruption of the public mind in general," *and* protecting "the manners of youth in particular." *Sharpless*, 2 Serge & Rawle, at 103 (opinion of Yeates, J.); see also *Holmes*, 17 Mass. at 336–337 (upholding an indictment for publishing an obscene book tending to " 'the manifest corruption and subversion of the youth and other good citizens of [this] Commonwealth' "). Similarly, many early obscenity statutes targeted for special regulation works "manifestly tending to the corruption of the morals of youth." *E.g.*, Me. Rev. Stat., ch. 160, § 19 (1840); Mass. Rev. Stat. ch. 130, § 10 (1836); Mich. Rev. Stat., Pt. 4, Tit. 1, ch. 8, § 10 (1838); 1838 Terr. of Wis. Stat. § 10, p. 366; Vt. Rev. Stat., ch. 99, § 10 (1840). This trend continued through the time of the Fourteenth Amendment's ratification, with States routinely enforcing statutes that punished indecent publications on the ground that they corrupted "the morals of youth." *E.g.*, *Fuller v. People*, 92 Ill. 182, 184 (1879); *Commonwealth v. Dejardin*, 126 Mass. 46, 46–47 (1878); *Barker v. Commonwealth*, 19

Pa. 412, 413 (1852); *State v. Hanson*, 23 Tex. 232, 233–234 (1859).

**\*7** Consistent with this history, our precedents recognize that States can impose greater limits on children's access to sexually explicit speech than they can on adults' access. When regulating adult access, a State must define obscenity from the perspective of "the average" adult, *Roth*, 354 U.S., at 489, 77 S.Ct. 1304, and so may not prohibit adults from accessing speech that is inappropriate only for children, *Butler v. Michigan*, 352 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957). Minors, however, have long been thought to be more susceptible to the harmful effects of sexually explicit content, and less able to appreciate the role it might play within a larger expressive work. See *Ginsberg v. New York*, 390 U.S. 629, 641–643, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); *United States v. Bennett*, 24 F.Cas. 1093, 1105, (No. 14,571) (CC SDNY 1879). They therefore possess "a more restricted right ... to judge and determine for themselves what sex material they may read or see." *Ginsberg*, 390 U.S., at 637, 88 S.Ct. 1274.

When regulating minors' access to sexual content, the State may broaden *Miller*'s "definition of obscenity" to cover that which is obscene from a child's perspective. *Ginsberg*, 390 U.S., at 638, 88 S.Ct. 1274. To be more precise, a State may prevent minors from accessing works that (a) taken as a whole, and under contemporary community standards, appeal to the prurient interest *of minors*; (b) depict or describe specifically defined sexual conduct in a way that is patently offensive *for minors*; and (c) taken as a whole, lack serious literary, artistic, political, or scientific value *for minors*. See *Miller*, 413 U.S., at 24, 93 S.Ct. 2607; *Ginsberg*, 390 U.S., at 635, 638, 88 S.Ct. 1274.[3] Restrictions of this kind trigger no heightened First Amendment scrutiny and are subject only to rational-basis review, even though they encompass speech that is "not obscene for adults." *Id.*, at 634, 639, 88 S.Ct. 1274.

In sum, two basic principles govern legislation aimed at shielding children from sexually explicit content. A State may not prohibit adults from accessing content that is obscene only to minors. *Butler*, 352 U.S., at 383, 77 S.Ct. 524. But, it may enact laws to prevent minors from accessing such content. *Ginsberg*, 390 U.S., at 637–638, 88 S.Ct. 1274.

C

This Court has applied these principles to regulations of internet-based speech on two prior occasions, both at the

dawn of the internet age. First, in *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), we addressed the constitutionality of the Communications Decency Act of 1996 (CDA), 110 Stat. 133. The CDA criminalized using the internet to knowingly transmit "obscene or indecent messages" to a minor, or to knowingly send or display "patently offensive messages in a manner that is available to" a minor. 521 U.S., at 859–860, 117 S.Ct. 2329. It provided an affirmative defense to "those who restrict access to covered material by requiring certain designated forms of age proof." *Id.*, at 860–861, 117 S.Ct. 2329.

We held that the CDA violated the First Amendment because it "effectively suppresses a large amount of speech that adults have a constitutional right to receive." *Id.*, at 874, 117 S.Ct. 2329. The CDA's age-verification defense was illusory because, in many cases, "existing technology did not include any effective method for a sender to prevent minors from obtaining access to its communications on the Internet without also denying access to adults." *Id.*, at 876, 117 S.Ct. 2329.[4] And, even as to minors, the CDA swept far beyond obscenity. Fairly read, the terms " 'indecent' " and " 'patently offensive' " encompassed "large amounts of nonpornographic material with serious educational or other value." *Id.*, at 877, 117 S.Ct. 2329. The Act was thus a "content-based restriction" of protected speech that could not survive strict scrutiny. *Id.*, at 879, 117 S.Ct. 2329.

**\*8** After *Reno*, Congress passed the Children's Online Privacy Protection Act of 1998 (COPA), 112 Stat. 2681–728, which we addressed in *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004) (*Ashcroft II*). COPA criminalized posting "content that is 'harmful to minors' " online for " 'commercial purposes.' " *Id.*, at 661, 124 S.Ct. 2783 (quoting 47 U.S.C. § 231(a)(1)). The Act defined such content as material that is obscene under the *Miller* test, as adjusted to minors. 542 U.S., at 661–662, 124 S.Ct. 2783 (citing § 231(e)(6)). It also provided "an affirmative defense to those who employ specified means to prevent minors from gaining access to the prohibited materials on their Web site," such as requiring the use of a credit card or a digital certificate that verifies age. *Id.*, at 662, 124 S.Ct. 2783 (citing § 231(c)(1)). Soon after COPA's passage, a District Court preliminarily enjoined its enforcement, holding that the Act likely violated the First Amendment. *Id.*, at 663, 124 S.Ct. 2783.

This Court held that the injunction was not an abuse of discretion. *Id.*, at 664–665, 124 S.Ct. 2783. The parties agreed that COPA was subject to strict scrutiny. So too did this Court, which briefly noted that this was so because COPA " 'effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another.' " *Id.*, at 665, 124 S.Ct. 2783 (quoting *Reno*, 521 U.S., at 874, 117 S.Ct. 2329). We then focused our analysis on whether the Government had shown that it was likely to satisfy its burden under strict scrutiny. 542 U.S., at 666–670, 124 S.Ct. 2783. We held that it had not, because the Government had not ruled out that it could protect children just as well through the less restrictive means of encouraging parents to install blocking and filtering software on their computers. *Ibid.* We also noted that age verification was "only an affirmative defense," meaning that even speakers adopting an approved verification method might be forced to "risk the perils of trial." *Id.*, at 670–671, 124 S.Ct. 2783; accord, *id.*, at 674, 124 S.Ct. 2783 (Stevens, J., concurring). And, we leaned heavily on the abuse-of-discretion standard, observing that "substantial factual disputes remain[ed] in the case," and that "the factual record does not reflect current technological reality" because it was "over five years" old. *Id.*, at 671, 124 S.Ct. 2783 (majority opinion).

For the past two decades, *Ashcroft II* has been our last word on the government's power to protect children from sexually explicit content online. During this period, the "technology of the Internet" has continued to "evolv[e] at a rapid pace." *Ibid.* With the rise of the smartphone and instant streaming, many adolescents can now access vast libraries of video content—both benign and obscene—at almost any time and place, with an ease that would have been unimaginable at the time of *Reno* and *Ashcroft II*.

### III

With that background in mind, we turn now to the level of scrutiny that applies to H. B. 1181. Petitioners contend that the law must survive strict scrutiny because it imposes a content-based regulation on protected speech. The State, on the other hand, argues that the statute is subject only to rational-basis review because it does not burden any protected speech. We think neither party has it right. Applying our precedents, we hold that intermediate scrutiny applies.

A

H. B. 1181 is an exercise of Texas's traditional power to prevent minors from accessing speech that is obscene from their perspective. To the extent that it burdens adults' rights to access such speech, it has "only an incidental effect on protected speech," making it subject to intermediate scrutiny. *Boy Scouts of America v. Dale*, 530 U.S. 640, 659, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000).

1

Age-verification laws like H. B. 1181 fall within States' authority to shield children from sexually explicit content. The First Amendment leaves undisturbed States' traditional power to prevent minors from accessing speech that is obscene from their perspective. *Ginsberg*, 390 U.S., at 641, 88 S.Ct. 1274. That power necessarily includes the power to require proof of age before an individual can access such speech. It follows that no person—adult or child—has a First Amendment right to access speech that is obscene to minors without first submitting proof of age.

**\*9** The power to verify age is a necessary component of the power to prevent children's access to content that is obscene from their perspective. "No axiom is more clearly established in law, or in reason, than that ... wherever a general power to do a thing is given, every particular power necessary for doing it is included." The Federalist No. 44, p. 285 (C. Rossiter ed. 1961) (J. Madison); accord, T. Cooley, Constitutional Limitations 63 (1868); A. Scalia & B. Garner, Reading Law 192–193 (2012). Hence, where the Constitution reserves a power to the States, it also reserves "the ordinary and appropriate means" of exercising that power. 1 J. Story, Commentaries on the Constitution of the United States § 430, pp. 412–413 (1833). For example, in the Eighth Amendment context we have explained that, because "capital punishment is constitutional, ... 'there must be a constitutional means of carrying it out.' " *Glossip v. Gross*, 576 U.S. 863, 869, 135 S.Ct. 2726, 192 L.Ed.2d 761 (2015) (alteration omitted). Similarly, because the First Amendment permits States to prohibit minors from accessing speech that is obscene to them, it likewise permits States to employ the ordinary and appropriate means of enforcing such a prohibition. Requiring proof of age to access that speech is one such means.

Requiring age verification is common when a law draws lines based on age. For example, Texas, like many States, requires proof of age to obtain alcohol, Tex. Alco. Bev. Code Ann. § 106.03(b) (2020); tobacco, Tex. Health & Safety Code Ann. §§ 161.082(d), (e) (Cum. Supp. 2024); a lottery ticket; [5] a tattoo, 25 Tex. Admin. Code §§ 229.406(a), (b) (2024); a body piercing, *ibid*.; fireworks, Tex. Occ. Code Ann. § 2154.252(c) (2019); and a driver's license, Tex. Transp. Code Ann. § 521.142(a) (2018). Federal law similarly mandates age verification to obtain certain medications from a pharmacist, 21 C.F.R. §§ 1306.26(c), (d) (2024), or to obtain employment as a minor, 29 C.F.R. § 570.5 (2024). Fundamental rights that turn on age are no different. Texas, again like many States, requires proof of age to obtain a handgun license, Tex. Govt. Code Ann. § 411.174(a)(3) (2019); to register to vote, Tex. Elec. Code Ann. §§ 13.002(c)(2), (8) (2020); and to marry, Tex. Fam. Code § 2.005(a) (Cum. Supp. 2024). In none of these contexts is the constitutionality of a reasonable, bona fide age-verification requirement disputed. See *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 38–39, n. 9, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022); *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 202–203, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (opinion of Stevens, J.); *Zablocki v. Redhail*, 434 U.S. 374, 386–387, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978).

Obscenity is no exception to the widespread practice of requiring proof of age to exercise age-restricted rights. The New York statute upheld in *Ginsberg* required age verification: It permitted a seller who sold sexual material to a minor to raise " 'honest mistake' " as to age as an affirmative defense, but only if the seller had made " 'a reasonable bona fide attempt to ascertain the true age of [the] minor.' " 390 U.S., at 644, 88 S.Ct. 1274. Most States to this day also require age verification for in-person purchases of sexual material. [6] And, petitioners concede that an in-person age verification requirement is a "traditional sort of law" that is "almost surely" constitutional. Tr. of Oral Arg. 17.

**\*10** The facts of *Ginsberg* illustrate why age verification, as a practical matter, is necessary for an effective prohibition on minors accessing age-inappropriate sexual content. The statute in that case prohibited the *knowing* sale of sexual content to a minor under the age of 17. 390 U.S., at 633, 88 S.Ct. 1274. The defendant was convicted of knowingly selling a pornographic magazine to a 16-year-old. *Id.*, at 631, 88 S.Ct. 1274. But, most of the time, it is almost impossible to distinguish a 16-year-old from a 17-year-old by sight alone. Thus, had the seller in *Ginsberg* not had an obligation to verify

--- S.Ct. ----

the age of the purchaser, he likely could have avoided liability simply by asserting ignorance as to the purchaser's age. Only an age-verification requirement can ensure compliance with an age-based restriction.

The need for age verification online is even greater. Unlike a store clerk, a website operator cannot look at its visitors and estimate their ages. Without a requirement to submit proof of age, even clearly underage minors would be able to access sexual content undetected. " '[T]he basic principles of freedom of speech ... do not vary' when a new and different medium for communication appears." *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 790, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011); accord, *Moody v. NetChoice, LLC*, 603 U.S. 707, 733, 144 S.Ct. 2383, 219 L.Ed.2d 1075 (2024). Because proof of age performs the same critical function online that it does in person, requiring age verification remains an ordinary and appropriate means of shielding minors in the digital age from material that is obscene to them.

H. B. 1181 imposes an age-verification requirement for online speech that is obscene to minors. The statute defines covered " '[s]exual material harmful to minors' " as material that qualifies as obscene under the *Miller* test, as adjusted to the perspective of a minor. Tex. Civ. Prac. & Rem. Code Ann. § 129B.001(6); see *supra*, at ——, ——. And, the statute does not ban adults from accessing this material; it simply requires them to verify their age before accessing it on a covered website. § 129B.002(a). [7] H. B. 1181 thus falls within Texas's traditional power to protect minors from speech that is obscene from their perspective.

### 2

**\*11** Because H. B. 1181 simply requires proof of age to access content that is obscene to minors, it does not directly regulate the protected speech of adults. A law can regulate the content of protected speech, and thereby trigger strict scrutiny, either "on its face" or in its justification. *Reed*, 576 U.S., at 163–164, 135 S.Ct. 2218 (internal quotation marks omitted). H. B. 1181 does not regulate the content of protected speech in either sense. On its face, the statute regulates only speech that is obscene to minors. That speech is unprotected to the extent the State seeks only to verify age. And, the statute can easily "be justified without reference to the [protected] content of the regulated speech," because its apparent purpose is simply to prevent *minors*, who have no First Amendment right to access

speech that is obscene to them, from doing so. *Id.*, at 164, 135 S.Ct. 2218 (internal quotation marks omitted).

That is not to say, however, that H. B. 1181 escapes all First Amendment scrutiny. Adults have the right to access speech that is obscene only to minors. *Butler*, 352 U.S., at 383–384, 77 S.Ct. 524. And, submitting to age verification is a burden on the exercise of that right. But, adults have no First Amendment right to avoid age verification, and the statute can readily be understood as an effort to restrict minors' access. Any burden experienced by adults is therefore only incidental to the statute's regulation of activity that is not protected by the First Amendment. That fact makes intermediate scrutiny the appropriate standard under our precedents. *Dale*, 530 U.S., at 659, 120 S.Ct. 2446.

In this respect, H. B. 1181 is analogous to the prohibition against destroying draft cards that this Court upheld in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The prohibition may have had the effect of making it unlawful to protest the draft by burning one's draft card. See *id.*, at 369, 88 S.Ct. 1673. But, the "destruction" of a draft card is not itself "constitutionally protected activity," because the card is a Government document that, among other functions, serves as proof of registration. *Id.*, at 376, 378, 88 S.Ct. 1673. The prohibition on destroying draft cards thus placed only an incidental burden on First Amendment expression, making it subject to intermediate scrutiny. *Id.*, at 376–377, 88 S.Ct. 1673. So too here, because accessing material obscene to minors *without verifying one's age* is not constitutionally protected, any burden H. B. 1181 imposes on protected activity is only incidental, and the statute triggers only intermediate scrutiny.

### B

Applying the more demanding strict-scrutiny standard would call into question the validity of *all* age-verification requirements, even longstanding requirements for brick-and-mortar stores. But, as petitioners acknowledge, after *Ginsberg*, no serious question about the constitutionality of in-person age-verification requirements for obscenity to minors has arisen. See Tr. of Oral Arg. 43 (acknowledging that they "don't know of any ... challenge being brought" to an age-verification requirement for "brick-and-mortar stores"). Petitioners insist that their proposed rule would not call into question these "traditional" requirements, because such requirements would "almost surely satisfy" strict scrutiny. *Id.*,

--- S.Ct. ----

at 17. They also contend that a sufficiently tailored online age-verification requirement (although not Texas's) could satisfy strict scrutiny too. *Id.*, at 6–8. But, if we are not to compromise " '[t]he "starch" in our constitutional standards,' " we cannot share petitioners' confidence. *Ashcroft II*, 542 U.S., at 670, 124 S.Ct. 2783 (quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 830, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (THOMAS, J., concurring)).

Strict scrutiny—which requires a restriction to be the least restrictive means of achieving a compelling governmental interest—is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). In the First Amendment context, we have held only once that a law triggered but satisfied strict scrutiny—to uphold a federal statute that prohibited knowingly providing material support to a foreign terrorist organization. See *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–39, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010). That case involved an unusual application of strict scrutiny, since our analysis relied on the "deference" due to the Executive's "evaluation of the facts" in the context of "national security and foreign affairs." *Id.*, at 33–34, 130 S.Ct. 2705. [8]

**\*12** Strict scrutiny is unforgiving because it is the standard for reviewing the direct targeting of fully protected speech. *Reed*, 576 U.S., at 163, 135 S.Ct. 2218. Strict scrutiny is designed to enforce "the fundamental principle that governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755, 766, 138 S.Ct. 2361, 201 L.Ed.2d 835 (2018) (internal quotation marks omitted). It succeeds in that purpose if and only if, as a practical matter, it is fatal in fact absent truly extraordinary circumstances. Strict scrutiny therefore cannot apply to laws, such as in-person age-verification requirements, which are traditional, widespread, and not thought to raise a significant First Amendment issue.

Once again, we need look no further than *Ginsberg*. There, this Court observed that it "is very doubtful" that New York's "legislative finding" about the harmful effects of the speech its statute restricted "expresses an accepted scientific fact." 390 U.S., at 641, 88 S.Ct. 1274. Nonetheless, because obscenity to minors is not fully protected speech, this Court readily upheld the statute. *Id.*, at 641–643, 88 S.Ct. 1274. Had the Court applied strict scrutiny, it could not have so easily cast that doubt aside. Cf. *Brown*, 564 U.S., at 799–

800, 131 S.Ct. 2729 (declining to defer to a legislature's view of "competing psychological studies" when applying strict scrutiny to a law restricting minors from purchasing violent video games).

Petitioners would like to invalidate H. B. 1181 without upsetting traditional in-person age-verification requirements and perhaps narrower online requirements. But, strict scrutiny is ill suited for such nuanced work. The only principled way to give due consideration to both the First Amendment and States' legitimate interests in protecting minors is to employ a less exacting standard.

### C

We also reject petitioners' contention that, regardless of first principles, our precedents require us to apply strict scrutiny to H. B. 1181. Every case that petitioners cite involved a law that *banned* both adults and minors from accessing speech. But, this Court has never held that every content-based burden on adults' access to speech that is obscene to minors always triggers strict scrutiny.

#### 1

Start with *Butler*, our earliest relevant precedent. There, this Court implicitly recognized that States may impose *some* burdens on adults in the course of protecting children from sexual material. The Court held that Michigan's legitimate interest in "shield[ing] juvenile innocence" could not justify a categorical ban on distributing sexually themed books " 'tending to the corruption of the morals of youth.' " 352 U.S., at 381, 383, 77 S.Ct. 524. In so holding, the Court admonished the State for overlooking its other statutes "designed to protect its children" that did not impose an outright ban. *Id.*, at 383, 77 S.Ct. 524. One of these laws was a prohibition on exhibiting sexual material " 'tending to the corruption of the morals of youth' " " 'in any ... place within the view of children passing on any public street or highway.' " *Ibid.*, n. This law imposed a content-based restriction on where adults could view such material. Yet, the Court implicitly suggested that it was a permissible alternative to an outright prohibition.

Similarly, *Ginsberg* upheld a law that required sellers to verify age if they wished to raise "honest mistake" of age as a defense. See 390 U.S., at 644, 88 S.Ct. 1274; *supra*, at ——. In the wake of that decision, the constitutionality of

laws like New York's that impose in-person age-verification requirements has been taken as a given. See Tr. of Oral Arg. 43. And, although *Ginsberg* did not explicitly address the burden that age verification imposes on adults, in the almost six decades since it was decided, no one has thought to subject such requirements to strict scrutiny.

**\*13** Petitioners invoke two pre-internet cases in which this Court applied strict scrutiny. In the first, the Court did so to invalidate "a blanket prohibition" on "dial-a-porn" phone messages that were "indecent but not obscene." *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 118, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). In the second, we did so to invalidate "a blanket ban" on broadcasting "indecent" but "not ... obscene" cable television channels between the hours of 6 a.m. and 10 p.m. *Playboy*, 529 U.S., at 808, 811, 814, 120 S.Ct. 1878. [9] In contrast, H. B. 1181 is not a blanket prohibition. Adults remain free to access pornography on covered websites, so long as they verify their ages first. Neither *Sable* nor *Playboy* addresses the First Amendment consequences of that more modest burden.

*Reno* and *Ashcroft II*—our two decisions addressing attempts to restrict children's access to pornography online—likewise provide no support for petitioners' position that strict scrutiny applies. *Reno* applied strict scrutiny to the CDA because it operated as a ban on speech to adults. The CDA made it a crime for any person to post content that is " 'indecent' " or " 'patently offensive' " anywhere in "the entire universe of cyberspace" where the person knew a child would be among the recipients. 521 U.S., at 868, 876, 117 S.Ct. 2329. And, although the CDA had an age-verification affirmative defense, that defense was illusory. In many cases, "existing technology did not include any effective method ... to prevent minors from obtaining access ... without also denying access to adults." *Id.*, at 876, 117 S.Ct. 2329. The CDA thus triggered—and failed—strict scrutiny because it "effectively *suppresse[d]* a large amount of speech that adults have a constitutional right to receive" and to share. *Id.*, at 874, 117 S.Ct. 2329 (emphasis added). [10] This kind of ban is categorically different from H. B. 1181's age-verification requirement.

*Ashcroft II* likewise characterized COPA as a ban. COPA criminally prohibited posting "content that is 'harmful to minors' " online for " 'commercial purposes,' " subject to an age-verification affirmative defense. 542 U.S., at 661–662, 124 S.Ct. 2783. We thus applied strict scrutiny, because, as in *Reno*, the statute " 'effectively suppresse[d] a large

amount of speech that adults have a constitutional right to receive and to address to one another.' " 542 U.S., at 665, 124 S.Ct. 2783 (quoting *Reno*, 521 U.S., at 874, 117 S.Ct. 2329). Because the parties agreed that strict scrutiny applied, the Court's discussion of the applicable standard was brief. See 542 U.S., at 665, 124 S.Ct. 2783. But, its wording was careful. The Government in *Ashcroft II* conceded that COPA triggered strict scrutiny because it "regulates expression ... that is constitutionally protected for adults ... on the basis of its content." Brief for Petitioner in *Ashcroft v. American Civil Liberties Union*, O. T. 2003, No. 03218, p. 18. Petitioners make essentially that same argument here. Yet, the Court did not endorse this sweeping proposition; instead, it invoked the narrower ground that COPA outright " 'suppresse[d]' " speech between adults. *Ashcroft II*, 542 U.S., at 665, 124 S.Ct. 2783.

**\*14** To be sure, COPA established an age-verification defense. *Id.*, at 662, 124 S.Ct. 2783. But, because it did so only as an affirmative defense, COPA still operated as a ban on the public posting of material that is obscene to minors. See *id.*, at 661–662, 124 S.Ct. 2783 (citing 47 U.S.C. §§ 231(a)(1), (c)(1)). This was so because an indictment need only "alleg[e] the necessary elements of an offense"; it need not "anticipate affirmative defenses." *United States v. Sisson*, 399 U.S. 267, 287–288, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970). Under COPA, the Government thus remained free to bring criminal charges against any covered person who publicly posted speech that was obscene to minors, even if he had fully implemented compliant age-verification procedures. See *Ashcroft II*, 542 U.S., at 670–671, 124 S.Ct. 2783; *id.*, at 674, 124 S.Ct. 2783 (Stevens, J., concurring). The same is not true under H. B. 1181, which makes the lack of age verification an element that the State must plead and prove. Tex. Civ. Prac. & Rem. Code Ann. § 129B.002(a).

2

Petitioners read *Reno* and *Ashcroft II* to establish a comprehensive framework to govern all future attempts to restrict children's access to online pornography. As we have just explained, that view cannot be squared with those cases, which addressed only outright bans on material that was obscene to minors but not to adults. Petitioners also fail to appreciate the context in which those cases were decided. This Court decided both cases when the internet was "still more of a prototype than a finished product"—*Reno* in 1997 and *Ashcroft II* in 2004, with factual findings made in 1999.

--- S.Ct. ----

A. Kennedy, The Rough Guide to the Internet 493 (8th ed. 2002) (Kennedy). We were mindful that "judicial answers" to "the totally new problems" presented by new technology are necessarily "truncated," and that in such circumstances "we ought not to anticipate" questions beyond those immediately presented. *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 300, 64 S.Ct. 950, 88 L.Ed. 1283 (1944); accord, *TikTok Inc. v. Garland*, 604 U.S. 45, —— – ——, 145 S.Ct. 57, 62–63, 220 L.Ed.2d 319 (2025) (*per curiam*). We did not purport to decide more than the specific circumstances of the cases that were before us.

The Court in *Reno* was quite concerned about the unique threat that the CDA posed to the development of the then-nascent internet. *Reno* was this Court's first decision about the internet. In describing the background of the case, we "felt the need to explain ... that the 'Internet' is an international network of interconnected computers,' " *NetChoice*, 603 U.S., at 713–714, 144 S.Ct. 2383 (quoting *Reno*, 521 U.S., at 849, 117 S.Ct. 2329), and we marveled that the internet had grown to 40 million users worldwide, *id.*, at 850, 117 S.Ct. 2329. In resolving the case, the Court was keenly aware that the "wholly unprecedented" "breadth of the CDA's coverage" "threaten[ed] to torch a large segment" of this emerging medium of communication. *Id.*, at 877, 882, 117 S.Ct. 2329. In these uncharted waters, the Court was cautious not to definitively establish when regulations on internet pornography triggered strict scrutiny.

Similarly, *Ashcroft II* was a self-consciously narrow and factbound decision. There, the Court reviewed a preliminary injunction based on a record that was "over five years" old, all while the "technology of the Internet" continued to "evolv[e] at a rapid pace." 542 U.S., at 671, 124 S.Ct. 2783. As a result, we emphasized the abuse-of-discretion standard and made clear that we did not mean to rule definitively on COPA's constitutionality. *Id.*, at 673, 124 S.Ct. 2783. Moreover, we could not have meant to offer a comprehensive discussion on the appropriate standard of scrutiny for laws protecting children from sexual content online, given that the appropriate standard was not even a contested issue in the case.

In the quarter century since the factual record closed in *Ashcroft II*, the internet has expanded exponentially. In 1999, only two out of five American households had home internet access. Dept. of Commerce, Census Bureau, Home Computers and Internet Use in the United States: Aug. 2000, p. 2 (2001). Nearly all those households used a desktop computer or laptop to connect to the internet, and most used

a dial-up connection. Dept. of Commerce, Economics and Statistics Admin., A Nation Online: Entering the Broadband Age 1, 5 (2004). Connecting through dial-up came with significant limitations: Dial-up is much slower than a modern broadband connection, and because dial-up relied on the home's phone line, many households could not use the internet and make or receive phone calls at the same time. See *Inline Connection Corp. v. AOL Time Warner Inc.*, 302 F.Supp.2d 307, 311 (Del. 2004). And, "video-on-demand" was largely just a notion that figures like "Bill Gates and Al Gore rhapsodize[d] about"; "most Netizens would [have] be[en] happy with a system fast enough to view static photos without waiting an age." Kennedy 493–494.

**\*15** In contrast, in 2024, 95 percent of American teens had access to a smartphone, allowing many to access the internet at almost any time and place. M. Faverio & O. Sidoti, Pew Research Center, Teens, Social Media and Technology 2024, p. 19. Ninety-three percent of teens reported using the internet several times per day, and watching videos is among their most common activities online. *Id.*, at 4–5, 20. The content easily accessible to adolescents online includes massive libraries of pornographic videos. For instance, in 2019, Pornhub, one of the websites involved in this case, published 1.36 million hours—or over 150 *years*—of new content. App. 177. Many of these readily accessible videos portray men raping and physically assaulting women—a far cry from the still images that made up the bulk of online pornography in the 1990s. See N. Kristof, The Children of Pornhub, N. Y. Times, Dec. 6, 2020, p. SR4. The Court in *Reno* and *Ashcroft II* could not have conceived of these developments, much less conclusively resolve how States could address them.

Of course, *Reno* and *Ashcroft II* do not cease to be precedential simply because technology has changed so dramatically. See *NetChoice*, 603 U.S., at 733–734, 144 S.Ct. 2383. "But respect for past judgments also means respecting their limits." *Brown v. Davenport*, 596 U.S. 118, 141, 142 S.Ct. 1510, 212 L.Ed.2d 463 (2022). It is misleading in the extreme to assume that *Reno* and *Ashcroft II* spoke to the circumstances of this case simply because they both dealt with "the internet" as it existed in the 1990s. The appropriate standard of scrutiny to apply in this case is a difficult question that no prior decision of this Court has squarely addressed. For the reasons we have explained, we hold today that H. B. 1181 triggers only intermediate scrutiny.

D

The dissent's arguments for strict scrutiny are no more persuasive than petitioners'. The dissent claims that strict scrutiny applies because H. B. 1181 is "a quintessential content-based law." *Post*, at —— (opinion of KAGAN, J.). We agree that H. B. 1181 targets speech that is obscene for minors based on its communicative content. But, where the speech in question is *unprotected*, States may impose "restrictions" based on "content" without triggering strict scrutiny. *Stevens*, 559 U.S., at 468, 130 S.Ct. 1577 (internal quotation marks omitted). Because speech that is obscene to minors is unprotected to the extent that the State imposes only an age-verification requirement, H. B. 1181's content-based restriction does not require strict scrutiny. The law is content based in the same way that prohibitions of "defamation," "fraud," and "incitement" are. *Ibid.*

The dissent's attempt to distinguish *O'Brien* and its progeny fails for the same reason. See *post*, at —— – ——. The dissent protests that H. B. 1181 cannot trigger intermediate scrutiny under *O'Brien* because it is "a direct regulation of speech," not "a regulation of conduct" that incidentally burdens "expressive activity." *Post*, at ——. When speech has both protected and unprotected features, however, "the unprotected features of the [speech] are, despite their [communicative] character, essentially a 'nonspeech' element" for purposes of the First Amendment. *R. A. V. v. St. Paul*, 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). With that principle in hand, H. B. 1181 fits comfortably within the *O'Brien* framework: The law directly regulates unprotected activity (accessing material that is obscene to minors *without submitting to age verification*) while only incidentally burdening protected activity (ultimately accessing that material).[11]

The dissent's real point of disagreement is whether an age-verification requirement regulates the *protected* speech of adults. On this point, the dissent has nothing to offer aside from the bald assertion that our precedents have held as much. See *post*, at —— – ——. But, our precedents have held no such thing. Because our previous decisions concerned only outright bans, see *supra*, at —— – ——, this Court has never before considered whether lesser burdens aimed at distinguishing children from adults directly regulate any free speech right of adults.[12]

*16  Instead, as we have explained, the First Amendment leaves undisturbed States' power to impose age limits on speech that is obscene to minors. That power, according to both "common sense" and centuries of legal tradition, includes the ordinary and appropriate means of exercising it. Scalia & Garner, Reading Law, at 192. And, an age-verification requirement is an ordinary and appropriate means of enforcing an age limit, as is evident both from all other contexts where the law draws lines based on age and from the long, widespread, and unchallenged practice of requiring age verification for in-person sales of material that is obscene to minors. *Supra*, at —— – ——. Beyond misreading precedent, the dissent's only other response to our reasoning is to assert that age verification is not necessarily included in the power to draw an age-based line because "an age verification mandate burdens an adult's First Amendment" rights. *Post*, at ——. That response simply assumes what the dissent sets out to prove.

The dissent expresses surprise that obscenity for minors is "only partially" protected speech for adults. *Post*, at —— (internal quotation marks omitted). But, it does not truly deny that this is the case. The defendant in *Ginsberg*, after all, was an adult vendor of pornography, not an underage purchaser. 390 U.S., at 631, 88 S.Ct. 1274. It would be difficult, practically speaking, for States to restrict children's access to pornography without regulating adult vendors. And, *Ginsberg* accordingly held that New York's content-based restriction on the rights of adult vendors triggered only rational-basis review. *Id.*, at 641, 88 S.Ct. 1274. Thus, so long as the dissent accepts *Ginsberg*, it cannot deny that the question before us is *which* content-based regulations States may impose on adults without triggering strict scrutiny, not *whether* they may do so.

Finally, the dissent claims that we engage in "backwards," results-oriented reasoning because we are unwilling to adopt a position that would call into question the constitutionality of longstanding in-person age-verification requirements. *Post*, at —— – ——. Not so. We appeal to these requirements because they embody a constitutional judgment—made by generations of legislators and by the American people as a whole—that commands our respect. A decision "contrary to long and unchallenged practice ... should be approached with great caution," "no less than an explicit overruling" of a precedent. *Payne v. Tennessee*, 501 U.S. 808, 835, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (Scalia, J., concurring). It would be perverse if we showed less regard for in-person age-verification requirements simply because their legitimacy

--- S.Ct. ----

is so uncontroversial that the need for a judicial decision upholding them has never arisen. [13]

E

Texas, like the Fifth Circuit, contends that intermediate scrutiny is too demanding and that only rational-basis review applies. This position fails to account for the incidental burden that age verification necessarily has on an adult's First Amendment right to access speech that is obscene only to minors. Rational basis is the appropriate standard for laws that do not implicate "fundamental constitutional rights" at all. *Beach Communications*, 508 U.S., at 313, 113 S.Ct. 2096. Intermediate scrutiny, which is deferential but not toothless, plays an important role in ensuring that legislatures do not use ostensibly legitimate purposes to disguise efforts to suppress fundamental rights.

Despite advocating for rational-basis review, Texas itself has acknowledged the need for more searching review. The State concedes, for instance, that it could not require as proof of age an "affidavit" from the individual's "biological parent." Tr. of Oral Arg. 107. That example is precisely the sort of manipulation of a legitimate kind of regulation that intermediate scrutiny can weed out but that rational-basis review cannot.

**\*17** Texas argues that *Ginsberg* establishes that age-verification requirements receive only rational-basis review. But, although *Ginsberg* applied that standard to a statute with an age-verification requirement, the Court did not squarely address the incidental effect that the law had on adults' First Amendment rights. See 390 U.S., at 637–643, 88 S.Ct. 1274. Moreover, *Ginsberg* was decided before this Court first articulated the intermediate-scrutiny standard for incidental burdens on free speech. See *O'Brien*, 391 U.S., at 376–377, 88 S.Ct. 1673. In a two-tiered framework, where the only options were strict scrutiny and rational-basis review, the latter was the better standard for an age-verification requirement.

IV

A statute survives intermediate scrutiny if it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner II*, 520 U.S.,

at 189, 117 S.Ct. 1174. H. B. 1181 readily satisfies these requirements.

A

H. B. 1181 undoubtedly advances an important governmental interest. Texas's interest in shielding children from sexual content is important, even "compelling." *Reno*, 521 U.S., at 869, 117 S.Ct. 2329; *Sable*, 492 U.S., at 126, 109 S.Ct. 2829. H. B. 1181 furthers that interest by preventing minors from easily circumventing a prohibition on their accessing sexual content.

H. B. 1181 is also sufficiently tailored to Texas's interest. Under intermediate scrutiny, a regulation is adequately tailored so long as the government's interest "would be achieved less effectively absent the regulation" and the regulation "does not burden substantially more speech than is necessary to further that interest." *TikTok*, 604 U. S., at ——, 145 S.Ct. at 67 (internal quotation marks omitted). The regulation "need not be the least restrictive ... means of " serving the State's interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). And, the regulation's validity " ' does not turn on [our] agreement with the [legislature] concerning the most appropriate method for promoting significant government interests' or the degree to which those interests should be promoted." *Id.*, at 800, 109 S.Ct. 2746.

Under this standard, requiring age verification online is plainly a legitimate legislative choice. Since at least the days of *Ginsberg*, States have commonly used age-verification requirements, in the case of in-person access to sexual materials, to reconcile their interest in protecting children with adults' right to avail themselves of such materials. This approach ensures that an age-based ban is not ineffectual, while at the same time allowing adults full access to the content in question after the modest burden of providing proof of age. H. B. 1181 simply adapts this traditional approach to the digital age.

The specific verification methods that H. B. 1181 permits are also plainly legitimate. At present, H. B. 1181 allows for verification using government-issued identification or transactional data. Tex. Civ. Prac. & Rem. Code Ann. § 129B.003(b)(2). Verification can take place on the covered website itself or through a third-party service. § 129B.003(b). Other age-restricted services, such as online gambling,

Free Speech Coalition, Inc. v. Paxton, 606 U.S. ---- (2025)

--- S.Ct. ----

alcohol and tobacco sales, and car rentals, rely on the same methods. App. 188–190, 194, 198. And, much of the online pornography industry has used analogous methods for decades. In *Reno*, this Court observed that age verification through credit-card transactions "is not only technologically available but actually is used by commercial providers of sexually explicit material," who (unlike many of the *noncommercial* sites covered by the CDA) " 'would remain relatively unaffected' " were such verification required. 521 U.S., at 856, 863, 881, 117 S.Ct. 2329. The District Court in *Ashcroft II* found that the users of tens of thousands of pornographic websites verified their ages by submitting "a copy of a passport or driver's license" to a third-party verification service. *American Civil Liberties Union v. Reno*, 31 F.Supp.2d 473, 490 (ED Pa. 1999) (findings 51–52). H. B. 1181 simply requires established verification methods already in use by pornographic sites and other industries. That choice is well within the State's discretion under intermediate scrutiny.

B

**\*18** Petitioners' counterarguments are unpersuasive. Petitioners contend that Texas could adopt less restrictive means of protecting children, such as encouraging parents to install content-filtering software on their children's devices or requiring internet service providers to block adult content unless a household opts in to receiving it. But, even assuming these approaches are equally or more effective, under intermediate scrutiny a "regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S., at 800, 109 S.Ct. 2746. Texas's interest in shielding children from sexual content " 'would be achieved less effectively absent' " H. B. 1181, and it cannot be said that "a substantial portion of the burden" that H. B. 1181 imposes fails "to advance [Texas's] goals." *Id.*, at 799, 109 S.Ct. 2746. That is enough to show that the Texas Legislature adequately tailored H. B. 1181, regardless of whether some other approach might be superior. [14]

Petitioners further argue that H. B. 1181 is not appropriately tailored, because it does not require age verification on other sites, such as search engines and social-media websites, where children are likely to find sexually explicit content. But, under intermediate scrutiny, " 'the First Amendment imposes no freestanding underinclusiveness limitation,' " and Texas " 'need not address all aspects of a problem in one

fell swoop.' " *TikTok*, 604 U. S., at ——, 145 S.Ct. at 70. Further, Texas has a reasonable basis for excluding these sites from H. B. 1181's coverage. The statute does not contain any special exception for social-media sites. See Tex. Civ. Prac. & Rem. Code Ann. § 129B.002(a). Rather, such sites fall outside the statute to the extent that less than a third of their content is obscene to minors. And, it is reasonable for Texas to conclude that websites with a higher proportion of sexual content are more inappropriate for children to visit than those with a lower proportion. The statute, on the other hand, does explicitly exempt search engines. § 129B.005(b). But, search engines do not exercise the same degree of control over the websites to which they link, so the State could reasonably conclude that it makes less sense to regulate them.

Petitioners next assert that privacy concerns and the unique stigma surrounding pornography will make age verification too chilling for adults. But, users only have to submit verification to the covered website itself or the third-party service with which the website contracts. See § 129B.003(b). Both those entities have every incentive to assure users of their privacy. In any event, the use of pornography has always been the subject of social stigma. This social reality has never been a reason to exempt the pornography industry from otherwise valid regulation. Cf. *United States v. American Library Assn., Inc.*, 539 U.S. 194, 209, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) (plurality opinion) (holding that the "risk of embarrassment" involved in asking a librarian to unblock a website wrongly blocked as obscene did not impose a cognizable burden on a library patron's access to speech). And, the decades-long history of some pornographic websites requiring age verification refutes any argument that the chill of verification is an insurmountable obstacle for users.

\* \* \*

**\*19** H. B. 1181 simply requires adults to verify their age before they can access speech that is obscene to children. It is therefore subject only to intermediate scrutiny, which it readily survives. The statute advances the State's important interest in shielding children from sexually explicit content. And, it is appropriately tailored because it permits users to verify their ages through the established methods of providing government-issued identification and sharing transactional data. The judgment of the Court of Appeals for the Fifth Circuit is affirmed.

*It is so ordered.*

Free Speech Coalition, Inc. v. Paxton, 606 U.S. ---- (2025)
--- S.Ct. ----

Justice KAGAN, with whom Justice SOTOMAYOR and Justice JACKSON join, dissenting.

No one doubts that the distribution of sexually explicit speech to children, of the sort involved here, can cause great harm. Or to say the same thing in legal terms, no one doubts that States have a compelling interest in shielding children from speech of that kind. What is more, children have no constitutional right to view it. The Texas statute before us (H. B. 1181) addresses speech understood in First Amendment law as "obscene for minors." That label leaves the First Amendment does not protect the speech *for minors*. The State can restrict *their* access without fear of colliding with the Constitution.

The trouble comes in the last two sentences' italics. Speech that is obscene for minors is often not so for adults. For them, the category of obscene—and therefore unprotected speech —is narrower. See *ante*, at —— – ——. So adults have a constitutional right to view the very same speech that a State may prohibit for children. And it is a fact of life—and also of law—that adults and children do not live in hermetically sealed boxes. In preventing children from gaining access to "obscene for children" speech, States sometimes take measures impeding adults from viewing it too—even though, for adults, it is constitutionally protected expression. What, then, to do?

Cases raising that question have reached this Court on no fewer than four prior occasions—and we have given the same answer, consistent with general free speech principles, each and every time. Under those principles, we apply strict scrutiny, a highly rigorous but not fatal form of constitutional review, to laws regulating protected speech based on its content. See *ante*, at ——. And laws like H. B. 1181 fit that description: They impede adults from viewing a class of speech protected for them (even though not for children) and defined by its content. So when we have confronted those laws before, we have always asked the strict-scrutiny question: Is the law the least restrictive means of achieving a compelling state interest? See *ibid*. There is no reason to change course.

A law like H. B. 1181 might well pass the strict-scrutiny test, hard as it usually is to do so. As just noted, everyone agrees that shielding children from exposure to the sexually explicit speech H. B. 1181 targets is a compelling state interest. And Texas might be right in arguing that it has no less restrictive way to achieve that goal: It is difficult, as everyone also agrees, to limit minors' access to things appearing on the

internet. If H. B. 1181 is the best Texas can do—meaning, the means of achieving the State's objective while restricting adults' speech rights the least—then the statute should pass First Amendment review.

But what if Texas could do better—what if Texas could achieve its interest without so interfering with adults' constitutionally protected rights in viewing the speech H. B. 1181 covers? That is the ultimate question on which the Court and I disagree. The majority says that Texas may enforce its statute regardless, because only intermediate scrutiny applies and that test does not ask whether a State has adopted the least speech-restrictive means available. I disagree, based on conventional First Amendment rules and the way we have consistently applied them in this very context. The State should be foreclosed from restricting adults' access to protected speech if that is not in fact necessary.

**\*20** The majority's opinion concluding to the contrary is, to be frank, confused. The opinion, to start with, is at war with itself. Parts suggest that the First Amendment plays no role here—that because Texas's law works through age verification mandates, the First Amendment is beside the point. See *ante*, at —— – ——. But even the majority eventually gives up that ghost. As, really, it must. H. B. 1181's requirements interfere with—or, in First Amendment jargon, burden—the access adults have to protected speech: Some individuals will forgo that speech because of the need to identify themselves to a website (and maybe, from there, to the world) as a consumer of sexually explicit expression. But still, the majority proposes, that burden demands only intermediate scrutiny because it arises from an "incidental" restriction, given that Texas's statute uses age verification to prevent minors from viewing the speech. See *ante*, at ——, —— – ——. Except that is wrong—nothing like what we have ever understood as an incidental restraint for First Amendment purposes. Texas's law defines speech by content and tells people entitled to view that speech that they must incur a cost to do so. That is, under our First Amendment law, a direct (not incidental) regulation of speech based on its content—which demands strict scrutiny.

The majority's attempt to distinguish our four precedents saying just that rounds out the list of its errors. According to the majority, all of those decisions involved prohibiting rather than merely burdening adults' access to obscene-for-children speech. See *ante*, at ——. But that is not true. And in any event it would not matter: The First Amendment prevents

making speech hard, as well as banning it outright. So on all accounts the majority's rationale craters.

The majority is not shy about why it has adopted these special-for-the-occasion, difficult-to-decipher rules. It thinks they are needed to get to what it considers the right result: giving Texas permission to enforce its statute. See *ante*, at —— – ——. But Texas should not receive that permission if it can achieve its goal as to minors while interfering less with the speech choices of adults. And if it cannot, then Texas's statute would survive strict scrutiny, given the obvious importance of its goal. For that reason, the majority's analysis is as unnecessary as it is unfaithful to the law.

I

Under ordinary First Amendment doctrine, this Court should subject H. B. 1181 to strict scrutiny. That is because H. B. 1181 covers speech constitutionally protected for adults; impedes adults' ability to view that speech; and imposes that burden based on the speech's content. Case closed. And making the right answer yet more obvious, we have said as much four times before, when reviewing statutes imposing similar content-based burdens on protected sexually explicit speech. So the case is closed even tighter: The standard should be strict scrutiny. The only open question here should be whether H. B. 1181 can satisfy that test.

A

No one (not even Texas, not even the majority) disputes that H. B. 1181 covers a substantial amount of speech protected by the First Amendment. We have, of course, often held that obscene speech, as defined in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), is not so protected. But H. B. 1181 does not use the ordinary *Miller* test (relating to prurience, offensiveness, and value) as the trigger for regulation. Instead, it adapts each part of that test "for minors," thus covering speech that is "obscene from a child's perspective." Tex. Civ. Prac. & Rem. Code Ann. § 129B.002(a) (West Cum. Supp. 2024); *ante*, at —— (emphasis deleted). And that child-centric category of speech extends wider than the traditional obscenity category. See *ante*, at —— – ——. In the gap between the two is much sexually explicit speech that adults have every right to view. For adults cannot be limited to "only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d

412 (1957). Their right to view "[s]exual expression," outside the traditional obscenity category, is "protected by the First Amendment." *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989).

And H. B. 1181 impedes the exercise of that right. Recall how the statute works. To enter a covered website—with all the protected speech just described—an individual must verify his age by using either a "government-issued identification" like a driver's license or "transactional data" associated with things like a job or mortgage. §§ 129B.001(7), 129B.003(b) (2); see *ante*, at —— – ——. For the would-be consumer of sexually explicit materials, that requirement is a deterrent: It imposes what our First Amendment decisions often call a "chilling effect." *E.g., Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 606, 141 S.Ct. 2373, 210 L.Ed.2d 716 (2021). It is not, contra the majority, like having to flash ID to enter a club. See *ante*, at —— – ——. It is turning over information about yourself and your viewing habits—respecting speech many find repulsive—to a website operator, and then to ... who knows? The operator might sell the information; the operator might be hacked or subpoenaed. We recognized the problem in a case involving sexual material on cable TV: Similar demands, we decided, would "restrict viewing by subscribers who fear for their reputations should the operator, advertently or inadvertently, disclose the list of those who wish to watch the 'patently offensive' channel." *Denver Area Ed. Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 754, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996). The internet context can only increase the fear. And the Texas law imposes costs not just on potential users, but on website operators too. They must either implement a system costing (the District Court found) at least $40,000 for every 100,000 verifications, or else pay penalties of $10,000 per day. See § 129B.006(b); *Free Speech Coalition, Inc. v. Colmenero*, 689 F.Supp.3d 373, 385–386 (WD Tex. 2023). Those expenses, Texas boasts, have already caused one major operator to exit the State's market. See Brief for Respondent 21. So in multiple ways, H. B. 1181 burdens expression.

**\*21** Finally, H. B. 1181 imposes those burdens on protected speech based on the speech's "communicative content," making it a quintessential content-based law. *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). A statute, we have often said, is content-based on its face when it "draws distinctions" based on the "topic," "subject matter," "idea," or "message expressed." *E.g., ibid.* H. B. 1181 does just that. It applies when more than a third of the expression on a website is "sexual material" of a

--- S.Ct. ----

certain kind (prurient, offensive, and valueless for minors). §§ 129B.001(6), 129B.002(a). And whether expression qualifies as such material depends entirely on what it depicts. If the website has the requisite sexually explicit content, the regulation kicks in. Alternatively, if that content is absent (if, say, the website focuses on politics or sports), the regulation does not. "That is about as content-based as it gets." *Barr v. American Assn. of Political Consultants, Inc.*, 591 U.S. 610, 619, 140 S.Ct. 2335, 207 L.Ed.2d 784 (2020) (plurality opinion). Not even the majority disputes the point. See *ante*, at ——.

All of that leads, under well-settled law, to just one conclusion: H. B. 1181 is subject to strict scrutiny. Take a law burdening protected speech based on its content—as H. B. 1181 does for every adult—and the standard of review follows in its wake. See *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (We "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content"). It does not matter whether we are persuaded in a given case that the State, in passing the regulation, had laudable, even compelling aims. See *Reed*, 576 U.S., at 166, 135 S.Ct. 2218 (A good "justification cannot transform a facially content-based law into" the opposite). Those interests are considered only in applying strict scrutiny, not in deciding whether that is the right standard to be applied. Over the years, we have recited the governing rule almost like a mantra: If a law burdens protected speech based on what that speech says or depicts—as H. B. 1181 does—the law has to clear the strict-scrutiny bar.

B

What is more, our precedents have applied that rule in four cases similar to this one—when a statute has limited adults' access to sexually explicit materials in order to prevent those materials from getting to minors. The laws at issue pertained to diverse media—the telephone, cable, and (twice, as here) the internet. But the analysis about the level of scrutiny was in each case the same. To show the Court's (previous) consistency—and its relevance today—it is worth reviewing them one by one by one by one.

In *Sable Communications v. FCC*, the Court considered a statute directed at dial-a-porn services that prohibited sexually "indecent" telephone messages, extending beyond those obscene for adults under *Miller*. 492 U.S., at 122–123,

109 S.Ct. 2829. The Government defended the law as an effort to protect children from exposure to the speech. See *id.*, at 128, 109 S.Ct. 2829. We recognized that interest as compelling. See *id.*, at 126, 109 S.Ct. 2829. But we also understood that adults had a "protected" First Amendment right to listen to the non-obscene indecent speech that the law covered. *Ibid.* And so the Court applied strict scrutiny—thus requiring the Government to show that the statute did not "unnecessarily interfer[e] with [adults'] First Amendment freedoms." *Ibid.*

Then, in *Reno v. American Civil Liberties Union*, 521 U.S. 844, 859–861, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), the Court addressed a statute barring internet transmissions of obscene, indecent, or "patently offensive" messages to those under 18, with an affirmative defense available to anyone making use of age verification measures. Although the statute encompassed only communications to minors and excused from penalties those using a "reasonable" method to verify age, the Court recognized the "burden" that the statute would impose "on adult speech." *Id.*, at 860, 874, 117 S.Ct. 2329. Because of that "interfere[nce] with adult-to-adult communication"—and despite the significance of the Government interest "in protecting children"—the Court again insisted on applying strict scrutiny. *Id.*, at 875–876, 117 S.Ct. 2329. So once more the key issue was whether "less restrictive alternatives would be at least as effective in achieving" the Government's goals. *Id.*, at 874, 117 S.Ct. 2329.

**\*22** Next, in *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 806, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000), the Court evaluated a law requiring that "sexually-oriented" cable channels "limit their transmission to hours when children are unlikely to be viewing." "[W]hat standard [must] the Government" meet, the Court asked, for the law to survive? *Id.*, at 814, 120 S.Ct. 1878. We did not think the question close. "As we consider a content-based regulation" of "protected speech," we said, "the answer should be clear: The standard is strict scrutiny." *Ibid.*; see *id.*, at 812–813, 120 S.Ct. 1878. So "if a less restrictive means" would serve the Government's goals, "the Government must use it." *Id.*, at 815, 120 S.Ct. 1878. Otherwise, the Court explained, the Government could, contrary to the First Amendment, "restrict speech without an adequate justification." *Id.*, at 813, 120 S.Ct. 1878.

And the denouement: The statute the Court addressed in *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656,

Free Speech Coalition, Inc. v. Paxton, 606 U.S. ---- (2025)

--- S.Ct. ----

124 S.Ct. 2783, 159 L.Ed.2d 690 (2004), was a near-twin of Texas's. The Child Online Protection Act (COPA) prohibited commercial entities from posting on the internet content "harmful to minors." *Id.*, at 661, 124 S.Ct. 2783 (quoting 47 U.S.C. § 231(a)(1)). And just like H. B. 1181, that statute defined the covered material by adapting the *Miller* obscenity test for children—thus creating a category of obscene-for-children speech. See 542 U.S., at 661–662, 124 S.Ct. 2783; *supra*, at ——. So too, COPA made the adoption of an age verification system crucial. It did so by providing an affirmative defense to any entity that verified age through an "adult personal identification number" or similar mechanism before granting access to the posted materials. *Ashcroft*, 542 U.S., at 662, 124 S.Ct. 2783. So, as in H. B. 1181, if the poster verified age, no liability could attach. How, then, to analyze such a statute? The Court viewed the problem as it had in prior cases: COPA, though directed at keeping sexually explicit materials from children, "was likely to burden some speech that is protected for adults." *Id.*, at 665, 124 S.Ct. 2783. And because of that "content-based restriction[ ]," the Court needed to apply strict scrutiny. *Id.*, at 660, 665, 670, 124 S.Ct. 2783. The Government thus had to show that "the proposed alternatives will not be as effective as the challenged statute." *Id.*, at 665, 124 S.Ct. 2783. In short, *Ashcroft* adhered to the view that " 'the governmental interest in protecting children from harmful materials' does not 'justify an unnecessarily broad suppression of speech addressed to adults.' " *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 581, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (THOMAS, J., concurring in part and concurring in judgment) (quoting *Reno*, 521 U.S., at 875, 117 S.Ct. 2329). [1]

Four times, one result. Which is not surprising, because it is the result that basic First Amendment principles command. A statute tries to cut off children's access to sexually explicit speech, in line with the most worthy objectives. But the statute as well impedes adults' access to that speech, which the First Amendment protects. And the statute does so by drawing content-based lines: Sexually explicit speech is burdened, other speech is not. It follows, as the night the day, that strict scrutiny applies—that the statute, in addition to serving a compelling purpose, can restrict only as much adult speech as is needed to achieve the State's goal. That is true in the four cases above, and it is true in this case too.

C

**\*23** Applying strict scrutiny in this context, however, need not be a death sentence. To the contrary, a State exercising care should be able to devise a regulatory means of achieving its objective consistent with the First Amendment.

The first part of the strict-scrutiny test is here easy to meet. The majority is right that a State has a compelling interest in shielding children from the obscene-for-children materials that H. B. 1181 covers. See *ante*, at ——. This Court has said as much before. See *Sable*, 492 U.S., at 126, 109 S.Ct. 2829 (recognizing a "compelling interest in protecting the physical and psychological well-being of minors," which "extends to shielding" them from materials "not obscene by adult standards"); *Denver Area*, 518 U.S., at 743, 116 S.Ct. 2374 (plurality opinion) (noting that the interest in "protect[ing] children from exposure to patently offensive sex-related material" is "one that this Court has often found compelling"). And a State is entitled to think that the need has become only more urgent over the years, given the time children now spend online and the materials they can find there. See *ante*, at ——.

The critical question, then, is whether the State can show that it has limited no more adult speech than is necessary to achieve its goal. Or said another way (in fact, *Ashcroft*'s way), whether the State can show that "the proposed alternatives will not be as effective as the challenged statute." 542 U.S., at 665, 124 S.Ct. 2783. If the State cannot, the statute should not take effect, because it would limit protected speech unnecessarily. There would be every reason to make the State switch to a less-speech-restrictive, equally-or-more-effective regulatory mechanism. But a State that has closely attended to the speech consequences of its regulation might well make the required showing in this sphere. Given how the internet works, no court should expect that a law effectively shielding children from sexually explicit expression could leave adults wholly unaffected. To the contrary, such a law will almost necessarily impose corollary burdens. And Texas may be right that the commonly proposed alternatives to laws like H. B. 1181—such as content filtering technology—cannot equal, or even approach, age verification systems in effectiveness. See Brief for Respondent 37–38. In that event, those alternatives will be irrelevant to the inquiry, and a court will explore only whether another, equally effective age verification mechanism will place a lesser burden on protected speech. Review of that kind should not be the horror show for Texas and other States that the majority maintains. See *ante*, at —— – ——. It is just what they should

--- S.Ct. ----

have to pass before implementing a content-based burden on protected expression.

## II

How does the majority reach a different result?

The analytic path of today's opinion is winding, but I take the majority to begin with a conviction about where it must not end—with strict scrutiny. The majority is not so coy about this backwards reasoning. To the contrary, it defends it. See *ante*, at ——. The "legitimacy" of age verification schemes for sexually explicit speech, the majority tells us, is "uncontroversial" (despite *Reno* and *Ashcroft*). *Ante*, at ——. And "[a]pplying the more demanding strict-scrutiny standard would call" those schemes "into question." *Ante*, at ——. Ergo, its conclusion. I have just explained why the majority's fear is overblown—why in fact carefully drawn age verification laws stand a real chance of surviving strict scrutiny. But suppose I am wrong. Suppose there are both less speech-restrictive and equally effective ways to accomplish the State's goal of protecting children from sexually explicit materials. In that event, strict scrutiny tells us, the State should use those constitutionally superior alternatives. And why argue with that? The usual way constitutional review works is to figure out the right standard (here, strict scrutiny because H. B. 1181 is content-based), and let that standard work to a conclusion. It is not to assume the conclusion (approve H. B. 1181 and similar age verification laws) and pick the standard sure to arrive there. But that is what the majority does. To answer what standard of scrutiny applies, the majority first spends four pages lauding age verification schemes as "common," "traditional," "appropriate," and "necessary." *Ante*, at —— – ——. In other words, all over the place, and a good thing too. No wonder the majority doesn't land on strict scrutiny.

**\*24** The more puzzling question is how the majority's reasoning fits with the idea that the First Amendment plays any role at all. For quite some time in today's opinion, speech rights are pushed to the sidelines, or entirely off the field. Age verification schemes are just age verification schemes—again, "common," "traditional," "appropriate," and "necessary." *Ibid.* States use them to regulate purchases of liquor and lottery tickets and fireworks. And so, the majority says, States can also use them to regulate access to speech that is obscene for children. The power to prevent minors from gaining access to that speech "necessarily

includes" the power to require proof of age. *Ante*, at ——. And that means, the majority concludes, that "accessing material obscene to minors without verifying one's age is not constitutionally protected," even for adults. *Ante,* at —— (emphasis deleted). It would seem the analysis is complete. If the First Amendment does not protect adults in viewing obscene-for-children materials unimpeded by age verification, as the majority argues, then how could there be any constitutional objection to age verification laws like H. B. 1181? Or said otherwise, why would those laws have to satisfy any heightened constitutional standard, whether strict or intermediate? We have apparently arrived at a place where States can act free of all constitutional scrutiny.

But that cannot be, for reasons that by now should sound familiar. As discussed earlier, speech that is obscene for children is often not obscene for adults. See *supra,* at —— – ——. When that is so, the First Amendment protects adults' access to obscene-for-children speech (unlike to liquor, lottery tickets, or fireworks). Or otherwise said, the First Amendment gives them a right in that expression. And because of that protected right, different rules apply. Without a special justification, a State cannot prohibit, tax, impede, or otherwise burden an adult's access to obscene-for-children speech. And an age verification requirement is a kind of burden. It may be smaller or larger—compare flashing ID in a store with (in the majority's own example) having to produce "an affidavit from [a] biological parent." *Ante*, at ——. It may be a simple inconvenience or it may, as suggested earlier, prevent individuals from exercising the right. See *supra,* at —— – ——. And those differences may well matter to the conclusion when a court gets around to applying the appropriate constitutional standard. But regardless, an age verification mandate burdens an adult's First Amendment protected right in viewing obscene-for-children expression. So a State's power to prohibit that speech for minors does not "necessarily include[ ]," as the majority contends, the power to mandate age verification. *Ante*, at ——. It might or might not, depending on whether the mandate satisfies the constitutional scrutiny that its burden on protected speech requires.

And in the end, the majority has to accept some version of that argument. For page upon page, the majority explains that the First Amendment has nothing to say about age verification schemes attached to obscene-for-children speech. See *ante*, at —— – ——. Again, that speech may as well be liquor, lottery tickets, or fireworks, for all it matters to the "States' authority." *Ante*, at ——. And then, in the space of one

brief paragraph, the idea falls apart. Yes, the majority at last concedes, "[a]dults have the right to access speech that is obscene only to minors." *Ante,* at ——. And yes, the majority admits, "submitting to age verification is a burden on the exercise of that right." *Ibid.* So sure, the majority acknowledges, a really onerous age verification scheme—like its parental affidavit requirement—would flunk constitutional review. See *ante,* at ——. And so too, the majority says, even the least onerous mandate, like the one in *Ginsberg v. New York,* 390 U.S. 629, 633, 643–644, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), to show ID in a store, has to satisfy some form of heightened constitutional scrutiny. See *ante,* at ——, —— – ——. [2] There is no getting around the fact: Obscene-for-children speech is constitutionally protected speech for adults. See *ante,* at ——. And age verification schemes "burden[ing]" adults' "right[s] to access [that] speech" are in fact not the kind of everyday, "appropriate," and "necessary" regulation courts can wave on by. *Ante,* at —— – ——. The Constitution, contrary to what the majority at first assured us, is now very much in the picture.

**\*25**   At that point, one might think, the right approach—as the Court once said—"should be clear: The standard is strict scrutiny." *Playboy,* 529 U.S., at 814, 120 S.Ct. 1878. Forgive a brief recap. H. B. 1181 regulates the communicative content of websites, imposing an age verification mandate on those exhibiting a specified amount of sexually explicit speech that, while obscene for children, is protected for adults. So the law directly burdens adults' right to view speech based on its sexual content. As the Court four times before found, that means strict scrutiny applies—even though the State is attempting to prevent the speech from reaching minors. See *supra,* at —— – ——.

The majority tries to escape that conclusion with a maneuver found nowhere in the world of First Amendment doctrine. It turns out, the majority says, that the First Amendment only "partially protects" the speech in question: The "speech is unprotected to the extent the State seeks only to verify age." *Ante,* at ——, ——, , n. 12 (emphasis deleted); see *ante,* at —— (the speech is "unprotected to the extent that the State imposes only an age-verification requirement"). Meaning, the speech is unprotected to the extent that the State is imposing the very burden under review. Or said another way, the right of adults to view the speech has the burden of age verification built right in. That is convenient, if altogether circular. In the end, the majority's analysis reduces to this: Requiring age verification does not directly burden adults' speech rights because adults have no right to be free from the burden of

age verification. Gerrymander the right to incorporate the burden, and the critical conclusion follows. If only other First Amendment cases were so easy!

Still, the majority must make one more move to square the circle of all it has said. Recall that notwithstanding the above, the majority has conceded that "[a]dults have the right to access" obscene-for-children speech and age verification schemes are "a burden on the exercise of that right." *Ante,* at ——; see *supra,* at —— – ——. To account for that concession in its analysis—and yet avoid strict scrutiny, as it wishes—the majority relies on a well-known distinction in First Amendment law between direct and incidental restrictions on speech. See (sorry) E. Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine, 63 U. Chi. L. Rev. 413, 491–505 (1996).* Says the majority: The "burden experienced by adults" as a result of H. B. 1181 is "only incidental to the statute's regulation of activity that is not protected by the First Amendment." *Ante,* at ——. Or more fully (prepare for a mouthful!): "The law directly regulates unprotected activity (accessing material that is obscene to minors *without submitting to age verification*) while only incidentally burdening protected activity (ultimately accessing that material)." *Ante,* at —— (emphasis in original). And because the burden imposed on adults' right to access the materials is only incidental, the majority concludes, only intermediate scrutiny need apply. To back up that view, the majority relies (exclusively) on *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). See *ante,* at —— – ——, ——.

*O'Brien* actually seems a good place to start in explaining why H. B. 1181 is *not* an incidental restriction under our law. In that case, a war protester who burned his draft card was charged with violating a statute that made it a crime for anyone to "knowingly destroy[ ]," "mutilate[ ]," or "change[ ]" draft registration documents. 391 U.S., at 370, 88 S.Ct. 1673 (emphasis deleted). The Court assumed that O'Brien himself had engaged in expressive conduct: By burning his draft card on the steps of a government building, he was communicating opposition to the Vietnam War. See *id.,* at 369–370, 376, 88 S.Ct. 1673. But the law O'Brien broke was not about speech; it was about conduct. That law, the Court explained, prohibited *all* alterations of draft cards, indifferent to whether they were "public [or] private," expressive or non-expressive. *Id.,* at 375, 88 S.Ct. 1673. So the "limitation[ ] on [O'Brien's] First Amendment freedoms" was purely "incidental." *Id.,* at 376, 88 S.Ct. 1673. And because that was so—because the statute

at issue addressed only the "noncommunicative aspect" of what O'Brien did—the Court decided to apply intermediate scrutiny. *Id.*, at 381–382, 88 S.Ct. 1673.

**\*26** In the years since, this Court has used the *O'Brien* view of incidental restrictions in several analytically identical cases—when a limitation on conduct, "having no connection with speech," happens to sweep in a person's expressive act. *Id.*, at 375, 88 S.Ct. 1673. In one, the National Park Service invoked a regulation that banned camping (defined to include sleeping) in designated parks to prevent a sleep-in demonstration about homelessness. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 289–291, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). The Court applied the *O'Brien* standard and approved the Park Service's action. In another, a law against "reenter[ing] a military base after having been barred by the commanding officer" was used to charge a person who had reentered a base to participate in a political demonstration. *United States v. Albertini*, 472 U.S. 675, 677–678, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985). We upheld the conviction under *O'Brien*. And in a third, the question was whether a law banning public nudity could be applied to an establishment featuring "expressive" nude dancing. *Erie v. Pap's A. M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion). Once again, we understood the case as in the *O'Brien* line, because a prohibition of conduct had an "incidental" effect on an expressive act. 529 U.S., at 294–295, 301, 120 S.Ct. 1382. So we used the *O'Brien* standard, and approved the nudity ban's application.

None of this has any bearing on H. B. 1181. That statute is not a regulation of conduct that just so happens, on occasion, to impinge on expressive activity. It is instead a direct regulation of speech, triggered by the amount of sexually explicit expression on a commercial website. Or said a bit differently: Rather than address the "noncommunicative" aspects of an activity—as all the laws described above did—H. B. 1181 regulates (and regulates only) what no one here disputes are communicative messages. *O'Brien,* 391 U.S., at 382, 88 S.Ct. 1673. Consider: a law about altering draft certificates; a law about sleeping in parks; a law about reentering military bases; a law about public nudity; a law about sexually explicit postings on websites. Which one of those laws is not like the others? As to the first four laws, the regulation is of conduct, and the burden on expression a rare knock-on effect. As to the fifth, the regulation is of speech, and the burden on that speech the very thing the statute does. See *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (noting

that *O'Brien* applies only when the "thing actually at issue" is "conduct"). The burden H. B. 1181 imposes, of course, raises constitutional concerns only for adults. But that fact does not make the law any less a direct, not incidental, restriction on protected expression. H. B. 1181 targets communicative content, and that alone—restricting adults' access to speech because of what it portrays, rather than because of any non-communicative element that it possesses.

And this Court, in four prior cases involving similar regulations enacted for similar reasons, has not once proposed an analogy to *O'Brien*. Forgive another brief recap. See *supra,* at —— – ——. In all of those cases, States burdened protected speech for adults as a way of cutting off children's access to the expression. Two of those efforts involved internet speech. The same two made liability for infractions turn on whether the publisher of the speech used an age verification measure. One of them—*Ashcroft*—defined the regulated speech identically to H. B. 1181 (using the *Miller* test adapted for minors). Yet in none of the four cases did even a single Justice float the idea that, because the restriction was geared toward protecting minors or involved age verification, the statute somehow effected only an incidental restriction. In every one, it was common ground (even among the dissenting Justices) that the statute's restriction on adults' access to speech was direct. So our precedents stand as an embarrassment to the majority's reasoning.

The majority's primary—and deficient—response is that those cases involved "outright bans" on speech, whereas this one involves only a burden. *Ante,* at ——; see *ante,* at —— – ——. To begin with, that assertion is factually inaccurate as to three of the four. In *Playboy,* the law did not ban adult cable channels, but instead limited their transmission to hours when children were unlikely to be in the audience. See 529 U.S., at 806, 812, 120 S.Ct. 1878. (The allowable hours were 10 p.m. to 6 a.m.—when, the District Court found, between 50% and 70% of adult viewing occurs anyway. See *ibid.*) So as the Court took care to explain, the statute did "not impose a complete prohibition." *Id.*, at 812, 120 S.Ct. 1878. Rather, it effected only a "content-based burden[ ]"—as H. B. 1181 does. *Ibid.* [3] The same is true of the statutes in *Reno* and *Ashcroft*, and in a way even more similar to Texas's law. Recall that under those statutes, publishers using age verification measures had an affirmative defense to all liability. See *supra,* at ——. So as long as those measures were in place, publishers could confidently press send on whatever sexual content they wanted to transmit. The majority argues that H. B. 1181 is yet more protective of

--- S.Ct. ----

publishers, because it turns the affirmative defense into an element—putting the burden on the State to show the absence of age verification measures. See *ante*, at —— – ——. But in this context, the difference between an affirmative defense and an element is but a smidge: It will matter only when a jury thinks the presence (or absence) of age verification is a literal toss-up (which in the real world will be rare). And even if the difference is more than I think, it is one between two points on a continuum—not (as the majority insists) the dividing line between a "ban" and a "burden" on speech.

**\*27** Much more important, the distinction between bans and burdens makes no difference to the level of scrutiny. When a statute draws lines based on the content of speech, strict scrutiny is required regardless of the amount of speech affected. *Playboy* made that point, in this context, at some length. "*It is of no moment*" to the level of scrutiny, the Court stated, that a law restricting speech "does not impose a complete prohibition." 529 U.S., at 812, 120 S.Ct. 1878 (emphasis added). And if that weren't clear enough: "The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Ibid.* And if that weren't clear enough: When a statute regulates expressive content, no "special consideration" is given to the government "merely because the law can somehow be described as a burden rather than outright suppression." *Id.*, at 826, 120 S.Ct. 1878. What's more, *Playboy* is not alone in repudiating the majority's reasoning. The refusal to countenance the ban/burden line the majority today peddles is fundamental to our free speech doctrine. Take any subject—say, because it is close to home, the Supreme Court. Ban speech about the Court; tax speech about the Court ($20 a pop); limit speech about the Court to certain times (Tuesdays and Thursdays); or (as here) demand identification to gain access to websites addressing the Court. Ban or burden, the level of scrutiny is the same: strict. See, *e.g.*, *Turner*, 512 U.S., at 642, 114 S.Ct. 2445 (stating the rule); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565–566, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011) (same); see also, *e.g.*, *Reed*, 576 U.S., at 159, 172, 135 S.Ct. 2218 (adhering to the rule when reviewing mere burdens); *Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd.*, 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (same). So the principal distinction the majority draws between this case and the four that should control it is a non-distinction, by command of how we have always understood the First Amendment.

That leaves only the majority's claim—again mistaken—that the internet has changed too much to follow our precedents'

lead. See *ante*, at —— – ——. Of course technology has developed, both swiftly and surely. And that fact might matter (as indeed the burden/ban distinction might) to how strict scrutiny applies—and particularly to whether the State can show it has adopted the least speech-restrictive means to achieve its goal. *Ashcroft* explicitly recognized that point: It thought that, given the pace of technological change, the District Court might make a different decision than it had five years earlier about whether there were "less restrictive alternative[s]" to COPA. 542 U.S., at 671–672, 124 S.Ct. 2783. To that extent—but to that extent only—the majority is right that *Ashcroft* was "self-consciously narrow and factbound." *Ante*, at ——. Not, though, as to the level of scrutiny. On that question, the Court was unequivocal that because COPA was "a content-based speech restriction," it must satisfy the strict-scrutiny test. 542 U.S., at 665, 124 S.Ct. 2783; see *supra*, at —— – ——, and n. 1. For that was a matter of basic First Amendment principle. And as this Court has understood: "Whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of the First Amendment do not vary." *Moody v. NetChoice, LLC*, 603 U.S. 707, 733, 144 S.Ct. 2383, 219 L.Ed.2d 1075 (2024) (quoting *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 790, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011)); see *TikTok Inc. v. Garland*, 604 U.S. ——, ——, 145 S.Ct. 57, 73, 220 L.Ed.2d 319 (2025) (GORSUCH, J., concurring in judgment) ("[E]ven as times and technologies change, 'the principle of the right to free speech is always the same' " (quoting *Abrams v. United States*, 250 U.S. 616, 628, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting))).

Except that those basic principles do vary today.

### III

The last part of the majority's opinion—plus some of its footnotes—shows why all this matters. In concluding that H. B. 1181 passes constitutional muster, the majority states (correctly) that under intermediate scrutiny Texas need not show it has selected the least speech-restrictive way of accomplishing its goal. See *ante*, at ——. Even if there were a mechanism that (1) as well or better prevented minors' access to the covered materials and (2) imposed a lesser burden on adults' ability to view that expression, Texas could spurn that "superior" method. *Ante*, at ——. Likewise, the majority—because it is applying a more forgiving standard —can ignore a host of questions about how far H. B. 1181

--- S.Ct. ----

burdens protected expression. See Tr. of Oral Arg. 67–68. In the fine print of two footnotes, the majority declares that it has no need to explore (1) whether H. B. 1181 requires covered websites to demand age verification for *all* their content or only for the subset that is obscene for minors; (2) whether H. B. 1181 requires that covered speech be obscene "only to *a* minor (including a toddler)" or "to *all* minors (including 17-year-olds)"; and (3) whether H. B. 1181 permits websites to use "newer biometric methods of age verification, like face scans," that pose fewer privacy concerns than submitting government ID and transactional data. *Ante*, at ——, n. 7 (emphasis in original); *ante*, at ——, n. 14. The majority explains that even if Texas answered each of those questions in a maximally burdensome way—requiring government ID to view speech that is protected even for children because one-third of the website's contents are obscene for two-year-olds—H. B. 1181 can go forward. And again, that is true even if Texas has a less burdensome way of "equally or more effective[ly]" achieving its objective. *Ante*, at ——.

**\*28** I would demand Texas show more, to ensure it is not undervaluing the interest in free expression. Texas can

of course take measures to prevent minors from viewing obscene-for-children speech. But if a scheme other than H. B. 1181 can just as well accomplish that objective and better protect adults' First Amendment freedoms, then Texas should have to adopt it (or at least demonstrate some good reason not to). A State may not care much about safeguarding adults' access to sexually explicit speech; a State may even prefer to curtail those materials for everyone. Many reasonable people, after all, view the speech at issue here as ugly and harmful for any audience. But the First Amendment protects those sexually explicit materials, for every adult. So a State cannot target that expression, as Texas has here, any more than is necessary to prevent it from reaching children. That is what we have held in cases indistinguishable from this one. And that is what foundational First Amendment principles demand. Because the majority departs from that right and settled law, I respectfully dissent.

## All Citations

606 U.S. ----, --- S.Ct. ----, 2025 WL 1773625

---

## Footnotes

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1     An entity may also verify age by requiring users to "provide digital identification," Tex. Civ. Prac. & Rem. Code Ann. § 129B.003(b)(1), which is defined as "information stored on a digital network that may be accessed by a commercial entity and that serves as proof of the identity of an individual," § 129B.003(a). The State concedes that "Texas does not yet have a state issued digital identification card or app." App. 189. Petitioners maintain that no other identification could qualify as "digital ID" under this definition. Tr. of Oral Arg. 36–37. We assume without deciding that petitioners are correct.

2     See Ala. Code § 8–19G–3(a) (Cum. Supp. 2024); 2025 Ariz. Sess. Laws ch. 193 (to be codified at Ariz. Rev. Stat. Ann. § 18–701(A)); Ark. Code Ann. § 4–88–1304(a) (2023); 2024 Fla. Laws ch. 42, § 2 (to be codified at Fla. Stat. § 501.1737(2)); 2024 Ga. Laws p. 316 (to be codified at Ga. Code Ann. § 39–5–5(b)); Idaho Code Ann. § 6–3803(1) (Cum. Supp. 2024); Ind. Code § 24–4–23–10 (Cum. Supp. 2024); 2024 Kan. Sess. Laws p. 451 (to be codified at Kan. Stat. Ann. § 50–6146(a)); Ky. Rev. Stat. Ann. § 436.002(1) (West Cum. Supp. 2024); La. Rev. Stat. Ann. § 51:2121(A)(1) (West 2025); Miss. Code Ann. § 11–77–5(1) (Cum. Supp. 2024); Mont. Code Ann. § 30–14–159(1) (2023); Neb. Rev. Stat. § 87–1003(1) (2024); N. C. Gen. Stat. Ann. § 66–501(a) (Supp. 2024); H. B. 1561, 69th Leg. Assem., Reg. Sess., § 1 (N. D. 2025) (to be codified at N. D. Cent. Code Ann. § 51–07(2)); S. C. Code Ann. § 37–1–310(C)(1) (Cum. Supp. 2024); H. B. 1053, 100th Leg. Sess., § 4 (S. D. 2025) (to be codified in S. D. Codified Laws ch. 22–24); Tenn. Code Ann. § 39–17–912(c)

(Supp. 2024); Utah Code § 78B–3–1002(1) (Supp. 2024); Va. Code Ann. § 8.01–40.5(B) (2024); 2025 Wyo. Sess. Laws ch. 139, § 1 (to be codified at Wyo. Stat. Ann. § 14–3–502(a)).

3    H. B. 1181 covers only depictions of activity that would qualify as "sexual conduct" in an adult obscenity statute. See Tex. Civ. Prac. & Rem. Code Ann. § 129B.001(6)(B). We therefore need not decide whether a statute addressing obscenity to minors can define a broader range of activity as "sexual conduct" than an adult obscenity statute.

4    Elsewhere in the CDA, Congress recognized that content filtering was still an emerging technology and that companies attempting to use it faced serious risks. A year before the CDA's enactment, a New York court had held that an online service provider could be held liable as a publisher for defamatory posts by third-party users because the provider had "held itself out as" "a family oriented computer network" that screened out inappropriate content. *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710, *2 (Sup. Ct. N. Y., May 24, 1995). In response, the CDA added a new § 230 to the Communications Act of 1934. § 509, 110 Stat. 137–139 (codified as amended at 47 U.S.C. § 230). Section 230 provides that computer service providers (1) shall not "be treated as the publisher or speaker of any information provided by" a third party, and (2) shall not "be held liable" for good-faith actions to restrict access to material that they consider to be "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable," or to enable others (such as users) to restrict access to such material. § 230(c). Congress thereby aimed to spur the development and use of filtering technology so that parents could prevent their children from accessing sexually explicit content online. See § 509, 110 Stat. 137 (title) ("Online Family Empowerment"); 47 U.S.C. § 230 (title) ("Protection for private blocking and screening of offensive material"); § 230(c) (title) ("Protection for 'Good Samaritan' blocking and screening of offensive material"); 141 Cong. Rec. 22045 (1995) (remarks of Rep. Cox) ("We want to encourage" computer service providers "to help us control ... what our children see" using filtering "technology" that "is very quickly becoming available").

5    See Tex. Lottery Comm'n, News Release, Texas Lottery Adds Age Verification to Self-Service Vending Machines (Jan. 7, 2025).

6    See, *e.g.*, Ala. Code §§ 13A–12–200.5(1), 13A–12–200.5(3)(a) (2015); Ariz. Rev. Stat. Ann. §§ 13–3501(3)(b), 13–3506(A) (2018); Ark. Code Ann. §§ 5–68–501(3)(B), 5–68–502(a)(2) (2024); Cal. Penal Code Ann. § 313.1(a) (West 2024); Colo. Rev. Stat. §§ 18–7–501(3)(b), 18–7–502(1) (2024); Conn. Gen. Stat. § 53a–196 (2025); Del. Code Ann., Tit. 11, §§ 1365(a)(2), (i)(1) (2015); D. C. Code §§ 22–2201(b)(1)(A), (b)(2)(F)(ii) (2001–2024); Fla. Stat. §§ 847.012(1)(b), (3) (2023); Ga. Code Ann. §§ 16–12–102(2)(B), 16–12–103(a) (2024); Idaho Code Ann. §§ 18–1514(10), 18–1515(1) (2016); Ill. Comp. Stat., ch. 720, §§ 5/11–21(b), (c)(1) (West 2023); Ind. Code §§ 35–49–3–3(a)(1), 35–49–3–4(a)(3) (2024); Iowa Code §§ 728.2, 728.10 (2023); Kan. Stat. Ann. §§ 21–6401(b), (h)(1) (2023); La. Rev. Stat. Ann. §§ 14:91.11(A)(1), (D) (West 2018); Minn. Stat. Ann. §§ 617.292, subd. 8 (2), 617.293, subd. 1 (West 2018); Mont. Code Ann. §§ 45–8–206(1), (2)(a) (2023); Neb. Rev. Stat. §§ 28–808(1), 28–810(1) (2016); N. H. Rev. Stat. Ann. §§ 571–B:1(II)(b), 571–B:2(I) (2021); N. M. Stat. Ann. §§ 30–37–1(G)(2), 30–37–2 (Lexis Nexis 2014); N. Y. Penal Law Ann. §§ 235.21(1), 235.23(2) (West 2024); N. C. Gen. Stat. Ann. §§ 14–190.15(a), 14–19.15(c)(3) (2023); Ohio Rev. Code Ann. §§ 2907.31(A)(1), (B)(3) (West 2020); Okla. Stat., tit. 21, §§ 1040.75(13)(b), 1040.76(2) (2011); 18 Pa. Cons. Stat. §§ 5903(c), (e)(7)(ii) (Cum Supp. 2022); S. C. Code Ann. §§ 16–15–385(A), (C)(3) (2023); S. D. Codified Laws §§ 22–24–28, 22–24–31(1) (2017); Utah Code Ann. § 76–10–1206(1)(a) (Lexis Nexis 2017); Vt. Stat. Ann., Tit. 13, §§ 2802a(a), 2805(b)(1) (2018); Va. Code Ann. §§ 18.2–390(7)(b), 18.2–391(A), (E) (2021); Wis. Stat. Ann. § 948.11(2) (West 2023).

7    The parties dispute whether H. B. 1181's definition of " '[s]exual material harmful to minors' " requires covered speech to be obscene to *all* minors (including 17-year-olds) or only to *a* minor (including a toddler). We need not resolve that question here. Whatever obscenity to minors can mean, the Texas Legislature plainly meant to tie H. B. 1181's definition to that category of speech. We also doubt that this dispute is as significant as it

--- S.Ct. ----

first may seem. Because the statute only covers *explicit portrayals of nudity or sex acts* that predominantly appeal to the prurient interest, it cannot conceivably be read to cover, say, a PG–13- or R-rated movie. We further question whether it is coherent to speak of the " 'prurient interest' " of a very young child with no concept of sexuality, so any reading of the statute may well call for assessing obscenity from the perspective of an adolescent. See *Ashcroft II,* 542 U.S. 656, 679, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004) (Breyer, J., dissenting).

The parties also dispute whether H. B. 1181 permits a covered website to require age verification for its sexual material harmful to minors but not for its other content. We need not resolve this disagreement either. Even if the statute requires covered websites to demand age verification for *all* their content, and even if such a requirement would be unconstitutional, petitioners still have not shown that H. B. 1181 is *facially* invalid. Under our precedents, a statute is facially invalid under the First Amendment only if its "unconstitutional applications" are "substantially disproportionate to the statute's lawful sweep." *United States v. Hansen,* 599 U.S. 762, 770, 143 S.Ct. 1932, 216 L.Ed.2d 692 (2023). Here, petitioners have not even attempted to show that the covered websites that would segregate their content if given the choice substantially outnumber those that would not.

8    In *Williams-Yulee v. Florida Bar,* 575 U.S. 433, 135 S.Ct. 1656, 191 L.Ed.2d 570 (2015), a bare majority held that a ban on the personal solicitation of campaign donations by candidates for judicial office survived strict scrutiny. *Id.,* at 444–456, 135 S.Ct. 1656. But, only four Members of the majority thought that the statute triggered strict scrutiny to begin with. *Id.,* at 442–444, 135 S.Ct. 1656 (plurality opinion). The fifth Member, Justice Ginsburg, concluded that strict scrutiny did not apply and that States enjoy "substantial latitude ... to enact campaign-finance rules geared to judicial elections." *Id.,* at 457–458, 135 S.Ct. 1656 (opinion concurring in part and concurring in judgment).

9    *Playboy* held that the statute at issue triggered strict scrutiny because it banned " '30 to 50% of all adult programming.' " 529 U.S., at 812, 120 S.Ct. 1878; see *ibid.* ("To prohibit *this much* speech is a significant restriction ... " (emphasis added)). Any discussion in that opinion of whether lesser burdens would also trigger strict scrutiny, see *post,* at —— – ——— (KAGAN, J., dissenting), was dicta. In any event, *Playboy* at a minimum cannot speak to when burdens on *obscenity to minors* trigger strict scrutiny. *Playboy* addressed a statute restricting " 'indecent' " speech, 529 U.S., at 811, 120 S.Ct. 1878, which is a broader category than obscenity to minors and so is entitled to greater First Amendment protection, see *Reno v. American Civil Liberties Union,* 521 U.S. 844, 877, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (holding that indecent speech encompasses "large amounts of nonpornographic material with serious educational or other value"). Thus, a burden on obscenity to minors may not trigger strict scrutiny even if a comparable burden on indecent speech would.

10    The dissent contends that *Reno* imposed a regulation "similar to Texas's law," not a ban. *Post,* at ——. But, at the same time, the dissent acknowledges that the statute at issue in *Sable Communications of Cal., Inc. v. FCC,* 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), was a ban. See *ibid.* And, *Reno* held that "the CDA effectively resembles the ban on 'dial-a-porn' invalidated in *Sable.*" 521 U.S., at 875, 117 S.Ct. 2329. The dissent's characterization of *Reno* is at war with *Reno*'s description of itself.

11    The dissent complains that *Sable, Playboy, Reno,* and *Ashcroft II* never "proposed an analogy to *O'Brien.*" *Post,* at ——; *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). That fact is unsurprising. Because all four cases involved outright bans on speech that is at most obscene only to minors, see *supra,* at 22–25, 130 S.Ct. 2705, the statutes at issue directly (and not merely incidentally) regulated adults' protected speech.

12    The dissent is correct that, for *fully protected speech,* "the distinction between bans and burdens makes no difference to the level of scrutiny." *Post,* at ——. But, when the First Amendment *partially* protects speech,

--- S.Ct. ----

such that the government may impose certain content-based restrictions on it but may not proscribe it outright, the distinction between a ban and lesser burdens is meaningful.

13    Even the dissent recognizes the force of this point to some extent, which is why it insists that in-person age-verification requirements would have "a real chance of surviving" under its approach. *Post*, at ——. But, the dissent has no way to make good on this assurance other than to say that strict scrutiny need not be a "horror show" for States—or, in other words, that the First Amendment is not really as great an obstacle to suppressing fully protected speech as it might seem. *Post*, at ——.

14    Petitioners contend that H. B. 1181 does not allow covered websites to use newer biometric methods of age verification, like face scans, that they claim are less likely to give rise to privacy concerns. Texas disagrees, maintaining that H. B. 1181 *does* allow such methods. We need not resolve this disagreement because Texas is not required to adopt the least restrictive means of advancing its interests to pass intermediate scrutiny. *Ward*, 491 U.S., at 800, 109 S.Ct. 2746. It is sufficient that verifying age by government identification and transactional data is a legitimate legislative choice that does not impose excessive burdens on users.

1    The majority does—and then does not—accept this simple fact. It first acknowledges that *Ashcroft* decided "COPA was subject to strict scrutiny." *Ante*, at ——. But later, it tries to take part of its concession back. The *Ashcroft* Court, it says, could not have "comprehensive[ly]" addressed the "appropriate standard of scrutiny for laws protecting children from sexual content online, given that the appropriate standard was not even a contested issue in the case." *Ante*, at ——. The second half of that sentence is right, but it does not support the first. Having argued in *Sable, Reno,* and *Playboy* for a less rigorous standard of review—and been rebuffed each time—the Government in *Ashcroft* finally gave up. Or otherwise said, it recognized reality. See Tr. of Oral Arg. 64. Three times before, the Court had said something like, "[T]he answer should be clear: The standard is strict scrutiny." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 814, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). The Court did so again, and just as firmly, in *Ashcroft*.

2    The majority acknowledges that *Ginsberg* itself never addressed whether, or what kind of, constitutional scrutiny is appropriate for age verification laws applying to speech. See *ante*, at ——, —— – ——. The many cites to *Ginsberg* in the majority opinion function mainly as atmosphere, to remind the reader that age verification mandates may impose only a trivial burden on speech rights. See *ante*, at —— – ——, —— – ——, ——. Which of course is true—just as it is true that they may impose a significant one. See *ante*, at ——; *supra,* at —— – ——.

3    The majority does not know what to do with the *Playboy* Court's description, so merely asserts that channeling adult programming to evening hours is a "ban[ ]." *Ante*, at ——, n. 9. But why? If a park's hours were limited to between 9 a.m. and 9 p.m., is there really a "ban" on entering the park? Does it matter when people typically use the park—or watch adult programming? If so, where is the tipping point? Questions like these may not have easy answers (which is one good reason not to make too much ride on the ban/burden line, see *infra*, at —— – ——). But the important point here is that *Playboy* understood the statute before it as imposing only a burden, not a ban—and still applied strict scrutiny. So its analysis—not its "dicta," but its so-called *ratio decidendi*—refutes the majority's position. *Ante,* at ——, n. 9.

---