# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 6, 2025

Lyle W. Cayce
Clerk

No. 23-20480

---

THE WOODLANDS PRIDE, INCORPORATED; ABILENE PRIDE
ALLIANCE; EXTRAGRAMS, L.L.C.; 360 QUEEN ENTERTAINMENT,
L.L.C.; BRIGITTE BANDIT,

*Plaintiffs—Appellees,*

*versus*

WARREN KENNETH PAXTON, *In an official capacity as Attorney General
of Texas*; BRETT LIGON, *In an official capacity as District Attorney of
Montgomery County*; MONTGOMERY COUNTY, TEXAS; JAMES
HICKS, *In an official capacity as District Attorney of Taylor County*;
TAYLOR COUNTY, TEXAS; CITY OF ABILENE, TEXAS,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:23-CV-2847

---

Before DENNIS, SOUTHWICK, and ENGELHARDT, *Circuit Judges.*

KURT D. ENGELHARDT, *Circuit Judge:*

A Texas law regulates sexually oriented performances on public
property and in the presence of minors. A drag performer and others in the
drag industry brought a pre-enforcement challenge, alleging that the law

No. 23-20480

facially violates the First Amendment.[1] After a two-day bench trial, the district court agreed with the plaintiffs and permanently enjoined the appellants from enforcing the law. We vacate that injunction and remand.

## I.

### A.

Texas Senate Bill 12 ("S.B. 12") regulates "sexually oriented performances" on public property and in the presence of minors. *See* Tex. Health & Safety Code Ann. § 769.002; Tex. Loc. Gov't Code Ann. § 243.0031; Tex. Penal Code Ann. § 43.28. A "sexually oriented performance" is "a visual performance" that (1) features a performer who "is nude" or "engages in sexual conduct," and (2) "appeals to the prurient interest in sex." Tex. Penal Code Ann. § 43.28(a)(2).

For the first prong, S.B. 12 defines the relevant conduct. "Nude" means "entirely unclothed" or "clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks." Tex. Bus. & Com. Code Ann. § 102.051(1). "Sexual conduct" means: (1) "the exhibition or representation, actual or simulated, of sexual acts, including vaginal sex, anal sex, and masturbation"; (2) "the exhibition or representation, actual or simulated, of male or female genitals in a lewd state, including a state of sexual stimulation or arousal"; (3) "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals"; (4) "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person"; or (5) "the exhibition

---

[1] Plaintiffs use the word "drag" to describe their activities and they call the law that they challenge a "drag ban." The text of the law does not include the word "drag."

No. 23-20480

of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics." Tex. Penal Code Ann. § 43.28(a)(1).

As for the second prong, Supreme Court precedent is instructive.[2] To appeal to the "prurient interest in sex," material, at a minimum, must be "in some sense erotic." *Ashcroft v. ACLU*, 535 U.S. 564, 579 (2002).

## B.

S.B. 12 regulates sexually oriented performances in three ways. Section One prohibits a "person who controls the premises of a commercial enterprise" from "allow[ing] a sexually oriented performance to be presented on the premises in the presence of an individual younger than 18 years of age." Tex. Health & Safety Code Ann. § 769.002(a). It is enforced by the Attorney General of Texas, *see id.* § 769.002(c), who is an appellant here.

Section Two authorizes municipalities and counties to "regulate sexually oriented performances as the municipality or county considers necessary to promote the public health, safety, or welfare." Tex. Loc. Gov't Code Ann. § 243.0031(b). In exercising this power, municipalities

---

[2] When interpreting undefined terms in state statutes, the Supreme Court of Texas "presume[s] that the Legislature uses statutory language with complete knowledge of the existing law and with reference to it." *Amazon.com, Inc. v. McMillan*, 625 S.W.3d 101, 106–07 (Tex. 2021) (cleaned up). "Prurient interest in sex" is a term of art coined by the United States Supreme Court as one part of the "obscenity" definition. *See Roth v. United States*, 354 U.S. 476, 487 (1957) ("Obscene material is material which deals with sex in a manner appealing to prurient interest."); *Miller v. California*, 413 U.S. 15, 24 (1973) (building on *Roth* to clarify three-part test for obscene material, including "appeal[s] to the prurient interest in sex" as one element). We conclude the Texas Legislature invoked the Supreme Court's description of a "prurient interest in sex" by using this phrase, and that jurisprudence guides what conduct is arguably proscribed by S.B. 12. *See infra* Section II.A (explaining injury-in-fact analysis for Article III standing in pre-enforcement First Amendment challenges).

No. 23-20480

and counties may not authorize a sexually oriented performance on public property or in the presence of individuals under the age of 18. *Id.* § 243.0031(c). Montgomery County, Taylor County, and the City of Abilene are the appellants to which Section Two confers authority.

Section Three establishes a Class A misdemeanor for engaging in a sexually oriented performance either (1) "on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child"; or (2) "in the presence of an individual younger than 18 years of age." Tex. Penal Code Ann. § 43.28(b). In Texas, district and county attorneys enforce state criminal laws. *See State v. Stephens*, 663 S.W.3d 45, 49–51 (Tex. Crim. App. 2021). Two appellants are authorized to enforce Section Three in their respective jurisdictions: Brett Ligon, the district attorney for Montgomery County; and James Hicks, the district attorney for Taylor County.

## II.

### A.

S.B. 12 has not been enforced yet. The plaintiffs—The Woodlands Pride, Inc.; Abilene Pride Alliance; 360 Queen Entertainment, LLC; Extragrams LLC; and Brigitte Bandit—brought a pre-enforcement challenge under 42 U.S.C. § 1983, alleging that the law facially violates the First and Fourteenth Amendments. The district court held a two-day bench trial, concluded that S.B. 12 is a facially unconstitutional restriction on speech, and enjoined the Attorney General of Texas, the City of Abilene, Taylor County, Montgomery County, and four district attorneys from enforcing it. *See Woodlands Pride, Inc. v. Paxton*, 694 F. Supp. 3d 820, 851 (S.D. Tex. 2023).

The appellants ask us to vacate the injunction.[3] Their first argument on appeal is that the plaintiffs lack standing. We review a district court's ruling on standing *de novo*. *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215 (5th Cir. 2023).

Standing "is not dispensed in gross." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Plaintiffs "must demonstrate standing for *each claim* that they press against *each defendant*, and for *each form of relief* that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (emphasis added) (quotation marks and citation omitted). When plaintiffs seek injunctive relief, "for every defendant, there must be at least one plaintiff with standing to seek [the] injunction." *Id.* So for each appellant here, at least one plaintiff must have "(1) an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent'; (2) is fairly traceable to th[at] defendant's actions; and (3) is likely to be redressed by a favorable decision." *Turtle Island Foods*, 65 F.4th at 215 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

In pre-enforcement free speech challenges, a plaintiff "need not have experienced 'an actual arrest, prosecution, or other enforcement action' to establish standing." *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Chilled speech or self-censorship is an injury in fact if a plaintiff shows that (1) he intends to engage in a course of conduct arguably affected with a constitutional interest; (2) the course of action is arguably proscribed by statute; and (3) there is a credible threat of prosecution under the statute.

---

[3] Two defendants at the district court—Travis County district attorney, Delia Garza, and Bexar County district attorney, Joe D. Gonzalez—did not appeal the district court's injunction.

No. 23-20480

*Turtle Island Foods*, 65 F.4th at 215–16 (citing *Susan B. Anthony List*, 573 U.S. at 159).

A plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Murthy*, 603 U.S. at 58 (quoting *Lujan*, 504 U.S. at 561). When a case has proceeded to final judgment, standing "must be supported adequately by the evidence adduced at trial." *El Paso County v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020) (cleaned up).

## B.

We start with whether—and to what extent—each plaintiff has standing. To make this determination, we rely on the evidence presented at trial. *See id.*

### 1.

The Woodlands Pride, Inc. hosts an annual pride festival in Montgomery County, Texas. Children attend the festival, which includes on-stage drag performances. Woodlands Pride often says that its festival is "a reflection of a family-oriented community." It "want[s] to make sure" that this message of "family-oriented community" is "pushed out through [the] music that's played, [and] through everything you see," including "what's happening on the stage." To achieve this objective, a Woodlands Pride board member approves the music playlists and meets with all performers to "talk about dos and don'ts."

When asked by the district court whether the drag performances are "specifically tailored to a family aspect," the Woodlands Pride representative testified: "Our performances aren't specifically tailored to a family aspect, but they are tailored to mostly ensuring that there's no bad language in music and that it is a festival for everybody." "For lack of better terms,"

the representative testified, "this is a family friendly drag performance." And he confirmed that this is true for all Woodlands Pride performances.

The Woodlands Pride representative also testified that he could "confidently describe to [the drag performers] how to avoid making a performance appear that it appeals to the prurient interest in sex." There has never been any nudity at any of Woodland Pride's performances,[4] no exhibition or representation of actual or simulated sexual acts or genitals, and no sexual gesticulations with exaggerated prosthetic penises. The performers "do a Conga line type thing and put their hands on each other's hips," and sometimes touch each other—including a "portion of their buttocks"—while dancing, but the representative testified that it is "just a dance routine" and does not appeal to the prurient interest in sex. He also testified that some of the performers may "twerk."

The Woodlands Pride festival also has vendors, including STI and STD testing vendors who hand out condoms and sexual lubricant. The plaintiffs argue that passing out condoms and sexual lubricant is arguably "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals."

None of the Woodlands Pride conduct introduced at trial arguably amounts to a "sexually oriented performance." A vendor handing out condoms and sexual lubricant is not "a visual performance," nor are STD and STI testing vendors "performers." *See* TEX. PENAL CODE ANN. §

---

[4] After testifying several times that there is no nudity during the performances, including as defined by TEX. BUS. & COM. CODE ANN. § 102.051(1)(B), the representative testified on redirect that some performers exhibited nudity as defined by S.B. 12 because the performers showed cleavage and a portion of their buttocks. Only one exhibit introduced into evidence at trial depicts a Woodlands Pride drag performer's outfit. The performer is wearing what appears to be a long-sleeved leotard with fishnet tights.

43.28(a)(2). As to the drag performances, even if making contact with another performer's buttocks is arguably "sexual conduct" under S.B. 12, it is not proscribed if it does not appeal to the prurient interest in sex. None of the trial evidence indicates that the performances are "in some sense erotic." *See Ashcroft*, 535 U.S. at 579. Because Woodlands Pride does not intend to engage in conduct that is arguably proscribed by S.B. 12, it does not have standing to seek an injunction against any of the appellants.

2.

Abilene Pride Alliance is an organization based in Abilene, Texas, which is in Taylor County. Abilene Pride hosts various community-based and fundraising events, including drag brunches, drag bingo, and a pride parade and festival. There is no age restriction for Abilene Pride's events and Abilene Pride asks all performers to "[p]lease be age appropriate."

There is no nudity, as defined by S.B. 12, at Abilene Pride's drag performances. Nor is there actual or simulated sex or masturbation. Drag performers for Abilene Pride's events wear a variation of sequins, big hair, wigs, breastplates, hip pads, packers, and exaggerated jewelry.[5] A typical Abilene Pride drag performance involves "dancing, lip syncing, engaging with the audience by hugging, kissing on the cheek, [and] sometimes bumping hips." A drag performer's buttocks have "come into contact with attendees" on a "a few occasions where the venue has been crowded and as the entertainer was moving to engage with the crowd, they [sic] bumped into some folks." Performers also "[o]ccasionally" "do a hip bump with one of the audience members." Performers may have sat in audience members' laps

---

[5] Breastplates are prosthetic breasts. Hip pads are prosthetics that exaggerate the appearance of the performer's buttocks. Packers are prosthetics that drag performers wear under clothing to create the appearance of male genitalia.

too, but the Abilene Pride president provided conflicting testimony on this.[6] Drag performers' breasts or breastplates come into contact with attendees only when giving front-facing hugs or during "accidental bumping."

Abilene Pride's president testified that he does not think that Abilene Pride's performances involve sexual gestures or gesticulations. He is nonetheless concerned that others might think that the performances violate S.B. 12 because Abilene Pride has had protestors at its events before and, on one occasion, someone called the police.[7] The public health department has also attended Abilene Pride's festival to share information and hand out free condoms and sexual lubricant. As with the Woodlands Pride vendors who passed out condoms and sexual lubricant, the plaintiffs contend that this is arguably proscribed by S.B. 12.

None of the Abilene Pride conduct introduced at trial arguably amounts to a "sexually oriented performance." First, that people have protested Abilene Pride's events before has no bearing on whether S.B. 12 arguably proscribes the performances. Second, giving front facing hugs and accidentally bumping into others are common interactions that do not inherently appeal to the prurient interest in sex. Nor does the trial record contain evidence indicating that under the circumstances described here, these common interactions are "in some sense erotic." *See Ashcroft*, 535 U.S. at 579. So even if these actions constitute "actual . . . or simulated contact occurring between one person and the buttocks, breast, or any part of the of

---

[6] He testified that drag performers have never sat in the laps of attendees at any of the events that he has attended. His written declaration, however, stated: "On some occasions our drag performers give front-facing hugs or hip bumps to audience members or even sit in their laps." After the attorney read him this statement on cross-examination, he testified that performers "usually will just sit and continue lip syncing," and that he has never observed lap dances.

[7] The police arrived and asked questions but left without taking further action.

No. 23-20480

the genitals of another person," they are not arguably proscribed by S.B. 12. Tex. Penal Code Ann. § 43.28(a)(1)(D). And like the STI and STD testing vendors at Woodlands Pride's events, handing out condoms and sexual lubricant is not "a visual performance," nor is the public health department a "performer."

Because Abilene Pride does not intend to engage in conduct that is arguably proscribed by S.B. 12, it does not have standing to seek an injunction against any of the appellants.

3.

360 Queen Entertainment, LLC is a drag production company that books drag queens to perform on the patio of Tomatillos Restaurant & Bar in San Antonio. Tomatillos is owned by the father of 360 Queen's owner. The restaurant is in a strip mall with several other businesses that can view the patio "very clearly." 360 Queen and Tomatillos have an agreement that on show days, 360 Queen "controls" the patio from the morning until the show ends. Tomatillos provides restaurant service to the audience but is not otherwise involved. 360 Queen sells the tickets and decides who enters the show through the patio's primary entrance. While 360 Queen tries to restrict restaurant customers from entering the patio via the dining room, it has "had instances where children have run into the patio through [the] show; not because they have any interest in watching the drag show itself, but because there's a field in the back where a lot of kids tend to go and play while their parents are dining."

360 Queen does not typically allow children to attend its shows. This is not because the shows are "sexual in nature" or "detrimental to children," but rather to "create an environment where adults [can] enjoy dinner, enjoy drinks, enjoy entertainment, but not necessarily have to do it around other people's kids." It makes exceptions to this rule, however. The owner

testified: "There have been situations where there are families dining inside and they have children with them . . . these families are very well aware of what drag is. And they have pleaded with us to allow them to come out onto the patio. And we have made exceptions in the past and allowed children to observe our drag show."

A picture introduced at trial depicts a 360 Queen drag performer who is fully clothed in a red dress and holding dollar bills. A different picture shows a 360 Queen drag performer who is wearing what appears to be a leotard. The 360 Queen owner described this outfit as "a very short leotard" and explained that the performer is "wearing butt pads that reveal her buttocks." Both images also demonstrate how the public can easily view the patio.

360 Queen performances include twerking—"a form of expression where you put your hands on your knees essentially and move your buttocks up and down rapidly"—and "death drops"—a dance move "where a performer will tuck one of their [sic] feet or legs behind their [sic] butt and then fall to the floor with the other leg extended." When asked whether the performers "simulate contact with the buttocks of another person," the owner testified that the performers sit on customers' laps while wearing thongs and one performer invited a "handsome" male customer "to spank her on the butt." When asked whether the performers "ever perform gesticulations while wearing prosthetics," the owner testified that in 360 Queen's most recent show, a drag queen "wore a breastplate that was very revealing, pulsed her chest in front of people, [and] put her chest in front of people's faces."

As to whether 360 Queen performances include nudity, the owner testified that a performer once had a wardrobe malfunction where a

No. 23-20480

breastplate fell out and that some performers "wear sort of string bikinis that will cover the nipples but be very, very revealing around the buttocks."

Based on the evidence introduced at trial, 360 Queen's performances arguably include proscribed conduct. The owner described one performance where a drag queen, who was wearing a "very revealing" breastplate pulsed the breastplate in front of people and put the breastplate in people's faces. This arguably constitutes "the exhibition of sexual gesticulations using . . . prosthetics that exaggerate . . . female sexual characteristics." *See* Tex. Penal Code Ann. § 43.28(a)(1)(E). He also described a second performance where an audience member was invited to spank a performer's buttocks. This arguably constitutes "actual contact or simulated contact occurring between one person and the buttocks . . . of another person." *Id.* § 43.28(a)(1)(D). Both performances are arguably "in some sense erotic," *see Ashcroft*, 535 U.S. at 579, and the owner testified that minors are sometimes present.

Because 360 Queen only holds performances in San Antonio, its claimed injury is not traceable to Abilene, Taylor County, Montgomery County, or the district attorney appellants. The Attorney General is the only appellant who 360 Queen could have standing to assert its claims against. Recall that the Attorney General enforces Section One, which prohibits a "person who *controls* the premises of a commercial enterprise" from "allow[ing] a sexually oriented performance to be presented on the premises in the presence of an individual younger than 18 years of age." Tex. Health & Safety Code Ann. § 769.002(a) (emphasis added).

The Attorney General argues that 360 Queen does not "control" the premises because a third party owns Tomatillos. Control is not necessarily synonymous with ownership, however. *See Control*, Black's Law Dictionary (11th ed. 2019) (defining "Control" as, *inter alia*, "[t]o

exercise power or influence over"). Again, for a pre-enforcement First Amendment challenge, the question is whether a plaintiff's conduct is *arguably* proscribed by the statute. *Turtle Island Foods*, 65 F.4th at 215–16. "Arguably proscribed" does not require that the plaintiff's interpretation of the challenged law be the *best* interpretation. *Id.* at 218. The owner of 360 Queen testified that 360 Queen controls the patio on show days, sells the tickets, and decides who enters the show through the patio's primary entrance. Put otherwise, 360 Queen "exercise[s] power or influence" over the premises. *See supra* BLACK'S LAW DICTIONARY. That is sufficient for this posture.[8]

Our determination that 360 Queen seeks to engage in arguably proscribed conduct does not conclude the standing inquiry. It does not even conclude the injury-in-fact inquiry. To satisfy the injury-in-fact requirement, the conduct must be arguably affected with a constitutional interest and there must be a credible threat of enforcement. *Turtle Island Foods*, 65 F.4th at 215–16. If an injury in fact is established, it must also be traceable to the Attorney General and redressable by the injunction sought. *Id.* at 215. "In pre-enforcement First Amendment challenges like this one, we assume a credible threat of prosecution in the absence of compelling contrary evidence, so long

---

[8] In a footnote, the Attorney General asserts this same position—that 360 Queen does not "control" Tomatillos—to argue that 360 Queen's claims against him run afoul of sovereign immunity. He correctly states that for *Ex parte Young* to apply, the defendant-official "must have '*some* connection with the enforcement of the [challenged] act.'" *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (emphasis in original) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). But the Attorney General has more than *some* connection with the enforcement of Section One. He has the sole authority to (1) recover civil penalties for Section One violations and (2) obtain injunctions to restrain Section One violations. *See* TEX. HEALTH & SAFETY CODE ANN. § 769.002(c). He therefore has the "particular duty" to enforce—that is, to compel or constrain compliance with—Section One, so the injunction 360 Queen seeks would prevent the purported constitutional violation that 360 Queen fears. *See Tex. All. for Retired Ams.*, 28 F.4th at 672.

No. 23-20480

as the challenged law is non-moribund." *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 329 (5th Cir. 2025) (cleaned up).

Although it "falls only within the outer ambit of the First Amendment's protection" and is subject to restrictions, *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 509 (5th Cir. 2021) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000)), nude dancing generally constitutes expressive conduct, *id.* (citing *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991)). 360 Queen's performances are therefore *arguably* affected with a constitutional interest.[9] We also assume a credible threat of enforcement, given the lack of evidence demonstrating otherwise and because S.B. 12 is non-moribund. *See Inst. for Free Speech*, 148 F.4th at 329. 360 Queen has established an injury in fact.

Traceability and redressability are the final hurdles for standing. 360 Queen satisfies these "dual elements" if its claimed injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court" and it is "likely, as opposed to merely speculative, that the injury will be redressed by a

---

[9] We have genuine doubt, however, that pulsing prosthetic breasts in front of people, putting prosthetic breasts in people's faces, and being spanked by audience members are actually constitutionally protected—especially in the presence of minors. While nude dancing receives *some* constitutional protection, "intentional contact between a nude dancer and a bar patron is conduct beyond the expressive scope of the dancing itself. The conduct at that point has overwhelmed any expressive strains it may contain. That the physical contact occurs while in the course of protected activity does not bring it within the scope of the First Amendment." *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1253 (5th Cir. 1995). "It is possible to find some kernel of expression in almost every activity a person undertakes . . . but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Id.* (quoting *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989)). Even though the performers here are not fully nude, *Hang On*'s reasoning is persuasive. At a minimum, *Hang On* confirms that each action in a performance is not necessarily protected even if the performance as a whole may receive some constitutional protection.

No. 23-20480

favorable decision." *Id.* at 330 (cleaned up); *see also Lujan*, 504 U.S. at 560–61.

360 Queen's claimed injury is traceable to the Attorney General, who enforces Section One, and its desired injunction would eliminate the threat of enforcement. *See supra* note 8; *see also Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 513–14 (5th Cir. 2017) (noting "significant overlap" between the redressability and traceability inquiries and *Ex parte Young*'s application). 360 Queen therefore has standing to seek an injunction against the Attorney General. Because one plaintiff with standing for a given defendant is sufficient, we need not determine whether the remaining two plaintiffs have standing to seek an injunction against the Attorney General. *See Murthy*, 603 U.S. at 61.

4.

Extragrams LLC is a drag telegram company that provides drag entertainment for celebrations, events, and parties, and hosts drag bingo. Extragrams' performances are primarily in Austin, Texas but it has also performed in San Antonio, Dallas, Houston, Fredericksburg, Round Rock, and Pflugerville.

This list does not include Abilene. Nor are any of these cities located in Taylor or Montgomery County. Because Extragrams does not seek to engage in arguably proscribed conduct in Abilene, Taylor County, or Montgomery County, its claimed injury is not traceable to these appellants or the district attorney appellants. Accordingly, Extragrams does not have standing to seek an injunction against the remaining appellants.

5.

The final plaintiff, Brigitte Bandit, is a drag performer who lives in

No. 23-20480

Austin, Texas, which is in Travis County.[10] Most of her performances are in Travis County but she has performed in Houston, San Marcos, San Antonio, and Dallas. As of September 9, 2023, Bandit had performances scheduled in Denton and Abilene.

Bandit typically performs in bars and nightclubs that are restricted to ages 21+, but she also performs at drag brunches (that are sometimes restricted to ages 21+ and sometimes open to all ages) and at "all-ages shows like drag story time." Most of Bandit's performances are not sexual, but she does have "some sexual shows." She testified that she would not perform one of her sexual shows at an all-ages event, however.

Bandit changes her performance and appearance depending on the audience. When performing for children, she "want[s] to appeal to something that would be interesting to kids." She has dressed as characters from *Toy Story* and *The Little Mermaid*, and "like a big pink princess." She testified that, when performing before kids, her costumes are "typically pretty covered," presumably meaning modest.

Bandit does not have standing to seek an injunction against the remaining appellants. Bandit has not performed, nor expressed an intent to perform, in Montgomery County, so her claimed injury is not traceable to Montgomery County or its district attorney. While Bandit testified that she had a performance scheduled in Abilene, her testimony did not include any information about this performance. Nor does the plaintiffs' brief reference Bandit's intent to perform in Abilene. Bandit's testimony stressed that her

---

[10] The district court granted this plaintiff permission to proceed under the pseudonym "Brigitte Bandit." *See Woodlands Pride*, 694 F. Supp. 3d at 829 n.3. "Bandit" is a drag character who dresses as a female. Because the actual gender of this plaintiff is not disclosed in the record, and "Bandit" portrays a female character, we refer to the character "Bandit" as a female.

sexual performances are restricted to 18+ or 21+ audiences, and no evidence indicates that an Abilene performance would be any different. Bandit's claimed injury therefore is not traceable to the City of Abilene, Taylor County, or the Taylor County district attorney either.

### III.

Because the plaintiffs only have standing to assert their claims against the Attorney General, and the Attorney General only has the authority to enforce Section One, the sole remaining issue on appeal is whether the plaintiffs have established that Section One, on its face, violates the First Amendment.

The choice to litigate a facial challenge "comes at a cost": facial challenges are "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). But this is a feature, not a bug. "Claims of facial invalidity often rest on speculation about the law's coverage and its future enforcement." *Id.* (internal quotation marks and citation omitted). Such claims also "threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (internal quotation marks and citation omitted). The *Moody* framework for facial free speech challenges safeguards the democratic will and states' interests while still "provid[ing] breathing room for free expression." *Id.* (cleaned up).

To determine if a law, on its face, violates the Free Speech Clause of the First Amendment, we must ask whether "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (alterations adopted) (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). This inquiry begins with an assessment of the law's scope: "What activities, by what actors," does the law "prohibit or otherwise regulate?" *Id.* at 724. We then determine which of the law's applications violate the First Amendment. *Id.* at 725. And finally,

No. 23-20480

we take the unconstitutional applications and "measure them against the rest." *Id.* The law is not facially invalid unless its "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724.

The district court did not conduct this analysis, nor did the parties brief the proper standard or adequately develop the record.[11] Consequently, we are unequipped to undertake this task in the first instance, and remand for the district court to do so. *See Ficher v. Bickham*, 70 F.4th 257, 260 (5th Cir. 2023) ("[W]e are a court of review, not first view.").

\*    \*    \*

We VACATE the injunction against the appellants and REMAND. On remand, the district court is instructed to (1) dismiss the claims against Brett Ligon, James Hicks, Montgomery County, Taylor County, and the City of Abilene; and (2) reconsider the plaintiffs' facial challenge to Section One of S.B. 12 under the *Moody* framework. The pending motion for stay pending appeal is denied as moot.

---

[11] To be fair, the Supreme Court decided *Moody* after the parties briefed this appeal, and the Attorney General promptly filed a Rule 28(j) letter to notify us of its relevance. And while *Moody* espoused existing law, that existing law had frequently been overlooked. *See Moody*, 603 U.S. at 743–45 (vacating judgments from this court and the Eleventh Circuit because neither court applied the proper standard for facial free speech challenges).

No. 23-20480

James L. Dennis, *Circuit Judge*, concurring in the judgment in part and dissenting in part:

I concur in the judgment that (1) 360 Queen has standing to sue the Attorney General; (2) Woodlands Pride and Abilene Pride lack standing to sue Montgomery and Taylor Counties and the claims against those Defendants should be dismissed without prejudice; (3) sovereign immunity does not bar Plaintiffs' claims against the Attorney General; and (4) remand is appropriate for the district court to reconsider Plaintiffs' facial challenge under *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). But in concluding that all other Plaintiffs do not intend to engage in conduct arguably proscribed by Senate Bill 12, the majority misapprehends the governing pre-enforcement standing principles, disregards unrebutted testimony and record evidence, and turns a blind eye to the Texas Legislature's avowed purpose: a statewide "drag ban." In place of meaningful review, the opinion offers a strained and wooden account of injury and traceability that ignores the statute's text and the practical realities of its enforcement. Worse still, the majority intimates in passing that it harbors "genuine doubt" whether Plaintiffs' drag performances are protected First Amendment expression. That gratuitous dictum runs headlong into settled First Amendment jurisprudence and threatens to mislead on remand. Accordingly, I concur in the judgment in part and dissent in part.

I

S.B. 12 traces its origins to late 2022, when Texas lawmakers expressed outrage over reports of a private "drag"[1] performance at a Plano,

_____

[1] "Drag" is a theatrical performance in which a performer overdramatizes a character or gender. The performer typically dresses as a celebrity or fictional persona—often, though not always, of the opposite sex or gender—and uses costumes, wigs, makeup, and other accessories to exaggerate their physical characteristics. These accessories may

No. 23-20480

Texas restaurant with minors among the audience. Shortly thereafter, Lieutenant Governor Dan Patrick identified S.B. 12 as a legislative priority, characterizing it as a measure to prohibit children's exposure to drag shows. When Senator Bryan Hughes introduced S.B. 12 in March 2023, he described it as prohibiting "sexually explicit performances like drag shows." Following swift legislative approval, both Governor Greg Abbott and Lieutenant Governor Patrick publicly celebrated the law as a ban on drag performances in public spaces and in the presence of minors.

S.B. 12 prohibits "sexually oriented performance[s]" from occurring in the "presence of an individual younger than 18 years of age" through three main enforcement mechanisms: (1) civil penalties on those who control commercial enterprises; (2) authorization for counties and municipalities to regulate and prohibit such performances; and (3) criminal penalties. These substantive provisions of S.B. 12 appear across three sections.

*Section One* establishes a civil penalty for any person who "controls a premises of a commercial enterprise" that "allow[s] a sexually oriented performance to be presented on the premises in the presence of an individual younger than 18 years of age." Tex. Health & Safety Code § 769.002(a). Section One is enforced by the Texas Attorney General who may bring an action to recover a civil penalty of up to $10,000 for each violation and obtain a temporary or permanent injunction to restrain violations. *Id.* § 769.002(b)–(c).

---

include prosthetics worn under their clothing, such as "packers" to simulate male anatomy or "breastplates" to appear female. Performances often incorporate singing, dancing, comedy, and physical interactions with audience members. Drag shows are held in a variety of settings, including weddings, corporate events, holiday parties, and birthday celebrations.

No. 23-20480

*Section Two* prohibits Texas municipalities and counties from authorizing sexually oriented performances on either (1) public property, or (2) in the presence of an individual younger than 18 years of age. Tex. Loc. Gov't Code § 243.0031(c). A municipality or county may, subject to the above prohibition, regulate sexually oriented performances as the municipality or county deems necessary to promote the public health, safety, or welfare. *Id.* § 243.0031(b). Municipalities and counties retain broad authority to license, tax, suppress, prevent, or otherwise regulate theatrical or other exhibitions, shows, or amusements. *Id.* § 243.0031(d)

*Section Three* creates a criminal offense for engaging in a sexually oriented performance, regardless of whether compensation is expected or received, if the performance (1) occurs on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child, or (2) takes place in the presence of an individual younger than 18 years of age. Tex. Penal Code § 43.28(b). A violation constitutes a Class A misdemeanor that is punishable by up to one year in jail, a fine of up to $4,000, or both. *Id.* §§ 43.28(c), 12.21.

Section Three defines "sexually oriented performance" used across S.B. 12's substantive provisions as a "visual performance" that (A) features (i) a performer who is "nude" or (ii) a performer who engages in "sexual conduct," and that (B) "appeals to the prurient interest in sex." *Id.* § 43.28(a)(2). The definition of "nude" is borrowed from § 102.051(1)(A)–(B) of the Texas Business and Commerce Code to mean either (A) "entirely unclothed" or (B) "clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks."

No. 23-20480

Section Three then defines five categories of "sexual conduct" to include:

> (A) The exhibition or representation, actual or simulated, of sexual acts, including vaginal sex, anal sex, and masturbation;
>
> (B) The exhibition or representation, actual or simulated, of male or female genitals in a lewd state, including a state of sexual stimulation or arousal;
>
> (C) The exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals;
>
> (D) Actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person; or
>
> (E) The exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics.

*Id.* § 43.28(a)(1)(A)–(E). Several words and phrases are left undefined by S.B. 12 and Texas law. For example, no Texas law defines, *inter alia*, "lewd," "performer," "visual performance," or "prurient interest in sex." *See, e.g.*, *id.* § 43.28(a)(1)–(2).

## B

Shortly before S.B. 12 took effect, Plaintiffs brought a pre-enforcement challenge through 42 U.S.C. § 1983 alleging the law facially violated the First and Fourteenth Amendments and seeking declaratory and injunctive relief. Plaintiffs are Brigitte Bandit, 360 Queen Entertainment LLC, Extragrams, LLC, The Woodlands Pride, Inc., and Abilene Pride Alliance.

No. 23-20480

Brigitte Bandit, a pseudonym, resides in Travis County, Texas where she hosts, produces, and performs in drag shows as a full-time profession. Bandit performs in a variety of venues including restaurants, bars, private residences, and public parks. 360 Queen Entertainment LLC is a drag production company in Bexar County, Texas owned by Richard Montez, Jr. 360 Queen produces drag performances exclusively for a restaurant in San Antonio, Texas owned by Montez's father. Extragrams, LLC is a drag production and entertainment company in Travis County that offers drag entertainment for various events including bingo, parties, weddings, and corporate and holiday events. The Woodlands Pride, Inc. is a nonprofit LGBTQ+ community organization in The Woodlands Township in Montgomery County, Texas. Woodlands Pride organizes a free yearly festival in a Montgomery County public park, which includes drag performances, and is attended by thousands of patrons and hundreds of exhibitors to support and highlight the LGBTQ+ community. Abilene Pride Alliance is also a nonprofit LGBTQ+ organization in the City of Abilene in Taylor County, Texas. Abilene Pride provides meeting spaces for social support groups and holds community-based and fundraising events. These events occur on public and private property and often feature drag performers.

Each Plaintiff sued Kenneth Warren Paxton in his official capacity as the Attorney General for the State of Texas, but named different cities, counties, or district attorneys also as defendants. Bandit and Extragrams asserted claims against Travis County District Attorney Delia Garza; 360 Queen asserted claims against Bexar County District Attorney Joe D. Gonzales; Woodlands Pride asserted claims against The Woodlands Township, Montgomery County, and Montgomery County District Attorney Brett Ligon; and Abilene Pride asserted claims against the City of Abilene, Taylor County, and Taylor County District Attorney James Hicks.

No. 23-20480

Following a two-day bench trial, the district court entered a permanent injunction against S.B. 12's enforcement, concluding that Plaintiffs had standing to seek injunctive relief against each Defendant and that the law facially violates the First Amendment. This appeal followed.[2]

## II

"Article III standing requires a plaintiff to show: (1) an injury in fact (2) that is fairly traceable to the actions of the defendant and (3) that likely will be redressed by a favorable decision." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) (quotations and citation omitted). In the majority's view, Plaintiffs' claims—save for 360 Queen's against the Attorney General—meet their end at Article III's injury-in-fact prong. That result rests on a cramped view of pre-enforcement injury, a selective view of the record, and an unduly narrow construction of S.B. 12's sweeping text and enforcement scheme.

## A

In the context of a pre-enforcement First Amendment challenge, the chilling of speech—whether by self-censorship or the reasonable fear of official sanction—constitutes an injury sufficient to confer Article III standing. *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215 (5th Cir. 2023) (quoting *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021)). A plaintiff alleging such an injury must demonstrate (1) an intention to engage in conduct that is arguably protected by the Constitution, (2) that the conduct is at least arguably proscribed by the challenged statute, and (3) that there exists a credible threat of prosecution under that statute. *Id.* at 215–16 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). We must assume

---

[2] Travis County District Attorney Delia Garza and Bexar County District Attorney Joe D. Gonzales did not appeal.

No. 23-20480

at this stage of the analysis that the conduct at issue—Plaintiffs' drag performances—falls within the ambit of protected First Amendment expression. *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 309 (5th Cir. 2023). So, this dispute concerns the second and third elements.

### 1. Arguably Proscribed

To satisfy the arguably proscribed standard, Plaintiffs need only show that their interpretation of S.B. 12 is "*arguable*," not that it is "the *best* interpretation*" of the statutory text. *Turtle Island Foods*, 65 F.4th at 218 (emphasis in original). Contrary to the majority's conclusion, Plaintiffs have shown that their drag performances arguably fall within S.B. 12's definition of "sexually oriented performance"—*i.e.*, a visual performance that features either nudity or at least one of five categories of "sexual conduct" that "appeal[s] to the prurient interest in sex"—and those performances will arguably occur in the presence of minors. Tex. Penal Code § 43.28(a)(2).

I begin with what the majority ignores: S.B. 12's legislative history. While S.B. 12 does not on its face purport to ban "drag performances" by name, even a cursory review of the law's legislative history reveals several indicia that this was undoubtedly the legislature's intent.[3] Consider what prompted lawmakers to introduce S.B. 12: a private drag performance in Plano, Texas, during which a performer allegedly lifted her skirt and danced

---

[3] Legislative history is a valid inquiry for the purposes of standing. *See United States v. One Parcel of Real Prop.*, 831 F.2d 566, 567 (5th Cir. 1987) (relying on legislative history to determine statute's scope for purposes of standing). And Texas law permits courts to "consider legislative history in construing a statute" even where that statute "is not ambiguous." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 n.6 (Tex. 2008) (citing Tex Gov't Code § 311.023(3)).

No. 23-20480

suggestively before an audience that included minors.[4] Senator Hughes, the bill's author, cited this isolated anecdote to justify a sweeping legislative conclusion, namely that "sexually oriented performances sometimes occur in venues generally accessible to the public, including children."[5]

From this premise, state officials characterized S.B. 12 as a targeted response to drag performances. Lieutenant Governor Patrick designated the legislation a priority and avowed its express purpose as "Banning Children's Exposure to Drag Shows." In presenting the bill to the State Affairs Committee, Senator Hughes likewise warned of a perceived risk that children were being exposed to "sexually explicit performances like drag shows." S.B. 12's legislative sponsors in the Texas House of Representatives promoted the statute as a means of "protecting children from explicit, hyper-sexualized drag performances in Texas," "restricting sexually oriented performances also known as 'drag shows' in the presence of children," and "protect[ing] a child's innocence" by banning such events. Governor Abbott affirmed this understanding when he announced the bill's signing: "Texas Governor Signs Law Banning Drag Performances in Public. That's right." The legislative record leaves little doubt that S.B. 12 was crafted with the specific aim of restricting drag performances.

---

[4] BRYAN HUGHES, BILL ANALYSIS: C.S.S.B. 12, 88th Leg., R.S., at 1 (2023), https://capitol.texas.gov/tlodocs/88R/analysis/pdf/SB00012H.pdf [https://perma.cc/CSR4-MLVU]; Mark Lungariello, *Video of Drag Queen Gyrating in Front of Child has Texas Pols Pushing for Legislative Action*, N.Y. POST (Oct. 18, 2022), https://nypost.com/2022/10/18/video-of-drag-queen-gyrating-next-to-child-sparks-backlash/ [https://perma.cc/D2R2-9P8Z].

[5] HUGHES, *supra* note 4 ("In cities around Texas, sexually oriented performances sometimes occur in venues generally accessible to the public, including children. For instance, on October 18, 2022, the New York Post reported an all ages lunch at the Ebb & Flow restaurant in Plano, Texas.").

No. 23-20480

So, it should come as no surprise that the statute's operative language "arguably" reaches the very conduct lawmakers intended to stymie. To begin, extensive trial testimony demonstrates that each Plaintiff either engages in or produces performances that arguably fall within the statute's definition of "sexual conduct" or nudity. Bandit described the use of elaborate costuming in her performances, including corsets, high heels, wigs, prosthetic breastplates, false eyelashes, and makeup. In her words, these features are intended to "exaggerate" her "female characteristics" and are integral to her expressive presentation. Bandit regularly incorporates into her performances choreography that includes hip thrusts, breast touching, and stylized body contact with audience members—for instance, the widely accepted custom of having audience members place tips into her prosthetic chest. Her use of prosthetics and sexually suggestive bodily movements arguably implicates the statutory prohibition against "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics." TEX. PENAL CODE § 43.28(a)(1)(E).

Representatives of 360 Queen and Extragrams offered similar testimony. Both entities produce drag performances in which artists frequently wear prosthetic breastplates, padded undergarments, and packers to simulate or accentuate secondary sex characteristics. While wearing these accessories, performers engage in highly stylized dance routines that involve twerking,[6] body rolls, splits, and other gestures that one 360 Queen representative described as "pulsing [their] chest in front of people's faces." These expressive elements—when viewed in combination—arguably fall within the statute's prohibition on gesticulations that utilize prosthetics to

---

[6] *Twerking*, MERRIAM-WEBSTER, https://perma.cc/W2S7-SKQD (defining "twerking" as "sexually suggestive dancing characterized by rapid, repeated hip thrusts and shaking of the buttocks especially while squatting").

No. 23-20480

exaggerate sexual characteristics. Tex. Penal Code § 43.28(a)(1)(E). Extragrams's director also reported that wardrobe malfunctions "happen[] often" during performances, such as the accidental exposure of cleavage or buttocks during energetic choreography (*e.g.*, jumping into a split or leotards riding up), which arguably constitutes nudity.[7] *Id.* § 43.28(a)(2)(A)(i); Tex. Bus. & Com. Code § 102.051(1)(B).

The same is true of drag performances hosted by Woodlands Pride and Abilene Pride. The president of Woodlands Pride testified that performers at its annual outdoor festival routinely appear in gendered attire including wigs, stylized makeup, and prosthetic breastplates. Their choreography often includes movements such as hip thrusts, body rolls, and other exaggerated gestures that accentuate sex characteristics. Abilene Pride's representatives offered similar testimony. At its events, drag performers often wear packers or breastplates and padded undergarments to shape or accentuate the appearance of sexual characteristics. These performers also engage in stylized choreography that, in the view of the organization's director, may at times carry sexual overtones or be perceived as suggestive by members of the public. When viewed in context, the combination of simulated anatomy, expressive movement, and costuming arguably amount to "the exhibition of sexual gesticulations using accessories

---

[7] The Attorney General conceded at trial that such wardrobe malfunctions would expose Extragrams, Woodlands Pride, and Abilene Pride to liability under S.B. 12. *See* Trial Tr. Day 2, ECF-78, 80:18-81:5 ("[O]ne of the responses to that was 'Well, one of our performers might have a wardrobe malfunction.' I don't really understand what they think that gets them. . . . If they're wearing a costume that might result in exposure of their private parts, they should not be performing in front of children wearing that costume. You can't just recklessly wear something that might expose yourself and then have a get out of jail free card and say, 'Oh, it was a wardrobe malfunction.'").

No. 23-20480

or prosthetics that exaggerate male or female sexual characteristics." Tex. Penal Code § 43.28(a)(1)(E).

Plaintiffs also have demonstrated that their performances arguably satisfy the second component of a "sexually oriented performance" under S.B. 12: that the conduct "appeal[s] to the prurient interest in sex." *Id.* § 43.28(a)(2)(B). The statute itself offers no definition of this phrase, which the Attorney General concedes.[8] He and the majority instead turn to obscenity jurisprudence, invoking language from *Roth v. United States*, 354 U.S. 476, 487 & n.20 (1957), and *Ashcroft v. ACLU*, 535 U.S. 564, 579 (2002), to suggest that the standard is satisfied by material that is "in some sense erotic" or has a "tendency to excite lustful thoughts." *See ante*, at 3 & n.2.

Even accepting that construction for present purposes, common sense and the record demonstrate that Plaintiffs' performances arguably meet the standard. S.B. 12's statutory framework remains notably open-ended; the law does not require proof of specific intent to arouse, nor does it identify any objective criteria for who determines whether a performance is erotic or how that judgment is to be made. In that interpretive vacuum, it is easy to see how "sexual conduct"—here, Plaintiffs' performances involving simulated or exaggerated sexual characteristics combined with stylized or suggestive physical gestures—is arguably "in some sense erotic" or has the potential to "excite lustful thoughts." *Roth*, 354 U.S. at 487 & n.20; *Ashcroft*, 535 U.S. at 579. The record supports this inference. Multiple Plaintiffs testified to receiving audience complaints or facing law enforcement responses from

---

[8] Although "prurient interest in sex" suggests the Texas Legislature may have intended to invoke the Supreme Court's formulation in *Miller v. California*, 413 U.S. 15, 24 (1973), Senator Hughes rejected that interpretation, and the Act omits the other two elements of the *Miller* test. *See Hearing on S.B. 12 before the Texas Senate*, 88th Leg., R.S. at 7:20–7:35 (April 4, 2023) (Statement of Senator Bryan Hughes), https://perma.cc/9W2D-ULUY; Tex. Penal Code § 43.28(a)(2).

individuals who perceived their performances as sexual in nature. Others explained that the phrase "prurient interest" was itself subjective and indeterminate—often tied to a viewer's own "independent moral code," or whatever that observer "thinks and feels."

The Attorney General resists this conclusion by arguing that Plaintiffs have repeatedly disclaimed any intention of conveying sexually explicit messages. But his argument misconstrues the present inquiry. The question is not whether Plaintiffs seek to violate the law or whether they subjectively view their performances as erotic; rather, it is whether those performances could *arguably* be interpreted by a factfinder as falling within the statute's scope. *See Turtle Island Foods*, 65 F.4th at 217 (explaining that a plaintiff "need not establish that [they] openly intend[] to violate the law" (alterations in original) (quoting *Driehaus*, 573 U.S. at 163 (2014)); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 301 (1979) (holding a case justiciable even though the plaintiffs disavowed any intent to "propagate untruths"). It is entirely plausible that Plaintiffs' gendered expressions, costuming, prosthetics, and choreography could be viewed by factfinders and officials empowered to enforce S.B. 12 as appealing to the prurient interest in sex.

Finally, Plaintiffs' performances arguably occur "in the presence of an individual younger than 18 years of age" or "in a manner that could reasonably be expected to be viewed by a child." Tex. Penal Code § 43.28(b)(1)–(2); Tex. Local Gov't Code § 243.0031(c)(1)–(2). This element is satisfied in at least two distinct settings reflected in the record: first, those performances expressly open to all ages, where drag prosthetics, choreography, or wardrobe mishaps could expose performers to liability regardless of intent; and second, those performances tailored for adult audiences where minors may still be present or capable of observing the event.

No. 23-20480

Extragrams, Woodlands Pride, and Abilene Pride fall within the first category. Each regularly organizes public-facing performances, including festivals, community gatherings, and private events, where children are either expressly invited or routinely present. Extragrams's drag entertainers perform at a variety of private and public gatherings including parties, weddings, holiday events, and bingo nights where children may be in attendance. Woodlands Pride and Abilene Pride hosts events—most notably, large-scale festivals—on public property where minor attendees are not only permitted but welcomed. Because children are routinely present at these events, the performances will occur "in the presence of" minors. Tex. Penal Code § 43.28(b)(1); Tex. Local Gov't Code § 243.0031(c)(2). And even if Plaintiffs confirmed that no minors were in the audience, the accessible nature of these public venues makes it at least arguable that the performances occur "in a manner that could reasonably be expected to be viewed by a child." Tex. Penal Code § 43.28(b)(1).

Bandit and 360 Queen fall into the second, adult-oriented category. Bandit testified that she cannot ensure all audience members at her adult-oriented performances are over the age of eighteen. Admission to her performances is typically controlled by the hosting venue, which may admit minors with parental consent. And Bandit recalled instances where parents brought their seventeen-year-old children to her shows. She also described performing at venues with outdoor stages or transparent façades, where her shows could be seen from adjacent sidewalks, nearby hotels or apartments, or public thoroughfares. Similarly, 360 Queen's drag performances take place on a restaurant patio, which is separated from the indoor dining room only by a long wall made entirely of windows. While access to the patio show is ticketed and generally restricted to adults, minors are permitted with parental approval. Moreover, the patio is visible to patrons dining inside the restaurant, which is separated only by a wall of windows. The patio itself is

No. 23-20480

bordered on three sides by a parking lot, and nearby commercial establishments also have a clear line of sight into the venue. Although Bandit and 360 Queen's events are intended for adult audiences, these structural features make it likely that a minor will observe a performance even without formal admission. In such circumstances, it is at least arguable that the performances occur in a manner reasonably expected to be viewed by a child.

The Attorney General counters that a minor's unintentional or incidental exposure is insufficient to trigger liability under S.B. 12, positing that "presence" requires both physical proximity and conscious awareness. In other words, a minor must be knowingly situated in the audience—not a passerby, remote observer, or otherwise unaware onlooker. But the statute provides no definition of "presence," and Plaintiffs offer a competing reading grounded in alternative dictionary definitions; namely, "[t]he quality, state, or condition of being in a particular time and place," with no requirement of perception or attentiveness. *See Presence*, BLACK'S LAW DICTIONARY (11th ed. 2019).[9] On this textual ambiguity alone, it is at least arguable that S.B. 12 applies when a performance is observable by a minor from an adjacent sidewalk, parking lot, restaurant interior, or public thoroughfare.

I also would reject the Attorney General's claim that the statute implicitly incorporates a scienter requirement—specifically, criminal negligence—such that performers would not be liable under Sections One or

---

[9] When interpreting an undefined term in a Texas statute, we look to its ordinary meaning informed by dictionary definitions and relevant legal usage. *Malouf v. State*, 694 S.W.3d 712, 718 (Tex. 2024); *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 34–35 (Tex. 2017); *see also* Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16 GREEN BAG 2D 419, 423, 428 (2013) (noting that BLACK'S LAW DICTIONARY is among "the most useful and authoritative for the English language generally and for law").

No. 23-20480

Three absent a failure to perceive a substantial and unjustifiable risk. *See* Tex. Penal Code § 6.03(d). Section Three is silent with respect to *mens rea* and under Texas law, such silence supports the presumption of strict liability. *See id.* § 6.02(b); *Aguirre v. State*, 22 S.W.3d 463, 470 (Tex. Crim. App. 1999) ("The typical strict liability statute is 'empty'—it simply says nothing about a mental state."), *as modified on denial of reh'g* (Dec. 8, 1999).[10] The same is true of the civil penalty provision. As the Texas Supreme Court has explained, where a civil penalty statute "makes no provision for knowledge or intent," it "does not include culpability as an element." *State v. Houdaille Indus., Inc.*, 632 S.W.2d 723, 729 (Tex. 1982). Nothing in the statutory text necessarily precludes strict criminal or civil liability where a minor is present or capable of viewing the proscribed performances. That includes settings where minors are admitted by parental choice, or where performances are observable through glass façades, from public sidewalks, or in other accessible spaces.

In sum, Plaintiffs' testimony, credited by the district court and consistent across each Plaintiff, amply establishes that their intended course of conduct is arguably proscribed by S.B. 12. Their shows feature costuming, choreography, and physical expression that plausibly constitute "sexual conduct" or "nudity" that may be seen to "appeal to the prurient interest in sex," particularly under the statute's ambiguous terms. These performances also occur in settings where minors are arguably present or could reasonably be expected to view them. This is sufficient to satisfy the "arguably

---

[10] Indeed, *Aguirre* noted a tradition in Texas criminal law of "finding statutes to impose strict liability as to entire offenses affecting public health and safety, and as to the element of a child's age in statutes that protect children." 22 S.W.3d at 475 (collecting cases).

proscribed" standard for pre-enforcement standing. *See Turtle Island Foods*, 65 F.4th at 217.

### 2. Credible Threat of Prosecution

Plaintiffs also have established a credible threat of prosecution under S.B. 12. In the context of a pre-enforcement challenge to a law regulating speech, we assume such a threat exists where the statute "facially restrict[s] expressive activity by the class to which the plaintiff belongs," unless the government offers "compelling contrary evidence" to rebut that presumption. *Id.* at 218 (alteration in original) (quoting *Speech First*, 979 F.3d at 335). Plaintiffs here engage in protected First Amendment expression for the purposes of standing and fall within the class of speakers S.B. 12 was enacted to reach. Accordingly, the presumption of a credible enforcement threat attaches, and the burden shifts to Defendants to rebut it with evidence that is not merely speculative or conclusory, but "compelling." *Id.*

The record contains no such rebuttal. Defendants point to the absence of prior prosecutions or explicit statements of intent to apply the statute to Plaintiffs. But Defendants refused to disavow an intention to enforce the statute against Plaintiffs. In fact, counsel for Bexar County District Attorney Joe D. Gonzales emphasized at trial that "no district attorney or prosecutor in the state can basically disavow an intent to prosecute any criminal offense in the state." Even if Defendants had disavowed enforcement, that would not suffice to defeat standing as the "lack[] [of] any intention to penalize the intended conduct" is not compelling contrary evidence. *Id.* (quoting *Speech First*, 979 F.3d at 336). Nor does the fact that the statute has not yet been enforced foreclose a finding of standing. As we have long held, "[t]hat the statute has not been enforced and that there is no certainty that it will be does not establish the lack of a case or controversy." *KVUE, Inc. v. Moore*, 709 F.2d 922, 930 (5th Cir. 1983). Because S.B. 12 arguably targets the

No. 23-20480

expressive conduct in which Plaintiffs routinely engage, and because no Defendant has provided compelling evidence to the contrary, the threat of enforcement is credible.

B

I turn next to the causation prong of standing: whether Plaintiffs have shown that their First Amendment injuries—manifested in chilled speech and self-censorship—are fairly traceable to the enforcement authority of the Defendants named in this suit.

Beginning with the Attorney General, his enforcement authority under Section One of S.B. 12 is limited to "a person who *controls* the premises of a commercial enterprise." TEX. HEALTH & SAFETY CODE § 769.002(a)–(c) (emphasis added). He contends that no Plaintiff exercises such control. But as with his other objections to standing, this argument can be distilled to a disagreement over the meaning of statutory language, and we ask only whether Plaintiffs' interpretation of "controls" is arguably correct. *Turtle Island Foods*, 65 F.4th at 218. "Control" commonly means to "exercise power or influence over," or to "regulate or govern." *Control*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also In Int. of H.S.*, 550 S.W.3d 151, 157 (Tex. 2018).

The Attorney General urges a narrow interpretation that equates "controls" with legal ownership or proprietorship of a venue. Like the majority, I view this reading as arguably too narrow. Section One proscribes "allow[ing]" a minor to attend a performance on commercial premises and predicates liability on those who "control[]" the premises. TEX. HEALTH & SAFETY CODE § 769.002(a). This statutory structure suggests "controls" and the transitive verb "allow" must be read together. *Cf. Cruz v. Abbott*, 849 F.3d 594, 599 (5th Cir. 2017). The plain meaning of "allow" is "[t]o give consent to" or "to approve." *Allow*, BLACK'S LAW

No. 23-20480

Dictionary (12th ed. 2024). It follows that a person arguably controls the premises of a commercial enterprise if they "regulate" that premises such that it gives "consent" or otherwise "approve[s]" of a minor's attendance to a sexually oriented performance. *Id.* The meaning of "controls," then, is not necessarily limited to *only* owners or proprietors of a business. This reading finds further support in the legislature's decision not to use more precise terms such as "owner" or "operator." *See Seals v. State*, 187 S.W.3d 417, 421 (Tex. Crim. App. 2005) (en banc).

On this reading, 360 Queen arguably exercises control over the premises of a commercial enterprise during its performances. The company's owner testified that it books drag artists to perform on the patio of a local restaurant and that, under a written agreement with the restaurant, it enjoys exclusive use of the performance area during the show. 360 Queen manages ticket sales, staff placement, and audience admission, while the restaurant restricts its role to food and beverage service. These facts support that 360 Queen plausibly "controls" the premises within the meaning of the statute, and that its First Amendment injury is therefore fairly traceable to the Attorney General's enforcement authority under Section One.[11]

Woodlands Pride and Abilene Pride also have shown that their injuries are fairly traceable to the threat of criminal prosecution by Montgomery County District Attorney Brett Ligon and Taylor County District Attorney James Hicks, respectively. Liability under Section Three extends to any "person" who "engages in a sexually oriented performance" in the presence of a minor. Tex. Penal Code § 43.28(b). The Texas Penal Code defines

---

[11] Because I agree that 360 Queen has standing to enjoin the Attorney General's enforcement of Section One, the remaining Plaintiffs also have standing to press their First Amendment claims against the Attorney General. *Horne v. Flores*, 557 U.S. 433, 446–47 (2009); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189 n.7 (2008).

No. 23-20480

"person" to include not only individuals but also corporations, limited liability companies, and other legal entities. *Id.* § 1.07(38); *see also Vaughan & Sons, Inc. v. State*, 737 S.W.2d 805, 811 (Tex. Crim. App. 1987) (en banc). The term "engage," though undefined, carries its ordinary meaning: "[t]o employ or involve oneself," "to take part in," or "to embark on." *Engage*, Black's Law Dictionary (12th ed. 2024).

Both organizations operate as nonprofit corporations and routinely sponsor public drag performances arguably proscribed by S.B. 12 within Montgomery and Taylor Counties. Their organizational role in producing and facilitating these events places them within the class of "persons" who may be held liable under Section Three. Tex. Penal Code §§ 1.07(38), 7.02(a)(2); *see also Vaughan & Sons*, 737 S.W.2d at 811. Moreover, Texas law imposes criminal liability on entities that aid, direct, or encourage the commission of an offense. *See* Tex. Penal Code § 7.02(a)(2). Woodlands Pride and Abilene Pride, then, plausibly faces a dual risk of criminal liability under Section Three traceable to Ligon and Hicks's enforcement of that provision. Woodlands Pride also explained that its expressive mission depends on the participation of performers who now fear prosecution. That fear has already caused disruptions to the organization's programming. Abilene Pride similarly expressed that it has considered abandoning drag altogether "to keep [its performers] as safe as [possible]." These injuries are no less traceable—they are the predictable result of the threat of enforcement by the district attorneys charged with applying Section Three and are thus sufficient to support standing. *See Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). I thus part from the majority opinion's conclusions here.

The showing of traceability, however, is more limited with respect to the municipality and county Defendants charged with enforcing Section Two: the City of Abilene, Taylor County, and Montgomery County. Woodlands Pride and Abilene Pride contend their injuries are traceable to

No. 23-20480

these Defendants by virtue of Section Two's negative command, which provides that municipalities and counties "may not *authorize*" a sexually oriented performance on public property or in the presence of a minor. Tᴇx. Lᴏᴄᴀʟ Gᴏv'ᴛ Cᴏᴅᴇ § 243.0031(c) (emphasis added). These Plaintiffs allege that Section Two's blanket prohibition has compelled them to alter or forgo drag performances planned for public festivals and similar events, thereby chilling their speech. The relevant inquiry, then, is whether these municipal and county Defendants bear some connection to authorizing the events in question. If they do, then Section Two imposes a legal obligation that links their refusal or inability to authorize those events with the constitutional injuries Plaintiffs allege.

That connection is plainly established with respect to Abilene Pride's claims against the City of Abilene. The organization hosts an annual pride parade on city property that includes performances arguably proscribed by S.B. 12. City approval is required before the event may proceed,[12] and Abilene Pride credibly fears that, in light of Section Two, the City of Abilene must revoke or deny the necessary permits. That concern has already led the organization to adopt contingency measures, including the removal of a drag float from its parade and the relocation of drag performances from its all-ages festival to a private venue. These acts of self-censorship, compelled by the City of Abilene's statutory obligations, render Abilene Pride's injuries fairly traceable to the City's enforcement of Section Two.

By contrast, neither Plaintiff identifies evidence sufficient to establish a similar link to Taylor County or Montgomery County, so I join the majority's judgment as to these Defendants. Abilene Pride's only asserted connection to Taylor County involves a planned pride festival at the Taylor

---

[12] *See* Aʙɪʟᴇɴᴇ, Tᴇx., Cᴏᴅᴇ ch. 29, art. IX, § 29-162(a) (2013).

No. 23-20480

County Expo Center. That facility is leased and operated by a nonprofit organization, and while Taylor County owns the underlying property, the City of Abilene—not the county—handles all permitting decisions related to the event. There is no evidence that Taylor County exercises any authority to approve or prohibit the event itself, nor is there any indication that it plays a role in enforcing Section Two against Abilene Pride's use of the venue.

Woodlands Pride's situation is similar. It holds its annual pride festival at Town Green Park, a public park owned and operated by The Woodlands Township—a non-party special-purpose district within Montgomery County. The Township owns the park, issues permits for events hosted there, and exercises sole responsibility over its use.[13] At trial, Woodlands Pride confirmed that the organization has never sought nor required permission from Montgomery County to use the park for its festival. On this record, there is no indication that Montgomery County plays any role in the permitting process, nor any showing that it exercises the kind of approval authority that would implicate Section Two. I thus agree with the majority that Montgomery County should be dismissed without prejudice.

Woodlands Pride offers two additional grounds to support a traceable injury to Montgomery County, but neither suffices on the present record. First, the organization argues that Section Two endangers its ability to obtain a temporary event permit to sell alcohol at its festivals, which it claims must be approved by the county sheriff. That assertion, however, misapprehends the relevant statutory framework. Under Texas law, the Texas Alcoholic Beverage Commission—not county officials—has exclusive authority over

---

[13] *See* The Woodlands Township, Tex., Order 019-09 (Nov. 16, 2009) (amended 2023). Plaintiffs stipulated as to the dismissal of The Woodlands Township upon its representation that it is "not a 'municipality' within the scope of the Texas Local Government Code that Senate Bill 12 seeks to amend."

No. 23-20480

such permits. *See* Tex. Alco. Bev. Code §§ 11.31, 30.02. Even assuming Montgomery County had some role in that process, Woodlands Pride presented no evidence that the denial of an alcohol permit would interfere with its ability to hold a public festival or that expressive activity depends on such sales. Second, Woodlands Pride claims that its ability to obtain a festival permit from The Woodlands Township is threatened by its reliance on a county contract for off-duty officers to fulfill a required security plan. Yet Woodlands Pride conceded that it contracts directly with off-duty officers, not the county itself, and that Township regulations do not require security to be provided by county law enforcement. Moreover, the organization presented no evidence that its ability to proceed with its public events would be meaningfully impaired absent that particular arrangement. This evidence is insufficient to show that Woodlands Pride's injury is fairly traceable to Montgomery County's obligations under Section Two.

At bottom, I would find that Woodlands Pride and Abilene Pride have not demonstrated that their injuries are fairly traceable to any enforcement authority exercised by Montgomery County or Taylor County under Section Two of S.B. 12. I otherwise see no error in the district court's determination that Plaintiffs have standing to pursue their claims.[14]

---

[14] I agree with the majority that sovereign immunity does not bar Plaintiffs' claims against the Attorney General, who is a proper *Ex parte Young* defendant given his specific enforcement authority under Section One of S.B. 12. *See City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019); *Tex. All. for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022). The same bottom line applies to the district attorney Defendants because they are not protected by the Eleventh Amendment in the first place. District Attorneys Ligon and Hicks are *county* officials rather than *state* officials. And as our court recently held, "'Texas district attorneys [are] not protected by the Eleventh Amendment' precisely because they are county officials, not state officials." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 780 (5th Cir. 2024) (alteration in original) (quoting *Hudson v. City of New Orleans*, 174 F.3d 677, 682 (5th Cir. 1999)). Sovereign immunity does not bar this suit.

III

The district court ruled that Plaintiffs' performances constitute protected expression and that S.B. 12 facially violates the First Amendment. Since then, the Supreme Court decided *Moody v. NetChoice, LLC*, clarifying the framework for First Amendment facial challenges. 603 U.S. 707, 724–26 (2024). In light of *Moody*, I agree with the majority that remand is appropriate so the district court can apply the Court's comparative inquiry across the statute's full range of applications. I am far less persuaded, however, that vacating the injunction is necessary to accomplish that task; a limited remand without vacatur would suffice and better preserves the status quo while the court undertakes the analysis *Moody* now requires.

In any event, the majority's vacatur does not disturb the portion of the district court's injunction barring Travis County Attorney Delia Garza and Bexar County District Attorney Joe D. Gonzales from enforcing Section Three of S.B. 12 because (1) neither appealed; (2) as to the district attorneys who did appeal, the majority dismisses on standing and never reaches the merits of injunctive relief; and (3) the majority expressly limits its analysis to the Attorney General's enforcement of Section One. *See, e.g.*, *United States v. City of Miami*, 664 F.2d 435, 445 (5th Cir. 1981) (en banc) (plurality op.) (Rubin, J., concurring) ("[A]n appellant may not appeal on behalf of others who have chosen not to intervene or to appeal."); *Tompkins v. Cyr*, 202 F.3d 770, 786–87 (5th Cir. 2000) (vacating erroneous damages calculation only as to "the losing defendants who have appealed" but declining to "vacate the damage award against the non-appealing defendants" despite the error's effect on the common verdict); Wright & Miller's Federal Practice & Procedure § 3950.7 (5th ed. 2025) ("[O]ther parties who have not joined in [an] initial notice of appeal must file their own notices of appeal if they wish to attack all or a portion of the judgment below and to be

relieved of the consequences thereof."). The district court's injunction therefore remains operative as to those non-appealing Defendants.

\*    \*    \*

Finally, the majority makes a passing remark that it harbors "genuine doubt" whether Plaintiffs' drag performances are protected by the First Amendment. *Ante*, at 14 n.9. That aside is dictum, contrary to settled First Amendment precedent, and it should not be read to constrain the district court's analysis on remand.

The First Amendment's protection "does not end at the spoken or written word," *Texas v. Johnson*, 491 U.S. 397, 404 (1989), and it embraces conduct "sufficiently imbued with elements of communication," *Spence v. Washington*, 418 U.S. 405, 409 (1974) (per curiam). Live performance, dance, theater, satire, and costuming falls comfortably within that ambit. *See, e.g.*, *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975). The Court has repeatedly safeguarded a "wide array of conduct that can qualify as expressive, including nude dancing, burning the American flag, flying an upside-down American flag with a taped-on peace sign, wearing a military uniform, wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 657 & n.1 (2018) (Thomas, J., concurring) (collecting cases). And under *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, a "narrow, succinctly articulable message is not a condition of constitutional protection." 515 U.S. 557, 569 (1995); *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011) ("[W]e have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try.").

Drag—a costumed, choreographed, and frequently parodic performance that speaks in the idiom of gender—plainly participates in that

protected tradition. *See Spectrum WT v. Wendler*, 151 F.4th 714, 729 (5th Cir. 2025) (Southwick, J.) ("Because theatrical performances plainly involve expressive conduct within the protection of the First Amendment, and because we find the plaintiffs' drag show is protected expression, discrimination among such shows must pass strict scrutiny."), *reh'g en banc granted, op. vacated*, No. 23-10994, 2025 WL 3008019 (5th Cir. Oct. 27, 2025); *HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207, 1227 (11th Cir. 2025) (finding substantively identical Florida law aimed at restricting drag shows and venues "reaches First-Amendment-protected speech, not just unprotected obscenity"); *Naples Pride, Inc. v. City of Naples*, 2025 WL 1370174, at *10 (M.D. Fla. May 12, 2025) (collecting persuasive authorities finding "that drag performances can be protected by the First Amendment"); Luke A. Boso, *Exclusionary Expressive Conduct*, 66 Bos. L. Rev. 295, 298 (2025) ("How could a . . . federal judge conclude that a traditional lesbian, gay, bisexual, transgender, and queer (LGBTQ) form of art, entertainment, and political resistance is not sufficiently expressive to warrant First Amendment analysis?"); Mark Satta, *Shantay Drag Stays: Anti-Drag Laws Violate the First Amendment*, 25 Geo. J. Gender & L. 95, 104 (2023) ("[D]rag performances are expressive conduct in virtue of being artistic performances that express a variety of messages, similar to those the Supreme Court has already recognized."). The majority's effort to collapse an entire art form into a few salacious acts turns these principles on their head.

Nor does the presence of sexual expression or purported goal of protecting minors remove First Amendment protections. The Court has insisted that "sex and obscenity are not synonymous." *Roth*, 354 U.S. at 487. Although obscenity—defined and cabined by *Miller v. California*, 413 U.S. 15 (1973)—may fall beyond the First Amendment's scope, "sexual expression which is indecent but not obscene is protected," *Sable Commc'ns of Cal., Inc.*

No. 23-20480

*v. FCC*, 492 U.S. 115, 126 (1989), and a state's power to shield minors is circumscribed by *Ginsberg v. New York*, 390 U.S. 629 (1968). Texas already possesses those tools by prohibiting "obscene" performances and the "exhibition" of "harmful material" to minors. Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ §§ 43.23(c)(2), .24(b)(1). What it may not do—and what S.B. 12 does—is discard *Miller* and *Ginsberg*'s guardrails and suppress protected performances through undefined, sweeping terms like "prurient interest," a path that *Roth*'s author found unworkable. *See Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 73 (1973) (Bʀᴇɴɴᴀɴ, J., dissenting) ("I am convinced that the approach initiated 16 years ago in *Roth* . . . cannot bring stability to this area of the law without jeopardizing fundamental First Amendment values."); *see also City of Houston v. Hill*, 482 U.S. 451, 480 (1987) (Pᴏᴡᴇʟʟ, J., concurring in part) ("[T]he ambiguous terms of this ordinance confe[r] on [the state] a virtually unrestrained power to arrest and charge persons with a violation. . . . The opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident." (internal quotations and citation omitted)). The majority's dictum invites precisely that instability.

Accordingly, I respectfully concur in the judgment in part and dissent in part.